## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: EHANG HOLDINGS, LTD. SECURITIES LITIGATION | Case No. 21 Civ. 1392 (GBD) <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Lead Plaintiff Sergiu Rata ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through his attorneys, which included, among other things, 1) a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), 2) news reports, 3) press releases issued by Defendants, 4) requests under public records laws including the Freedom of Information Act, 5 U.S.C., § 552, et seq., 5) the reports of independent investigators retained by his attorneys, 6) information provided in consultations with subject matter experts retained by his attorneys, and other publicly available documents, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Ehang Holdings Limited ("EHang" or the "Company") American depositary shares ("ADS") between December 12, 2019, and February 16, 2021, inclusive (the "Class Period"). This action is brought on behalf of the Class to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      EHang purports to be an autonomous aerial vehicle ("AAV") technology platform company. The Company represents that it is "pioneering the future of transportation through our proprietarily developed AAVs and related commercial solutions. We believe we are the first in the world to launch passenger-grade AAVs, setting a new milestone in AAV technology." EHang's flagship, purportedly "autonomous" and "passenger-grade" AAV, is the "EH216." As alleged, Defendants have repeatedly asserted that EHang is "the world's leading autonomous aerial vehicle technology platform company."

3.      Since December 12, 2019, the start of the Class Period, EHang ADS have traded on the NASDAQ stock exchange under the ticker "EH."

4.      In press releases and other public statements made since EHang ADS began trading on NASDAQ, Defendants have touted EHang's AAV business and prospects, including the Company's allegedly strong customer base, purportedly proprietary technologies, supposedly advanced manufacturing facilities, and extensive research and development efforts. The Company also claimed to have begun construction of the world's first "E-Port for AAV services," and publicized its receipt of several "flight certifications," including "long-term" approvals for its "autonomous" and "passenger-grade" EH-216 in China, the US, Canada, Norway, Austria, and Spain.

5.      In the afternoon on February 16, 2021, analyst Wolfpack Research published a scathing report entitled "EHang: A Stock Promotion Destined to Crash and Burn." Wolfpack wrote that EHang is "an elaborate stock promotion, built on largely fabricated revenues based on sham sales contracts with a customer [Shanghai Kunxiang Intelligent Technology Co., Ltd.

("Kunxiang")] who appears to us to be more interested in helping inflate the value of its investment in EH . . . than about buying its products." Wolfpack wrote that it had "gathered extensive evidence" to support its report, "including behind-the-scenes photographs, recorded phone calls, and videos of on-site visits to EH's various facilities . . ."

6.      In essence, Wolfpack alleged that EHang's most significant reported sales were a sham, its claimed intellectual property was not unique, its advanced manufacturing facility was an empty shell, its planned E-Port for AAV services did not exist at any stage of development or construction, its research and development efforts consisted of drone test flights in a small dilapidated concrete area with a single helipad, its claims about vehicles operating "autonomously" were doubtful, and the Company had deliberately misled investors by making substantively different statements about the Company's prospects for regulatory approval for commercial operations in English versus Chinese versions of the same press releases.

7.      Wolfpack Research observed that "in just 14 months as a publicly traded company, EH's PR team has put out 50 press releases" calling the pattern "[t]ypical of a stock promotion" but noting that the "constant stream of press releases are easily proven untrue."

8.      Wolfpack revealed, and Lead Plaintiff's investigation has confirmed, that EHang consistently made different claims about regulatory approvals in the English and Chinese versions of its press releases – telling different stories to different audiences. EHang omitted, for example, the qualifier "trial" from the English language version of a press release describing a regulatory approval granted to its vehicles by Chinese regulators but included it in the Chinese language version of the same press release. In other words, its Chinese audience investors were informed that EHang obtained regulatory approval to conduct a "trial" in China, but American investors were told that EHang obtained an unqualified approval to operate as a logistics provider in China.

3

In other press releases, EHang omitted similar qualifiers from its Chinese language press releases describing approvals granted by regulators in the US, Canada, and Europe.

9.      Wolfpack concluded, and Lead Plaintiff's investigation has now confirmed, that many locations identified in EHang's SEC filings were not as described. For example, Wolfpack found EHang's main offices essentially vacant and Lead Plaintiff's investigation also found no evidence of business activity at either of two addresses listed as the corporate headquarters of EHang's variable interest entity, Guangzhou EHang Intelligent Technology Co. Ltd. Wolfpack Research concluded, and Lead Plaintiff's investigation confirmed, that EHang's main research and development facility was located at an abandoned amusement park lacking any of the equipment one might need to test the strength of materials, the battery life of EHang's vehicles, the performance of its subsystems at altitude, or any of the myriad other systems and materials necessary to meaningfully evaluate test flights of an eVTOL, let alone one that allegedly operates autonomously. Lead Plaintiff's investigation also found an abandoned amusement park at the location EHang claimed was its main research and development facility. Wolfpack Research concluded that EHang's manufacturing plant in Yunfu was not built by EHang as the Company had claimed, and lacked any kind of advanced manufacturing capability, consisting of an essentially empty warehouse except for areas set up as a staged backdrop for an anticipated promotional video.

10.      Wolfpack Research also consulted Dr. Mark Moore, a former NASA engineer with more than three decades of experience, who stated that, based on his personal evaluation and close inspection of the EH216 for Uber Elevate, the vehicle uses "hobby-grade motors" made by a Chinese hobby motor company, T-Motor.

11.     Dr. Moore explained that, based on EHang's anemic R&D budget and spending, EHang's autonomous systems "couldn't possibly be ready."

12.     Finally, Wolfpack Research wrote that it "obtained Chinese court records which show that EH's ADRs may already be in serious jeopardy due to legal issues in China." Lead Plaintiff's investigation substantially corroborated this claim and uncovered additional evidence suggesting that EHang and its executives directly and concretely benefitted from the misconduct alleged, by trading shares during the Class Period when the price of EHang's ADS were inflated as a result of the false and misleading statements described below, as well as, in at least one instance, pledging shares of the Company before the IPO to secure a personal loan which was undisclosed in the IPO, and extending zero-interest loans to two company insiders to facilitate the sale of the Company's Variable Interest Entity, to the benefit of two of the Individual Defendants.

13.     Immediately following the publication of the Wolfpack Research Report during the afternoon of February 16, 2021, EHang's ADS dropped sharply. The price of EHang's ADS fell from its February 12, 2021, close of $124.09 to a February 16, 2021, close of $46.30 per share, a one-day drop of $77.79 per share or about 62.7%.[1]

14.     As alleged in greater detail below, throughout the Class Period, Defendants made false and/or misleading statements and/or failed to disclose material facts about the Company on a wide range of topics, but the fraud focused on six categories of misrepresentations:

i.      misleading descriptions of EHang's vehicles – using evocative but vacuous terms like "passenger grade" to misleadingly suggest regulatory approval for passenger operations where none existed and describing off-the-shelf hobby grade parts as proprietary intellectual property;

---

[1] The markets were closed between February 13 and February 15, 2021, for the weekend and the President's Day holiday.

ii.  misstating revenues – basing publicly reported revenue figures on sham contracts with an affiliated entity;

iii.  falsely claiming to have engaged in extensive research and development and developing proprietary intellectual property while, in truth, merely conducting repeated test flights in a single location for vehicles consisting of off-the-shelf parts;

iv.  falsely claiming to have "built" its "manufacturing facility" in Yunfu and proceeding with ramping up production as of December 2020, while, in truth, the Company rented the facility, a former Wholesale Market, and, as of December 2020 it had done little more than stage a promotional video, leaving the building practically empty, with no advanced manufacturing equipment or employees;

v.  misleading investors about the Company's plans to build the world's first "E-port for AAV services," furnishing renderings and falsely claiming financial support for a construction project that was supposed to be completed and operational by the end of 2020 that, as of April 2022, does not appear to exist at any stage of development; and

vi.  misleading investors as to purported regulatory approvals in China, Europe, and North American for its EH216 – repeatedly releasing different versions of the same press releases to different audiences, omitting, for example, essential qualifiers, such as "trial," when describing the scope and purpose of "regulatory approvals" in China in its English language press releases, and omitting similar language from its Chinese language press releases as to "regulatory approvals" in the United States, in both instances suggesting that temporary authorizations for flying a drone were

longer term regulatory approvals for commercial operations involving carrying passengers.

As a result, the Company's public statements identified below were materially false and misleading and caused EHang's ADS to trade at artificially inflated prices. When the truth was revealed, EHang's stock price declined, causing damages to Lead Plaintiff and the Class.

## JURISDICTION AND VENUE

15.    The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation that has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company's ADS trade on the NASDAQ stock exchange, which is located within this District, and because the Company conducts substantial business here. Furthermore, EHang's agent for service of process in the United States is Cogency Global Inc., located at 122 East 42nd Street, 18th Floor, New York, NY 10168.

19.    In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

20.     Lead Plaintiff Sergiu Rata acquired and held shares of EHang at artificially inflated prices during the class period and suffered damages as alleged herein. See ECF #40, Exhibit C.

21.     Defendant EHang purports to be an autonomous aerial vehicle technology platform company engaged in "pioneering" the future of transportation through the Company's purportedly proprietarily developed AAVs and related commercial solutions. EHang ADS trade on the NASDAQ stock exchange under the ticker "EH." The Company's headquarters are located at Building C, Yixiang Technology Park, No. 72 Nanxiang Second Road, Huangpu District, Guangzhou, 510700, People's Republic of China. EHang is incorporated under the laws of the Cayman Islands.

22.     Defendant Huazhi Hu is EHang's founder and has served as Chief Executive Officer and Chairman of the Board of Directors since EHang was founded. As set out in greater detail below, Defendant Hu signed EHang's SEC Form F-1 filed December 9, 2019, and Form 20-F filed April 20, 2020, and is quoted in a substantial number of EHang's press releases.

23.     Defendant Richard Jian Liu is EHang's Chief Financial Officer and has served in that capacity since May 2017. Defendant Liu signed EHang's SEC Form F-1 filed December 9, 2019, Form 20-F filed April 20, 2020, and Forms 6-K filed on March 25, 2020, May 29, 2020, August 26, 2020, and December 6, 2020.

24.     Defendant Edward Huaxiang Xu is EHang's Chief Strategic Officer and has served in that capacity since July 2019.

25.     Defendant Derrick Yifang Xiong was EHang's cofounder and Chief Marketing Officer and served in that capacity from December 2014 until June 2020. Defendant Xiong served on EHang's board of directors, including the audit committee, between December 12, 2019, and June 2020. Defendant Xiong signed EHang's SEC Form F-1 filed December 9, 2019.

26.     Collectively, Defendants Hu, Liu, Xu and Xiong are referred to throughout this complaint as the "Individual Defendants."

27.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading before its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded here.

## SUBSTANTIVE ALLEGATIONS

### I.    EHang's Origins and Focus on Attracting Foreign Investment

28.     EHang is a Cayman Islands holding company that purports to be an autonomous aerial vehicle technology platform company mainly operating in the People's Republic of China.

29.     From the outset, EHang was solicitous of substantial foreign investments and focused on employing the allure of their allegedly futuristic technology to distract investors from the intentionally opaque and byzantine corporate structure of EHang's business enterprise and the slim possibility of securing regulatory approval for commercial operations in key markets, including the United States and European Union, given the dangers inherent with the design of their products and lack of regulatory pathways for operating unmanned passenger aircraft in urban areas.

30.     In an interview posted on YouTube November 24, 2021, Defendant Xiong described how he first encountered Defendant Hu, EHang's founder and CEO, in 2014, learned about EHang, and offered his services as a marketer, touting his experience as an entrepreneur and describing his initial pitch to Defendant Hu as "I can take your product oversees for crowdfunding."[2]

31.     According to EHang's 2019 Form 20-F, EHang was incorporated in December 2014 in the Cayman Islands to "facilitate financing and offshore listing." In the same month, Ehfly Technology Limited ("Ehfly") was established in Hong Kong, which became EHang's wholly-owned subsidiary. In October 2015, Ehfly established a wholly-owned subsidiary in China, EHang Intelligent Equipment Co. Ltd. ("EHang Intelligent"), which purported to be engaged in the research, development, manufacture, and sale of AAVs, and the research and development of software, communication technology and autonomous control technology related to air mobility and intelligent aviation.

32.     EHang Intelligent controls two subsidiaries, Guangzhou EHang Intelligent Technology Co. Ltd. ("EHang GZ" or the "VIE") and Guangdong EHang Egret Media Technology Co., Ltd. ("EHang Egret") via contractual arrangements with EHang GZ, which owns a majority stake in EHang Egret). EHang Intelligent also owns 100% of the beneficial interest of a third subsidiary, Xi'an EHang Tianyu Intelligent Technology Co., Ltd. (EHang Tianyu").

33.     As noted in the first footnote of the chart below, Defendants Hu and Xiong, besides serving as directors and managers of EHang, owned 100% of the equity of EHang GZ, with Defendant Hu owning a 95% interest and Defendant Xiong owning a 5% interest respectively.

34.     The Company provided the following diagram illustrating its corporate structure as

_____

[2] Eastwest connect, EHang: co-founder tells the story of cooperation and entrepreneurship, YouTube (Nov. 24, 2021), https://www.youtube.com/watch?v=M8dpt_o2AZ8.

of the date of the Prospectus:



(1) Messrs. Huazhi Hu and Derrick Yifang Xiong are directors and beneficial owners of our company and hold 95.0% and 5.0% equity interests in EHang GZ, respectively.
(2) The remaining 40.0% equity interest in EHang Egret is held by Mr. Lei Shi, an executive officer of EHang Egret.

35.     In January 2016, at the Las Vegas convention center during the CES gadget show, EHang debuted its first vehicle purportedly capable of carrying a human passenger, the EHang 184.

36.     In a press release put out January 6, 2016, the Company touted the display of the vehicle in glowing hyperbole, saying "EHang unveiled today at CES the EHang 184, the world's first electric, personal Autonomous Aerial Vehicle (AAV) that will achieve humanity's long-standing dream of easy, everyday flight for short-to-medium distances." The press release went on to describe the vehicle as "ready-to-fly" and having "massive potential" promising "limitless possibilities" that would "undoubtedly impact the way we all travel in profound ways." Defendant Hu was quoted as saying "[t]he 184 is evocative of a future we've always dreamed of and is primed to alter the very fundamentals of the way we get around."

37.     Defendant Xiong was at CES to coordinate EHang's exhibition and respond to media inquiries. He extolled the virtues of the EH184, telling the Associated Press that the vehicle

had been flown more than 100 times at low altitudes in a forested area in Guangzhou, including several times with a passenger onboard and that "even if three of the four arms had their six propellers disabled, the final arm's working propellers could ensure a rough landing by spiraling toward the ground."

38.    In June 2019, EHang submitted an initial draft registration statement on Form F-1 to the SEC as part of the Company's efforts to secure additional funding from overseas investors.

39.    In correspondence taking place over the next six months, the SEC sought more information from EHang on a range of topics, but with particular emphasis on the regulatory obstacles to the Company's business model, the basis for EHang's claimed revenues, and the opacity of EHang's corporate governance – subjects that would later feature prominently in the Company's public statements and the Wolfpack Research Report.

40.    In a letter dated July 5, 2019, the SEC sought more clarity as to how air travel and safety regulations prohibiting the intended use of the company's allegedly "passenger grade AAVs" influenced the possibility of the company recognizing revenues. This problem was particularly pronounced given the conditions or provisions in EHang's sales contracts in which regulatory approval was a prerequisite for "recognizing substantially all revenue under the contract."

41.    In the same correspondence, the SEC sought "complete disclosure of the material terms" of the contract between EHang and EHang Intelligent and shareholders, including the amounts of outstanding loans.

42.    Following the submission of a further revised draft registration statement, in a letter dated September 23, 2019, the SEC sought "additional context" for EHang's claim to have delivered a "dual-seat EHang 216 to a customer" and the Company's statement that it "believe[s]

this was the world's first delivery of a passenger-grade AAV" considering the Company's acknowledgment that it could not estimate the time it would take to obtain regulatory approval for the intended use of their vehicle and was unaware of "any operator obtaining the required approvals for commercial operations of passenger-grade AAVs in China or the US."

43.    In total, EHang submitted eight iterations of the draft registration statement, encompassing repeated revisions to statements about the Company's structure, revenues, prospects for regulatory approval and other material aspects of its business operations, before arriving at a draft Prospectus filed on Form 424B4 with the SEC through which EHang's ADS began trading on the NASDAQ in December 2019.

44.    Based on the arduous process of getting the SEC's approval for listing EHang's ADS, the Company and its executives were aware of the issues that were material to investors about the Company and its prospects.

45.    On December 12, 2019, EHang's ADS began trading on the NASDAQ stock exchange.

46.    As discussed below in Section V, EHang's initial Prospectus contained numerous, false and misleading statements and omitted to disclose material facts necessary to make the statements made therein not misleading.

## II.    EHang's Misleading and False Statements in SEC filings, Press Releases, Promotional Videos, and Other Public Statements

47.    In its first fourteen months as a publicly traded company, EHang issued at least 50 press releases and nearly a dozen promotional videos on its YouTube channel. As already noted, the Company was engaging in a rapid-fire spate of official pronouncements that, according to Wolfpack Research, is "typical of a stock promotion." Many of these press releases and public statements were accompanied by regulatory filings with the SEC.

48.     EHang's public statements, SEC filings and press releases consistently portrayed the company as moving rapidly to achieve "regulatory breakthroughs" in countries around the world for its "autonomous" and "passenger grade" vehicles using "proprietary technologies" developed through extensive research and development, while also expanding its advanced manufacturing capacities and growing revenues. These claims were false.

49.     Though the particulars varied from statement to statement, as noted above, EHang's false and misleading statements focused on six topics: (i) EHang's vehicles, (ii) the Company's revenues, (iii) the Company's research and development efforts, (iv) EHang's manufacturing capacities, (v) the funding and construction of EHang's AAV E-Port, and (vi) the Company's prospects for obtaining regulatory approval to commercially transport passengers. Each of these statements is identified in Section V below and the reasons why the statements were materially false, misleading and/or omitted material facts is also specified in Section V.

50.     First, throughout the Class Period, EHang repeatedly described its vehicles, particularly the EH216, in public statements, press releases, and SEC filings with evocative language with no fixed meaning within the aviation industry. These statements therefore mislead investors.

51.     Examples of this include EHang regularly referring to their products as "autonomous" and "passenger-grade." The term "autonomous" has a specific meaning distinct from "remotely operated" or "unmanned." As noted in the Wolfpack Research Report, and confirmed by Lead Plaintiff's investigation, leading eVTOL industry experts do not believe EHang's vehicles are truly "autonomous" based on the Company's incredibly limited spending on research and development and that such research and development appears to have been limited to conducting test flights predominantly in an abandoned amusement park. The EH216's only

approved demo flight in the U.S was expressly conditioned on the vehicle remaining under the "operational control" of EHang's ground crew. The term "passenger-grade" has no meaning in the aviation industry, but EHang repeatedly used the term when describing the EH216 in statements omitting any clarifying language explaining as much.

52.     During the Class Period, the EH216 was not approved for its purported intended use, commercial operations involving the transport of passengers, by any regulatory body anywhere on the planet. Neither was EHang approved to fly any of its vehicles "autonomously." Thus, misrepresenting that the EH216 received regulatory approvals for passenger travel rendered the statement(s) utilizing the terms "autonomous" and "passenger-grade" materially misleading.

53.     In passenger aviation in the United States at least three Federal Aviation Administration ("FAA") certifications are required before newly designed aircraft, such as the EH216, is approved for commercial operations with passengers aboard:

a)  A Type Certificate– indicating that the FAA has evaluated and approved the vehicle's design and all component parts for airworthiness, emissions, noise, fuel venting, and other factors and deemed it sound;

b)  A Production Certificate – indicating that the FAA has evaluated the manufacture of the vehicle and determined that the manufacture of aircrafts subcomponents can be safely and reliably replicated within stringent and specific quality standards. This evaluation includes a review of the tooling required to make the components of the aircraft, the training of personnel, the condition of manufacturing facilities, a review of quality control and other elements of the industrial process. Obtaining a Production Certificate involves physical on-the-ground inspection by FAA personnel of facilities where an aircraft is produced; and

c) A Certificate of Airworthiness ("CoA") – the approval process for which involves 5 separate steps and 3 separate "gates" that an aircraft must pass through. Obtaining a CoA requires a pre-application, a formal application accompanied by a proposed schedule, compliance documents, manuals, training materials, descriptions of safety assurance systems tools, engineering and design assessments, performance assessments, and a final FAA evaluation. A typical approval process, even from established manufacturers with multiple previous approvals, can take several years.

54.    An aircraft must receive all three certificates before entering commercial operations. Similar regulatory approval processes are in place around the world. The receipt of any one certificate is a significant milestone in an aircraft being approved for passenger flight, and aircraft makers in the electronic vertical takeoff and landing ("eVTOL") industry regularly tout the progress of new products within this process.

55.    To date, the FAA has not issued a final CoA for any eVTOL aircraft.

56.    Further, there are no exceptions under the FAA's limited and strictly enforced guidelines for rotorcraft that would allow for the certification of unique configurations of rotors, such as those on the EH216.

57.    Current FAA regulations also do not allow for the autonomous operation of AAVs, or indeed, passenger aircraft of any kind.

58.    The term "passenger-grade" has no defined meaning under any of the three relevant certifications for passenger aircraft operations in the United States or elsewhere.

59.    To date, EHang has not even submitted a pre-application for a CoA, nor has it sought a Type or Production Certificate from the FAA.

60.     Second, EHang regularly reported false or misleading financial information purporting to show significant quarterly growth.

61.     Since filing its initial prospectus, EHang's public statements, including press releases touting unaudited financial reports, claimed double digit revenue growth attributed to increases in vehicle sales. The most significant vehicle orders disclosed by EHang during the Class Period related to Kunxiang, which, as explained below, are attributable to sham sales. As EHang's revenues grew on paper, so too did the backlog of accounts receivable, showing that the Company was only able to collect on a fraction of the sales it reported making.

62.     Third, EHang falsely claimed its vehicles underwent rigorous and extensive research and development and utilized proprietary technologies. EHang's main research and development facility referenced in its SEC filings was little more than a stretch of concrete located at an abandoned amusement park used for test flights. Instead of unique and proprietary technologies, EHang's vehicles rely on off-the-shelf hobby-grade motors and the Company's collection of patents and patent applications appear to be of limited value.

63.     Fourth, EHang falsely claimed in both press releases and regulatory filings to have substantially greater and more sophisticated manufacturing and operations facilities than was the case. The Company falsely claimed to have "built" a new advanced manufacturing facility. In truth, EHang leased the warehouse where it claimed it was building a new manufacturing facility, and, during the Class Period, the facility lacked any advanced manufacturing capacity.

64.     Fifth, EHang falsely claimed to have secured financing for and started work on a first-of-its-kind "E-Port" for AAV services. In truth, the planned "E-port" did not exist at any stage of development.

65.     Sixth, EHang's press releases and regulatory filings included false and misleading statements about the Company's prospects for obtaining regulatory approval for the commercial operations of its vehicles. EHang repeatedly reported limited approvals for unmanned test flights in terms that either misleadingly implied or falsely stated that such approvals were broader or more meaningful than they in fact were. Far from achieving "regulatory breakthroughs," nearly all the flight approvals EHang received during the Class Period were for simple takeoff and landing demonstrations. In the United States, equivalent approvals are routinely granted by the FAA to academics, filmmakers, hobbyists, and even children flying drones for recreation. Tellingly, EHang described these approvals differently in different language versions of the same press release. EHang omitted the word "trial" from the Chinese language version of a press release describing FAA approval for a drone flight in North Carolina but included it in the English language version of the same press release. Months later, EHang made the same omission in reverse, omitting the word "trial" from the English language version of a press release concerning approval by the Civil Aviation Administration of China ("CAAC") for EHang's logistics operations in China, but including the same crucial qualifier in the Chinese language version of the same document.

66.     The statements identified in Section V were materially false and misleading and failed to disclose material facts about the Company's business, operations, and prospects. As discussed below, the Defendants misled investors by misrepresenting or failing to disclose that: the Company's purported regulatory approvals in Europe and North American for its EH216 were for use as a drone, not for carrying passengers; its relationship with its purported primary customer is a sham; EHang has only collected on a fraction of its reported sales since its ADS began trading on NASDAQ in December 2019; the Company's manufacturing facilities were practically empty

18

and lacked evidence of advanced manufacturing equipment or employees; and as a result, the

Company's public statements were materially false and misleading at all relevant times.

## III.    The Truth Emerges

67.    At 1:53 pm on February 16, 2021, analyst Wolfpack Research issued a Tweet that

it published a report entitled: "EHang: A Stock Promotion Destined to Crash and Burn." In

Wolfpack's summary of its report, Wolfpack wrote that EHang:

> [I]s an elaborate stock promotion, built on largely fabricated revenues based on
> sham sales contracts with a customer who appears to us to be more interested in
> helping inflate the value of its investment in EH (*i.e.*, pump EH's stock price) than
> actually buying its products. EH has perpetuated its story with a collection of lies
> about its products, manufacturing, revenues, partnerships, and potential regulatory
> approval of its purported main business, an "autonomous" aerial vehicle ("AAV")
> ridesharing network.

68.    The Wolfpack Research report continued that "EH's relationship with its primary

purported customer is a sham. Government records and credit reports show that EH's major

customer is [Kunxiang]. We have gathered extensive evidence including behind-the-scenes

photographs, recorded phone calls, and videos of on-site visits to EH's various facilities, as well

as Kunxiang's offices which lead us to believe that Kunxiang signed sham sales contracts to

benefits its investment (stock price) in EH." As support for this conclusion, Wolfpack Research

wrote:

      i.    "Kunxiang has an exaggerated physical presence and its real operations appear to

         be a fraction of what is claimed. Out of the 3 addresses listed on Kunxiang's

         website, one is a hotel with no Kunxiang presence, one is a 13th floor address of an

         11-story building, and the last one had only one Kunxiang employee in the office

         on a weekday afternoon." The Wolfpack Research report included photographic

         evidence of its visits to Kunxiang's purported offices.

ii. "To the extent Kunxiang actually does sell vehicles, it did not want to sell EH's products to us. When asked, the only employee on-site at Kunxiang, who claimed to be the finance manager, had no hesitation voicing his disapproval of the EH216, and instead offered their own, supposedly much higher quality products for sale." This finance manager further referred to EH216 as an "old model," and stated that EHang's battery technology is "not very good" because the battery can last only about 30 minutes, including takeoff and landing, "giving the user about 10 minutes of flying time."

iii. "Kunxiang appears to be a willing participating in EH's stock promotion. According to the same finance manager at Kunxiang, Kunxiang made an undisclosed RMB100 million (~14 million) pre-IPO investment in EH, which leads us to believe its true motive for signing these shambolic contracts was to benefit its investment, which is worth ~RMB473 million (~68 million) today."

iv. "As is common with a sham customer, SAIC files and national credit reports show that Kunxiang was established just 9 days before it signed a RMB450 million (~650 million) sales contract with EH. Kunxiang had only RMB10 million (~\$1.4 million) of registered capital, rendering far too thinly capitalized to actually fulfill this purported sales contract. Nonetheless, Kunxiang signed another RMB30 million (~\$4.3 million) contract with EH four months later."

v. "One of the sloppiest details of this 'customer/supplier' relationship, the first purported sales agreement between EH and Kunxiang provides that Kunxiang will supposedly pay a per unit ('per set') price of RMB150 million (~\$21.5 million). We assume that before the second purported agreement was signed four months

later, EH realized that the unit price was too high to be believable and cut it to RMB1.5 million (~$215k), 1% of the price in the first contract."

vi.    "Between September 10, 2019, and October 31, 2019, EH filed a confidentiality request with the SEC to redact the prices on these contracts, likely because the prices are so absurd that they would ruin EH's credibility if seen by investors or competitors. We only found the unredacted versions of these contracts within the SEC's EDGAR archive."

69.    Wolfpack Research further reported that "EH has only collected on a fraction of its reported sales since its mid-December 2019 IPO. We see EH's collection rate of only 20% and DSOs at nearly 200 days (despite its purported credit terms of up to 180 days) as a clear indication of fabricated revenues." Wolfpack noted that although EH has reported RMB125.5 million (~$18 million) in total revenues since its December 2019 IPO, that "its accounts receivable balance has increased by ~RMB100.3 million (~$14.4 million)," meaning that "EH has only collected RMB25.2 million (~$3.6 million) in cash since becoming a publicly traded company."

70.    In its report, Wolfpack Research further detailed that "in just 14 months as a publicly traded company, EH's PR team has put out 50 press releases . . . [h]owever, EH's constant stream of press releases are easily proven untrue." Wolfpack continued:

i.    "EH has announced numerous 'flight certifications' and 'long-term' approvals for its 'passenger-grade' EH216 in the US, Canada and various countries throughout Europe."

ii.    "According to aviation regulators or experts in aviation regulation in the US, Canada and Europe, EH has only received permits for recreational test flights of its drones in specified areas, below a specified altitude and at a specified time. In no

way are these permits endorsements of EH's 'passenger-grade' claims, nor are they 'regulatory breakthroughs' of any kind."

iii.  "EH also claims in an English PR to have received the 'World's First Commercial Pilot Operation Approval of Passenger-Grade AAVs for Air Logistics Uses' from China's CAAC. However, the title of the Chinese version of the same PR says nothing about 'commercial' or 'passenger-grade.' What EH obtained was '特定类无人机试行批准函' (special approval letter for trial runs of drones of a specified class). CAAC had granted the same license to at least one other company in Hangzhou, China one year earlier in 2019."

iv.  "EH consistently makes different claims regarding regulatory approvals in the English and Chinese versions of its press releases. In English, EH makes false claims of commercial approval of its vehicles the EH216 by Chinese regulators. In its Chinese press releases, EH makes false claims of commercial approvals by regulators in the US, Canada, and Europe."

71.  Wolfpack Research wrote it "visited EH's corporate headquarters/main manufacturing facility in Guangzhou, which only reinforced our belief that EH isn't a legitimate company. Similar to frauds we have exposed in the past, EH's headquarters/main manufacturing facility was practically empty when our investigator visited in the middle of a workday. There was minimal activity and strikingly few employees." Wolfpack continued:

> We found that the facility has near zero security, which is unimaginable for a factory that produces and stores a product full of supposedly highly valuable IP and proprietary technologies used in EH's "world-class" AAVs. Our investigator noted that they had seen coat hanger factories in China with more security than EH's main manufacturing facility in Guangzhou. **EH's main manufacturing facility seems to lack any advanced manufacturing equipment, employees, or even a basic assembly line seen in typical aircraft/drone factories. Our investigator was**

**able to walk around EH's facility for ~20 minutes without seeing a single person working on a weekday afternoon.**

(Emphasis added).

72.     Wolfpack Research further wrote that it was "not able to find any production equipment or raw material inventory on site," such that "it is highly likely that EH has the near-finished parts manufactured and shipped in from contractors, performs simple light assembly on site, and then stores units at EH's corporate headquarters in Guangzhou." Wolfpack Research "question[ed] whether EH's products, including EH216, can be legally claimed as 'manufactured by EHang,'" and wrote that "[t]he PRC lawyers we spoke to believe that EH may be violating PRC laws regarding manufacturer certification and labeling, at the least."

73.     Wolfpack Research further wrote that it "spoke on the record with a leading expert in the eVTOL industry, a manufacturing set-up specialist, and Chinese lawyers. Based on their expert opinions, even if EH was intended to be a real business, we believe its product is majorly flawed, inherently dangerous and would likely attract very few, if any, actual buyers." As evidence of these conversations, Wolfpack Research reported that its analysts spoke with Dr. Mark Moore, a 32-year NASA veteran engineer who most recently served as the Director of Aviation Engineering for Uber Elevate. Wolfpack wrote that Dr. Moore:

     i.     "[P]ersonally evaluated the EH216 for Uber Elevate and determined that it didn't meet Uber's criteria for partnership." Dr. Moore **was "concerned by [EH216's] overall 'rough' quality and its use of 'hobby-grade motors' made by Chinese hobby motor company, T-Motor."** Dr. Moore "made it clear that these hobby grade motors are not aerospace products and should never be used in a passenger carrying vehicle."

ii.    Dr. Moore is further quoted in Wolfpack Research's article that he **"firmly feel[s] that the current configuration is inherently not safe"** and has **"significant reservations about whether [the EH216] could ever be certified for carrying passengers in the US market."**

iii.    According to Wolfpack, when told about EH's "anemic R&D budget," Dr. Moore was horrified, saying **"I mean, seriously, if they've only spent $10 to $20 million in the development process, they should not even be flying people around in limited demonstrations, it's just, that's really scary."**

iv.    Dr. Moore also stated, according to Wolfpack Research, "[s]o, if EHang can't show that they've spent millions of dollars in research then their autonomy isn't even – and I mean, hundreds of millions of dollars, **then their autonomy couldn't possibly be ready."**

(Emphasis added).

74.    Finally, Wolfpack Research wrote that it "obtained Chinese court records which show that EH's ADRs may already be in serious jeopardy due to legal issues in China." Wolfpack continued that:

> EH Guangzhou, the onshore entity which holds most of EH's assets and operations likely had 95% of its equity frozen by a Chinese court. The basis for this freeze is said to be the "creditor's right to cancel", which means a creditor (in this case a major investment fund in Shenzhen called Join-Share) sued to undo certain questionable transactions EH Guangzhou might have done to reduce assets and avoid debt repayment. ***In other words, a Chinese court could liquidate EH's equity to repay the creditor, rendering its ADRs completely worthless. American investors would be left with no legal recourse against the company or anyone else for their losses.***

(Emphasis added).

75.    On this news, the price of EHang ADS fell from its February 12, 2021, close of $124.09 to a February 16, 2021, close of $46.30 per share, a one-day drop of $77.79 per share or about 62.7%.

## IV.    Plaintiff's Independent Investigation Corroborates the Wolfpack Research Report

76.    In connection with this action, Lead Plaintiff retained a business intelligence firm to investigate EHang's facilities and presence in various locations in the People's Republic of China, and evaluate corporate filings, legal disputes, patents, and media accounts relating to EHang's business and operations.

77.    The investigators retained by Lead Plaintiff confirmed that the business address identified in the Wolfpack Research Report as EHang's design and testing center (Building #4, Room #402, 11 Aoti Road, Tianhe District, Guangzhou City) is indeed an abandoned amusement park. The investigators did not uncover any information evidencing that EHang has a meaningful business presence at this location, but signs bearing the company name EHang were noted in a large parking lot accessible through the main entrance to the property as well as at the side entrance of the amusement park which was closed and not guarded by any security staff.

78.    The investigators retained by Lead Plaintiff did not uncover any information showing that EHang has a current business presence at the location reported as EHang GZ's current registered address in available corporate records in China (Room 5986, 5/F, No. 1021, Gaopu Road, Tianhe District, Guangzhou City). Inquiries were made with staff of the property management office at Tianhe Software Park (where the address is located) and these individuals stated that they had no knowledge of any company at this address/building operating as "EHang", nor was EHang identified anywhere in the company directory in the entrance of the building.

79.     Searches of Chinese-language litigation filings, corporate documents, regulatory filings and Chinese-language media uncovered discrepancies between EHang's public statements and records relating to EHang's purported AAV E-Port in Hezhou. Whether the E-Port was ever constructed is unclear as no specific information was identified about the project's exact location or its operating company. According to planning documents, the E-port's supposed construction period was scheduled to take place between June 2021 and December 2021 according to the Hezhou Unmanned Aircraft Industry Development Plan (Draft) released by the Hezhou Development and Reform Commission on June 24, 2021. This contrasts sharply with EHang's April 23, 2020, announcement that the project would be completed by the end of 2020.

80.     A review of EHang's public disclosures and Chinese corporate filings uncovered a dozen EHang subsidiaries/affiliates not previously disclosed in filings with the SEC.

81.     Lead Plaintiff's investigators confirmed at least six ongoing civil litigation matters where EHang Intelligent Equipment (Goungzhou) Co. Ltd. is listed as a defendant. These matters include multiple disputes relating to sales and purchases contracts, and several labor disputes.

82.     Lead Plaintiff's investigators also confirmed the freeze order on 570 million shares of Guangzhou EHang Intelligent Technology Co. Ltd. referenced in the Wolfpack Research Report.

83.     Additionally, according to a judgement dated December 25, 2020, as a result of a legal dispute between Defendant Hu and Shenzhen Join-Share Equity Investment Center, a second freeze order on about RMB 75,045,440.91 or about $11,542,433.08 of Defendant Hu's shares in Guangzhou EHang Intelligent Technology Co. Ltd. was put in place as of October 2020.

84.     According to the judgment, before EHang's IPO, Defendant Hu agreed to sell 1,679,557 shares of EHang to Highest Glory Limited (HGL). On December 24, 2018, Defendant Hu signed a Share Entrust Management Agreement with HGL, under which HGL agreed to provide Defendant Hu a loan of RMB 50 million, which would be returned in the form of EHang shares after its IPO. On December 25, 2018, Hu and HGL's Chinese affiliate, Shenzhen Join-Share Equity Investment Center (L.P.), signed a loan agreement, under which the Shenzhen entity offered a RMB 50 million loan to Defendant Hu, in exchange for his shares at EHang after the IPO. On September 16, 2020, Shenzhen Join-Share Equity Investment Center (L.P.) referred the matter to the Guangzhou Arbitration Commission, claiming Defendant Hu did not transfer the shares or pay the loan, seeking return of the payment RMB 73,492,923.

85.     Together, Plaintiff's independent investigation substantively confirms the accuracy of the Wolfpack Research Report and adds new information that provides indication of the accuracy of the Wolfpack Research Report's conclusions.

**V.     EHang's False and Misleading Representations to Investors**

86.     While each of the press releases and statements below contains their own individual misrepresentations or omissions, there are several elements of each that served to mislead shareholders.

87.     First, in almost all press releases, EHang refers to their products as "passenger-grade." As discussed above, the term "passenger-grade" has no fixed industry definition. New aircraft designs must satisfy a rigorous multi-step regulatory review process, typically spanning several years, and obtain a Type Certificate, Production Certificate, and CoA before they are approved to carry passengers.  During the Class Period, EHang never sought, much less acquired any such regulatory approvals in any jurisdiction.

27

88.    In the case of a CoA in the United States, multiple industry experts have contended that EHang has no plausible pathway to acquiring such an approval based on the inherent dangerousness of its design. The Company's repeated statements suggesting otherwise were false, misleading, or omitted material adverse facts the inclusion of which was necessary to make such statements not misleading.

89.    Second, many press releases discussed below contain statements that are materially false and misleading and fail to disclose material facts because they fail to clarify that the various approvals EHang did receive merely to take off and land without passengers aboard. EHang regularly used broad language to imply wide ranging and significant approvals, when the reality is their products have largely been approved for one off events in tightly circumscribed conditions.

90.    Finally, EHang publishes almost all its press releases in both English and Mandarin. The content of these press releases differs depending on the language and audience. As first disclosed by the Wolfpack Research Report and confirmed by Lead Plaintiff's independent investigation, EHang will, for English speaking audiences, make approvals it has received in China seem broad and significant, while describing them in Mandarin accurately as the limited approvals they are. In similar manner, Mandarin press releases will remove limiting language to make it appear as if non-Chinese regulators have granted broader, more significant approvals than they have.

91.    The Wolfpack Research Report examined 5 press releases. Lead Plaintiff's investigation commissioned certified translations of the same 5 press releases and identified the same discrepancies. The discrepancies in language always work to the benefit of EHang's false narrative of having received several significant approvals for their products.

92.     During the class period, EHang and in the Individual Defendants made several false and misleading statements about all aspects of EHang's business and operations. These misstatements were made in press releases, SEC filings, and other public statements.

93.     EHang's Prospectus filed on Form 424B4 with the SEC opens with the following statement:

> We are an autonomous aerial vehicle technology platform company. We are pioneering the future of transportation through **our proprietarily developed autonomous aerial vehicles**, or AAVs, and related commercial solutions. **We believe we are the first in the world to launch passenger-grade AAVs, setting a new milestone in the deployment and proliferation of AAV technology.**

(Emphasis added).

94.     The statement above contains at least two materially false and misleading components and fails to disclose material adverse facts.

95.     First, EHang's representation that its vehicles are "proprietarily developed autonomous aerial vehicles" is misleading, given Dr. Mark Moore's assessment that key components, including the motors, are off-the-shelf and hobby-grade, and not truly autonomous as described above. Second, the claim that the Company's products are "passenger-grade" is misleading as that the term has no defined meaning under applicable regulations or within aviation or aeronautical engineering generally and without appropriate regulatory approvals renders the statement misleading. In the United States, for a vehicle to fly with human passengers onboard, it requires a CoA issued by an FAA Aviation Safety Inspector or authorized Representatives of the Administrator after an extensive review and testing process. EHang has never sought, much less received, a CoA for its vehicles in the United States. Defendants misled investors by claiming to have "launch[ed] passenger-grade AVVs" suggesting that EHang's AVV's were already "launched" and were carrying passengers when, in fact, this was not true. Finally, EHang is not

the first company to envision or begin development of AAVs designed mainly for transporting passengers.

96.    The Prospectus continued:

**We design, develop, manufacture, sell and operate AAVs and their supporting systems and infrastructure for a broad range of industries and applications, including passenger transportation, logistics, smart city management and aerial media solutions.** We aim to make it safe and convenient for both passengers and goods to take to the air.

We are the first mover in AAV technology. In January 2016, we unveiled the world's first passenger-grade AAV, EHang 184, a single-seat model, at CES. In March 2018, we delivered a unit of our dual-seat EHang 216 to a customer for testing, training and demonstration purposes. We believe this was the world's first delivery of a passenger-grade AAV. In addition, we have developed a number of non-passenger-grade AAV models suitable for a variety of industrial and commercial applications.

**Unlike manually controlled UAVs, our intelligent AAVs can fly and operate autonomously. Our proprietary in-flight operating systems and on-the-ground infrastructure enable reliable and simultaneous control of a large number of AAVs. The operating systems installed on each AAV consist of an autopilot and flight control system, communication systems, a battery management system and a safety management system. Our on-the-ground infrastructure consists primarily of command-and-control systems, handheld and computer-based control units and AAV charging equipment.**

(Emphasis added).

97.    The statements above are materially false, misleading, and fail to disclose material adverse facts because they come directly after a paragraph referring to both "passenger-grade" AAVs and "non-passenger-grade" AAVs together, deliberately obfuscating what functionalities are available for each of the two, markedly different, vehicles. An AAV that could attain a CoA with EHang's described capabilities would be highly valuable and ground-breaking technology. As the Wolfpack Research Report claimed and Lead Plaintiff's independent investigation confirm, EHang's AVVs were not capable of obtaining a CoA.

98.    The Prospectus describes EHang's research and development efforts:

**Our strong in-house research and development capabilities underpin our leadership and support our innovation. As of September 30, 2019, our 125-member research and product development team represented more than half of our total employees. Our research and development efforts are led by our founder, chairman and chief executive officer, Mr. Huazhi Hu, one of the pioneers and leaders in the global AAV industry.** Our key research and development team includes personnel with strong backgrounds in electrical engineering, aerospace engineering, mechanical engineering, automation, material engineering and software development. As of September 30, 2019, we had 138 issued patents in China, many of which relate to our core technologies, such as flight control and command-and-control systems.

(Emphasis added).

99.    The statements above are materially false, misleading, and fail to disclose material adverse facts for two reasons. First, as revealed by Wolfpack Research, EHang's R&D operations consisted of little more than test flights predominantly at a single dilapidated amusement park. Further, Dr. Moore pointed out that the Company's spending is hundreds of millions of dollars below what would be required for the technological advances claimed and the EH216 relies on hobby-grade motors, not unique or proprietary technologies developed by EHang.

100.    Describing EHang's sales to date, the Prospectus stated:

**As of December 5, 2019, we had cumulatively delivered 38 passenger-grade AAVs for testing, training and demonstration purposes and developed two command-and-control centers for smart city management. As of December 5, 2019, we had unfilled purchase orders for 48 passenger-grade AAVs.**

**Our core business, air mobility solutions, grew significantly in the first nine months of 2019. Since early 2019, we have accelerated the commercialization of our passenger-grade AAVs in air mobility solutions. In the third quarter of 2019, we sold 18 passenger-grade AAVs, compared with 17 in the first two quarters of 2019 combined.**

Our revenues increased by 109.8% from RMB31.7 million in 2017 to RMB66.5 million (US$9.3 million) in 2018. Our net loss decreased by 7.1% from RMB86.6 million in 2017 to RMB80.5 million (US$11.3 million) in 2018. Our revenues increased by 19.9% from RMB56.0 million in the nine months ended September 30, 2018 to RMB67.1 million (US$9.4 million) in the nine months ended September 30, 2019, and our net loss decreased by 3.9% from RMB49.8

million in the nine months ended September 30, 2018 to RMB47.8 million (US$6.7 million) in the nine months ended September 30, 2019. In 2018, revenues generated by air mobility solutions, smart city management solutions and aerial media solutions were RMB3.1 million (US$0.4 million), RMB30.5 million (US$4.3 million) and RMB31.3 million (US$4.4 million), representing 4.7%, 45.8% and 47.0% of our total revenues, respectively. **In the nine months ended September 30, 2019, revenues generated from air mobility solutions, our core business, increased significantly to RMB48.8 million (US$6.8 million), representing 72.7% of our total revenues.**

(Emphasis added).

101.   The statements above are materially false, misleading, and fail to disclose material adverse facts. As revealed in the Wolfpack Research Report, EHang's claimed revenues derive mostly from continually increasing Accounts Receivable, rather than proceeds collected from the sale of products. As noted already, a substantial portion of EHang's purported revenues are attributable to sham sales to an affiliated company.

102.   The Prospectus was accompanied by EHang's amended Form F-1, signed by Defendants Hu, Xiong, and Liu.

103.   According to EHang's 2019 Form 20-F, the Company "raised approximately US $33.9 million in net proceeds from the issuance of new shares from [the] initial public offering" and another "US $9.8 million in net proceeds from the issuance of new shares" in January 2020 following the exercise of over-allotment options by the IPO's underwriters.

104.   On January 8, 2020, EHang issued a press release entitled "EHang Conducts First-Ever U.S. Trial Flight of Pilotless Air Taxi at North Carolina Transportation Summit" (the "January 8, 2020, Press Release").  EHang stated that it would "**conduct its first-ever U.S. trial flight of its two-seater passenger-grade AAV. . . . This represents the first time that the EHang 216 has received flight approval from the Federal Aviation Administration** . . ." (emphasis added). This statement was materially misleading when made. While the FAA did

approve the takeoff and landing of the EH216 at a specified time and place, an identical certification could be obtained by anyone seeking to fly or operate a drone anywhere in the United States. Referring to a "passenger-grade AAV" having received "flight approval" was materially misleading as it omitted to disclose the material facts that the approval merely allowed the EHang 216 to take-off and land at a specified time and place while under the operational control of EHang's ground crew, not operating autonomously, and did not suggest that it was capable of or certified to carry passengers.

105.     Tellingly, as alleged in the Wolfpack Research report and confirmed by independent certified translations obtained by Lead Plaintiff, the Chinese language version of the January 8, 2020, press release omits the word "trial" – falsely suggesting to Chinese readers that EHang's passenger "air taxi" services were approved for commercial operations by the FAA. This trend of removing key qualifiers depending on the audience and country continued throughout this period.

106.     On March 5, 2020, EHang announced via press release ("The March 5, 2020, Press Release") that it had "obtained operational permit for its two-seater passenger-grade AAV, the EHang 216, from the Civil Aviation Authority of Norway . . . This is the first operational permit for long term testing flight of EHang 216 in Europe, laying a solid foundation for future urban air mobility (UAM) operations in other EU countries." EHang stated it had "obtained operational permit for its two-seater passenger-grade AAV, the EHang 216, from the Civil Aviation Authority of Norway . . . This is the first operational permit for long term testing flight of EHang 216 in Europe, laying a solid foundation for future urban air mobility (UAM) operations in other EU countries." The March 5, 2020 Press Release continued:

> "After the assessment of test flight plans and contingency plans, the CAA Norway issued an operational permit for EHang 216 to conduct flights together with a local customer for

the purpose of testing and certification. According to CAA Norway, it believes the country's geographic conditions suit the testing of unmanned aircraft well. Covered with a long strip of land with abundance of sparsely populated areas and free airspace, the country has started to build a network of small airports since 1960's, connecting most territories throughout the country. For the test flight of EHang 216, CAA Norway looks forward to witnessing it at Elvenes airport."

107.   This statement was misleading when made. As with the January 8, 2020 Press Release, this approval is the same as one would acquire to fly any drone in Norway. There was nothing in this approval that cleared it for passenger flight in urban environments. Nothing in this approval would lay the foundation for regulatory approval of UAV operation for passenger flight. Nothing about the Norwegian approval would confer rights to EHang to operate in an urban environment in the rest of the EU. Norway is not a member of the European Union. Though it has a relationship the EU via its participation in the European Economic Area, it falls outside of many EU regulations, including aviation. All certification and regulation of flight in the EU is governed by the European Union Air Safety Agency ("EASA"). Norway is not a member of, nor has any formal ability to influence regulatory decision making by, EASA. Describing a limited approval for a test flight in Norway as "laying a solid foundation for future urban air mobility (UAM) operations in other EU countries" was false and misleading.

108.   On March 16, 2020, EHang announced in a press release that it had "entered into a cooperation agreement with the city government of Seville, Spain to execute the first Urban Air Mobility (UAM) pilot program in Spain." In press release EHang, in describing its current agreement with the government of Seville stating "[t]he agreement specifies that EHang will work with the Seville government to develop the urban air mobility including passenger transportation, air logistics and command and control platforms in the city. The city will also collaborate on applications for permission to conduct test flights, in accordance with Spanish and European

legislation, and will coordinate with EHang in the planning of flight routes."

109.    This statement was misleading when made. EHang's agreement with Seville was an initial collaboration to explore the potential of sometime in the future deploying a product. Spain, as part of the European Union, does not allow for passenger carrying drones to operate in its airspace. There does not exist a regulatory pathway towards allowing drones to operate with passengers in EU airspace. EHang, in describing the agreement with the government of Seville, continues to refer to "urban air mobility" as an existing product area that was being deployed, not a wholly aspirational goal of the Company for which there is no legal framework.

110.    On March 25, 2020, EHang filed a press release announcing its fourth quarter and full year 2019 unaudited financial results as an attachment to a Form 6-K with the SEC (the "March 25 6-K"). Defendant Liu signed the March 25 6-K. In this filing, EHang announced that for the full year 2019, total revenues increased 83.2%, gross margins were up 7.7%, operating losses were down 37.7%, and that sales of "passenger-grade AAVs" reached 61 units in 2019, up from just 3 units in 2018.

111.    As part of the March 25 6-K, EHang issued a press release detailing their purported earnings. Defendant Hu was quoted in the press release as follows:

> In December 2019, EHang successfully completed its IPO on Nasdaq and became the world's first publicly traded UAM company, which was a milestone achievement not only for EHang but also for the whole industry. **As a new public company, EHang delivered record high quarterly results with impressive financial and operating performance. Our revenues grew significantly, gross margin continued to increase and we achieved first ever quarterly positive operating cash flow and operating profit.** Such achievements reflect our strong competitive advantages arising from our global leadership in the UAM industry. Our business is experiencing some short-term turbulence from the COVID-19 outbreak. These include absence and late return of frontline workers, delayed fulfillment across our supply chain, and the short-term disruption on some of our customers' industries such as tourism. However, this has also created new opportunities for us to explore, such as emergency delivery and rescue. We are confident in the long-term growth and robustness of our business. We are very

optimistic about the future of the global UAM industry, which is expected to reach US$1.5 trillion by 2040 according to Morgan Stanley. We are confident that we will keep our leadership in this promising industry.

We are the first to enter into commercialization in the global industry. Our first-mover advantage has helped us be a pioneer in commercializing AAVs and establishing market standards. **Our breakthroughs in the regulatory front, both in China and internationally (e.g. having obtained the first flight permit for the EHang 216 AAV by the Federal Administration of Aviation (FAA) in the US and the first flight permit for the EHang 216 AAV by the Civil Aviation Authority in Norway), have also underpinned our industry leadership and enhanced our customers' confidence globally.** Leveraging all these, we aim to not just be a technology product provider but a leading UAM platform company offering a comprehensive suite of solutions and services to develop an integrated UAM ecosystem. We look forward to building more partnerships with other businesses, city governments, regulators and investors globally to achieve this strategic goal and benefiting together from fast growing demands for UAM globally.

(Emphasis added).

112.    The above statement was misleading when made. First, Hu repeats the misleading statements from the press release on March 5, 2020, discussed in ¶¶104 - 107 above regarding the scope of regulatory approval in Norway and misrepresented the scope of EHang's approval from the FAA described in the press release of January 8, 2020. As discussed more fully above, EHang's regulatory approval in Norway was a basic approval for drone flights, and aspirational statements to look at possibly, in the future, exploring a type of operations – passenger carrying drones – that does not exist under relevant Norwegian or EU laws. Further, the approval by the FAA was for a single use limited drone operation, not a broader certification by the FAA of EHang products. At the very least, the statements above did nothing to correct the misleading nature of previous statements, and therefore buttressed and reinforced the misstatements made by EHang earlier.

113.    Second, Hu's assertions that EHang's earnings were "record high" and demonstrated "impressive operating and financial performance" were false. As revealed by the Wolfpack Research Report, EHang's financial performance was achieved through a straw

purchaser, and driven by an increase in accounts receivable that were not and would not be realized as cash. In short, the March 25 6-K and the accompanying press release doubled down on earlier misstatements and further perpetuated the fiction of EHang's earnings being driven by customer demand and delivery of products.

114.    On April 20, 2020, EHang issued its Annual Report on Form 20-F with the SEC (the "April 20 20-F"). The April 20 20-F, among other things, reiterated the financial results announced on March 25, 2020.

115.    In the April 20, 2020, Form 20-F, Defendants Hu and Liu both personally certified to the accuracy of the financial condition of EHang. As attachments to this Form 20-F, Defendants Hu and Liu signed certifications that **"[b]ased on [their] knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."** They also certified that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report." As discussed more fully in ¶¶68 - 70 EHang's financial condition as reported in the April 20, 2020, Form 20-F was false and misleading. Sales were as a result of a straw purchaser, and money ostensibly going into research and development was instead being funneled into a subsidiary largely owned by the defendants.

116.    On April 22, 2020, EHang issued a press release announcing the Company's "intention to build the world's first E-port for AAV services." EHang's statements in the press release were false and misleading when made. In announcing plans to create an "E-Port" the release stated in relevant part:

**EHang will cooperate with a local partner in the City of Hezhou in Guangxi Province, China, to build the E-port, which will accelerate the commercialization of EHang AAVs in the tourism industry.** The city of Hezhou is a pioneer in air tourism, and this project will make it model for air tourism innovation around the world. **The E-port is planned to be completed and operational by around the end of 2020.**

The plan includes the delivery of 20 units of the EHang 216, the Company's two-seat passenger-grade AAV, which will be deployed for aerial sightseeing.

**The E-port terminal building will be three stories covering 2,500 square meters. Architectural features include a first floor reception hall, second floor passenger waiting area, and a third floor departure/arrival zone. Four landing pads will be located on the roof-top, which can accommodate the landing/take-off of four AAVs simultaneously.**

(Emphasis added).

117.     EHang also uploaded a YouTube video on or about April 22, 2020, describing the AAV E-port, but also, going beyond claims in the associated press release, proclaiming "**we've created the world's first AAV command and control center**."

118.     The statements above were false. To date, EHang has done nothing to construct the described facility, as explained in the Wolfpack Research Report which was confirmed by Lead Plaintiff's independent investigation.

119.     On May 27, 2020, EHang issued a press release announcing that it "obtained the world's first commercial pilot operation approval from CAAC to use EHang 216 passenger-grade AAVs for air logistics purpose. Thus, EHang became the world's first AAV company approved by a national aviation authority to carry out commercial pilot operation for the category of 150 kg plus heavy-lift air logistics uses" (the "May 27 2020 Press Release").

120.     The May 27, 2020 Press Releases under the headline "EHang Obtained World's First Commercial Pilot Operation Approval of Passenger-grade AAVs for Air Logistics Uses" Defendant Hu stated, in relevant part:

We are thrilled that the CAAC and EHang took the lead on the **world's first commercial pilot operation approval of passenger-grade AAVs for air logistics uses. This approval is of great significance.** For EHang, it enables us to enhance our first-mover advantage and accelerate the commercialization of AAV technology and air mobility solutions for logistics. **It also lays a foundation for regulators around the world to jointly explore and establish a coordinated, supportive and sustainable regulatory environment.** This will benefit the long-term development of the promising Urban Air Mobility ("UAM") applications.

(Emphasis added).

121.    Here, again, Defendant Hu, echoing the headline's misleading description, describes a limited step achieved by a number of other companies (temporary approval for delivery services) as though it were a more significant step towards regulatory approval for passenger travel by drone. Most importantly, as noted in the Wolfpack Research Report and confirmed by the certified translations obtained by Lead Plaintiff, the English language version of the press release omits the word "trial" from headline description of the CAAC's approval of "commercial pilot operation approval of passenger-grade AAVs" but the Chinese language version of the press release does not. Hu and EHang misrepresented to American investors the CAAC's approval, claiming it was an approval to operate a "commercial pilot . . . passenger-grade AAV" when, in fact, it was an approval was for a ***trial*** run to operate an AAV as acknowledged in the Chinese language version of the same press release.

122.    Further, describing this limited approval as a step towards international cooperation on regulation was misleading. There is simply no basis to claim that because one country might provide an aeronautical approval suggests that another country would do the same. Indeed, there is no basis to claim that just because the People's Republic of China might provide an approval (even though it did not in this instance) supports a claim that the FAA would follow suit.

123.    On May 29, 2020, EHang issued a press release attached to a Form 6-K filing with

the SEC announcing the unaudited financial results for its first quarter 2020 (the "May 29 6-K").

Defendant Liu signed the May 29 6-K. In the release, EHang reported that total revenues were up

80.3% year over year, that gross margins increased 0.8 percentage points year over year, and that

gross profits increased 82.7% year over year.

124.    In addition, Defendant Hu stated in relevant part:

We are pleased to deliver solid financial and operational results in the first quarter of 2020. Despite the challenges posed by the virus outbreak, we still achieved significant year-over-year top line growth. Although there was some short-term impact to our supply chain and customers, since mid-March our operations have gradually resumed and our business initiatives are back on track. Meanwhile, we have continued to increase our customer base for emerging use cases, such as medical emergency transportation and air tourism. We have also expanded the UAM pilot city network and **successively achieved regulatory breakthroughs in the U.S. and Europe, paving the way for global business expansion in the post-COVID-19 world.** Looking forward, we will continue to invest in technology and talents to accelerate commercialization of AAVs and related solutions. We are confident we can achieve our targets for 2020 and further strengthen our leadership in the promising UAM market.

(Emphasis added).

125.    Despite Hu's assertions, EHang did not then and does not now possess significant

regulatory approval of its products in the European Union or the United States. Norway's approval

of test flights for EHang's drones remains 1) limited to small test flights in remote, unpopulated

areas, and 2) not in the European Union. As discussed above, approval of certification for

passenger flight in the European Union is governed by the EASA of which Norway is not a

member. In so much as EHang ever described approval in Norway as somehow having significance

outside the borders of Norway, it is materially false.

126.    EHang's regulatory approvals in the United States were limited to a single, time-

limited approval for a drone flight in Raleigh, North Carolina, not a wider "regulatory

breakthrough" relating to EHang's prospective commercial operations. To date, EHang has never

applied for, nor does it have any pathway under current regulation to acquire, a CoA for its products. The Company's one-time approval for operating a drone without passengers did not move it any closer to acquiring an approval it likely could not acquire and has never sought.

127.   In a press release and 6-K filed on August 26, 2020, EHang reported that total revenues were up 62.7% year over year, "driven by significant growth across all revenue streams." The Company further reported that gross profits increased 60% year over year. In this release, Defendant Hu stated:

> During the second quarter of 2020, we significantly grew revenues and strengthened our core business of air mobility solutions, despite the ongoing COVID-19 pandemic challenges in China and overseas. **We set a significant regulatory milestone for the industry by achieving the world's first commercial operation approval of passenger-grade AAVs for air logistics from the CAAC.** We are well-prepared and confident that we can accelerate growth by deploying our AAV solutions for more practical uses and expect to roll out more new products including the ones with the flight range exceeding 100 kilometers. We are proud of our continued progress in global markets."

(Emphasis added).

128.   As with previous statements of EHang's financial condition and sales, Hu's statement was materially misleading.  As stated more fully above, sales growth and profits were both being driven by straw purchases and "sales" that involved no realization of revenue by EHang. Further, EHang did not obtain "commercial operation approval of passenger-grade AAVs for air logistics from the CAAC." Instead, the CAAC granted approval for a trial flight for one of EHang's AAVs which did not allow for carrying passengers. The claim that EHang achieved a "significant regulatory milestone" was therefore false, misleading and omitted to reveal material facts.

129.   On July 29, 2020, EHang issued a press release announcing that "EHang 216 has obtained a Special Flight Operations Certificate (SFOC) issued by the Transport Canada Civil Aviation (TCCA), the civil aviation authority in Canada. This is another milestone in regulatory

breakthroughs for EHang 216 and the first of this kind permit for periodic operations of passenger-grade AAVs in North America" (the "July 29 Press Release").

130. In the July 29, 2020, Press Release, Defendant Hu stated in relevant part:

> **We are pleased to see the EHang 216 receiving such an important certificate from the TCCA, following consecutive flight approvals received from aviation authorities in different countries, including the U.S. Federal Aviation Administration, the Civil Aviation Authority of Norway and the Civil Aviation Administration of China.** It conveys a positive signal from global regulators to establish a supportive and sustainable regulatory environment for the UAM industry. As a leader in the industry, EHang will continue to work with our customers and partners to provide safe, autonomous and eco-friendly air mobility solutions to the world.

(Emphasis added).

131. As attested to by Mark Moore in the Wolfpack Research Report, the TCCA approval is for unmanned flights at limited, specified times, in limited specified conditions. EHang's statement that the approval was "the first of this kind permit for periodic operations of passenger-grade AAVs in North America" was false and misleading. The approval was not for "operations of passenger-grade AAVs" but for an unmanned flight at a limited and specified time and under limited conditions. Indeed, the approval granted was for limited testing of unmanned flights, that could be acquired for any drone aircraft. It was materially misleading for Defendants to assert that the permit allowed "for periodic operations of passenger-grade AAVs" as it did not allow for this.

132. On July 30, 2020, EHang issued a press release announcing that it "will build a new AAV production facility in Yunfu city in Guangdong, China with a planned initial annual capacity of 600 units and an RMB 42 million . . . investment supported by the local government in the facility. The EHang Yunfu facility is aimed to be established as an industry leading AAV production center, including an R&D facility for air mobility solutions and a training center for

operations and technical talents." In the release, Defendant Hu stated, "The increasing market demands and commercialization of AAVs in China are driving us to expand our production and upgrade our manufacturing capabilities. The EHang Yunfu facility serves as an expansion of our existing facility and will support the growth of our air mobility business in China."

133.    The statement above was false when made. As revealed by Wolfpack Research, EHang did not "build" the Yunfu structure, the Company rented the facility, a former Wholesale Market. As of December 2020, it had done little more than stage a promotional video and put the EHang logo on the building, leaving it practically empty and with no advanced manufacturing equipment or employees when Wolfpack Research investigated the site.

134.    On December 3, 2020, EHang issued a press release attached to a Form 6-K filing with the SEC announcing the unaudited financial results for its third quarter 2020 (the "December 3 6-K"). Defendant Liu signed the Form 6-K. The same day, EHang and the Individual Defendants held a call with financial analysts to discuss its third quarter 2020 results (the "December 3 2020 Earnings Call").

135.    As with other quarterly filings, EHang filed a press release to accompany its earnings reports for Q3 of 2020 in its December 3 6-K. In the release EHang referred to itself as "the world's leading autonomous aerial vehicle (AAV) technology platform company," EHang stated that it "Achieved Record High Quarterly Revenues and Gross Profit," "Maintained Stable and High Gross Margin," and "Attained Second Quarter of Adjusted Operating Profitability."

136.    For the third quarter of 2020, ended September 30, 2020, EHang reported total revenues of RMB71.0 million ($10.5 million USD), which the Company said was "up 104.3% year over year, with growth across the main revenue streams." The Company further reported gross margins of 59.2%, "an increase of 4.3 percentage points year over year, driven by optimized cost

structure of certain products and the change in revenue mix." EHang also reported a gross profit of RMB42.0 million ($6.2 million USD), "an increase of 120.3% year over year," and that operating loss shrunk to RMB1.8 million ($0.3 million USD), down from RMB10.6 million in the third quarter of 2019. Moreover, EHang reported "[s]ales of the EH216, the Company's flagship passenger-grade AAV, reached 23 units in the third quarter of 2020 versus 18 units in the third quarter of 2019."

137.    In the "Business Highlights" section of this release, EHang stated that it:

- **Launched the EH216F AAV and intelligent aerial firefighting solution**: In July, EHang introduced the EH216F, the firefighting version of EH216. The EH216F is the world's first large-payload AAV for high-rise aerial firefighting. With a peak altitude of up to 600 meters, it is superior to conventional extinguisher equipment for high-rise fires. Given significant market demand, it has attracted strong interest from emergency management departments and fire departments at national and local level in China.

- **Unveiled the heavy-lift EH216L AAV for aerial logistics**: In September, EHang unveiled another new product, the aerial logistics version of EH216 named the EH216L. The EH216L is a multi-rotor AAV with the record payload capacity. This model opens up more commercial opportunities for various urban and rural aerial logistics uses that require frequent and point-to-point deliveries.

- **Capacity expansion to meet high demand for AAVs in China**: In July, EHang announced that it will build a new AAV production facility in Yunfu, Guangdong. This factory expands upon the current facility in Guangzhou and will support the growth of the air mobility business in China with a planned initial capacity of 600 units of passenger-grade AAVs per annum. The Yunfu factory is designed to be an industry-leading AAV production center and will feature an R&D facility and a training center for air mobility.

- **Obtained the first operational flight permit for passenger-grade AAVs in North America**: In July, the EH216 was awarded a Special Flight Operations Certificate issued by the Transport Canada Civil Aviation with which trial flights have been permitted and are routinely conducted in Québec province, Canada.

- **Joined an international project to develop an air ambulance**: In August 2020, EHang was selected to join Ambular, an important international project

supported by the International Civil Aviation Organization, which is dedicated to the development of a flying ambulance for emergency medical uses.

138.    Defendant Hu included several quotes in this December 3, 2020, announcement.

Defendant Hu stated:

**In the third quarter we had significant growth in revenues and gross profit, both year-over-year and quarter-over-quarter.** Notably, we have attained positive quarterly operating profitability on an adjusted basis again since last time in the fourth quarter of 2019. This reflects our improving business operations despite the impact of COVID-19 around the world.

**We are excited by the launch of two new products based on the cutting-edge EH216 passenger-grade AAV technology platform. The EH216F and the EH216L are designed to meet strong market demand for high-rise firefighting solutions and heavy-lift aerial logistics solutions.** Both are expected to drive revenue growth in the years to come. **With increasing demand and stronger government emphasis on supporting the development of urban air mobility and unmanned civil aviation in China, we have started to ramp up our production capacity with the new facility in Yunfu.** This is an important step forward as we get ourselves ready for the next phase of growth.

We are confident in our long-term growth prospects. We are the recognized world leader in UAM. Further regulatory breakthroughs should drive faster growth of the global UAM market. We are creating new use cases, increasing our air mobility operations, and most importantly, providing compelling and integrated technologies and solutions. With the government support and relevant infrastructure upgrade, it is expected that we will receive the airworthiness certificate for EH216 in 2021 and start to provide commercial operation services.

(Emphasis added).

139.    The statements above were misleading when made. First, the Yunfu facility was non-operational as of December 3, 2020, with no employees and no manufacturing capacity. At the time of the Wolfpack Research Report several months later, the facility was not meaningfully engaged in production. Referring to EHang as "hav[ing] started to ramp up our production capacity with the new facility in Yunfu" is misleading as that facility had no manufacturing capacity. Second, the purported EH216F and EH216L show no evidence of being anything but concept vehicles. EHang has no certifications from relevant aviation regulators for operations of

a firefighting platform or the use of an EH216 as a delivery aircraft in any environment. Third, stating there is an "increasing demand and stronger government emphasis on supporting the development of urban air mobility and unmanned civil aviation in China" omits to reveal the key fact that neither is currently allowed under Chinese regulation. EHang has no more a path to acquire a CoA under then current Chinese regulations as it did from the FAA. It was misleading to claim "increasing demand and stronger government emphasis" for a service for which regulatory approval was not possible. In fact, such services did not then, and do not currently exist in the People's Republic of China.

140.    Additionally, EHang's claim that "further regulatory breakthroughs should drive faster growth of the global UAM market" omits the material fact that no such products have been approved for passenger travel anywhere on the planet. EHang's descriptions of the ministerial certifications of test flights it had received as "regulatory breakthroughs" is misleading in the context of there being no regulatory ability to engage in EHang's purported core business in any market. A more complete disclosure would note that EHang was working to change regulations that existed. A "regulatory breakthrough" implies succeeding in meeting regulations that existed, not the truth, that the entire regulatory order needed to change for EHang's purported business plan to become feasible.

141.    Further, the statement "[w]ith the government support and relevant infrastructure upgrade, it is expected that we will receive the airworthiness certificate for EH216 in 2021 and start to provide commercial operation services" was false and misleading when made. EHang was not in the process of applying for or reasonably likely to get a CoA for its AAVs, for reasons already discussed in ¶¶52 – 58, 87 – 88. There was not then and is not now a regulatory pathway for an AAV to receive a CoA for passenger flights. This statement was materially misleading as

it suggests EHang was in the process of obtaining approval for the EH216 for passenger travel and other commercial applications. It was not.

142.    In addition to the filing of the 6-K and the accompanying press release, EHang also held the December 3 Earnings Call. On this call, Defendant Xu, translating for Defendant Hu, stated "we have already delivered over 100 units of EH216 passenger-grade autonomous aerial vehicles, or AAVs, cumulatively in China and in the world. We have completed near 10,000 safe flights worldwide with zero accidents. This is an amazing accomplishment for such an innovative passenger-grade AAV. Our proprietary full redundancy safety systems have been fully testified by the abundance of real flights."

143.    Hu's description of the EH216 as a "passenger-grade AAV" and as having already delivered "over 100 units . . . in China and around thew world" was misleading.  Describing the EH216 as "passenger-grade AAV" was misleading as the EH216 had never received any regulatory approval to carry passengers. Referring to the delivery of EH216s in China, where Hu and EHang had previously misrepresented that it obtained regulatory approval in China for the EH216 to carry passengers – which was a false statement when made – misrepresented that EHang was selling the EH216 as a passenger ready AAV, in use, when this was false. Additionally, as revealed in the Wolfpack Research Report, many flights referred to by Hu consisted entirely of simple take-offs and landings.

144.    Defendant Xu, again translating for Defendant Hu, continued:

Since our current production facility can no longer meet the needs of the mass production, **we decided to build a new production facility in Guangdong, Yunfu** with an area of 40,000 square meters and the planned initial annual capacity of 600 units passenger-grade AAVs. More important, we will establish a complete set of industry standards and systems from designing, production and operations and will devote ourselves to designing and developing infrastructure, including the automated vertiports so as to gradually establish an integrated operating system like

that in existing airports. This is also an important measure to ensure the safe operations of EH216.

Today, we have developed an integrated AAV technology platform with proprietary intellectual properties. Leveraging our experiences and expertise in the fields of hardware, software and supply chains, we will release more AAV models with different payload levels to meet the demands for mid-haul and long-haul flights, thus gradually expanding the operational range of autonomous air mobility.

In terms of new products, while we continue to accumulate potential orders of the EH216F firefighting model, we are accelerating the official certification process. Meanwhile, China's State Council has also proposed to accelerate the industrial upgrade and the practical applications of firefighting unmanned aerial vehicles. The EH216 AAVs, including the passenger version, the firefighting version and the logistics version are expected to be key revenue drivers in the years to come.

In respect of policies and regulations, we are trying to push forward the process. In China, we received an approval from the Civil Aviation Administration of China for airworthiness certification pilot and trial operation programs as early as 2018. Recently, the CAAC announced 13 selected cities as the civil unmanned aviation experimental zones. Just recently in last week, China State Council also urged to include UAM development into the national strategies.

With the government support and a relevant infrastructure upgrade, we will receive airworthiness certificate for EH216 in 2021 and begin to provide commercial operation services. The commercialization of UAM will definitely be realized sooner than expected. So let's embrace the future together.

145.    The statements above were misleading when made. As discussed more fully above in Section III the Yunfu facility was merely a concept and was not contributing to EHang's production capacity months later. Second, as discussed in Section III and IV above, EHang's intellectual property as represented by its filed Chinese patents are neither proprietary nor innovative.

146.    Third, Defendant Hu continued to misstate the scope of regulatory approval and prospects for EHang products. His statement that "we will receive airworthiness certificate for EH216 in 2021" was materially misleading. As alleged herein, the EH216 was nowhere close to receiving the necessary regulatory approvals, much less in less than 12 months. EHang was not

in the process of attempting to obtaining regulatory approvals and such approvals were far from

assured. EHang did not then and does not now have a CoA for the EH216 and aviation regulators

continue to have no process for providing CoAs to drone aircraft like the EH216.

147.    Additionally on the December 3, 2020, Earnings Call, Defendant Xu, again

translating for Defendant Hu, stated:

> So it is very clear that we see more and more positive attitudes or messages sent by
> the government, including the CAAC and the State Council. For example, CAAC
> recently selected 13 cities to be the experimental city for unmanned aviation zones
> in China. And specifically, EHang, we had a connection with at least 3 of them.
> And this would give us a good opportunity to testify our EH216. And also, this can
> expedite our process of certification. And more importantly, just in last week, we
> had the State Council's circular, which stressed 3 points. One is that it specifically
> mentioned that UAM development is going to be a national strategy in China.
> Understand that the government feel the urge, because Korea and Japan, both
> countries have elevated this UAM development into their national strategy. And so
> China, it's very good to hear that government realized this problem and also, they
> see the potential for this industry.

> So after including UAM into the national strategy, this will be a very important
> critical factor for the development of the whole industry. And understand that we
> are the industry leader, and so we should be the key beneficiary of this policy
> change.

> And secondly, they specifically mentioned that it urged the acceleration of the
> legislation for the UAV in China, given the faster development of the industry. And
> so we understand that improved legislative framework will do more good for the
> industry.

> And the third, it specifically mentioned that for the firefighting and emergency
> service in China, we need to adopt the technology of the UAV. And just in the right
> time, we launched the firefighting version of EH216, so which can just meet the
> demand for such a product. And so 3 of the points of the State Council's circular
> are very positive message for EHang.

148.    Defendant Liu also stated:

> So in respect of our gross margin, we have seen our gross margin maintained at a
> stable high level of around 50% plus since we started the commercial delivery in
> the first half of last year. If you look at other electrical transportation technology
> products such as electrical cars, our gross margin is much higher. So in respect of

our new model, firefighting model, the gross margin is expected to be in line with that of the other existing models.

And overall, it is expected, our gross margin will be maintained at the similar level of 50% plus going forward.

149.    Defendant Hu's statements here were misleading when made. First, as revealed by the Wolfpack Research Report, EHang's reported margins are badly distorted by sales agreements from Kunxiang that had allegedly inflated prices and were never designed to be collected on. EHang's reporting of other income is similarly suspect, consisting largely of increasing accounts receivable rather than payment for delivery. Second, Hu's statements about EHang's purported firefighting model are pure conjecture. The alleged firefighting model had no regulatory approval or confirmed customers. It had no mature production process. There was no basis for the claim that the fictious margins of EHang's then existing products would continue into products that had not been approved for sale or had a concrete sales order for.

150.    On December 14, 2020, EHang issued a press release entitled "EHang 216 Receives Long-term Trial Flight Permit across Austria National Airspace" (the "December 14, 2020, Press Release"). Notably, however, as pointed out by Wolfpack Research and confirmed by the Lead Plaintiff's investigation, the Chinese language version of the press release omitted the word "trial." In this release, EHang referred to the EH216 as a "passenger-grade AAV" and claimed the event was a "significant milestone on the path to offering Urban Air Mobility (UAM) worldwide." These statements were misleading. As revealed by the Wolfpack Research Report, the EH216 was not approved to transport passengers by EASA, autonomously or otherwise. The conspicuous absence of the key qualifier "trial" from the Chinese language version of the press release suggests that EHang was attempting to mislead the intended audience for that version of the press release as to the scope of its regulatory approval to conduct operations in Austria.

151.    On December 28, 2020, EHang issued a press release titled "EHang Launches Aerial Tourism Services with Strategic Partner Greenland Hong Kong" (the "December 28 2020 Press Release"). In this release, EHang referred to itself as "the world's leading autonomous aerial vehicle ("AAV") technology platform company," and announced "the launch of its own autonomous urban air mobility ("UAM") services with its strategic partner Greenland Hong Kong Holdings Limited . . ."

152.    In the December 28, 2020, Press Release EHang declared "the launch of its own autonomous urban air mobility ("UAM") services with its strategic partner Greenland Hong Kong Holdings Limited" and further stated "[t]he trial services include an aerial sightseeing program and aerial media shows, which will be rolled out in the partner's tourism real estate project (Forest Lake) located in Zhaoqing, a popular tour destination city in Guangdong, China. The Company intends to work jointly with Greenland Hong Kong over time to offer aerial tourism services using its EH216 AAVs in more cities." The release continued:

> The collaboration will start with a flight base in Forest Lake first, independently run by EHang, to offer aerial sightseeing services to passengers. Forest Lake is located close to the new Zhaoqing-Pearl River Delta-Hub Airport, which is under construction. The area offers abundant tourism attractions, including 7 natural lakes and wetlands covering 3 million square meters. Going forward, the two parties will work together to commercialize EHang AAV technologies in various use cases including aerial sightseeing.

* * *

> Edward Xu, Chief Strategy Officer of EHang said, "**We are excited to partner with Greenland Hong Kong to launch trial operations of the EH216 and bring our safe, green and comfortable UAM services to local residents.** As an AAV technology platform company and a UAM operator, we are steadily rolling out global trial operations and will further work with our partners to build more UAM networks."
>
> **The Company sees various advantages of its EH216 AAVs to conventional single-propeller helicopters, such as higher safety level, lower noise level, lower costs, and zero emissions.** Powered by fossil fuel, helicopters discharge significant

amounts of green-house gases and have high failure risks. Yet they are more expensive to operate with pilots. Given the key advantages, EHang believes its EH216 AAVs have the potential to become a new travel vehicle for low-altitude aerial sightseeing.

(Emphasis added).

153.    The December 28, 2020, Press Release contained false and misleading statements. First, and most crucially EHang announcing it would be commencing "trial operations" for passenger and sight-seeing omitted to reveal that it did not have a CoA for passenger flight for any of its products much less for tourist operations. Without a CoA from a regulator, EHang could not perform any sort of manned flight.

154.    Second, EHang refers to "advantages" of its products relative to "conventional. . . helicopters" including "high safety level, lower costs and zero emissions." Helicopters are an existing, licensed, regulated technology with CoAs from relevant regulators. EHang products have never met the standard every commercial helicopter has. Stating that EHang's products are safer than helicopters is untrue. Additionally, EHang has never engaged in passenger transport operations because of its lack of a CoA, so there is no basis for estimating what such services might cost. EHang wisely qualifies the future use case of their products as what it "believes" will be a use but states the advantages it sees as factual reality rather than wholly ungrounded, unproven hopes.

155.    On December 29, 2020, EHang issued a press release entitled "China's First National Standard for Express Delivery Service by Unmanned Aircraft Jointly Formulated by EHang will be Effective from January 1, 2021" (the "December 29 Press Release").

156.    In this release, EHang stated:

As the world's leading autonomous aerial vehicle ("AAV") technology platform company and the UAM industry pioneer, **EHang has proprietarily developed a complete suite of intelligent aerial logistics solutions**, including the EH216L

heavy-lift AAV for short-to-medium-haul aerial transport, the Falcon medium-sized AAV for urban express delivery, the unmanned aircraft systems, take-off and landing control sites and intelligent self-express service machines. With abundant operating experience, service workflow and practical data, EHang made significant contribution to the groundbreaking for the Standard based on its industry expertise and valuable insights.

With the implementation of the Standard, **EHang will continue to accelerate regular operations of its intelligent AAV technologies for aerial logistics, and provide customized solutions for clients from various sectors including logistics, retail, e-commerce and offshore oil and gas** by helping them improve efficiency at lower costs.

(Emphasis added).

157.    EHang's descriptions of its products and capabilities in the Press Release was misleading and omitted to reveal material facts. As stated in the Wolfpack Research Report, EHang has nothing resembling a "complete suite of intelligent aerial logistics solutions." At best, it has created a vehicle, the EH216, that purports to fly independently but has not been approved by an aviation regulator to do so outside narrow test conditions. The EH216 is not certified to carry passengers. It is not allowed to operate in urban environments. It does not conduct the transportation of goods. As a product, the EH216 is not licensed to, and as alleged in the Wolfpack Research Report, is not capable of performing any function of logistics. To refer to this as a "complete suite of intelligent aerial logistics solutions" is materially misleading.

158.    EHang's further references to "provide customized solutions for clients from various sectors including logistics, retail, e-commerce and offshore oil and gas" is misleading because of the fact that EHang did not have customers in those industries, nor certified products capable of meeting needs for such clients, if they were ever to exist.

159.    On January 21, 2021, EHang issued a press release entitled "EHang Joins European Union's AMU-LED Project to Demonstrate Urban Air Mobility." In this release, EHang referred to itself as "the world's leading autonomous aerial vehicle ("AAV") technology platform company

with about 10,000 incident-free flights . . . ." In this release, EHang further stated that "[t]hroughout

2022, Ehang will perform trial operations of the EH216, its flagship two-seat passenger-grade

AAV, in three countries: Spain, the United Kingdom and the Netherlands." EHang further stated

that its:

> Participation in the AMU-LED project will enable EHang to demonstrate the
> benefits of its leading AAV products and technology platform solutions.
> EHang products enable smart city management, shorten the travel time of both people and
> goods, and reduce air pollution and traffic accidents. EHang believes the AMU-
> LED is a great opportunity to demonstrate the promise of autonomous air taxis and
> further inspire the global UAM community to develop new product innovations and
> enabling legal frameworks.
>
> As the world's first publicly-listed UAM company **to achieve global
> commercialization of its passenger-grade AAVs**, EHang has been paying
> attention to the development of the European market. EHang has achieved multiple
> milestones in UAM development in Europe. **In 2020, the Company made great
> regulatory breakthroughs by obtaining flight permits for the EH216 from the
> civil aviation authorities of Norway and Austria.** So far it has expanded its UAM
> Pilot City Initiative to three cities in Austria and Spain, and established strategic
> UAM partnerships with FACC, the leading Austrian aerospace company and
> Vodafone, one of the world's biggest telecoms and technology service providers.

(Emphasis added).

160.    EHang's statement that it is "the world's first . . . company to achieve global

commercialization of its passenger-grade AAVs" was false and misleading when made. EHang

had obtained prior regulatory approvals to allow for its AAVs to take off and land in various

jurisdictions but had not obtained any approvals for "commercialization" of its AAVs.

Characterizing its AAVs as "passenger-grade" was misleading as EHang had no approvals for its

AAVs to carry passengers on a commercial basis.

161.    On January 27, 2021, EHang issued a press release entitled "The World's Leading

AAV Provider EHang Wins Urban Air Mobility Call from Paris Region." In the release, EHang

referred to itself as "the only commercialized passenger-grade AAV solution provider and a

pioneer of urban air mobility." As discussed in ¶¶ 139, 143, 146, 153 – 154 above, claiming that EHang was a "commercialized passenger-grade AAV solution provider" was materially false and misleading.

162.    On February 5, 2021, EHang issued a press release entitled "EHang to Demonstrate Medical Air Mobility via Participation in EU-supported SAFIR-Med Project." EHang stated that it "will use EH216, its flagship two-seat passenger-grade AAV, and its Falcon medium-sized AAV to transport medical supplies in urban environment." EHang further wrote:

> Using its expertise and abundant experience, EHang will help formulate a performance assessment and recommendations report, which will refine the current U-space architecture principles, propose operational procedures and mechanisms for an effective interface between Air Traffic Control . . . and U-Space service providers, and suggest a set of Urban Air Mobility . . . indicators to complement the existing smart urban mobility indicators used by European cities.

> * * *

> Leveraging its past regulatory breakthroughs and comprehensive partnership network, Ehang will expand its global flight tour to more cities and showcase its leading AAV products and solutions in various use cases including passenger commuting and emergency medical transport, etc. As the world's first listed UAM company **to achieve global commercialization of its passenger-grade AAVs,** EHang is also well positioned to work with all parties to facilitate product innovations and construction of a UAM legal framework in Europe.

163.    As discussed in ¶161 above, claiming that EHang had "achieve[d] commercialization of its passenger-grade AAV" was materially false and misleading.

### ADDITIONAL INDICIA OF SCIENTER

164.    As alleged herein, Defendants acted with scienter since Defendants knew, or in reckless disregard for the truth should have known, that when the statements in ¶¶ 86 - 163, issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of

such statements or documents as primary violations of the federal securities laws. As set forth

elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information

reflecting the true facts about EHang, their control over, and/or receipt and/or modification of

EHang's allegedly materially misleading misstatements and/or their associations with the

Company which made them privy to confidential proprietary information about EHang,

participated in the fraudulent scheme alleged herein.

I.      **EHang's Publication of Differing Versions of English and Chinese Language Press Releases That Omitted Key Qualifiers When Describing Regulatory Approvals**

165.    As noted above, the Wolfpack Research Report alleged, and Lead Plaintiff's

investigation confirmed, that EHang made different claims regarding regulatory approvals in the

English and Chinese versions of several press releases – telling two different stories to different

audiences. EHang omitted, for example, the qualifier "trial" from the English language press

release on May 27, 2020, describing a regulatory approval granted to its vehicles by the CAAC

but included it in the Chinese language version of the same press release. In other press releases,

EHang omitted similar qualifiers from its Chinese language versions describing approvals

granted by regulators in the US, notably the FAA, as well as regulators in Canada, and Europe.

166.    EHang's May 27, 2020, press release about the CAAC's trial approval of

EHang's operation as a logistics company serves as the mirror image of the Company's earlier

January 8, 2020, press release about its trial flight in North Carolina. In each case, the Company

included the word "trial" to qualify the scope of the regulatory approval obtained in the version

of the press release distributed to audiences more likely to be familiar with the regulator in

question but omitted it from press releases directed to others. Investors reading the English

language version of both press releases would be left with the impression that regulators in the

People's Republic of China had given EHang more meaningful approvals than the FAA, whereas investors reading the Chinese language version of the press releases would draw the opposite conclusion. This omission is not a trivial error attributable to mistranslation, but rather direct evidence of an attempt to mislead investors. Altering key qualifying language in different language versions of the same press release is an intentional act, strongly suggestive of scienter.

## II.    EHang's Ineffective Responses to the Wolfpack Research Report

167.    With the Company's stock in freefall, Defendants moved quickly to respond to the Wolfpack Research Report, releasing a press release at approximately 6:51 PM EST on February 16, 2021, entitled "EHang Responds to Deceptive Wolfpack Research Report." The Company's initial response to the Wolfpack Research Report was essentially limited to a generalized assertion that the short report wasn't reliable but contained no detailed refutations of specific claims.

168.    The two-paragraph press release issued on February 16, 2021, simply stated that "[t]he Company strongly believes that the report contains numerous errors, unsubstantiated statements, and misinterpretation of information," and, promised to "consider any necessary and appropriate course of action to protect the interest of the Company and all of its shareholders."

169.    The next day, on February 17, 2021, EHang put out a press release entitled "A Brief Explanation on EHang's Mission, Technological Advancements and Why the Short-Seller is Wrong." The press release was limited to Defendant Hu's carefully worded responses to nine questions, apparently posed by Company, without follow-ups, documentary support, or corroborating evidence of any kind. The questions included such puzzlers as "Why did you start EHang? What is EHang's mission?" and "Can you please tell us your own experience of riding on EH216?"

170.    When he did address allegations made in the Wolfpack Research Report, Defendant Hu offered no evidence supporting his assertions, and, in a few instances, conspicuously avoided directly refuting what the short report had alleged.

171.    As to Kunxiang, Defendant Hu asserted that "Kunxiang has never been a shareholder of EHang *prior to our IPO*." (Emphasis added). Tellingly, Hu did not deny that Kunxiang had made an investment in EHang through some other means, offered no other details concerning the sales contract between EHang and Kunxiang, and failed to explain, contextualize, or even address EHang's apparent difficulties with collecting on revenues attributable to the Kunxiang contract.

172.    As to the "practically empty" so-called "production facilities" in Guangzhou, Defendant Hu demurred, claiming that EHang's facility "spans a total area of 8,750 square meters" and reiterating the Company's previous projections about the productive capacity of the new facility in Yunfu. These statements do not refute the conclusions drawn in the Wolfpack Research Report—a building can be both vast and empty.

173.    Finally, as to the lawsuit allegedly affecting EHang GZ, Defendant Hu stated that EHang GZ was not a defendant and that the matter related to a dispute with a pre-IPO shareholder. Without reference to any legal doctrine, memorandum, opinion letter or supporting evidence of any kind, Defendant Hu asserted that the lawsuit would not "have any material adverse impact on EHang's business or results of operations."

174.    On February 18, 2021, EHang released yet another press release featuring a carefully edited promotional video allegedly showcasing the new manufacturing facility in Yunfu where "production of EHang AAVs is expected to start in the second quarter of 2021" and promising an "onsite investors day" in late June 2021. Far from contradicting the Wolfpack

Research Report, this press release essentially confirmed that EHang did not "build" the facility in Yunfu and had not "started to ramp up. . . production" in noting that the "retrofitting process of **the existing building**" (emphasis added) was ongoing and the actual manufacture of AAV's wouldn't start for months. The included promotional video essentially confirmed Wolfpack Research's suggestion that "[a]t best, some areas [of the Yunfu facility] may have been staged for pictures to be used in a future press release." The mere promise of an "onsite investors day" several months in the future during a global pandemic did nothing to rebut the claims made in the Wolfpack Research Report.

175.    On February 19, 2021, EHang released another press release entitled "EHang Further Rebuts Short-Seller's Allegations Concerning its Relationship with Kunxiang." The release was little more than a rehash of Defendant Hu's statements from two days prior, including the unsupported assertions that Kunxiang "is one of EHang's customers but it is not a related party of EHang" and "Kunxiang had never been a shareholder of EHang prior to its IPO" and further that "Kunxiang has never purchased any shares from EHang after its IPO." A hyperlink in the press release purportedly linked to a version of the Kunxiang contract, which, based on the description, appears to have been the same document that had previously been submitted to the SEC. Unfortunately, the link is no longer functional.

176.    Finally, on February 22, 2021, EHang put out a final press release addressing the Wolfpack Research Report, asserting that "Kunxiang is only one of EHang's many customers and it is not a related party of EHang," and setting out a table allegedly detailing the number of units sold to Kunxiang in 2019, the contract price, associated revenues derived from those sales and the percentage of total revenues that those sales collectively represented. A separate table included the reference numbers for the vehicles allegedly sold to Kunxiang, the model number

(either the older EH116 or the EH216) and an approximate location where the vehicles were allegedly delivered. The press release also linked to a video, posted on EHang's official YouTube channel, allegedly showing "selected public trial flight activities by Kunxiang."

177.    The February 22, 2021, press release contained no new information, it merely summarized the information already available through the SEC and referenced in the Wolfpack Research Report. Further, if it shows anything, the promotional video allegedly showing Kunxiang's use of the EH216 undercuts the claim that EHang and Kunxiang are not closely related. Based on the video, it appears that Kunxiang purchased EHang vehicles, prominently displaying the EHang logo inside and out, merely to conduct a series of brief test flights at public events frequently featuring banners describing EHang's alleged accomplishments, while being filmed on the ground and in the air by EHang videographers to bolster the case for the, as yet, unlicensed, but theoretically possible, commercial uses of those same vehicles. Kunxiang is either an unbelievably forward looking and supportive customer, or there is more to the relationship between the two companies than EHang has acknowledged.

178.    Put simply, nearly a week after the Company's stock went into freefall, EHang had essentially nothing to offer investors beyond a handful of unsupported assertions and promotional videos. Those offerings came with no disclosures of additional information to contextualize, update, explain or describe the apparent irregularities with one of the Company's major customers and, notably, EHang made essentially no attempt whatsoever to disprove, refute or even address any of the myriad claims in the other thirty-two pages of the report's findings.

III.    **The Individual Defendants Personally Benefitted Directly and Concretely from the False Statements and Omissions**

60

179.    During the Class Period, the Individual Defendants personally benefitted directly and concretely from the false and misleading statements alleged herein in at least three ways: the pre-IPO pledge of EHang ADS to secure a loan, the direct sale of EHang ADS during the Class Period, and the sale of Guangzhou EHang Intelligent Technology Co. Ltd. while the price of the Company's ADS was inflated.

180.    First, as set out above, based on a judgment dated December 25, 2020, uncovered by Lead Plaintiff's investigation, prior to EHang's IPO, Defendant Hu pledged to sell 1,679,557 shares of EHang to Highest Glory Limited (HGL) in order to secure a loan. Specifically, on December 25, 2018, Defendant Hu and HGL's Chinese affiliate, Shenzhen Join-Share Equity Investment Center (L.P.), signed a loan agreement, under which the Shenzhen entity offered a RMB 50 million loan to Defendant Hu, in exchange for his shares at EHang after the IPO.

181.    Second, at least two of the Individual Defendants sold EHang ADS directly during the Class Period while the price of the stock was artificially inflated based on the false and misleading statements above.

182.    While defendants have conspicuously avoided making disclosures about insider transactions, in the Prospectus filed on Form 424B4 with the SEC on December 12, 2019, in the "Principal Shareholders" section EHang identified the Individual defendants as owning the following shares owned before the IPO:

| Defendant | Number of Ordinary Shares | % | Class A Ordinary Shares | Class B Ordinary Shares | Total Ordinary Shares on an as-Converted Basis | % of Beneficial Ownership | % of Aggregate Voting Power |
|---|---|---|---|---|---|---|---|
| Def. Hu | 45,422,663 | 45.6 | 800000 | 45,422,663 | 46,222,663 | 43.6 | 88.4 |
| Def. Liu | 1,300,000 | 1.3 | 1,300,000 | - | 1,300,000 | 1.2 | .3 |
| Def. Xu | - | - | - | - | - | - | - |
| Def. Xiong | 3,365,313 | 3.4 | 3,365,313 | - | 3,365,313 | 3.2 | .07 |

183.    While under SEC rules EHang insiders, including the Individual Defendants, are

not obligated to Schedule 13D forms identifying their individual transactions at or near the time

they take place, similar figures from EHang's belatedly filed form 20-F for 2020, filed June 15,

2021, revealed that Defendant Hu and Defendant Xiong sold considerable volumes of EHang

ADS during the Class Period. The 20-F filed June 15, 2021 (the "2020 20-F") reflects as follows:

| Defendant | Class A Ordinary Shares | Class B Ordinary Shares | Total Ordinary Shares on an as-Converted Basis | % of Beneficial Ownership | % of Aggregate Voting Power | Change During the Class Period |
|---|---|---|---|---|---|---|
| Defendant Hu | 670,258 | 44,992,555 | 45,662,813 | 41.2 | 87.4 | -559,850 |
| Defendant Liu | 1,387,500 | - | 1,387,500 | 1.2 | .3 | +87,500 |
| Defendant Xu | - | - | - | - | - | - |
| Defendant Xiong | * | * | * | * | * | * |

184.    Based on what has been disclosed, it is apparent that during the Class Period,

Defendant Hu sold at least 559,850 shares of EHang ADS. Defendant Xiong's holdings are not

reported in the 2020 20-F.

185.    Third, EHang's 2020 20-F, notes that both Defendant Hu and Defendant Xiong

sold their 95% and 5% respective ownership interests in EHang's variable interest entity, EHang

GZ or the VIE, "during 2020." The sale was made possible via interest-free loans of RMB

60,000,000, about $9.228 million, provided from EHang Intelligent Equipment (Guangzhou)

Co., Ltd. to two EHang employees so that they could purchase Defendant Hu and Defendant

Xiong's equity in the VIE.

186.    EHang is, and throughout the Class Period was, a "controlled company" under the

Nasdaq Stock Market Rules because Defendant Hu, its founder, chairman of the board of

directors and chief executive officer, owned more than 50% of the company's total voting power.

187.    Thus, the sale of the VIE during the period when the value of EHang's ADS were inflated both directly and concretely benefitted Defendant Hu and Defendant Xiong, and, further, given Defendant Hu's control over the Company, he was effectively on both sides of this transaction – approving the issuance of zero-interest loans to one set of company insiders to facilitate payments to himself.

188.    These direct and concrete financial gains and the misuse of the corporate form to facilitate self-dealing were facilitated, in part, by the weakness of EHang's internal controls. In particular, EHang's Prospectus and Form 20-F filed April 20, 2020, identified "two material weaknesses in [EHang's] internal control over financial reporting." First, the Company acknowledged a "lack of sufficient accounting and financial reporting personnel with requisite knowledge of and experience in application of U.S. GAAP and SEC rules," and second a "lack of financial reporting policies and procedures that are commensurate with U.S. GAAP and SEC reporting and compliance requirements."

189.    These problems persisted throughout the Class Period The 2020 20-F identified the Company's efforts to hire additional accounting and financial reporting personnel, it also identified two new material weaknesses, namely "lack of sufficient controls for properly tracking the shipping records of the AAVs" and "monitoring the collection of accounts receivables on a timely basis." Both of these new issues lend support to the conclusions reached in the Wolfpack Research Report.

## IV.    EHang's Extremely High Proportion of Accounts Receivable is Strongly Indicative of Fraud

190.    As of February 16, 2021, EHang had only collected a fraction of its reported sales since its IPO on December 12, 2019.

191.     Before the publication of the Wolfpack Research Report, EH had reported approximately $18 million in total revenues following its IPO.

192.     During the same period, its accounts receivable balance increased by approximately $14.4 million.

193.     Thus, EHang had actually collected only approximately $3.6 million in cash since becoming a publicly traded company.

194.     The diminutive share of sale proceeds collected, combined with longstanding unpaid balances exceeding the timespan covered by EHang's purportedly offered credit terms are, taken together, strongly indicative of fabricated revenues.

195.     Even if sales before the IPO are accounted for, before the publication of the Wolfpack Research Report, EHang had trailing 12 months of revenues of less than $10 million supporting a total market capitalization approaching $7 billion.

## LOSS CAUSATION

196.     As alleged herein, Defendants made materially false and misleading statements, omitted to disclose facts necessary to make the statements made not misleading and engaged in a scheme and a course of conduct that artificially inflated the price of EHang ADS during the Class Period.

197.     Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased EHang ADS at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased EHang ADS at the artificially inflated prices at which they traded during the Class Period.

198.     The truth was revealed via a corrective disclosure, the Wolfpack Research Report, that was disseminated on February 16, 2021, at approximately 1:53 pm EST.  Following the

64

release of the Wolfpack Research Report, the price of EHang ADS fell precipitously as the artificial inflation caused by Defendants' unlawful conduct dissipated.

199.    EHang's ADS closed at $124.09 on Friday February 12, 2021, and opened for trading on February 16, 2021, at $123.50. It traded between $124 and $120 per share until just before 2 pm when Wolfpack released its short report. Thereafter, EHang's stock plunged by 59% to close at $46.30 per share and trading volume spiked after 2 pm on February 16, 2021. The price of EHang ADS fell from its prior trading day[3] close on February 12, 2021, of $124.09 to a February 16, 2021, close of $46.30 per share, a one-day drop of $77.79 per share or approximately 62.7%.

200.    The decline in the price of EHang ADS during this period is directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions prior to and during the Class Period. The revelations in the Wolfpack Research Report contradicted statements made by Defendants during the Class Period and were a substantial causal element of the concurrent decline in the Company's share price

201.    As a result of their purchases of EHang ADS during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  Defendants' materially false and misleading statements had the intended effect and caused EHang ADS to trade at artificially inflated levels throughout the Class Period and caused inflation in EHang's stock price.

202.    By concealing the adverse facts detailed herein from investors, Defendants presented a false and misleading picture of EHang's business.  As the truth about the Company

---

[3] February 12, 2021 fell on a Friday, and the NASDAQ was closed the following Monday, February 15, 2021 in observance of Presidents Day.

and the extent of the fraud was revealed to the market, the price of EHang ADS fell significantly.

This decline removed the inflation from the price of EHang ADS, causing real economic loss to

investors who had purchased EHang ADS during the Class Period.

203.    Moreover, the market for EHang ADS was open, well-developed, and efficient at

all relevant times.  As a result of Defendants' misstatements and material omissions, as alleged

herein, EHang ADS traded at artificially inflated prices.  Lead Plaintiff and other Class members

purchased EHang ADS relying on the integrity of the market relating to EHang ADS and

suffered economic losses as a result.

204.    This news was widely reported to the market.  For example, on February 17, 2021

CNN published a news article with the headline "Chinese drone company EHang's shares

plunged 63% after fraud claim" discussing the Wolfpack Research Report, calling it "scathing"

and "detailed" and noting that investors had been "dumping shares" following its release.

205.    The February 16, 2021, publication of the Wolfpack Research Report, and the

related news coverage reporting on EHang's representations about its intellectual property,

manufacturing capabilities, products, and prospects for regulatory approval, was a foreseeable

consequence of, and within the zone of the risk concealed by, the Defendants' misrepresentations

and omissions.

## CONTROL PERSON ALLEGATIONS

206.    The Individual Defendants, by virtue of their high-level and controlling positions

at EHang, directly participated in the management of the Company, were directly involved in the

day-to-day operations of the Company at the highest levels and were privy to confidential

proprietary information about the Company, its business, operations, internal controls, growth,

financial statements, and financial condition as alleged herein.  As set forth below, the materially

misstated information conveyed to the public was the result of the collective actions of these individuals.

207.     Defendants Hu, Liu, Xu and Xiong as senior executive officers of EHang —a publicly-traded company whose American Depository Shares were, and are, traded on the NASDAQ, and governed by the federal securities law—each had a duty to disseminate prompt, accurate, and truthful information about the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of EHang's publicly traded common stock would be based on accurate information.  The Individual Defendants each violated these requirements and obligations during the Class Period.

208.     Defendants Hu, Liu, Xu and Xiong (prior to June 2020), because of their positions of control and authority as senior executive officers of EHang, were able to and did control the content of EHang's SEC filings, press releases, and other public statements issued by or on behalf of EHang during the Class Period.  Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements alleged herein.

209.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of EHang ADS by disseminating materially false and misleading information and concealing and omitting material adverse facts.  The scheme deceived the investing public regarding EHang's business,

operations, and management, and the intrinsic value of EHang's ADS, and caused Lead Plaintiff and members of the Class to purchase EHang's ADS at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

210.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Ehang ADS during the Class Period (the "Class). Excluded from the Class are Defendants, directors and officers of the Company, as well as members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

211.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, EHang ADS were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by EHang or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. The disposition of such claims in a class action will provide substantial benefits to the parties and the Court.

212.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal securities laws set forth below.

213.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

214.    There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. The common questions of law and fact common to the Class include the following:

i.    whether the federal securities laws were violated by Defendants' acts and omissions during the Class Period as alleged herein;

ii.    whether Defendants' public statements during the Class Period misrepresented material facts about EHang's business and operations;

iii.    whether Defendants' public statements during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

iv.    Whether Defendants acted knowingly or recklessly in making statements during the Class Period about EHang's business and operations that were false and misleading;

v.    Whether the price of the EHang's ADS was artificially inflated because of the Defendants' conduct described herein; and

vi.    The extent of damage sustained by Class members and the appropriate measure of damages.

215.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy as joinder of all Class members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FRAUD ON THE MARKET**

216.    Lead Plaintiff will rely on the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

  i.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

  ii.  The omissions and misrepresentations were material;

  iii.  The Company's ADS traded in an efficient market;

  iv.  The Company's ADS were liquid and traded with moderate to heavy volume during the Class Period;

  v.  The misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's ADS; and

  vi.  Lead Plaintiff and other members of the class purchased acquired and/or sold the Company's ADS between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

217.  For these reasons, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance on the integrity of the market.

218.  Lead Plaintiff and the Class relied on the price of the Company's ADS, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

219.  The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

220.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

221.    The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.  First, many statements alleged to be false and misleading relate to historical facts or existing conditions.  Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

222.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

223.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.  To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had passed or manifested.

224.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of EHang who knew that the statement was false when made.

**Count One**
**Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

225.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

226.    During the Class Period, Defendant EHang and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

227.    Defendant EHang and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

228.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's ADS. Plaintiff and the Class would not have purchased the Company's ADS at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count Two**
**Violation of § 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

229.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

230.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Lead Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

### PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Lead Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)    awarding compensatory and punitive damages in favor of Lead Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)    awarding Lead Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)    awarding Lead Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Lead Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: April 25, 2022

Respectfully submitted,

*/s/ Jeffrey C. Block*
Jeffrey C. Block
Jacob Walker (*admitted pro hac vice*)
Brendan T. Jarboe (*pro hac vice forthcoming*)
Bryan J. Jennings (*pro hac vice forthcoming*)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
brendan@blockleviton.com
bryan@blockleviton.com

*Attorneys for Plaintiff and Lead Counsel*