# Exhibit 1

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 20-F

(Mark One)

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Date of event requiring this shell company report

For the transition period from to

Commission file number 001-39151

# EHang Holdings Limited

(Exact name of Registrant as specified in its charter)

**N/A**
(Translation of Registrant's name into English)

**Cayman Islands**
(Jurisdiction of incorporation or organization)

**Building C, Yixiang Technology Park**
**No.72 Nanxiang Second Road, Huangpu District**
**Guangzhou, 510700**
**People's Republic of China**
(Address of principal executive offices)

**Richard Jian Liu**
**Chief Financial Officer**
**EHang Holdings Limited**
**Building C, Yixiang Technology Park**
**No.72 Nanxiang Second Road, Huangpu District**
**Guangzhou, 510700**
**People's Republic of China**
**Phone: +86 20 2902 8899**

(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| American depositary shares, each representing two Class A ordinary shares, par value US$0.0001 per share | EH | The Nasdaq Global Market |
| Class A ordinary shares, par value US$0.0001 per share* | | The Nasdaq Global Market* |

\* Not for trading, but only in connection with the listing on the Nasdaq Global Market of American depository shares, each representing two Class A ordinary shares

Securities registered or to be registered pursuant to Section 12(g) of the Act:

None

**Table of Contents**

## FORWARD-LOOKING INFORMATION

**Special Note Regarding Forward-Looking Statements**

This annual report contains forward-looking statements that reflect our current expectations and views of future events. These forward-looking statements are made under the "safe-harbor" provisions of the U.S. Private Securities Litigation Reform Act of 1995. Known and unknown risks, uncertainties and other factors, including those listed under "Item 3. Key Information—D. Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to," "potential," "continue" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

- our goals and strategies;
- our future business development, financial conditions and results of operations;
- the expected growth of the PRC and global UAV industry;
- our expectations regarding the demand for and market acceptance of our products and services;
- our expectations regarding our relationships with distributors, customers, component suppliers, strategic partners and other stakeholders;
- our expectations regarding our capacity to develop, manufacture and delivery AAV products in fulfilment of our contractual commitments;
- competition in our industry;
- relevant government policies and regulations relating to our industry; and
- assumptions underlying or related to any of the foregoing.

These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations. Other sections of this annual report include additional factors that could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. You should read thoroughly this annual report and the documents that we refer to with the understanding that our actual future results may be materially different from, or worse than, what we expect. We qualify all of our forward-looking statements by these cautionary statements.

This annual report contains certain data and information that we obtained from various government and private publications. Statistical data in these publications also include projections based on a number of assumptions. The AAV industry may not grow at the rate projected by market data, or at all. Failure of this market to grow at the projected rate may have a material adverse effect on our business and the market price of our ADSs. In addition, the rapidly evolving nature of the AAV industry results in significant uncertainties for any projections or estimates relating to the growth prospects or future condition of our market. Furthermore, if any one or more of the assumptions underlying the market data are later found to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward-looking statements.

2

**Table of Contents**

**PART I**

**ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3. KEY INFORMATION**
**A.**    **Selected Financial Data**

The following selected consolidated statements of comprehensive loss data for the years ended December 31, 2017, 2018 and 2019 and selected consolidated balance sheet data as of December 31, 2018 and 2019 and selected consolidated cash flow data for the years ended December 31, 2017, 2018 and 2019 have been derived from our audited consolidated financial statements included in this annual report beginning on page F-1. The following selected consolidated balance sheet data as of December 31, 2017 have been derived from our audited consolidated financial statements not included in this annual report. Our historical results for any period are not necessarily indicative of results to be expected for any future period. The selected consolidated financial data should be read in conjunction with, and are qualified in their entirety by reference to, our audited consolidated financial statements and related nots and "Item 5. Operating and Financial Review and Prospects" below. Our consolidated financial statements are prepared and presented in accordance with U.S. GAAP.

The following table presents our selected consolidated statements of comprehensive loss data for the years indicated:

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019(2) | |
| | RMB | RMB | RMB | US$ |
| | | (in thousands) | | |
| **Total revenues** | **31,695** | **66,487** | **121,814** | **17,497** |
| **Costs of revenues(1)** | **(27,511)** | **(32,740)** | **(50,596)** | **(7,268)** |
| **Gross profit** | **4,184** | **33,747** | **71,218** | **10,229** |
| **Operating expenses:** | | | | |
| Sales and marketing expenses(1) | (30,357) | (20,174) | (26,855) | (3,857) |
| General and administrative expenses(1) | (35,387) | (35,939) | (36,948) | (5,307) |
| Research and development expenses(1) | (68,669) | (60,276) | (57,167) | (8,212) |
| **Total operating expenses** | **(134,413)** | **(116,389)** | **(120,970)** | **(17,376)** |
| **Other operating income** | 4,312 | 8,293 | 3,407 | 489 |
| **Operating loss** | **(125,917)** | **(74,349)** | **(46,345)** | **(6,658)** |
| **Other income/(expense):** | | | | |
| Interest income | 174 | 1,057 | 883 | 127 |
| Interest expenses | — | (564) | (837) | (120) |
| Foreign exchange gain/(loss) | 440 | 70 | 109 | 16 |
| Loss on deconsolidation of subsidiaries | (45) | — | — | — |
| Other income | 44,113 | 1,690 | 440 | 63 |
| Other expense | (156) | (8,129) | (1,416) | (203) |
| **Total other income/(expense)** | **44,526** | **(5,876)** | **(821)** | **(117)** |
| **Loss before income tax and share of net loss from an equity investee** | **(81,391)** | **(80,225)** | **(47,166)** | **(6,775)** |
| Income tax expenses | (5,184) | (76) | (754) | (108) |
| **Loss before share of net loss from an equity investee** | **(86,575)** | **(80,301)** | **(47,920)** | **(6,883)** |
| Share of net loss from an equity investee | — | (162) | (74) | (11) |
| **Net loss** | **(86,575)** | **(80,463)** | **(47,994)** | **(6,894)** |

(1)    Share-based compensation expense was allocated in costs of revenues and operating expenses as follows:

3

Table of Contents

|  | For the Year Ended December 31, | | | |
|  | 2017 | 2018 | 2019 | |
|  | RMB | RMB | RMB | US$ |
|  | | (in thousands) | | |
| Costs of revenues | 1,024 | 707 | 365 | 52 |
| Sales and marketing expenses | 2,851 | 1,932 | 743 | 107 |
| General and administrative expenses | 16,400 | 11,606 | 8,520 | 1,224 |
| Research and development expenses | 11,889 | 8,055 | 5,119 | 735 |
| **Total** | **32,164** | **22,300** | **14,747** | **2,118** |

(2)  We adopted ASU No. 2014-09, "Revenue from Contracts with Customers (Topic 606)," using the modified retrospective transition approach beginning from January 1, 2019. The adoption did not have a significant impact on our operating results for the year ended December 31, 2019 and the comparable periods.

The following table presents our selected consolidated balance sheet data as of the dates indicated:

|  | As of December 31, | | | |
|  | 2017 | 2018 | 2019 | |
|  | RMB | RMB | RMB | US$ |
|  | | (in thousands) | | |
| Cash and cash equivalents | 61,455 | 61,519 | 321,662 | 46,204 |
| Short-term investments | 39,000 | — | 7,674 | 1,102 |
| Accounts receivable, net | 6,248 | 2,538 | 41,103 | 5,905 |
| Unbilled revenue | — | — | 4,807 | 690 |
| Cost and estimated earnings in excess of billings | — | 18,411 | 14,212 | 2,041 |
| Inventories | 1,398 | 3,917 | 18,490 | 2,656 |
| Prepayments and other current assets | 22,251 | 15,369 | 20,565 | 2,954 |
| Property, plant and equipment, net | 19,496 | 19,058 | 16,272 | 2,337 |
| **Total assets** | **153,298** | **124,671** | **449,413** | **64,553** |
| Short-term bank loan | — | 5,000 | 5,000 | 718 |
| Accounts payable | 13,742 | 14,659 | 27,285 | 3,919 |
| Accrued expenses and other liabilities | 17,920 | 31,197 | 53,310 | 7,658 |
| Long-term loans | — | — | 32,534 | 4,673 |
| **Total liabilities** | **38,434** | **62,247** | **134,058** | **19,256** |
| **Total mezzanine equity** | **604,741** | **604,741** | **—** | **—** |
| **Total shareholders' (deficit)/equity** | **(489,877)** | **(542,317)** | **315,355** | **45,297** |

The following table presents our selected consolidated cash flow data for the years indicated:

|  | For the Year Ended December 31, | | | |
|  | 2017 | 2018 | 2019 | |
|  | RMB | RMB | RMB | US$ |
|  | | (in thousands) | | |
| Net cash used in operating activities | (38,432) | (42,985) | (55,518) | (7,975) |
| Net cash (used in)/provided by investing activities | (51,068) | 25,326 | (10,988) | (1,578) |
| Net cash provided by financing activities | 34,300 | 16,000 | 325,302 | 46,727 |
| Effect of exchange rate changes on cash and cash equivalents | 7,677 | 1,723 | 1,347 | 193 |
| Net (decrease)/increase in cash and cash equivalents | (47,523) | 64 | 260,143 | 37,367 |
| Cash and cash equivalents at the beginning of the year | 108,978 | 61,455 | 61,519 | 8,837 |
| Cash and cash equivalents at the end of the year | 61,455 | 61,519 | 321,662 | 46,204 |

**B.**   **Capitalization and indebtedness.**

Not applicable.

**C.**   **Reasons for the offer and use of proceeds.**

Not applicable.

4

Table of Contents

**D.    Risk factors.**

**Risks Relating to Our Business and Industry**

*Our future growth depends on the demand for, and customers' willingness to adopt, our passenger-grade AAVs and air mobility solutions.*

We operate in the new and evolving AAV industry. Our business and operating results depend in large part on the acceptance of and demand for our passenger-grade AAVs and air mobility solutions. The success of these products and services are and will be subject to risks, including with respect to:

- the extent of market reception and adoption of AAVs as transportation and logistics solutions;
- our navigating a new and evolving regulatory environment;
- our timely fulfillment of product orders;
- our ability to produce safe, high-quality and cost-effective AAVs on an ongoing basis;
- the performance of our AAVs relative to customer expectations and customers' interest in and demand for our passenger-grade AAVs and air mobility solutions; and
- our building a well-recognized and respected brand.

Our failure to manage the risks described above may discourage current or potential customers from purchasing our passenger-grade AAVs or using our AAV commercial solutions, and there may be downward price pressure on our AAVs and commercial solutions. If the market for passenger-grade AAVs or air mobility solutions does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition and operating results will be materially and adversely affected.

*In the jurisdictions where we sell and plan to sell our products, the commercial use of our passenger-grade AAVs, and in some cases our non-passenger-grade AAVs, is subject to an uncertain or lengthy approval process; we cannot predict when regulations will change, and any new regulations may impose onerous requirements and restrictions with which we, our AAVs and our potential customers may be unable to comply. As a result, we may be limited in, or completely restricted from, growing our business in the foreseeable future.*

We operate in a new and rapidly evolving industry, which is subject to extensive legal and regulatory requirements. As described below, in the jurisdictions relevant to us, the commercial use and delivery of our passenger-grade AAVs is and in the near future is expected to continue to be subject to an uncertain or lengthy approval process. We are unable to estimate the average length of time required to obtain the applicable regulatory approvals due to the nascent nature of AAV-related regulations and the lack of relevant precedents. For example, we are not aware of any operator having been granted all required approvals for the commercial operations of passenger-grade AAVs in China, the United States or elsewhere. In addition, PRC and U.S. regulations impose significant restrictions on our non-passenger-grade AAVs. We cannot predict when these regulations will change, and any new regulations may impose onerous requirements and restrictions.

In China, the Civil Aviation Administration of China, or CAAC, has recently published the Guidance on UAV Airworthiness Assessment Based on Operation Risks, or the UAV Airworthiness Guidance, which is based on the assessment classification and management of operational risks of UAVs. For our passenger-grade AAVs, we have obtained written approval issued by the CAAC for trial flights in certain locations in China for the purpose of evaluating their airworthiness and formulating industry standards on airworthiness of passenger-grade AAVs. However, we are not allowed to engage in commercial operation or pilot operation of our passenger-grade AAVs merely with this approval. Groundbreaking rules and regulations with respect to the airworthiness of passenger-grade AAVs are under discussion by the CAAC. We are making contributions as a member of the CAAC Special Expert Taskforce. However, we cannot assure you that we will be able to obtain any of the certificates of airworthiness as required under the detailed rules and regulations in a timely manner or that we can satisfy the relevant requirements or standards under the detailed rules or regulations to be promulgated in the future.

5

Table of Contents

Under the *Pilot Operation Rules (Interim) for Specific Unmanned Aircraft issued by the CAAC* on February 1, 2019, or Interim Rules, to start any specific pilot operation, the prospective operator of certain classes of UAVs must submit an application and be approved by the CAAC. In February 2019, we submitted an application to the CAAC for pilot operation in relation to a customer's use of our EHang 216, a model of our passenger-grade AAVs, in its logistics business. As our application has passed the CAAC's final examination, we currently expect this application to be formally approved with a certificate shortly after the CAAC resumes its normal operations, which are currently affected by the COVID-19 pandemic. However, even if this approval is granted by the CAAC, we cannot assure you that it can be extended to the operations of other customers.

In addition, under the Interim Rules, we may be required to obtain a pilot operation approval for our non-passenger-grade AAVs. In February 2019, we voluntarily submitted an application to the CAAC for pilot operation in relation to a customer's use of our non-passenger-grade AAVs for logistic purposes. We cannot assure you that we will be able to obtain such approval. Even if this approval is granted by the CAAC, we cannot assure you that it can be extended to the operations of other customers or the same customer for other purposes.

Further, we are required to obtain approvals from local divisions of the People's Liberation Army Air Force, or PLAAF, for proposed flight routes in connection with our business. As the approvals from the PLAAF are usually granted on a one-off basis or are only valid for a limited period of time and the local divisions of PLAAF may exercise air traffic control under certain circumstances which may restrict us from operating our AAVs from time to time, we cannot assure you that we will be able to obtain such approval for each matter on which we will work on with our customers or partners in the future. If such approval is not granted in a timely manner, we, our customers or partners will not be able to fly the AAVs in the proposed flight routes.

As we sell our AAV products internationally, we face challenges in quickly and sufficiently familiarizing ourselves with foreign regulatory environments and policy frameworks. If any new regulation is put in place, or a different interpretation of existing regulation is adopted, our ability to manufacture, market, sell or operate our AAVs or to advertise or deliver air mobility solutions in general may be limited or otherwise affected. Failure to comply with applicable regulations or to obtain, maintain or renew the necessary permits, licenses, registrations or certificates could cause delays in, or prevent us from, manufacturing, marketing, selling and operating our AAV products, meeting product demand and expectations, introducing new products or expanding our service coverage, and could materially and adversely affect our operation results. If we are found to be in violation of applicable laws or regulations, we could be subject to administrative punishment, including fines, injunctions, recalls or asset seizures, as well as potential criminal sanctions, any of which could have a material adverse effect on our business, financial condition, results of operations and prospects.

### We may be unable to make timely product deliveries due to limited production capacity.

As of December 31, 2019, we had unfilled purchase orders for 33 passenger-grade AAVs. Commercial production of our passenger-grade AAVs requires timely and adequate supply of various types of raw materials and components, as well as mass production capacity and efficient manufacturing and assembly. We have limited experience in high-volume manufacturing of our AAVs. We cannot assure you that we will be able to expand our production capacity efficiently and cost-effectively, or to procure sufficient raw materials and components to meet our production volume. While we are looking into expanding our manufacturing capacity through partnerships, such partnerships may not be successful, or we may not be able to do so in a timely manner to fulfill our backlog orders. While we obtain components from multiple sources whenever possible, some of the components used in our AAVs are currently selected to be purchased from a single source to improve cost-efficiency. Disruption in the supply of components, whether or not from a single-source supplier, could temporarily disrupt commercial production of our AAVs. We also outsource certain manufacturing activities to third party contract manufacturers. We may experience operational difficulties with our contract manufacturers, including reductions in the availability of production capacity, failure to comply with product specifications, insufficient quality control, failure to meet production deadlines, increases in manufacturing costs and longer lead time.

Any of the foregoing could result in our failure to make timely deliveries to our customers. Such failure would materially and adversely affect our business, results of operations, financial condition and prospects.

6

Table of Contents

*Our framework and conditional agreements may not result in material sales of our products*

We have entered into a number of long-term agreements with customers and partners relating to the sale of our passenger-grade AAVs. Some of these agreements are conditional, and our counterparty is not obligated to purchase our products unless a number of conditions are satisfied. Under our agreement with a U.S. biotechnology customer, the customer is not required to purchase our AAVs unless our AAVs achieve a number of performance milestones and it obtains required approvals from the Federal Aviation Administration, or the FAA, and Food and Drug Administration, or the FDA, for the commercial operation of our AAVs. We have yet to achieve the performance milestones, which allows the customer to terminate the agreement. Further, it may be time-consuming for the customer to obtain the required approvals, if they are able to do so at all. Some other agreements are framework agreements containing sales targets, but that does not obligate our counterparties to purchase our products at all. We expect the number of orders we receive under these framework agreements to depend on a number of factors, including changes in the regulatory environment, customers' acceptance of and demand for our products and services and our production capacity. For the foregoing reasons, we may not receive any substantial orders from our current or potential customers, and we currently do not expect material deliveries to some of our business partners, including the U.S. biotechnology company and a Norwegian automobile distributor. As our long-term agreements may not result in material sales of our products, our future results of operations may not scale or otherwise meet our current expectations.

*We have substantial customer concentration and we have experienced a significant increase in accounts receivable.*

Due to the short history of our business and that we have not achieved significant scale, we had and expect to continue to have customer concentration. In 2018 and 2019, our largest customer accounted for 30% and 24% of our revenues, respectively. There are inherent risks whenever a large percentage of revenues are concentrated with a limited number of customers. We are unable to predict the future level of demand for our services that will be generated by these customers. In addition, our accounts receivable balance significantly increased from RMB2.5 million (US$0.4 million) as of December 31, 2018 to RMB41.1 million (US$5.9 million) as of December 31, 2019. As of December 31, 2019, accounts receivable from top two customers accounted for 73% of our total accounts receivable balance. The credit period for some of our customers, including the largest customer of our AAVs, can be as long as 180 days. If our major customers were to cease purchasing our products or services, cancel existing orders or fail to make payments to us in a timely fashion, our business and results of operation will be materially and adversely affected.

*Our technology platform may not perform in line with customer specifications or expectations.*

Our technology platform, consisting of our AAVs, in-flight operating systems and on-the-ground infrastructure, may not perform in line with customers' expectations. For example, our AAVs may not be as easy to operate or maintain as customers expect. In addition, certain orders of our passenger-grade AAVs are conditioned on their meeting defined technical specifications (such as a specified cruising speed, operational range and payload capacity) according to agreed-upon delivery timetables. See "Item 4. Information on the Company— B. Business Overview—Our AAV Commercial Solutions" for further details. Future customers may also require performance specifications that we are unable to deliver. Some of these target specifications, such as those dependent on battery technology, are constrained by the pace of general technological advancement and the capabilities of our suppliers, which are largely beyond our control.

Our technology platform may contain design or manufacturing defects that result in unsatisfactory performance or require repair. Our technology platform uses a substantial amount of algorithms and software to operate. Software products are inherently complex and often contain defects and errors, especially when first introduced. While we have performed extensive internal testing on our AAV software and hardware systems, we have a limited frame of reference by which to evaluate the long-term performance of our technology platform. There can be no assurance that we will be able to detect and fix any defects in our technology platform before we sell products and services to customers.

If our technology platform is defective or otherwise fails to perform as expected or in accordance with prescribed technical specifications and timetable, our AAVs may experience accidents and we may suffer adverse publicity, order cancellations, revenue declines, delivery delays, product recalls, product liability claims, and significant warranty and other expenses. These consequences could have a material adverse impact on our business, financial condition, operating results and prospects.

*We are a relatively young company with a short operating history, and we may not be able to sustain our rapid growth, effectively manage our growth or implement our business strategies.*

We have been providing AAV commercial solutions since 2014. Although we have experienced growth, our historical performance may not be indicative of our future performance due to our limited operating history. We are currently commercializing our AAVs and air mobility solutions, and have a short history of accepting orders for our AAVs and delivering them to customers for testing purposes. There is only a limited historical basis for making judgments on the demand for our products and services or our ability to produce and deliver AAVs and air mobility solutions, or to become profitable in the future.

7

7

Table of Contents

You should consider our business and future prospects in light of the risks and challenges we face as a new entrant to a nascent industry and to overseas markets, including risks and challenges associated with our ability to:

- provide safe, convenient and effective air mobility solutions;
- maintain reliable, secure, high-performance and scalable infrastructure;
- identify suitable facilities to expand manufacturing capacity;
- navigate the evolving and complex regulatory environment across all the markets in which we operate;
- anticipate and adapt to changing market conditions, including technological developments and changes in the competitive landscape, and adjust, manage and execute our marketing and sales activities to cater to local economic and demographic conditions, cultural differences and customer preferences across all our current and future markets;
- successfully market our AAV commercial solutions;
- improve and maintain our operational efficiency; and
- attract, retain and motivate talented employees.

If we fail to address any or all of these risks and challenges, our business may be materially and adversely affected.

As our business grows, we may adjust our product and service offerings. These adjustments may not bring about expected results and may instead have a material and adverse impact on our financial condition and results of operations. For example, we historically manufactured and sold consumer drones while we were developing our passenger-grade AAVs and AAV commercial solutions. Our consumer drone business was not successful. We gradually phased out this business to focus on more innovative products and services. Our revenue structure may continue to evolve in response to market demand. In particular, we expect the relative revenue contribution from air mobility solutions to increase and that from aerial media solutions to decrease in the foreseeable future. Our growth is dependent on the development of such new products and services. We may not accurately identify market needs before we invest in the development of a new product or a new service. In addition, we might face difficulties or delays in the development process, which may result in losses in our market share and competitive advantages.

In pursuit of our growth strategy, we may enter into new strategic relationships to further penetrate our targeted markets. Should these relationships fail to materialize and develop into demand or orders for our products and services, or should we fail to work effectively with these companies, we may lose opportunities to generate sales growth and our business, results of operations and financial condition could be adversely affected.

***Our AAVs and AAV commercial solutions are subject to safety standards, and the failure to satisfy such mandated safety standards or failure to design, manufacture and operate safe and high-performance AAVs and related operating systems and infrastructure would have a material adverse effect on our business and operating results.***

Sales of our AAVs, including our passenger-grade AAVs and non-passenger-grade AAVs, must comply with applicable standards in the market where they are sold, including standards on design, manufacturing and operation. In China, for example, certain components of our AAVs must pass various tests and undergo a certification process and be affixed with a China Compulsory Certificate, or CCC, before they can be installed on our AAVs. We cannot assure you that we have obtained the CCC for all the components of our AAVs that are listed in the CCC Product Catalogue. Failure to install components with a CCC may prevent us from selling the affected products and negatively affect our manufacturing and sales of AAVs. In the United States, the FAA oversees the safety of aircraft operations in the national airspace system and has the authority to grant airworthiness certificates and related exemptions to AAV products. See "Item 4. Information on the Company—B. Business Overview—PRC Regulation" for further details. If we fail to have our AAVs satisfy applicable aerial vehicle standards in any jurisdiction where we operate, our business and operating results would be adversely affected. To achieve a high level of safety assurance, we have also established our own AAV safety standards. While we are committed to producing safe and high-quality products, there can be no assurance that our safety technology will be effective in preventing incidents related to product safety, such as accidents involving our AAVs. Failure to ensure the safe operation of our AAVs will affect our reputation and the sales of our AAVs, which will ultimately adversely affect our business operation and financial results.

8

Table of Contents

*We have incurred, and in the future may continue to incur, net losses.*

We have incurred net losses in the past. In 2017, 2018 and 2019, we had net losses of RMB86.6 million, RMB80.5 million and RMB48.0 million (US$6.9 million), respectively, and we had net operating cash outflows of RMB38.4 million, RMB43.0 million and RMB55.5 million (US$8.0 million), respectively. We expect our costs to increase in future periods as we continue to expand our business and operations. We also expect to incur substantial costs and expenses as a result of being a public company.

We cannot assure you that we will be able to generate net profits or positive operating cash flows in the future. Our ability to achieve profitability depends in large part on, among other factors, our ability to increase orders and sales of our AAVs and AAV commercial solutions, achieve economies of scale, establish effective pricing strategies, effectively navigate the regulatory environments in different jurisdictions, and increase operational efficiency. If we are unable to generate adequate revenues or effectively manage our expenses, we may continue to incur significant losses in the future and may not be able to achieve or subsequently maintain profitability.

*We may not be successful in competing in the UAV industry.*

We operate in the UAV industry and provide various commercial solutions, including air mobility, smart city management and aerial media solutions. In addition to competing with other UAV companies, we compete with traditional industry players providing similar solutions, such as aircraft and ground transportation service providers. Many of our current and potential competitors, particularly international competitors, have significantly greater financial, technical, manufacturing, marketing and other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products.

We expect competition in our industry to intensify in the future in light of increased demand for alternative transportation, continuing globalization and consolidation in the global UAV industry. Factors affecting competition include, among others, ability to innovate, development speed, product quality, reliability, safety and features, pricing and customer service. Increased competition may lead to lower AAV unit sales and increased inventory, which may result in downward price pressure and adversely affect our business, financial condition, operating results and prospects.

Our ability to successfully compete in our industry will be fundamental to our future success in existing and new markets and will affect our market share. If our competitors introduce AAVs or services that are superior in quality or performance and/or lower in price compared with our offerings, we may lose existing customers or be unable to attract new customers at prices that would allow us to generate attractive rates of return on our investment, if at all.

*Any significant cybersecurity incident or disruption to our operating systems or our command-and-control centers could subject us to significant reputational, financial, legal and operational consequences.*

We depend on our integrated in-flight operating systems and on-the-ground infrastructure to operate our products and services. Any material disruption to or slowdown of our operating systems or infrastructure could cause our AAVs to malfunction or result in outages or delays in our services, which could harm our brand and adversely affect our operating results.

Our command-and-control centers rely on our proprietary cloud database, which can store all of the data collected under our clients' approvals. Problems with our command-and-control centers or our telecommunications network providers could adversely affect our services and products. Our telecommunications network providers could decide to cease providing services to us without adequate notice. Any change in service levels of our telecommunications network or any errors, defects, disruptions or other performance problems with our operating systems or infrastructure could harm our brand and potentially affect our user data. If changes in technology cause our operating systems or infrastructure to become obsolete, or if our operating systems or command-and-control centers are inadequate to support our growth, we could lose customers, and our business and operating results could be adversely affected.

9

Table of Contents

We could be subject to breaches of security by hackers. Although we proactively employ multiple measures to defend our systems against intrusions and attacks, our measures may not prevent unauthorized access or use of sensitive data. A breach of our AAV operating systems or command-and-control systems may result in product damages, data losses and, in extreme cases, AAV accidents or hijacking of our AAVs to perform unlawful activities. A cybersecurity breach could harm our reputation and deter our customers and potential customers from using our AAVs. In addition, any such breach could cause us to incur costs to correct the breaches or failures, expose us to uninsured liability, increase our risk of regulatory scrutiny, subject us to lawsuits and result in the imposition of material penalties and fines.

### An accident involving an AAV provided by us or another manufacturer could harm the AAV industry.

An accident involving an AAV provided by us or another manufacturer could cause regulatory agencies around the world to tighten restrictions on the use of AAVs, particularly over populated areas, and could cause the public to lose confidence in our products and AAVs generally. There are risks associated with autopilot, flight control, communications and other advanced technologies, and, from time to time, there have been accidents associated with these technologies. The safety of certain cutting-edge technologies depends in part on user interaction, and users may not be accustomed to using such technologies. We could face unfavorable and tightened regulatory control and intervention on the use of autopilot and other advanced technologies and be subject to liability and government scrutiny to the extent accidents associated with our autonomous navigation systems occur. Should a high-profile accident occur resulting in substantial casualty or damages, either involving our AAVs or products offered by other companies, public confidence in and regulatory attitudes toward AAVs could deteriorate. Any of the foregoing could materially and adversely affect our results of operations, financial condition and growth prospects.

### We may be compelled to undertake product recalls or take other actions, which could adversely affect our brand image and results of operations.

Our AAVs may not perform in line with customers' expectations. Any product defects, accidents or any other failure of our AAVs to perform as expected could harm our reputation and result in adverse publicity, revenue loss, delivery delays and product recalls, which could harm our brand and reputation. Any product recall or lawsuit seeking significant monetary damages either in excess of or outside of our insurance coverage may have a material adverse effect on our business and financial condition. In the future, we may, voluntarily or involuntarily, initiate a recall if any of our AAVs, including any systems or components sourced from our suppliers, prove to be defective or noncompliant with applicable laws and regulations. Such recalls, whether voluntary or involuntary and whether caused by systems or components engineered or manufactured by us or our suppliers, could incur significant expenses and adversely affect our brand image in our target markets. They may also inhibit or prevent commercialization of our current and future product candidates.

### We may become subject to product liability claims or warranty claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.

We may be exposed to significant product liability claims if our AAVs do not perform as expected or malfunction. Any defects, errors, or failures in our products or the misuse of our AAVs, operating systems and infrastructure could also result in injury, death or property damage. Our risks in this area are particularly pronounced given we have limited field experience in the operation of our AAVs. A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, a product liability claim could generate substantial negative publicity about our AAVs and business and inhibit or prevent commercialization of our current and future AAV models. Our insurance coverage might not be sufficient to cover all potential product liability claims. In addition, the same level of insurance coverage may not be available in the future at economical prices, or at all. Even if we are fully insured as it relates to a claim, the claim could nevertheless diminish our brand and divert management's attention and resources, which could have a negative impact on our business, financial condition and result of operations.

We generally provide standard warranties on our AAVs. The term of a warranty is between six months to three years, depending on the product line and the specific part or component. The occurrence of any material defects in our AAVs could make us liable for damages and warranty claims. In addition, we could incur significant costs to correct any defects or other problems, including costs related to product recalls. Warranty claims may also lead to litigation. Any negative publicity related to the perceived quality of our AAVs could affect our brand image, decrease retailer, distributor and customer demand, and adversely affect our operating results and financial condition.

10

Table of Contents

***If we fail to successfully develop and commercialize new products, services and technologies that are well received by customers, our operating results may be materially and adversely affected.***

Our future growth depends on whether we can continually develop and introduce new generations of our existing AAV product lines and update our operating systems and infrastructure with enhanced functionalities and value-added services. This is particularly important in the current industry landscape where technologies and consumer preferences evolve rapidly, which may shorten the lifecycles of our existing products. We plan to upgrade our current AAV models and introduce new models in order to continue to provide AAVs with the latest technologies. As technological advancements can be complex and costly, we could experience delays in the development and introduction of new products and services in the future.

Our ability to roll out new and innovative products and services depends on a number of factors, including significant investments in research and development, quality control of our products and services and effective management of our supply chain. We may need to devote more resources to the research and development of new or enhanced products, services and technologies, which may reduce our profitability. In addition, our research and development efforts may not yield the benefits we expect to achieve in a timely manner, or at all. To the extent that we are unable to execute our strategy of continuously introducing new and innovative products, diversifying our product portfolio and satisfying consumers' changing preferences, we may not be able to grow our user base, and our competitive position and results of operations may be adversely affected. Even if we are able to keep up with technological changes and develop new models, our prior models may as a result become obsolete sooner than expected, potentially reducing our return on investment.

***We have limited experience in managing sales to multiple countries and we are subject to a variety of costs and risks due to our continued international expansion.***

We delivered two and five passenger-grade AAVs abroad in 2018 and 2019, respectively. We have entered into sales contracts with customers outside China. In 2019, we also entered into an agreement to establish a command-and-control center in Azerbaijan. As international expansion is one of our core strategies, we expect our international sales to increase in the future. In markets outside China, we generally have limited or no experience in marketing, selling and deploying our AAVs. International expansion has required and will continue to require us to invest significant capital and other resources, and our efforts may not be successful. International sales and operations are subject to risks such as:

- limited brand recognition;
- costs associated with establishing new distribution networks;
- difficulty in finding qualified partners for overseas distribution;
- inability to anticipate changes in local market conditions, economic landscapes, and consumers' preferences and customs;
- difficulties in staffing and managing foreign operations;
- lack of familiarity with and understanding of the local legal, regulatory and policy frameworks, as well as burdens of complying with a wide variety of local laws and regulations, including those governing personal data protection and safety control;
- political and economic instability;
- trade restrictions;
- differing employment laws and practices, as well as potential labor disruptions;
- the imposition of government controls;
- lesser degrees of intellectual property protection;
- tariffs and customs duties and the classifications of our goods by applicable governmental bodies; and
- a legal system subject to undue influence or corruption.

11

**Table of Contents**

Additionally, to export our AAVs to certain jurisdictions, we may face challenges in coordinating with both PRC and the applicable foreign governments and regulatory authorities. If we cannot export our AAVs to such jurisdictions, our business, prospects, financial condition and operating results may be materially and adversely impacted.

The failure to manage any of these risks could negatively affect our international business and consequently our overall business and operating results. In addition, the concern over these risks may also prevent us from entering into, or marketing, selling or releasing certain of our AAVs and AAV commercial solutions in, certain markets.

### *We rely on some third-party distributors for sales, marketing and distribution activities relating to our AAVs.*

Some of our business partners are acting as third-party distributors that sell, market and distribute our AAVs to their customers. Accordingly, we may be subject to a number of risks associated with third-party distributors, including a lack of day-to-day control over the activities of third-party distributors selling or using our products and solutions; third-party distributors may terminate their arrangements with us on limited or no notice, or may change the terms of these arrangements in a manner that is unfavorable to us for reasons outside of our control; and any disagreements with our third-party distributors could lead to costly and time-consuming litigation or arbitration. If we fail to establish and maintain satisfactory relationships with our third-party distributors, we may not able to sell, market and distribute our AAVs according to our internal budget and plans, our future revenues and market share may not grow at a pace that we expect, and we could be subject to increases in sales and marketing and other costs which would harm our results of operations and financial condition.

### *Our operations may be interrupted by production difficulties or delays due to mechanical failures, utility shortages or stoppages, fire, natural disaster or other calamities at or near our facilities.*

Production difficulties, such as capacity constraints, mechanical and systems failures and the need for equipment upgrades, may suspend our production and/or reduce our output. There can be no assurance that we will not experience problems with our production facilities in the future or that we will be able to address any such problems in a timely manner. Problems with key equipment in one or more of our production facilities may affect our ability to produce our AAVs or cause us to incur significant expenses to repair or replace such equipment. Scheduled and unscheduled maintenance programs may affect our production output. Any of these could have a material adverse effect on our business, financial condition, results of operations and prospects.

We depend on a continuous supply of utilities, such as electricity and water, to operate our production facilities. Any disruption to the supply of electricity or other utilities may disrupt our production, or cause the deterioration or loss of our inventory. This could adversely affect our ability to fulfill our sales orders and consequently may have an adverse effect on our business and results of operations. In addition, fire, natural disasters, pandemics or extreme weather, including droughts, floods, typhoons or other storms, or excessive cold or heat, could cause power outages, fuel shortages, water shortages, damage to our production, processing or distribution facilities or disruption of transportation channels, any of which could impair or interfere with our operations. We cannot assure you that such events will not happen in the future or that we will be able to take adequate measures to mitigate the likelihood or potential impact of such events, or to effectively respond to such events if they occur.

### *Our consumers may experience service failures or interruptions due to defects in the software, infrastructure, components or engineering system that compromise our products and services, or due to errors in product installation, any of which could harm our business.*

Our products and services may contain undetected defects in the software, infrastructure, components or engineering system. Sophisticated software and applications, such as those adopted and offered by us, often contain "bugs" that can unexpectedly interfere with the software and applications' intended operations. Our internet services may from time to time experience outages, service slowdowns or errors. Defects may also occur in components or processes used in our products or for our services.

There can be no assurance that we will be able to detect and fix all defects in the hardware, software and services we offer. Failure to do so could result in decreases in sales of our products and services, lost revenues, significant warranty and other expenses, decreases in customer confidence and loyalty, losing market share to our competitors, and harm to our reputation.

12

**Table of Contents**

***Our success depends on the continuing efforts of our key employees, including our senior management members and other key personnel. If we fail to hire, retain and motivate our key employees, we could lose the innovation, collaboration and focus that contribute to our business.***

We believe that our success depends substantially on the continued efforts of our key employees, including our senior management members and other qualified and key personnel. We rely on our executive officers, senior management and key employees to generate business and execute programs successfully. In addition, the relationships and reputation that members of our management and key employees have established and maintain with government personnel contribute to our ability to maintain good customer relations and to identify new business opportunities. The loss of any key personnel or our failure to attract additional talent could reduce our employee retention, disrupt our research and development activities and operations, and impair our revenue growth and competitiveness. If one or more of our executive officers or key employees were unable or unwilling to continue their services with us, we might not be able to replace them easily, in a timely manner, or at all, and we might lose the innovation, collaboration and focus that contribute to our business.

***Our business and prospects depend significantly on our ability to build our EHang brand.***

Our business and prospects are heavily dependent on our ability to build, maintain and strengthen the EHang brand. If we do not continue to establish, maintain and strengthen our brand, we may lose the opportunity to build a critical mass of customers. Promoting and positioning our brand will likely depend significantly on our ability to provide high-quality AAVs and AAV commercial solutions and engage with our customers as intended. In addition, we expect that our ability to develop, maintain and strengthen the EHang brand will also depend heavily on the success of our user development and branding efforts. Such efforts mainly include building a community of engaged online and offline users as well as other branding initiatives, such as AAV shows and events. To promote our brand, we may be required to change our user development and branding practices, which could result in substantially increased expenses. If we do not develop and maintain a strong brand, our business, prospects, financial condition and operating results will be materially and adversely impacted.

Our EHang brand could be subject to adverse publicity if incidents related to our products occur or are perceived to have occurred, whether or not we are at fault. In particular, given the popularity of social media, including WeChat and Weibo in China, any negative publicity, regardless of its truthfulness, could quickly proliferate and harm consumer perceptions of and confidence in our brand. Furthermore, we may be affected by adverse publicity related to our manufacturing or other partners, whether or not such publicity is related to their collaboration with us. Our ability to successfully position our brand could also be adversely affected by perceptions of the quality of our partners' products and services. In addition, from time to time, our AAVs and AAV commercial solutions are evaluated and reviewed by third parties. Any unfavorable reviews could adversely affect consumer perceptions of our AAVs and AAV commercial solutions.

***Weather and seasonality may have a material adverse effect on our operations.***

Our sales of AAVs and AAV commercial solutions may be affected by weather and seasonality. Our AAV commercial solutions are mainly delivered outdoor. Customers may choose alternative transportation in severe weather conditions in consideration of safety factors, even if our AAVs are able to endure such conditions. As a result, our business, financial condition and operating results may be materially and adversely impacted by the weather conditions. Our operating results may vary from period to period due to many factors, including seasonal factors that may have an effect on the demand for our AAV commercial solutions in the future. As a result, our quarterly results of operations and financial position at the end of a particular quarter may not necessarily be representative of the results we expect at year-end or in other quarters of a year. Our operating results would suffer if we did not achieve revenues consistent with our expectations due to seasonal demand and weather changes because many of our expenses are based on anticipated levels of annual revenues.

***Any deterioration of our relationship with our strategic business partners could have a material adverse effect on our operating results.***

We collaborate with various business partners to promote our AAVs and AAV commercial solutions. For example, we collaborate with several companies including Yonghui Group to provide logistics services for last-mile delivery. There can be no guarantee that those business partners will continue to collaborate with us in the future. If we are unable to maintain good relationships with our business partners, or the business of our business partners declines, the reach of our products and services may be adversely affected and our ability to maintain and expand our user base may decrease.

13

13

Table of Contents

Most of the agreements with our business partners do not prohibit them from working with our competitors or from offering competing services. If our partners change their standard terms and conditions in a manner that is detrimental to our business, or if our business partners decide not to continue working with us, or choose to devote more resources to supporting our competitors or their own competing products, we may not be able to find a substitute on commercially favorable terms, or at all, and our competitive advantages may diminish.

***We rely on external suppliers for raw materials and certain components and parts used in our AAVs, and have limited control over the quality of these components and parts.***

We purchase certain key components and raw materials, such as computers chips, batteries, motors and electronic displays, from external suppliers for use in our operations and production of AAVs. A continuous and stable supply of components and raw materials that meet our standards is crucial to our operations and production. We cannot assure you that we will be able to maintain our existing relationships with our suppliers and continue to be able to stably source key components and raw materials at reasonable prices, or at all. We have integrated our suppliers' technologies within our products such that having to change to an alternative supplier may cause significant disruption to our operations. The supply of key components could be interrupted for any reason, or there could be significant increases in the prices of these key components. Additionally, changes in business conditions, force majeure, governmental changes and other factors beyond our control, or that we do not presently anticipate, could also affect our suppliers' ability to deliver components to us on a timely basis. If any of these events occurs, our business, financial condition, results of operations and prospects may be materially and adversely affected.

We cannot guarantee that the quality of components and parts manufactured by external suppliers will be consistent and maintained at a high standard. Any defects of or quality issues with these components or any noncompliance incidents associated with these third-party suppliers could result in quality issues with our AAVs and hence compromise our brand image and results of operations. In extreme situations, we may be exposed to liabilities as a result of significant damages caused by certain components from external suppliers and we cannot assure you that we will be able to obtain sufficient insurance coverage at an acceptable cost in the future. A successful claim brought against us in excess of our available insurance coverage may have a material adverse effect on our business, financial condition and operating results.

***Safety issues or public perceptions of safety issues concerning lithium-ion batteries could have a material adverse impact on our business.***

The battery packs installed on our AAVs make use of lithium-ion cells. On rare occasions, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the battery packs used for our AAVs are designed to passively contain any single cell's release of energy without spreading to neighboring cells, a field or testing failure of our AAVs could occur, which could result in accidents, casualty or damages, and subject us to lawsuits, product recalls, or redesign efforts. Also, negative public perceptions regarding the suitability of lithium-ion cells for AAV applications or any future incident involving lithium-ion cells, even if such incident does not involve our AAVs, could seriously harm our business. In addition, we store a significant number of lithium-ion cells at our facilities. Any mishandling of battery cells may cause disruption to the operation of our facilities. While we have implemented safety procedures related to the handling of the cells, a safety issue or fire related to the cells could disrupt our operations. Such damage or injury could lead to adverse publicity and potentially a safety recall.

***We rely on third-party logistics providers to deliver our domestic sales orders and certain overseas orders. Inadequate third-party logistics services or failure to mitigate the risks of damage or disruption to our distribution logistics could adversely affect our business.***

Our ability to transport and sell our AAVs is critical to our success across our operations. We typically rely on third-party logistics service providers to deliver our domestic sales orders and certain overseas orders. Damage or disruption to our distribution logistics due to disputes, weather, natural disasters, fire, explosions, terrorism, pandemics or labor strikes could impair our ability to distribute or sell our AAVs. Inadequate third-party logistics services could also potentially disrupt our distribution and sales and compromise our business reputation. Failure to take adequate steps to mitigate the likelihood or potential impact of such events, or to effectively manage such events if they occur, could adversely affect our business, financial condition and results of operations, as well as require additional resources to restore our supply chain.

14

Table of Contents

***If our business partners, contractors, suppliers, sales agents, dealers or third-party logistics services providers fail to use ethical business practices and comply with applicable laws and regulations, our brand image could be harmed due to negative publicity beyond our own control.***

Our reputation is sensitive to allegations of unethical business practices. We do not control the business practices of our business partners, independent contractors and suppliers, sales agents, dealers or third-party logistics services providers. Accordingly, we cannot guarantee their compliance with ethical business practices, such as environmental responsibilities, fair wage practices, and compliance with child labor laws, among others. A lack of demonstrated compliance could lead us to seek alternative suppliers, sales agents or dealers, which could increase our costs and result in delayed delivery of our products, product shortages or other disruptions of our operations. Violation of labor or other laws by our suppliers, business partners, sales agent, dealers or third-party logistics services suppliers or the divergence of their labor or other practices from those generally accepted as ethical in the markets in which we do business could also attract negative publicity, diminish our brand image and reduce demand for our AAVs and AAV commercial solutions.

***If customers modify our AAVs or operating systems, the AAVs may not operate properly, which may cause damage, create negative publicity and harm our business.***

Our customers may try to modify our AAVs or operating systems for various reasons, which could compromise the performance and safety of our AAVs, as well as the safety of their passengers. During such modifications, they may use third-party parts that may not be compatible with our products. We do not test, nor do we endorse, such modification. In addition, the use of improper external cabling or unsafe charging outlets can expose our customers to injury from AAV malfunctioning. Any injuries or damages resulting from such modifications or misuses could result in adverse publicity, which would negatively affect our brand and harm our business, prospects, financial condition and operating results.

***A new health epidemic could significantly disrupt our operations and adversely affect our results of operations.***

Our business could be significantly affected by public health epidemics that may hit China and/or other countries where we sell our products, such as the outbreak of coronavirus, avian influenza, severe acute respiratory syndrome, or SARS, Zika virus, Ebola virus or other disease. For example, the severity of the current COVID-19 pandemic resulted in lock-downs, travel restrictions and quarantines imposed by governments across the world and materially affected general commercial activities on a global scale, particularly in Asia, North America and Europe. Because most of our operations, including the manufacture of all of our AAVs, are conducted in China and most of our customers and business partners are located in Asia, North American and Europe, the outbreak of COVID-19 has caused a disruption to our business. For example, currently our business development activities in North America and Europe are severely restricted, and we may not be able to deliver AAVs abroad even if we receive customer orders. As a result, the international sales of our AAVs are materially affected. Furthermore, in response to intensifying efforts to contain the spread of this coronavirus, we postponed the normal return to work of our employees after the Chinese New Year holiday. In addition, we have also experienced delayed fulfillments from suppliers. We expect that such delays will continue to exist in the second quarter of 2020. While the disruption of our operations was temporary, the duration of the business disruption, reduced manufacturing capacity and related financial impact are expected to materially affect our results of operations for first fiscal quarter ended March 31, 2020 and full fiscal year ending December 31, 2020. The COVID-19 outbreak is expected to have a negative impact on the global economy at least in 2020. Such general economic slowdown may reduce the demand for our products and services. For example, currently our passenger-grade AAVs are typically sold to tourism operators for sightseeing. The COVID-19 outbreak has had a particularly severe impact on global tourism industry, which could cause the tourism operators to cancel or reduce their orders for our products. Any future outbreak of a contagious disease, and other adverse public health developments may restrict economic activities in affected regions, resulting in reduced business volume, temporary closure of our production facilities and offices or otherwise disrupt our business operations and adversely affect our results of operations.

15

15

Table of Contents

*Our business could be adversely affected by security-related concerns of the United States and other countries against Chinese companies and products.*

Due to security-related concerns, U.S. government actions targeting exports of certain technologies to China are becoming more pervasive. The U.S. government has in the past issued export restrictions that effectively banned U.S. companies from selling products to ZTE Corporation, and in May 2019 imposed a similar ban on sales of all products to Huawei. In 2018, the U.S. adopted new laws designed to address concerns about the export of emerging and foundational technologies to China. In addition, in May 2019, President Trump issued an executive order that invoked national emergency economic powers to implement a framework to regulate the acquisition or transfer of information communications technology in transactions that imposed undue national security risks. These actions could lead to additional restrictions on the export of products that include or enable technologies on which we rely. Such restrictions imposed by the United States or any other countries may make it more difficult us to procure or license technological products from these countries, or affect the ability of our PRC suppliers to manufacture and provide us with advanced components, which may increase our costs, impair our products' competitiveness, and have a material adverse effect on our business.

Similar security-related concerns may affect our ability to export our products to the United States and other countries. In May 2019, the U.S. Department of Homeland Security advised American companies about the inherent security risks associated with Chinese-made drones. In a related development, the U.S. government was also reportedly considering placing Chinese surveillance systems providers, including Hikvision Digital Technology and Dahua Technology, on a trade blacklist that would cut off their access to American hi-tech suppliers. We cannot assure you that our AAVs will not be placed on such trade blacklist in the future. If that event occurs, our ability to export our products to the United States will be adversely affected.

*We may need to defend ourselves against claims of intellectual property infringement, which may be time-consuming and costly.*

Companies, organizations or individuals, including our competitors, may hold or obtain patents, trademarks or other proprietary rights that would prevent, limit or interfere with our ability to make, use, develop, sell or market our AAVs, AAV operating systems and infrastructure or their components, which could make it more difficult for us to operate our business. Companies holding patents or other intellectual property rights may bring suits alleging infringement of such rights by us or otherwise assert their rights against us. Moreover, our applications and uses of trademarks relating to our design, software or artificial intelligence technologies could be found to infringe upon existing trademark ownership and rights. We may also fail to apply for key trademarks in a timely manner. For example, we discovered some precedent registrations by several other Chinese companies of the trademark " 亿航 " (the Chinese characters for our brand, "EHang") for vehicles and bicycles, which fall into the same class of products as remote aerial vehicles and aerospace transportation. Although we received a favorable judgement in a proceeding relating to such precedent registrations, we may continue to face intellectual property infringement claims in the future.

If we are determined to have infringed upon a third party's intellectual property rights, we may be required to do one or more of the following:
- cease selling, incorporating certain components into, or using AAVs or offering goods or services that incorporate or use the challenged intellectual property;
- pay substantial damages;
- seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms or at all;
- redesign our AAVs, AAV operating systems and infrastructure, components or services; or
- establish and maintain alternative branding for our products and services.

In the event of a successful claim of infringement against us and our failure or inability to obtain a license to the infringed technology or other intellectual property right, our business, prospects, operating results and financial condition could be materially and adversely affected. In addition, any litigation or claims, even if frivolous, could result in substantial costs, negative publicity and diversion of resources and management attention.

16

Table of Contents

*Our intellectual property rights may not protect us effectively.*

As of March 31, 2020, we had 153 issued patents, 123 pending patent applications in China, 358 registered trademarks, and 21 registered copyrights in China in relation to our technologies. We cannot assure you that our pending patent applications will be granted. Even if our applications are successful, patents may be contested, circumvented or invalidated in the future.

In addition, the rights granted under any issued patents may not provide us with proprietary protection or competitive advantages. The claims under any patents that issue from our patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve results similar to ours. It is also possible that the intellectual property rights of others could bar us from licensing and exploiting any patents that are issued from our pending applications. Numerous patents and pending patent applications owned by others exist in the fields in which we have developed and are developing our technology. These patents and patent applications might have priority over our patent applications and could subject our patent applications to invalidation. Finally, in addition to those who may claim priority, any of our existing or pending patents may also be challenged by others on the basis that they are otherwise invalid or unenforceable.

Implementation and enforcement of PRC laws on intellectual property rights have historically been deficient and ineffective. Accordingly, protection of intellectual property rights in China may not be as effective as in the United States or other developed countries. Furthermore, policing unauthorized use of proprietary technology is difficult and expensive. We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions on disclosure to protect our intellectual property rights. Despite our efforts to protect our proprietary rights, third parties may attempt to copy or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe upon our intellectual property rights. Any unauthorized use of our intellectual property by third parties may adversely affect our current and future revenues and our reputation. Monitoring unauthorized use of our intellectual property is difficult and costly, and we cannot assure you that the steps we have taken or will take will prevent misappropriation of our intellectual property. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

*Failure to safeguard personal information could subject us to penalties, damage our reputation and brand, and harm our business and results of operations.*

Through our AAVs, EHang Play app and command-and-control centers, we log information about each AAV's use, such as charge time, battery usage, mileage and location information, in order to aid us in vehicle diagnostics, repair and maintenance, as well as to help us customize and optimize the flying experience. Images and videos captured by cameras attached to our AAVs are stored on our servers, servers of third-party cloud storage providers or other servers designated by our customers. Possession and use of our users' flying behavior and data in conducting our business may subject us to legislative and regulatory oversight in China and other jurisdictions, such as the European Union and the United States. For example, in January 2018, the European Union promulgated the General Data Protection Regulation to further protect fundamental rights in privacy and personal information so that members of the general public have more control over their personal information. Regulations in relevant jurisdictions may require us to obtain user consent for the collection of personal information, restrict our use of such personal information and hinder our ability to expand our user base. In the event of a data breach or other unauthorized access to our user data, we may have obligations to notify users about the incident and we may need to provide some form of remedy for the individuals affected by the incident.

If users allege that we have improperly used, released or disclosed their personal information, we could face legal claims and reputational damage. We may incur significant expenses to comply with privacy, consumer protection and security standards and protocols imposed by law, regulation, industry standards or contractual obligations. A major breach of our network security and systems could create serious negative consequences for our business and future prospects, including possible fines, penalties, reduced customer demand for our AAVs, and harm to our reputation and brand. See "Item 4. Information on the Company— B. Business Overview—PRC Regulation" for further details.

*The execution of our business plans requires a significant amount of capital. In addition, our future capital needs may require us to sell additional equity or debt securities that may dilute the equity interests of our shareholders or introduce covenants that may restrict our operations or our ability to pay dividends.*

We will need significant capital to, among other things, conduct research and development, expand our manufacturing capacity and roll out new products. We may also need significant capital to maintain our existing property, plant and equipment. Our expected sources of capital include both equity and debt financing. However, financing might not be available to us in a timely manner or on acceptable terms, or at all.

17

**Table of Contents**

Our ability to obtain the necessary financing to carry out our business plan is subject to a number of factors, including general market conditions and investor acceptance of our business plans. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to us. If we are unable to raise sufficient funds, we will have to significantly reduce our spending, delay or cancel our planned activities, substantially change our current corporate structure, or even curtail or discontinue our operations.

In addition, our future capital needs and other business concerns could require us to sell additional equity or debt securities or obtain a credit facility. The sale of additional equity or equity-linked securities could dilute the equity interests of our shareholders. Additional indebtedness would increase our debt-service obligations and may be accompanied by covenants that would restrict our operations or our ability to pay dividends to our shareholders.

***We are subject to risks associated with strategic alliances or acquisitions. If we cannot manage the growth of our business or execute our strategies effectively, our business and prospects may be materially and adversely affected.***

We have entered into strategic alliances with various business partners including DHL-Sinotrans, and may in the future enter into joint research and development agreements or co-branding agreements with third parties to further our business purpose from time to time. These alliances could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by the third parties and increased expenses in establishing new strategic alliances, any of which may materially and adversely affect our business. We may have limited ability to monitor or control the actions of these third parties. If any of these strategic third parties suffers negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with any such third party.

Although we currently do not have any specific acquisition plans, if appropriate opportunities arise, we may acquire additional assets, products, technologies or businesses that are complementary to our existing business. In addition to any required shareholders' approval, we may also have to obtain approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable PRC laws and regulations, which could result in delays and increased costs, and may derail our business strategy if we fail to do so. Furthermore, past and future acquisitions and the subsequent integration of new assets and businesses into our own require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our business operations. Acquired assets or businesses may not generate the financial results we expect. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

***Our business could be adversely affected by trade tariffs or other trade barriers.***

Starting from early 2018, the U.S. President announced the imposition of tariffs on certain Chinese goods entering the United States and recently both China and the United States have each imposed additional tariffs. The United States may also in the future impose tariffs on the importation of consumer products related to our business, such as AAVs. In addition, the European Union has recently imposed tariffs on imports of AAVs originating from the PRC. We plan to export our AAVs to the United States and the European Union. Any new tariffs on AAVs or other relevant products imposed by the United States or the European Union may significantly increase our costs. It is not yet clear what impact these tariffs may have or what actions other governments, including the Chinese government, may take in retaliation. In addition, these developments could have a material adverse effect on global economic conditions and the stability of global financial markets. Any of these factors could have a material adverse effect on our business, financial condition and results of operations.

Table of Contents

***We have limited insurance coverage, which could subject us to significant costs and business disruption.***

We have limited liability insurance coverage for our products and business operations. We may not be able to secure additional product liability insurance coverage on acceptable terms or at reasonable costs when needed. A successful liability claim against us due to injuries or damages suffered by our users could materially and adversely affect our financial conditions, results of operations and reputation. Even if unsuccessful, such a claim could cause us adverse publicity, require substantial costs to defend, and divert the time and attention of our management. In addition, we do not have any business disruption insurance. Any business disruption could result in substantial cost to us and diversion of our resources. Furthermore, China, the United States or any other jurisdiction relevant to our business may impose requirements for maintaining certain minimum liability or other insurance relating to the operation of AAVs. Such insurance policies could be costly, which would reduce the demand for our AAVs. Alternatively, certain insurance products that would be desirable to AAV operators may not be commercially available, which would increase the risks of operating our AAVs and also reduce the demand for them.

***The bankruptcy proceedings of our former subsidiaries could subject us to adverse consequences.***

Two of our former subsidiaries, one in the United States and one in Germany, were established as regional sales offices for our consumer drone business in September 2014 and February 2016, respectively. Due to intense competition in the consumer drone business at the time, we decided to exit the consumer drone markets in these two countries. Both of these entities filed for voluntary bankruptcy as part of the winding up process, and the U.S. entity was deconsolidated from our group in December 2017 and the German entity was deconsolidated from our group in October 2017. Based on the claims registers for these bankruptcy proceedings, these entities are subject to various creditors' claims, which include employment litigation, lease, tax and insurance claims. The claims related to the bankruptcy proceedings for the U.S. entity have been settled and the bankruptcy proceedings for the German entity are ongoing. As these entities were deconsolidated since 2017 and are limited liability companies, our group companies have no direct liability for these claims.

If claimants or trustees decide to assert claims against us to satisfy, among other things, the debt of our former subsidiaries' creditors and any such claims were to prevail, they could have an adverse effect on our results of operations and cash flows. Even if these claims do not result in a liability to us, they could subject us to negative publicity and harm the perception and confidence of our customers and suppliers in our brand and financial condition, which in turn could have a negative effect on our results of operations and cash flows.

***We are subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws, and noncompliance with such laws can subject us to administrative, civil and criminal fines and penalties, collateral consequences, remedial measures and legal expenses, all of which could adversely affect our business, results of operations, financial condition and reputation.***

We are subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations in various jurisdictions in which we conduct our business or sell our products, including the PRC anti-corruption laws and regulations, the U.S. Foreign Corrupt Practices Act, or the FCPA, the U.K. Bribery Act 2010, and other anti-corruption laws and regulations. The FCPA and the U.K. Bribery Act 2010 prohibit us and our officers, directors, employees and business partners acting on our behalf, including agents, from corruptly offering, promising, authorizing or providing anything of value to a "foreign official" for the purposes of influencing official decisions or obtaining or retaining business or otherwise obtaining favorable treatment. The FCPA also requires companies to make and keep books, records and accounts that accurately reflect transactions and dispositions of assets and to maintain a system of adequate internal accounting controls. The U.K. Bribery Act 2010 also prohibits non-governmental "commercial" bribery and soliciting or accepting bribes. The PRC anticorruption laws and regulations prohibit bribery to government agencies, state or government owned or controlled enterprises or entities, to government officials or officials that work for state or government owned enterprises or entities, as well as bribery to non-government entities or individuals. There is uncertainty in connection with the implementation of PRC anti-corruption laws. A violation of these laws or regulations could adversely affect our business, results of operations, financial condition and reputation.

We have direct or indirect interactions with officials and employees of government agencies and state-owned affiliated entities in the ordinary course of business. We have also entered into joint ventures and/or other business partnerships with government agencies and state-owned or affiliated entities. These interactions subject us to an increased level of compliance-related concerns. We are in the process of implementing policies and procedures designed to ensure compliance by us and our directors, officers, employees, representatives, consultants, agents and business partners with applicable anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations. However, our policies and procedures may not be sufficient and our directors, officers, employees, representatives, consultants, agents, and business partners could engage in improper conduct for which we may be held responsible.

19

Table of Contents

Non-compliance with anti-corruption, anti-bribery, anti-money laundering or financial and economic sanctions laws could subject us to whistleblower complaints, adverse media coverage, investigations, and severe administrative, civil and criminal sanctions, collateral consequences, remedial measures and legal expenses, all of which could materially and adversely affect our business, results of operations, financial condition and reputation. In addition, changes in economic sanctions laws in the future could adversely impact our business and investments in our shares.

*We are involved in litigation from time to time and, as a result, we could incur substantial judgments, fines, legal fees or other costs.*

We may be the subject of complaints or litigation from customers, employees or other third parties for various actions. The damages sought against us in some of these litigation proceedings could be substantial. We cannot assure you that we will always have meritorious defenses to the plaintiffs' claims. While the ultimate effect of these legal actions cannot be predicted with certainty, our reputation and the result of operations could be negatively impacted. The proceedings we may be involved in from time to time, including the aforementioned bankruptcy proceedings, could incur substantial judgments, fines, legal fees or other costs and have a material adverse effect on our business, financial condition, results of operations and cash flows.

*Any financial or economic crisis or perceived threat of such a crisis may materially and adversely affect our business, financial condition and results of operations.*

The global financial markets experienced significant disruptions in 2008. The recovery since then has been geographically uneven. New challenges have also emerged, including the escalation of the European sovereign debt crisis since 2011, the hostilities in the Ukraine, the end of quantitative easing by the U.S. Federal Reserve and the economic slowdown in the Eurozone in 2014. It is unclear whether these challenges will be contained and what effects they each may have. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies that have been adopted by the central banks and financial authorities of some of the world's leading economies, including China's. Economic conditions in China are sensitive to global economic conditions. Recently there have been signs that the rate of China's economic growth is declining. Any prolonged slowdown in China's economic development might lead to tighter credit markets, increased market volatility, sudden drops in business and customer confidence and dramatic changes in business and customer behaviors.

*We face risks related to natural disasters, which could significantly disrupt our operations.*

We are vulnerable to natural disasters and other calamities such as hurricanes, tornadoes, floods, earthquakes and other adverse weather and climate conditions. Although we have servers that are hosted in an offsite location, our backup system does not capture data on a real-time basis and we may be unable to recover certain data in the event of a server failure. We cannot assure you that any backup systems will be adequate to protect us from the effects of fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events. Any of the foregoing events may give rise to interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide services on our platform.

*We have granted, and may continue to grant, restricted share units and other types of awards under our share incentive plan, which may result in increased share-based compensation expenses.*

We adopted the 2015 Share Incentive Plan, or the 2015 Plan, and the 2019 Share Incentive Plan, or the 2019 Plan (collectively, the "Plans"), to incentivize our employees, directors and consultants and align their interests with ours. We recognize expenses in our consolidated statement of loss in accordance with U.S. GAAP. Under the Plans, we are authorized to grant restricted share units and other types of awards. Under the 2015 Plan and the 2019 Plan, the maximum number of ordinary shares that may be issued pursuant to all awards is 8,867,053 and 5,455,346, respectively. As of December 31, 2019, 7,807,335 restricted share units had been granted and 735,476 restricted share units were outstanding under the Plans, including shares underlying 135,476 RSUs transferred to a trust established by us and under the management of our company. As of December 31, 2019, our unrecognized share-based compensation expenses relating to unvested awards, amounted to RMB17.6 million (US$2.5 million).

20

Table of Contents

We believe the granting of share-based awards is of significant importance to our ability to attract and retain key personnel and employees, and we will continue to grant share-based awards to employees in the future. However, the number of shares reserved for issuance under our share incentive plan may not be sufficient to recruit new employees and to compensate existing employees. Furthermore, prospective candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. Thus, our ability to attract or retain highly skilled employees may be adversely affected by declines in the perceived value of our equity or equity awards. To attract and retain qualified employees, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

***If we fail to implement and maintain an effective system of internal controls to remediate our material weaknesses over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud, and investor confidence in our company and the market price of the ADSs may be materially and adversely affected.***

Prior to our initial public offering, we were a private company with limited accounting and financial reporting personnel and other resources to address our internal control over financial reporting. In connection with the audits of our consolidated financial statements as of and for the years ended December 31, 2017, 2018 and 2019, we and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting. As defined in the standards established by the U.S. Public Company Accounting Oversight Board, or PCAOB, a "material weakness" is a deficiency, or combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

The material weaknesses that have been identified relate to our lack of sufficient accounting and financial reporting personnel with requisite knowledge of and experience in application of U.S. GAAP and SEC rules, and lack of financial reporting policies and procedures that are commensurate with U.S. GAAP and SEC reporting and compliance requirements. We are in the process of implementing a number of measures to address the material weaknesses and deficiencies that have been identified. See "Item 5. Operating and Financial Review and Prospects—B. Liquidity and Capital Resources —Internal Control Over Financial Reporting." However, we cannot assure you that these measures may fully address the material weaknesses and deficiencies in our internal control over financial reporting or that we may conclude that they have been fully remediated.

We are subject to the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act, or Section 404, requires that we include a report from management on the effectiveness of our internal control over financial reporting in our annual report on Form 20-F beginning with our annual report for the fiscal year ending December 31, 2020. In addition, once we cease to be an "emerging growth company" as such term is defined in the JOBS Act, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue an adverse opinion on the effectiveness of internal control over financial reporting because of the existence of a material weakness if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. In addition, after we become a public company, our reporting obligations may place a significant strain on our management, operational and financial resources and systems for the foreseeable future. We may be unable to timely complete our evaluation testing and any required remediation.

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify other weaknesses and deficiencies in our internal control over financial reporting. If we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. Generally speaking, if we fail to achieve and maintain an effective internal control environment, it could result in material misstatements in our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis. As a result, our businesses, financial condition, results of operations and prospects, as well as the trading price of the ADSs, may be materially and adversely affected. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. We may also be required to restate our financial statements from prior periods.

21

Table of Contents

**Risks Relating to Our Corporate Structure**

***If the PRC government finds that the agreements that establish the structure for operating some of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.***

We are a Cayman Islands company and our PRC subsidiaries are currently considered to be foreign-invested enterprises. In December 2014, we incorporated EHang in the Cayman Islands as our offshore holding company to facilitate financing and offshore listing. In the same month, we established Ehfly in Hong Kong, which subsequently became our wholly-owned subsidiary. In October 2015, we established EHang Intelligent, our WFOE, wholly owned by Ehfly. In January 2016, we obtained control over EHang GZ through our WFOE by entering into a series of contractual arrangements with EHang GZ, our VIE, and its shareholders, which enable us to (i) exercise effective control over EHang GZ, (ii) receive economic benefits from the VIE that potentially could be significant to our VIE, and (iii) have an exclusive option to purchase all or part of the equity interests and assets in EHang GZ, when and to the extent permitted by PRC laws. As a result of these contractual arrangements, we have control over and are the primary beneficiary of our VIE and hence consolidate their financial results under U.S. GAAP. See "Item 4. Information on the Company—C. Organizational Structure" for further details.

Our PRC legal counsel, Allbright Law Offices, based on its understanding of the relevant laws and regulations, is of the opinion that (i) the ownership structure of our WFOE, our VIE and its subsidiaries are in compliance with applicable PRC laws or regulations and (ii) such contractual arrangements constitute valid, legal and binding obligations enforceable against each party of such agreements in accordance with the terms of each agreement, and will not result in any violation of PRC laws or regulations currently in effect. However, our PRC legal counsel has also advised us that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may take a view that is contrary to the opinion of our PRC legal counsel.

If we or our VIE are found to be in violation of any existing or future PRC laws or regulations, or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion to take action in dealing with such violations or failures, including:

- revoking the business licenses and/or operating licenses of such entities;
- shutting down our servers or blocking our website, or discontinuing or placing restrictions or onerous conditions on our operation through any transactions between our WFOE and our VIE;
- imposing fines, confiscating the income from our WFOE or our VIE, or imposing other requirements with which we or our VIE may not be able to comply;
- requiring us to restructure our ownership structure or operations, including terminating the contractual arrangements with our VIE and deregistering the equity pledges of our VIE, which in turn would affect our ability to consolidate, derive economic interests from, or exert effective control over our VIE;
- restricting or prohibiting our use of the proceeds of our initial public offering to finance our business and operations in China, and taking other regulatory or enforcement actions that could be harmful to our business;
- confiscating any of our income deemed to be obtained through illegal operations;
- discontinuing or placing restrictions or onerous conditions on our operations;
- imposing additional conditions or requirements with which we may not be able to comply; or
- taking other regulatory or enforcement actions against us that could be harmful to our business.

22

Table of Contents

The imposition of any of these penalties would result in a material and adverse effect on our ability to conduct our business. In addition, it is unclear what impact the PRC government actions would have on us and on our ability to consolidate the financial results of our VIE in our consolidated financial statements, if the PRC government authorities were to find our legal structure and contractual arrangements to be in violation of PRC laws and regulations. If the imposition of any of these government actions causes us to lose our right to direct the activities of our VIE or our right to receive substantially all the economic benefits and residual returns from our VIE and we are not able to restructure our ownership structure and operations in a satisfactory manner, we would no longer be able to exert effective control over or consolidate the financial results of our VIE in our consolidated financial statements. Either of these results, or any other significant penalties that might be imposed on us in this event, would have a material adverse effect on our financial condition and results of operations.

### Our business may be significantly affected by the newly enacted Foreign Investment Law.

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which will take effect on January 1, 2020 and replace the trio of existing laws regulating foreign investment in China, namely, the PRC Equity Joint Venture Law, the PRC Cooperative Joint Venture Law and the Wholly Foreign-owned Enterprise Law, together with their implementation rules and ancillary regulations. Since the Foreign Investment Law is newly enacted, uncertainties still exist in relation to its interpretation and implementation. The Foreign Investment Law does not explicitly classify whether variable interest entities that are controlled via contractual arrangements would be deemed as foreign invested enterprises if they are ultimately "controlled" by foreign investors. However, it has a catch-all provision under definition of "foreign investment" to include investments made by foreign investors in China through means stipulated by laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions to provide for contractual arrangements as a form of foreign investment.

The Foreign Investment Law grants foreign invested entities the same treatment as PRC domestic entities, except for those foreign invested entities that operate in industries deemed to be either "restricted" or "prohibited" in the "negative list" to be published. The Foreign Investment Law provides that only foreign invested entities operating in foreign restricted or prohibited industries will require entry clearance and other approvals that are not required by PRC domestic entities or foreign invested entities operating in other industries. Pursuant to the latest version of the "negative list," namely, the Special Management Measures (Negative List) for the Access of Foreign Investment (2019), which became effective on July 30, 2019, our principal business does not fall into the "restricted" or "prohibited" categories. However, we cannot assure you that the "negative list" will not be updated in the future in any way adverse to our business. In the event that our VIE and its subsidiaries through which we operate our business are not treated as domestic investment and our operations carried out through such VIE and its subsidiaries are classified in the "restricted" or "prohibited" industry in the "negative list" under the Foreign Investment Law, such contractual arrangements may be deemed as invalid and illegal, and we may be required to unwind such contractual arrangements and/or dispose of such business.

Furthermore, if future laws, administrative regulations or provisions mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether we can complete such actions in a timely manner, or at all. In addition, the Foreign Investment Law provides that existing foreign invested enterprises established according to the existing laws regulating foreign investment may maintain their structure and corporate governance within five years after the implementation of the Foreign Investment Law, which means that we may be required to adjust the structure and corporate governance of certain of our PRC entities then. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure, corporate governance and business operations.

### We rely on contractual arrangements with our VIE and its shareholders for a large portion of our business operations, which may not be as effective as direct ownership in providing operational control.

Our VIE contributed 74.9%, 95.4% and 25.0% of our consolidated revenues for the years ended December 31, 2017, 2018 and 2019, respectively. We have relied on and expect to continue to rely on contractual arrangements with our WFOE, our VIE and its shareholders to conduct certain of our key businesses. These contractual arrangements may not be as effective as direct ownership in providing us with control over our VIE. For example, our WFOE, our VIE and its shareholders could breach their contractual arrangements with us by, among other things, failing to conduct the operations of our VIE in an acceptable manner or taking other actions that are detrimental to our interests.

23

23

Table of Contents

If we had direct ownership of our VIE, we would be able to exercise our rights as shareholders to effect changes in the directors and senior management of our VIE, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the current contractual arrangements, we rely on the performance by our VIE and its respective shareholders of their obligations under the contracts to exercise control over our VIE. However, the shareholders of our consolidated VIE may not act in the best interests of our company or may not perform their obligations under these contracts. Such risks exist throughout the period in which we intend to operate certain portions of our business through the contractual arrangements with our VIE. If any dispute relating to these contracts remains unresolved, we will have to enforce our rights under these contracts through the operations of PRC laws and arbitrations, litigations and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. See "—Any failure by our VIE or its shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business." Therefore, our contractual arrangements with our VIE may not be as effective in ensuring our control over the relevant portion of our business operations as direct ownership would be.

*Any failure by our VIE or its shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business.*

EHang Intelligent has entered into a series of contractual arrangements with our VIE and its shareholders. For a description of these contractual arrangements, see "Corporate History and Structure." If our VIE or its shareholders fail to perform their respective obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements. We may also have to rely on legal remedies under PRC laws, including seeking specific performance or injunctive relief, and claiming damages, the effectiveness of which may not be enforceable under PRC laws. For example, if the shareholders of our VIE refuse to transfer their equity interest in our VIE to us or our designee if we exercise the purchase option pursuant to these contractual arrangements, or if they otherwise act in bad faith toward us, then we may have to take legal actions to compel them to perform their contractual obligations.

All of the agreements under our contractual arrangements are governed by PRC laws and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC laws and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. See "—Risks Relating to Doing Business in China—Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us." Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a VIE should be interpreted or enforced under PRC laws. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC laws, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and if the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delays. In the event we are unable to enforce these contractual arrangements, or if we suffer significant delays or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our VIE, and our ability to conduct our business may be negatively affected.

*The shareholders of our VIE may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.*

The shareholders of our VIE include Mr. Huazhi Hu and Mr. Derrick Yifang Xiong, who are also directors, officers and beneficial owners of our company. Conflicts of interest may arise from them in their roles as directors, officers and beneficial owners of our company and as shareholders of our consolidated affiliated entity. These shareholders may breach, or cause our VIE to breach, or refuse to renew, the existing contractual arrangements we have with them and our VIE, which would have a material and adverse effect on our ability to effectively control our VIE and receive economic benefits from them. For example, the shareholders may be able to cause our agreements with our VIE to be performed in a manner adverse to us by, among other things, failing to remit payments due under the contractual arrangements to us on a timely basis. We cannot assure you that when conflicts of interest arise any or all of these shareholders will act in the best interests of our company or such conflicts will be resolved in our favor.

24

Table of Contents

Currently, we do not have any arrangements to address potential conflicts of interest between these shareholders and our company, except that we could exercise our purchase option under the exclusive option agreements with these shareholders to request them to transfer all of their equity interests in our VIE to a PRC entity or individual designated by us, to the extent permitted by PRC laws. For the shareholders who are also our directors and executive officers, we rely on them to abide by the laws of the Cayman Islands and China, which provide that directors owe a fiduciary duty to the company that requires them to act in good faith and in what they believe to be the best interests of the company and not to use their position for personal gain. There is currently no specific and clear guidance under PRC laws that addresses any conflict between PRC laws and laws of Cayman Islands in respect of any conflict relating to corporate governance. The shareholders of our VIE have executed powers of attorney to appoint our WFOE to vote on their behalf and exercise voting rights as shareholders of our VIE, and such rights were reassigned to us in February 2019. If we cannot resolve any conflicts of interest or disputes between us and the shareholders of our VIE, we would have to rely on legal proceedings, which may be expensive, time-consuming and disruptive to our operations. There is also substantial uncertainty as to the outcome of any such legal proceedings.

The shareholders of our VIE may be involved in personal disputes with third parties or other incidents that may have an adverse effect on their respective equity interests in our VIE and the validity or enforceability of our contractual arrangements with its shareholders. For example, in the event that any of the shareholders of our VIE divorces his or her spouse, the spouse may claim that the equity interest of our VIE held by such shareholder is part of their community property and should be divided between such shareholder and his or her spouse. If such claim is supported by the court, the relevant equity interest may be obtained by the shareholder's spouse or another third party who is not subject to obligations under our contractual arrangements, which could result in a loss of the effective control over our VIE by us. Similarly, if any of the equity interests of our VIE is inherited by a third party with whom the current contractual arrangements are not binding, we could lose our control over our VIE or have to maintain such control by incurring unpredicted costs, which could cause significant disruption to our business and operations and harm our financial condition and results of operations.

*Contractual arrangements in relation to our VIE may be subject to scrutiny by the PRC tax authorities and they may determine that we or our VIE and their subsidiaries, owe additional taxes, which could negatively affect our financial condition and the value of your investment.*

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. The Enterprise Income Tax Law requires every enterprise in China to submit its annual enterprise income tax return together with a report on transactions with its related parties to the relevant tax authorities. The tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's length principles. We may face material and adverse tax consequences if the PRC tax authorities determine the contractual arrangements among EHang Intelligent, EHang GZ and shareholders of EHang GZ were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust the income of our VIE in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by our VIE for PRC tax purposes, which could increase our tax expenses. In addition, the PRC tax authorities may impose late payment fees and other penalties on our VIE for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if our VIE's tax liabilities increase or if it is required to pay late payment fees and other penalties.

*We may lose the ability to use and enjoy assets held by our VIE that are material to the operation of certain portion of our business if the VIE goes bankrupt or becomes subject to a dissolution or liquidation proceeding.*

As part of our contractual arrangements with our VIE, our VIE and its subsidiaries hold certain assets that are material to the operation of certain portion of our business, including permits, domain names and most of our IP rights. If our VIE goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. Under the contractual arrangements, our VIE may not, in any manner, sell, transfer, mortgage or dispose of its assets or legal or beneficial interests in the business without our prior consent. If our consolidated affiliated entity undergoes a voluntary or involuntary liquidation proceeding, the independent third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

25

25

Table of Contents

**Risks Relating to Doing Business in China**

*Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business, financial conditions and results of operations.*

A majority of our revenues are expected to be derived in China in the near future and most of our operations, including all of our manufacturing, is conducted in China. Accordingly, our business, prospects, financial condition and results of operations may be influenced to a significant degree by political, economic and social conditions in China generally and by continued economic growth in China as a whole. The Chinese economy differs from the economies of most developed countries in many respects, including the degree of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the PRC government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development by imposing industrial policies. The Chinese government also exercises significant control over China's economic growth through strategically allocating resources, controlling the payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies.

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy, and the rate of growth has been slowing since 2012. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. As a result, changes in economic conditions and government policies could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position.

*Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us.*

The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions may be cited for reference but have limited precedential value in China. Our PRC legal system is evolving rapidly, but its current slate of laws may not be sufficient to cover all aspects of the economic activities in China, including such activities that relate to or have an impact on our business. Implementation and interpretations of laws, regulations and rules are not always undertaken in a uniform matter and enforcement of these laws, regulations and rules involves uncertainties.

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of protection we enjoy than in more developed legal systems. Furthermore, the PRC legal system is based in part on government policies and internal rules (some of which are not published in a timely manner or at all) that may have a retroactive effect. As a result, we may not always be aware of any potential violation of these policies and rules until sometime after the violation. Such uncertainties, including unpredictability towards the scope and effect of our contractual, property (including intellectual property) and procedural rights, and any failure to respond to changes in the regulatory environment in China could materially and adversely affect our business and impede our ability to continue our operations.

*We may be adversely affected by the complexities, uncertainties and changes in PRC regulations on technology companies.*

The PRC government imposes licensing and permit requirements for companies in the technology industry. These laws, regulations and even such announcements are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.

26

**Table of Contents**

In addition, our mobile application, EHang Play is regulated by the Administrative Provisions on Mobile Internet Applications Information Services, or the App Provisions, promulgated by the Cyberspace Administration of China, or the CAC, effective on August 1, 2016. According to the App Provisions, the providers of mobile applications shall not create, copy, publish or distribute information and content that is prohibited by laws and regulations. However, we cannot assure that all the information or content displayed on, retrieved from or linked to our mobile applications complies with the requirements of the App Provisions at all times. If our mobile applications were found to be violating the App Provisions, we may be subject to administrative penalties, including warnings, service suspensions or removal of our mobile applications from relevant mobile application stores, which may materially and adversely affect our business and operating results.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the technology industry, particularly the policies relating to new energy vehicles, have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including our business. We cannot assure you that we have obtained all the permits or licenses required for conducting our business in China or will be able to maintain or renew our existing licenses or obtain new ones.

*Increases in labor costs and enforcement of stricter labor laws and regulations in the PRC may adversely affect our business and our profitability.*

China's overall economy and the average wage level in China have increased in recent years and are expected to continue to grow. The average wage level for our employees has also increased in recent years. We expect that our labor costs, including wages and employee benefits, will continue to increase. Unless we are able to pass on these increased labor costs to our customers, our profitability and results of operations may be materially and adversely affected.

In addition, we have been subject to stricter regulatory requirements in terms of entering into labor contracts with our employees and paying various statutory employee benefits, including pensions, housing funds, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to designated government agencies for the benefit of our employees. Pursuant to the PRC Labor Contract Law and its implementation rules, employers are subject to stricter requirements in terms of signing labor contracts, minimum wages, paying remuneration, determining the term of employee's probation and unilaterally terminating labor contracts. In the event that we decide to terminate some of our employees or otherwise change our employment or labor practices, the PRC Labor Contract Law and its implementation rules may limit our ability to effect those changes in a desirable or cost-effective manner, which could adversely affect our business and results of operations.

In October 2010, the Standing Committee of the National People's Congress promulgated the PRC Social Insurance Law, which came into effect on July 1, 2011. In April 1999, the State Council promulgated the Regulations on the Administration of Housing Funds, which was amended in March 2002. Companies registered and operating in China are required under the Social Insurance Law and the Regulations on the Administration of Housing Funds to, apply for social insurance registration and housing fund deposit registration within 30 days of their establishment and, to pay for their employees different social insurance including pension insurance, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to the extent required by law. Recently, the PRC government enhanced its measures relating to social insurance collection, which lead to stricter enforcement. We could be subject to orders by the competent labor authorities for rectification and failure to comply with the orders which may further subject us to administrative fines.

As the interpretation and implementation of labor-related laws and regulations are still evolving, we cannot assure you that our employment practices do not and will not violate labor-related laws and regulations in China, which may subject us to labor disputes or government investigations. We cannot assure you that we have complied or will be able to comply with all labor-related laws and regulations including those relating to obligations to make social insurance payments and contribute to the housing provident funds. We have not fully paid the social insurance payment and housing provident funds for all of our employees as required by applicable PRC regulations. In addition, we have made social insurance payments and contribute to the housing provident funds for some of our employees through the third party agents, which should be paid by us directly under the applicable PRC regulations We may be required to make up the contributions for our employees, and may be further subjected to late fees payment and administrative fines, resulting in financial conditions and results of operations to be adversely affected.

27

Table of Contents

***We rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business.***

We are a holding company, and we rely on dividends and other distributions on equity paid by our PRC subsidiaries for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and service any debt we may incur. If our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing the debt may restrict its ability to pay dividends or make other distributions to us.

Under PRC laws and regulations, wholly foreign-owned enterprises in China, such as EHang Intelligent, may pay dividends only out of their respective accumulated after-tax profits as determined in accordance with PRC accounting standards and regulations. In addition, a wholly foreign-owned enterprise is required to set aside at least 10% of its accumulated after-tax profits each year, if any, to fund certain statutory reserve funds, until the aggregate amount of such funds reaches 50% of its registered capital. At its discretion, a wholly foreign-owned enterprise may allocate a portion of its after-tax profits based on PRC accounting standards to staff welfare and bonus funds. These reserve funds and staff welfare and bonus funds are not distributable as cash dividends.

Our ability to pay dividends is primarily dependent on receiving distributions of funds from our PRC subsidiaries, our VIE and its subsidiaries. Relevant PRC statutory laws and regulations permit payments of dividends by our PRC subsidiaries, our VIE and its subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the consolidated financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of our PRC subsidiaries, our VIE and its subsidiaries.

In response to the persistent capital outflow and the Renminbi's depreciation against the U.S. dollar, the People's Bank of China and the State Administration of Foreign Exchange, or SAFE, have implemented a series of capital control measures, including stricter vetting procedures for China-based companies to remit foreign currency for overseas acquisitions, dividend payments and shareholder loan repayments. The PRC government may continue to strengthen its capital controls and EHang Intelligent dividends and other distributions may be subjected to tighter scrutiny in the future. Any limitation on the ability of our PRC subsidiaries to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business.

***PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of our offshore offerings to make loans to or make additional capital contributions to our PRC subsidiaries, our VIE and its subsidiaries, which could materially and adversely affect our liquidity and our ability to fund and expand our business.***

We are an offshore holding company conducting our operations in China through our PRC subsidiaries, VIE and its subsidiaries. We may make loans to our PRC subsidiaries, VIE and its subsidiaries, or we may make additional capital contributions to our PRC subsidiaries, or we may establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, or we may acquire offshore entities with business operations in China in an offshore transaction.

28

Table of Contents

Most of these activities are subject to PRC regulations and approvals. For example, loans by us to our wholly owned PRC subsidiaries to finance their activities cannot exceed statutory limits and must be registered with the local counterpart of the State Administration of Foreign Exchange, or SAFE. If we decide to finance our wholly owned PRC subsidiaries by means of capital contributions, these capital contributions are subject to the requirement of making necessary filings in the Foreign Investment Comprehensive Management Information System and registration with other governmental authorities in China. Due to the restrictions imposed on loans in foreign currencies extended to any PRC domestic companies, we are not likely to make such loans to the VIE, which is a PRC domestic company. SAFE promulgated Circular on the Reforming of the Management Method of the Settlement of Foreign Currency Capital of Foreign-invested Enterprises, or SAFE Circular 19, effective on June 1, 2015, in replacement of the Circular on the Relevant Issues Concerning the Launch of Reforming Trial of the Administration Model of the Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, the Notice From the State Administration of Foreign Exchange on Relevant Issues Concerning Strengthening the Administration of Foreign Exchange Businesses, and the Circular on Further Clarification and Regulation of the Issues Concerning the Administration of Certain Capital Account Foreign Exchange Businesses. According to SAFE Circular 19, the flow and use of the RMB capital converted from foreign currency-denominated registered capital of a foreign-invested company is regulated such that RMB capital may not be used for the issuance of RMB entrusted loans, the repayment of inter-enterprise loans or the repayment of banks loans that have been transferred to a third party. Although SAFE Circular 19 allows RMB capital converted from foreign currency-denominated registered capital of a foreign-invested enterprise to be used for equity investments within China, it also reiterates the principle that RMB capital converted from the foreign currency-denominated capital of a foreign-invested company may not be directly or indirectly used for purposes beyond its business scope. Thus, it is unclear whether SAFE will permit such capital to be used for equity investments in China in actual practice. SAFE promulgated the Notice of the State Administration of Foreign Exchange on Reforming and Standardizing the Foreign Exchange Settlement Management Policy of Capital Account, or SAFE Circular 16, effective on June 9, 2016, which reiterates some of the rules set forth in SAFE Circular 19, but changes the prohibition against using RMB capital converted from foreign currency-denominated registered capital of a foreign-invested company to issue RMB entrusted loans to a prohibition against using such capital to issue loans to non-associated enterprises. Violations of SAFE Circular 19 and SAFE Circular 16 could result in administrative penalties. SAFE Circular 19 and SAFE Circular 16 may significantly limit our ability to transfer any foreign currency we hold, including the net proceeds from our initial public offering, to our PRC subsidiaries, which may adversely affect our liquidity and our ability to fund and expand our business in China.

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, we cannot assure you that we will be able to complete the necessary government registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans by us to our PRC subsidiaries or with respect to future capital contributions by us to our PRC subsidiary. If we fail to complete such registrations or obtain such approvals, our ability to use the proceeds we received from our initial public offering and to capitalize or otherwise fund our PRC operations may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

***PRC regulations relating to the establishment of offshore special purpose vehicles by PRC residents may subject our PRC resident beneficial owners or our PRC subsidiaries to liabilities or penalties, limit our ability to inject capital into our PRC subsidiaries, limit the ability of our PRC liabilities to increase its registered capital or distribute profits to us, or may otherwise adversely affect us.***

The SAFE promulgated the Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Round-Trip Investment through Special Purpose Vehicles, or SAFE Circular 37, in July 2014 that requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing with such PRC residents or entities' legally owned assets or equity interests in domestic enterprises or offshore assets or interests. On February 13, 2015, SAFE issued SAFE Circular No. 13, which took effect on June 1, 2015, pursuant to which, the power to accept SAFE registration was delegated from local SAFE to local qualified banks where the assets or interest in the domestic entity was located. SAFE Circular 37 is issued to replace the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents Engaging in Financing and Roundtrip Investments via Overseas Special Purpose Vehicles, or SAFE Circular 75.

If our shareholders who are PRC residents or entities do not complete their registration pursuant to SAFE Circular 37 as required, our PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiaries. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

We have used our best efforts to notify PRC residents or entities who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents to complete the foreign exchange registrations. However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. We cannot assure you that all other shareholders or beneficial owners of ours who are PRC residents or entities have complied with, and will in the future make, obtain or update any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit the ability of our PRC subsidiaries to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

29

Table of Contents

***The M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

The Regulations on Mergers and Acquisitions of Domestic Companies by Foreign Investors, or the M&A Rules, adopted by six PRC regulatory agencies in August 2006 and amended in September 2009, and some other regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex, including requirements in some instances that shall obtained an approval from the MOFCOM in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. Moreover, the Anti-Monopoly Law requires that the MOFCOM shall be notified in advance of any concentration of undertaking if certain thresholds are triggered. In addition, the security review rules issued by the MOFCOM that became effective in September 2011 specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire de facto control over domestic enterprises that raise "national security" concerns are subject to strict review by the MOFCOM, and the rules prohibit any activities attempting to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from the MOFCOM or its local counterparts may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

***Fluctuations in exchange rates could have a material and adverse effect on our results of operations and the value of your investment.***

The value of the Renminbi against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in political and economic conditions in China and by China's foreign exchange policies. On July 21, 2005, the PRC government changed its decade-old policy of pegging the value of the Renminbi to the U.S. dollar, and the Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, the Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. On November 30, 2015, the Executive Board of the International Monetary Fund (IMF) completed the regular five-year review of the basket of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, Renminbi is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and we cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

Significant revaluation of the Renminbi may have a material and adverse effect on your investment. For example, to the extent that we need to convert U.S. dollars we receive from our initial public offering into Renminbi for our operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any material hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

Table of Contents

***Governmental control of currency conversion may limit our ability to utilize our operating revenues effectively and affect the value of your investment.***

The PRC government imposes controls on the convertibility of the Renminbi into foreign currencies and, in certain cases, the remittance of currency out of China. We receive substantially all of our revenues in Renminbi. Under our current corporate structure, our Cayman Islands holding company may rely on dividend payments from our PRC subsidiaries to fund any cash and financing requirements we may have. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval of SAFE if certain procedural requirements are complied with. Specifically, under the existing exchange restrictions, without prior approval of SAFE, cash generated from the operations of our PRC subsidiaries in China may be used to pay dividends to our company. However, approval from or registration with appropriate government authorities is required where Renminbi is to be converted into foreign currency and remitted out of China to pay capital expenses, such as the repayment of loans denominated in foreign currencies. As a result, we need to obtain SAFE approval to use cash generated from the operations of our PRC subsidiaries and consolidated affiliated entities to pay off their respective debt in a currency other than Renminbi owed to entities outside China, or to make other capital expenditure payments outside China in a currency other than Renminbi.

The PRC government has imposed more restrictive foreign exchange policies and stepped up scrutiny of major outbound capital movements including overseas direct investments. More restrictions and substantial vetting processes are put in place by SAFE to regulate cross-border transactions falling under the capital account. For example, if a person (i) uses Renminbi to pay amounts due that should be settled in a foreign currency or (ii) makes payments in Renminbi on behalf of a third party in exchange for repayments in a foreign currency, such person may be subject to a fine of not more than 30% of the illegal payment. In severe cases, the fine could be increased to 100% of the illegal payment. If any of our shareholders or affiliates to whom SAFE regulations are applicable violates any of the foreign exchange policies, it may be subject to penalties from the relevant PRC authorities. Historically, certain minority shareholders invested in our company through payments in Renminbi to our VIE in lieu of payments in U.S. dollars outside of the PRC. In an uncertain event that we are deemed to have participated in our shareholders' actions that are not in compliance with the relevant foreign exchange policies by the PRC regulatory authorities, we could be subject to restrictions on our ability to convert foreign currencies into Renminbi or vice versa, as well as monetary penalties. If the PRC foreign exchange control system prevents us from converting foreign currencies into Renminbi or vice versa, our ability to obtain sufficient foreign currencies to satisfy our foreign currency demands may be materially and adversely affected. For example, we may not be able to pay dividends in foreign currencies to our shareholders, including holders of our ADSs, and we may also encounter difficulties in remitting proceeds from our overseas financings and our revenue from the transactions with our overseas customers.

***Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

Pursuant to SAFE Circular 37, PRC residents who participate in share incentive plans in overseas non-publicly-listed companies may submit applications to SAFE or its local branches for the foreign exchange registration with respect to offshore special purpose companies. In the meantime, our directors, executive officers and other employees who are PRC citizens or who are non-PRC residents residing in the PRC for a continuous period of not less than one year, and who have been granted incentive share awards by us, may follow the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, promulgated by the SAFE in 2012. Pursuant to the 2012 SAFE notices, PRC citizens and non-PRC citizens who reside in China for a continuous period of not less than one year who participate in any stock incentive plan of an overseas publicly listed company, are required to register with SAFE through a domestic qualified agent, which could be the PRC subsidiary of such overseas listed company, and complete certain other procedures. In addition, an overseas entrusted institution must be retained to handle matters in connection with the exercise or sale of stock options and the purchase or sale of shares and interests. We and our executive officers and other employees who are PRC citizens or who reside in the PRC for a continuous period of not less than one year and who have been granted restricted share units are subject to these regulations as our company has become an overseas listed company. Failure to complete the SAFE registrations may subject us to fines, and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiaries and limit the ability of our PRC subsidiaries to distribute dividends to us. We also face regulatory uncertainties that could restrict our abilities to adopt additional incentive plans for our directors, executive officers and employees under PRC laws.

31

Table of Contents

The State Administration of Taxation, or SAT, has issued certain circulars concerning employee share options and restricted shares. If our employees fail to pay or we fail to withhold their income taxes according to relevant laws and regulations, we may face sanctions imposed by the tax authorities or other PRC governmental authorities.

*Discontinuation of any of the preferential tax treatments and government subsidies or imposition of any additional taxes and surcharges could adversely affect our financial condition and results of operations.*

Each of EHang Intelligent, EHang GZ and EHang Egret is currently qualified as a high and new technology enterprise, or HNTE, and as such is eligible for a 15% preferential tax rate, which will expire in December 2020, November 2022 and November 2021, respectively. The discontinuation of any of the preferential income tax treatment that we currently enjoy could have a material and adverse effect on our result of operations and financial condition. We cannot assure you that we will be able to maintain or lower our current effective tax rate in the future.

Our PRC subsidiaries have received various financial subsidies from PRC local government authorities. The financial subsidiaries result from discretionary incentives and policies adopted by PRC local government authorities. The discontinuation of such financial subsidies or imposition of any additional taxes could adversely affect our financial condition and results of operations.

*If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.*

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with its "de facto management body" within the PRC is considered a "resident enterprise" and will be subject to PRC enterprise income tax on its global income at the rate of 25%. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control and overall management over the business, production, personnel, accounts and properties of an enterprise. In 2009, the State Administration of Taxation issued a circular, known as SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners, the criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" text should be applied in determining the tax resident status of all offshore enterprises. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." If the PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, we will be subject to the enterprise income tax on our global income at the rate of 25% and we will be required to comply with PRC enterprise income tax reporting obligations. In addition, gains realized sale or other disposition of the ADSs or ordinary shares may be subject to PRC tax at a rate of 10% (in the case of non-PRC enterprise) or 20% in the case of non-PRC individuals (in each case, subject to the provisions of any applicable tax treaty), if such gains are deemed to be from PRC sources. These rates may be reduced by an applicable tax treaty, but it is unclear whether non-PRC shareholders of EHang Intelligent would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that EHang Intelligent is treated as a PRC resident enterprise. Any such PRC tax may reduce the returns on your investment in the ADSs.

32

Table of Contents

***We may not be able to obtain certain benefits under the relevant tax treaty on dividends paid by our PRC subsidiaries to us through our Hong Kong subsidiary.***

We are a holding company incorporated under the laws of the Cayman Islands and as such rely on dividends and other distributions on equity from our PRC subsidiaries to satisfy part of our liquidity requirements. Pursuant to the PRC Enterprise Income Tax Law, a withholding tax rate of 10% currently applies to dividends paid by a PRC "resident enterprise" to a foreign enterprise investor, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with China that provides for preferential tax treatment. Pursuant to the Arrangement between the Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income, such withholding tax rate may be lowered to 5% if a Hong Kong resident enterprise owns no less than 25% of a PRC enterprise. Furthermore, the Administrative Measures for Non-Resident Enterprises to Enjoy Treatments under Tax Treaties, which became effective in August 2015, require non-resident enterprises to determine whether they are qualified to enjoy the preferential tax treatment under the tax treaties and file relevant report and materials with the tax authorities. There are also other conditions for enjoying the reduced withholding tax rate according to other relevant tax rules and regulations. See "Item 10. Additional Information—E. Taxation—People's Republic of China Taxation." As of December 31, 2019, our PRC subsidiaries and the VIE located in the PRC reported accumulated loss and therefore they had no retained earnings for offshore distribution. In the future, we intend to re-invest all earnings, if any, generated from our PRC subsidiaries for the operation and expansion of our business in China. Should our tax policy change to allow for offshore distribution of our earnings, we would be subject to a significant withholding tax. We cannot assure you that our determination regarding our qualification to enjoy the preferential tax treatment could be challenged by the relevant tax authority and we may be unable to complete the necessary filings with the relevant tax authority and enjoy the preferential withholding tax rate of 5% under the arrangement with respect to dividends to be paid by our PRC subsidiary to our Hong Kong subsidiary.

***We face uncertainty with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies.***

In February 2015, the State Administration of Taxation issued the Public Notice Regarding Certain Enterprise Income Tax Matters on Indirect Transfer of Properties by Non-Resident Enterprises, or SAT Public Notice 7. SAT Public Notice 7 extends its tax jurisdiction to not only indirect transfers but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. In addition, SAT Public Notice 7 provides certain criteria on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. SAT Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets must report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may disregard the existence of the overseas holding company if it lacks a reasonable commercial purpose and was established for the purpose of reducing, avoiding or deferring PRC tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of 10% (subject to available preferential tax treatment under applicable tax treaties or similar arrangements) for the transfer of equity interests in a PRC resident enterprise. On October 17, 2017, the SAT issued the Announcement of the State Administration of Taxation on Issues Concerning the Withholding of Non-resident Enterprise Income Tax at Source, or SAT Bulletin 37, which came into effect on December 1, 2017. The SAT Bulletin 37 further clarifies the practice and procedure of the withholding of nonresident enterprise income tax.

We face uncertainties on the reporting and consequences of future private equity financing transactions, share exchanges or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises. The PRC tax authorities may pursue such non-resident enterprises with respect to a filing or the transferees with respect to withholding obligation, and request our PRC subsidiaries to assist in the filing. As a result, we and non-resident enterprises in such transactions may risk being subject to filing obligations or being taxed under SAT Public Notice 7 and SAT Bulletin 37, and may be required to expend valuable resources to comply with them or to establish that we and our non-resident enterprises should not be taxed under these regulations, which may have a material adverse effect on our financial condition and results of operations.

33

Table of Contents

***If the custodians or authorized users of controlling non-tangible assets of our company, including our corporate chops and seals, fail to fulfill their responsibilities, or misappropriate or misuse these assets, our business and operations could be materially and adversely affected.***

Under PRC law, legal documents for corporate transactions are executed using the chops or seal of the signing entity or with the signature of a legal representative whose designation is registered and filed with the relevant branch of the Administration of Industry and Commerce.

Although we usually utilize chops to enter into contracts, the designated legal representatives of each of our PRC subsidiaries, VIE and its subsidiaries have the apparent authority to enter into contracts on behalf of such entities without chops and bind such entities. All designated legal representatives of our PRC subsidiaries, variable interest entity and its subsidiaries are members of our senior management team who have signed employment agreements with us or our PRC subsidiaries, VIE and its subsidiaries under which they agree to abide by various duties they owe to us. In order to maintain the physical security of our chops and chops of our PRC entities, we generally store these items in secured locations accessible only by the authorized personnel in the legal or finance department of each of our subsidiaries, VIE and its subsidiaries. Although we monitor such authorized personnel, there is no assurance such procedures will prevent all instances of abuse or negligence.

Accordingly, if any of our authorized personnel misuse or misappropriate our corporate chops or seals, we could encounter difficulties in maintaining control over the relevant entities and experience significant disruption to our operations. If a designated legal representative obtains control of the chops in an effort to obtain control over any of our PRC subsidiaries, VIE or its subsidiaries, we or our PRC subsidiaries, VIE and its subsidiaries would need to pass a new shareholders or board resolution to designate a new legal representative and we would need to take legal action to seek the return of the chops, apply for new chops with the relevant authorities, or otherwise seek legal redress for the violation of the representative's fiduciary duties to us, which could involve significant time and resources and divert management attention away from our regular business. In addition, the affected entity may not be able to recover corporate assets that are sold or transferred out of our control in the event of such a misappropriation if a transferee relies on the apparent authority of the representative and acts in good faith.

***Our leased property interest may be defective and our right to lease the properties may be challenged, which could cause significant disruption to our business.***

We lease all the premises used in our operations from third parties. We require the landlords' cooperation to effectively manage the condition of such premises, buildings and facilities. In the event that the condition of the office premises, buildings and facilities deteriorates, or if any or all of our landlords fail to properly maintain and renovate such premises, buildings or facilities in a timely manner or at all, the operation of our offices could be materially and adversely affected.

Moreover, certain lessors have not provided us with valid ownership certificates or authorization of sublease for our leased properties. Under the relevant PRC laws and regulations, if the lessors are unable to obtain certificate of title because such properties were built illegally or failed to pass the inspection or other reasons, such lease contracts may be recognized as void and as a result, we may be required to vacate the relevant properties. In addition, if our lessors are not the owners of the properties and they have not obtained consents from the owners or their lessors or permits from the relevant government authorities, our leases could be invalidated. If this occurs, we may have to renegotiate the leases with the owners or the parties who have the right to lease the properties, and the terms of the new leases may be less favorable to us, or we may be required to vacate the relevant properties if the terms of the new leases are not reached. Furthermore, certain leased properties may be recalled anytime by the lessors, and we may not pursue any recovery from such lessors due to the agreed terms between the company and the lessors, which may cause monetary lost to the company.

Under PRC laws, all lease agreements are required to be registered with the local housing authorities. We have not registered certain of our lease agreements with the relevant government authorities. Failure to complete these required registrations may expose our landlords, lessors and us to potential monetary fines.

Table of Contents

***The audit report included in this annual report is prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board and, as such, our investors are deprived of the benefits of such inspection.***

Our independent registered public accounting firm that issues the audit report included in this annual report, as auditors of companies that are traded publicly in the United States and a firm registered with the PCAOB, is subject to laws in the United States pursuant to which the PCAOB conducts regular inspections to assess its compliance with professional standards. Because our auditors are located in China, a jurisdiction where the PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, our auditors are not currently inspected by the PCAOB. On December 7, 2018, the SEC and the PCAOB issued a joint statement highlighting continued challenges faced by the U.S. regulators in their oversight of financial statement audits of U.S.-listed companies with significant operations in China. The joint statement reflects a heightened interest in an issue that has vexed U.S. regulators in recent years. However, it remains unclear what further actions the SEC and PCAOB will take to address the problem.

Inspections of other firms that the PCAOB has conducted outside China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. This lack of PCAOB inspections in China prevents the PCAOB from regularly evaluating our auditor's audits and its quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures as compared to auditors outside of China that are subject to PCAOB inspections. Investors may lose confidence in our reported financial information and procedures and the quality of our consolidated financial statements.

***Proceedings instituted by the SEC against the "big four" PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.***

Starting in 2011 the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, were affected by a conflict between U.S. and Chinese law. Specifically, for certain U.S.-listed companies operating and audited in mainland China, the SEC and the PCAOB sought to obtain from the Chinese firms access to their audit work papers and related documents. The firms were, however, advised and directed that under Chinese law, they could not respond directly to the U.S. regulators on those requests, and that requests by foreign regulators for access to such papers in China had to be channeled through the CSRC.

In late 2012, this impasse led the SEC to commence administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against the Chinese accounting firms, including our independent registered public accounting firm. A first instance trial of the proceedings in July 2013 in the SEC's internal administrative court resulted in an adverse judgment against the firms. The administrative law judge proposed penalties on the firms including a temporary suspension of their right to practice before the SEC, although that proposed penalty did not take effect pending review by the Commissioners of the SEC. On February 6, 2015, before a review by the Commissioner had taken place, the firms reached a settlement with the SEC. Under the settlement, the SEC accepts that future requests by the SEC for the production of documents will normally be made to the CSRC. The firms will receive matching Section 106 requests, and are required to abide by a detailed set of procedures with respect to such requests, which in substance require them to facilitate production via the CSRC. If they fail to meet specified criteria, the SEC retains authority to impose a variety of additional remedial measures on the firms depending on the nature of the failure. Remedies for any future noncompliance could include, as appropriate, an automatic six-month bar on a single firm's performance of certain audit work, commencement of a new proceeding against a firm, or in extreme cases the resumption of the current proceeding against all four firms. If additional remedial measures are imposed on the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, in administrative proceedings brought by the SEC alleging the firms' failure to meet specific criteria set by the SEC with respect to requests for the production of documents, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against these audit firms may cause investor uncertainty regarding China-based, U.S.-listed companies and the market price of our ADSs may be adversely affected.

35

Table of Contents

In December 2018, the SEC and the PCAOB issued a joint statement on regulatory access to audit and other information internationally that cites the ongoing challenges faced by them in overseeing the financial reporting of companies listed in the United States with operations in China, the absence of satisfactory progress in discussions on these issues with Chinese authorities and the potential for remedial action if significant information barriers persist. If our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of the ADSs representing our Class A ordinary shares from the Nasdaq Global Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

As part of a continued regulatory focus in the United States on access to audit and other information currently protected by national law, in particular China's, in June 2019, a bipartisan group of lawmakers introduced bills in both houses of Congress that would require the SEC to maintain a list of issuers for which the PCAOB is not able to inspect or investigate an auditor report issued by a foreign public accounting firm. The Ensuring Quality Information and Transparency for Abroad-Based Listings on our Exchanges (EQUITABLE) Act prescribes increased disclosure requirements for such issuers and, beginning in 2025, the delisting from national securities exchanges of issuers included for three consecutive years on the SEC's list. Enactment of this legislation or other efforts to increase U.S. regulatory access to audit information could cause investor uncertainty for affected issuers, including us, and the trading price of our ADSs could be adversely affected. It is unclear if this proposed legislation would be enacted.

If our independent registered public accounting firm was denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of the ADSs from Nasdaq Stock Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of the ADSs in the United States.

**Risks Relating to the ADSs and Trading Market**

***The trading price of the ADSs is likely to be volatile, which could result in substantial losses to investors.***

Since our ADSs became listed on the Nasdaq Global Market on December 12, 2019, the trading price of our ADSs has ranged from US$7.84 to US$14.57 per ADS. The trading price of the ADSs is likely to be volatile and could fluctuate widely due to multiple factors, some of which are beyond our control. This may happen because of broad market and industry factors, including the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. In addition to market and industry factors, the price and trading volume for the ADSs may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, earnings and cash flows;
- regulatory developments affecting us, our customers, or our industry;
- announcements of studies and reports relating to the quality of our products and service offerings or those of our competitors;
- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;
- announcements of new products or service offerings and expansions by us or our competitors;
- changes in financial estimates by securities analysts;
- detrimental adverse publicity about us, our products or services or our industry;
- additions or departures of key personnel;
- detrimental negative publicity about us, our management or our industry;
- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities; and
- actual or potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which the ADSs will trade.

In the past, shareholders of public companies have often brought securities class action suits against companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

36

Table of Contents

***Our dual-class share structure with different voting rights will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Our authorized share capital is divided into Class A ordinary shares and Class B ordinary shares. In respect of matters requiring the votes of shareholders, holders of Class B ordinary shares is entitled to ten votes per share, while holders of Class A ordinary shares is entitled to one vote per share based on our dual-class share structure. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, transfer, assignment or disposition of any Class B ordinary shares by their holder or a change of ultimate beneficial ownership of any Class B ordinary share to any person other than our founder, Mr. Huazhi Hu, or an affiliate controlled by our founder, such Class B ordinary shares are automatically and immediately converted into the same number of Class A ordinary shares.

As of March 31, 2020, our founder will beneficially own all of our issued Class B ordinary shares. These Class B ordinary shares will constitute approximately 42.2% of our total issued and outstanding share capital and 87.8% of the aggregate voting power of our total issued and outstanding share capital as of March 31, 2020. See "Item 6. Directors, Senior Management and Employees—E. Principal Shareholders."

Although we have no current plan to issue additional Class B ordinary shares, our board of directors has the authority without further action by our shareholders to issue additional Class B ordinary shares, which will further dilute the voting power of our Class A ordinary shareholders. As a result of the dual-class share structure and the concentration of ownership, our founder has considerable influence over matters such as mergers, consolidations and the sale of all or substantially all of our assets, election of directors, amendments to organizational documents and other significant corporate actions. Our founder may take actions that are not in the best interest of our other shareholders. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could have the effect of depriving our other shareholders of the opportunity to receive a premium for their shares as part of a sale of our company and may reduce the price of our ADSs. This concentrated control will limit your ability to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A ordinary shares and ADSs may view as beneficial.

In addition, our founder will continue to be able to control all matters submitted to our shareholders for approval even if his share holdings represent substantially less than a majority of our outstanding common shares. This concentrated control will limit your ability to influence corporate matters for the foreseeable future, and, as a result, the market price of our Class A common shares could be adversely affected.

In July 2017, FTSE Russell and Standard & Poor's announced that they would cease to allow most newly public companies utilizing dual- or multi-class capital structures to be included in their indices. Affected indices include the Russell 2000 and the S&P 500, S&P MidCap 400 and S&P SmallCap 600, which together comprise the S&P Composite 1500. Under the announced policies, our dual-class share structure would make us ineligible for inclusion in any of these indices, and as a result, mutual funds, exchange-traded funds and other investment vehicles that attempt to passively track these indices will not be investing in our shares. These policies are new, and it is as of yet unclear what effect, if any, they will have on the valuations of publicly traded companies excluded from these indices, but it is possible that they may depress these valuations or depress our trading volume compared to those of other similar companies that are included in these indices.

***We are a "controlled company" within the meaning of the Nasdaq Stock Market Rules and, as a result, may rely on exemptions from certain corporate governance requirements that provide protection to shareholders of other companies.***

We are a "controlled company" as defined under the Nasdaq Stock Market Rules because our founder, chairman of the board of directors and chief executive officer, Mr. Huazhi Hu, owns more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we may rely on certain exemptions from corporate governance rules, including the rule that a majority of our board of directors must be independent directors and that we have to establish a nominating committee and a compensation committee composed entirely of independent directors. As a result, you will not have the same protection afforded to shareholders of companies that are subject to these corporate governance requirements. We currently do not plan to rely on these exemptions.

Table of Contents

***If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding the ADSs, the market price for the ADSs and trading volume could decline.***

The trading market for the ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade the ADSs, the market price for the ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume of the ADSs to decline.

***The sale or availability for sale of substantial amounts of the ADSs could adversely affect their market price.***

Sales of substantial amounts of the ADSs in the public market, or the perception that these sales could occur, could adversely affect the market price of the ADSs and could materially impair our ability to raise capital through equity offerings in the future. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs.

***Because we do not expect to pay dividends in the foreseeable future, the holders of our ADSs must rely on price appreciation of the ADSs for a return on their investment.***

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, the ADS holders should not rely on an investment in the ADSs as a source for any future dividend income.

Our board of directors has discretion as to whether to distribute dividends, subject to certain restrictions under Cayman Islands law, namely that our company may only pay dividends out of profits or share premium, and provided always that in no circumstances may a dividend be paid if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our board of directors. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return to ADS holders on the investment in the ADSs will likely depend entirely upon any future price appreciation of the ADSs. There is no guarantee that the ADSs will appreciate in value or even maintain the price at which the ADS holders purchased the ADSs. Our ADS holders may not realize a return on their investment in the ADSs and they may even lose their entire investment in the ADSs.

***Our memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our ordinary shares and ADSs.***

Our memorandum and articles of association contain provisions which could limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders and ADS holders of an opportunity to sell their shares or ADSs at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. Our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of the ADSs may fall and the voting and other rights of the holders of our ordinary shares and ADSs may be materially and adversely affected.

38

Table of Contents

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.***

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Law (2020 Revision) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against our directors, actions by our minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records (other than the memorandum and articles of association) or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by our management, members of our board of directors or our controlling shareholders than they would as public shareholders of a company incorporated in the United States.

***Certain judgments obtained against us by our shareholders may not be enforceable.***

We are a Cayman Islands exempted company and substantially all of our assets are located outside of the United States. Most of our current operations are conducted in China. In addition, most of our current directors and officers are nationals and residents of countries other than the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers.

***The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to direct how the Class A ordinary shares which are represented by your ADSs are voted.***

Holders of ADSs do not have the same rights as our registered shareholders. As a holder of the ADSs, you will not have any direct right to attend general meetings of our shareholders or to cast any votes at such meetings. You will only be able to exercise the voting rights which are carried by the underlying Class A ordinary shares represented by your ADSs indirectly by giving voting instructions to the depositary in accordance with the provisions of the deposit agreement. Under the deposit agreement, you may vote only by giving voting instructions to the depositary. If we instruct the depositary to ask for your instructions, then upon receipt of your voting instructions, the depositary will try, as far as is practicable, to vote the underlying Class A ordinary shares which are represented by your ADSs in accordance with your instructions. If we do not instruct the depositary to ask for your instructions, the depositary may still vote in accordance with instructions you give, but it is not required to do so. You will not be able to directly exercise your right to vote with respect to the underlying Class A ordinary shares represented by your ADSs unless you cancel and withdraw such shares and become the registered holder of such shares prior to the record date for the general meeting.

Under our memorandum and articles of association, the minimum notice period required to be given by our company to our registered shareholders to convene a general meeting is ten calendar days. When a general meeting is convened, you may not receive sufficient advance notice of the meeting to withdraw the underlying Class A ordinary shares represented by your ADSs and become the registered holder of such shares to allow you to attend the general meeting and to vote directly with respect to any specific matter or resolution to be considered and voted upon at the general meeting. In addition, under our articles of association, for the purposes of determining those shareholders who are entitled to attend and vote at any general meeting, our directors may close our register of members and/or fix in advance a record date for such meeting, and such closure of our register of members or the setting of such a record date may prevent you from withdrawing the underlying Class A ordinary shares represented by your ADSs and becoming the registered holder of such shares prior to the record date, so that you would not be able to attend the general meeting or to vote directly. If we ask for your instructions, the depositary will notify you of the upcoming vote and will arrange to deliver our voting materials to you. We have agreed to give the depositary at least 45 days' prior notice of shareholder meetings. Nevertheless, we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote the underlying Class A ordinary shares represented by your ADSs. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. This means that you may not be able to exercise your right to direct how the underlying Class A ordinary shares represented by your ADSs are voted and you may have no legal remedy if the underlying Class A ordinary shares represented by your ADSs are not voted as you requested.

Table of Contents

***The depositary for the ADSs will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs if you do not vote at shareholders' meetings, which could adversely affect your interests.***

Under the deposit agreement for the ADSs, if you do not vote, the depositary may give us a discretionary proxy to vote the Class A ordinary shares underlying your ADSs at shareholders' meetings if:

- we have timely provided the depositary with notice of meeting and related voting materials;
- we have instructed the depositary that we wish a discretionary proxy to be given;
- we have informed the depositary that there is no substantial opposition as to a matter to be voted on at the meeting; and
- a matter to be voted on at the meeting would not have a material adverse impact on shareholders.

The effect of this discretionary proxy is that if you do not vote at shareholders' meetings, you cannot prevent the Class A ordinary shares underlying your ADSs from being voted, except under the circumstances described above. This may make it more difficult for shareholders to influence the management of our company. Holders of our ordinary shares are not subject to this discretionary proxy.

***You may not receive dividends or other distributions on our ordinary shares and you may not receive any value for them, if it is illegal or impractical to make them available to you.***

The depositary of the ADSs has agreed to distribute, subject to the terms of the deposit agreement, the cash dividends or other distributions it or the custodian receives on our Class A ordinary shares or other deposited securities underlying the ADSs, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A ordinary shares your ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed under an applicable exemption from registration. The depositary may also determine that it is not feasible to distribute certain property. Additionally, the value of certain distributions may be less than the cost of distribution. In these cases, the depositary may determine not to distribute such property. We have no obligation to register under U.S. securities laws any ADSs, ordinary shares, rights or other securities received through such distributions. We also have no obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive distributions we make on our ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may cause a material decline in the value of the ADSs.

***You may experience dilution of your holdings due to inability to participate in rights offerings.***

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

40

Table of Contents

*You may be subject to limitations on transfer of your ADSs.*

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events, such as a rights offering, or "for record date or processing purposes" in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of the ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

*ADSs holders may not be entitled to a jury trial with respect to claims arising under the deposit agreement, which could result in less favorable outcomes to the plaintiffs in any such action.*

The deposit agreement governing the ADSs representing our Class A ordinary shares provides that, to the fullest extent permitted by law, ADS holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our shares, the ADSs or the deposit agreement, including any claim under the U.S. federal securities laws.

If we or the depositary opposed a jury trial demand based on the waiver, the court would determine whether the waiver was enforceable based on the facts and circumstances of that case in accordance with the applicable state and federal law. To our knowledge, the enforceability of a contractual pre-dispute jury trial waiver in connection with claims arising under the federal securities laws has not been finally adjudicated by the United States Supreme Court. However, we believe that a pre-dispute contractual waiver of jury trial is generally enforceable, including under the laws of the State of New York, which govern the deposit agreement, by a federal or state court in the City of New York, which has non-exclusive jurisdiction over matters arising under the deposit agreement. In determining whether to enforce a pre-dispute contractual waiver of jury trial, courts will generally consider whether a party knowingly, intelligently and voluntarily waived the right to a jury trial. We believe that this is the case with respect to the deposit agreement and the ADSs. It is advisable that you consult legal counsel regarding the jury waiver provision before entering into the deposit agreement.

If you or any other holders or beneficial owners of ADSs bring a claim against us or the depositary in connection with matters arising under the deposit agreement or the ADSs, including claims under federal securities laws, you or such other holder or beneficial owner may not be entitled to a jury trial with respect to such claims, which may have the effect of limiting and discouraging lawsuits against us and the depositary. If a lawsuit is brought against either or both of us and the depositary under the deposit agreement, it may be heard only by a judge or justice of the applicable trial court, which would be conducted according to different civil procedures and may result in different outcomes than a trial by jury would have, including results that could be less favorable to the plaintiffs in any such action.

Nevertheless, if this jury trial waiver provision is not permitted by applicable law, an action could proceed under the terms of the deposit agreement with a jury trial. No condition, stipulation or provision of the deposit agreement or ADSs serves as a waiver by any holder or beneficial owner of ADSs or by us or the depositary of compliance with any substantive provision of the U.S. federal securities laws and the rules and regulations promulgated thereunder.

*We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.*

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including:

- the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC;
- the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act;
- the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and
- the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

41

Table of Contents

We are required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of the Nasdaq Stock Market. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information which would be made available to you were you investing in a U.S. domestic issuer.

### *We are an emerging growth company within the meaning of the Securities Act and may take advantage of certain reduced reporting requirements.*

We are an "emerging growth company," as defined in the JOBS Act, and we may take advantage of certain exemptions from requirements applicable to other public companies that are not emerging growth companies including, most significantly, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 for so long as we remain an emerging growth company. As a result, if we elect not to comply with such auditor attestation requirements, our investors may not have access to certain information they may deem important.

The JOBS Act also provides that an emerging growth company does not need to comply with any new or revised financial accounting standards until such date that a private company is otherwise required to comply with such new or revised accounting standards.

### *We will incur increased costs as a result of being a public company, particularly after we cease to qualify as an "emerging growth company."*

We are a public company and expect to incur significant legal, accounting and other expenses that we did not incur as a private company, including additional costs associated with our public company reporting obligations. The Sarbanes-Oxley Act of 2002, as well as rules subsequently implemented by the SEC and the Nasdaq Stock Market, impose various requirements on the corporate governance practices of public companies. As a company with less than US$1.07 billion in revenues for our last fiscal year, we qualify as an "emerging growth company" pursuant to the JOBS Act. An emerging growth company may take advantage of specified reduced reporting and other requirements that are otherwise applicable generally to public companies. These provisions include exemption from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002 in the assessment of the emerging growth company's internal control over financial reporting. The JOBS Act also permits an emerging growth company to delay adopting new or revised accounting standards until such time as those standards apply to private companies. We rely on such exemption provided by the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with public company effective dates.

We expect these rules and regulations to increase our legal and financial compliance costs and to make some corporate activities more time-consuming and costly. After we are no longer an "emerging growth company," we expect to incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002 and the other rules and regulations of the SEC. For example, as a result of being a public company, we need to increase the number of independent directors and adopt policies regarding internal controls and disclosure controls and procedures. In addition, operating as a public company makes it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. In addition, we will incur additional costs associated with our public company reporting requirements. It may also be more difficult for us to find qualified persons to serve on our board of directors or as executive officers. We are currently evaluating and monitoring developments with respect to these rules and regulations, and we cannot predict or estimate with any degree of certainty the amount of additional costs we may incur or the timing of such costs.

42

Table of Contents

***As a company incorporated in the Cayman Islands, we are permitted to adopt certain home country practices in relation to corporate governance matters that differ significantly from the Nasdaq Stock Market corporate governance listing standards; these practices may afford less protection to shareholders than they would enjoy if we comply fully with the Nasdaq Stock Market corporate governance listing standards.***

As a Cayman Islands exempted company listed on Nasdaq Global Market, we are subject to the Nasdaq Stock Market corporate governance listing standards. However, Nasdaq Stock Market rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the Nasdaq Stock Market corporate governance listing standards. We have elected to following our home country practice in lieu of certain corporate government requirements of the Nasdaq Stock Market. See "Item 16G. Corporate Governance." As a result, our shareholders may be afforded less protection than they would otherwise enjoy under the Nasdaq Stock Market corporate governance listing standards applicable to U.S. domestic issuers.

***There can be no assurance that we were not a passive foreign investment company, or PFIC, for 2019 or that we will not be a PFIC for 2020 or any other taxable year, which could result in adverse U.S. federal income tax consequences to U.S. investors owning the ADSs or Class A ordinary shares.***

A non-U.S. corporation, such as our company, will be a PFIC for U.S. federal income tax purposes for any taxable year if either (i) at least 75% of its gross income for such year is passive income or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets) during a such year is attributable to assets that produce or are held for the production of passive income. A separate determination must be made after the close of each taxable year as to whether a non-U.S. corporation is a PFIC for that year. Although the law in this regard is unclear, we intend to treat our VIE and its subsidiaries as being owned by us for U.S. federal income tax purposes, not only because we exercise effective control over the operations of such entities but also because we are entitled to substantially all of their economic benefits and, as a result, we consolidate their results of operations in our consolidated financial statements.

Assuming that we are treated as the owner of our VIE (and its subsidiaries) for U.S. federal income tax purposes, and based upon our current and expected income and assets, including goodwill and other unbooked intangibles, and the market value of the ADSs, we do not believe we were a PFIC for U.S. federal income tax purposes for the taxable year ended December 31, 2019 and we do not expect to be a PFIC for the current taxable year or the foreseeable future. While we do not expect to become a PFIC, because the value of our assets for purposes of the asset test may be determined by reference to the market price of the ADSs, fluctuations in the market price of the ADSs may cause us to become a PFIC for the current or subsequent taxable years. In addition, the composition of our income and assets will also be affected by how, and how quickly, we use our liquid assets and the cash raised in our initial public offering. If we determine not to deploy significant amounts of cash for active purposes or if it were determined that we do not own the stock of our VIE for U.S. federal income tax purposes, our risk of being a PFIC may substantially increase. In light of the foregoing, there can be no assurance that we were not, or will not be, a PFIC for any taxable year.

If we are a PFIC for any taxable year during which a U.S. Holder (as defined in "Item 10. Additional Information—E. Taxation—U.S. Federal Income Taxation") holds the ADSs or ordinary shares, certain adverse U.S. federal income tax consequences could apply to such U.S. Holder. See "Item 10. Additional Information—E. Taxation—U.S. Federal Income Taxation—Passive Foreign Investment Company Rules."

## ITEM 4. INFORMATION ON THE COMPANY
### A.    History and Development of the Company

In December 2014, we incorporated EHang in the Cayman Islands as our offshore holding company to facilitate offshore financing and listing. In the same month, we established Ehfly.

From 2015 to 2018, we established the following principal subsidiaries to conduct our principal business of AAV manufacturing and sales and the provision of AAV commercial solutions and related services:

- In October 2015, Ehfly established a wholly-owned subsidiary in China, EHang Intelligent, our WFOE. EHang Intelligent is engaged in the research, development, manufacture and sale of AAVs, and the research and development of software, communication technology and autonomous control technology related to air mobility and intelligent aviation.
- In January 2016, we obtained control over EHang GZ, our VIE, through EHang Intelligent by entering into a series of contractual arrangements with EHang GZ and its shareholders. EHang GZ is primarily engaged in the research, development, manufacture and sale of AAVs, and the research and development of AAV operating systems and infrastructure.

43

Table of Contents

- In July 2016, EHang GZ established EHang Egret, to provide aerial media solutions and related services.
- In March 2018, EHang Intelligent established EHang Tianyu, to provide logistics solutions and related services.

Under PRC laws and regulations, our PRC subsidiaries may pay cash dividends to us out of their respective accumulated profits. However, the ability to our PRC subsidiaries to make such distribution to us is subject to various PRC laws and regulations, including the requirement to fund certain statutory funds, as well as potential restriction on currency exchange and capital controls imposed by the PRC government. For more details, see "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China— We rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business" and "Item 4. Information on the Company—B. Business Overview—PRC Regulation—Regulations Relating to Dividend Distributions." As a result of our contractual arrangements with the VIE and its shareholders, EHang is regarded as the primary beneficiary of the VIE, and we treat the VIE and its subsidiaries as our consolidated affiliated entities under U.S. GAAP. We have consolidated the financial results of the VIE and its subsidiaries in our consolidated financial statements in accordance with U.S. GAAP.

On December 12, 2019, our ADSs commenced trading on the Nasdaq Global Market under the symbol "EH." We raised approximately US$33.9 million in net proceeds from the issuance of new shares from our initial public offering after deducting underwriting commissions and the offering expenses payable by us. In January 2020, the underwriters exercised their over-allotment option and we raised approximately US$9.8 million in net proceeds from the issuance of new shares after deducting underwriting discounts and offering expenses payable by us.

Our principal executive offices are located at Building C, Yixiang Technology Park, No.72 Nanxiang Second Road, Huangpu District, Guangzhou 510700, People's Republic of China. Our telephone number at this address is +86 20 29028899. Our registered office is situated at the office of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands. Our agent for service of process in the United States is Cogency Global Inc., located at 122 East 42nd Street, 18th Floor, New York, NY 10168.

The SEC maintains an internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC on www.sec.gov. You can also find information on our website *www.ehang.com*. The information on our website should not be deemed a part of this annual report.

**B.    Business Overview**

We are an autonomous aerial vehicle technology platform company. We are pioneering the future of transportation through our proprietarily developed AAVs and related commercial solutions. We believe we are the first in the world to launch passenger-grade AAVs, setting a new milestone in AAV technology.

In today's increasingly populated and interconnected world, traditional modes of urban transportation continue to contribute to congestion and pollution, and they are largely confined to land-based infrastructure. Mobility for the future requires a revolutionary solution. While the sky above has always been a possibility, we brought a safe, eco-friendly, cost-effective and easy-to-use air mobility solution one step closer to reality when we unveiled our first passenger-grade AAV in 2016. Our AAVs require minimal space for vertical take-off and landing, enabling urban travel to expand to the three-dimensional space. We believe AAV technology will transform the future of transportation, improving lives and creating new industries.

We design, develop, manufacture, sell and operate AAVs and their supporting systems and infrastructure for a broad range of industries and applications, including air mobility (consisting of passenger transportation and logistics), smart city management and aerial media solutions. We aim to make it safe and convenient for both passengers and goods to take to the air.

Table of Contents

***Contracts with Our Customers and Partners***

We have entered into a number of long-term framework and conditional agreements with our business partners relating to the sale of passenger-grade AAVs. These business partners include several PRC AAV distributors, a U.S. biotechnology company and a Norwegian automobile distributor. Each framework or conditional agreement generally sets forth a target or expected sale quantity over a multi-year period. There is one agreement, the one with a U.S. biotechnology company and the only one among our agreements with customers, pursuant to which purchases are explicitly conditioned on our meeting certain deadlines for specified performance milestones and the receipt of applicable regulatory approvals. We have yet to achieve the performance milestones, which allows the customer to terminate the agreement. In some other agreements, the sales targets are non-binding. See "Item 3. Key Information—D. Risk Factors—Risks Relating to Our Business and Industry—Our framework and conditional agreements may not result in material sales of our products." Specifically, currently in China, the United States and other jurisdictions relevant to us, the commercial use of our passenger-grade AAVs, and in some cases our non-passenger grade AAVs, is subject to an uncertain or lengthy approval process. None of our business partners has obtained the regulatory approval for the commercial operations of our passenger-grade AAVs. We are unable to estimate the average length of time required to obtain the applicable regulatory approvals due to the nascent nature of AAV-related regulations and the lack of relevant precedents. We also cannot be sure that we or our business partners will obtain the required approvals in a timely manner, or at all. We are not aware of any operator having been granted all required approvals for the commercial operations of passenger-grade AAVs in China, the United States or elsewhere. Nor can we predict when these regulations will change, and any new regulations may impose onerous requirements and restrictions. Before regulatory approvals for the commercial operations of our passenger-grade AAVs have been obtained in China and/or other relevant jurisdictions, customer demand will likely be limited in volume. For the foregoing reasons, we may not receive any substantial orders from our current or potential customers, and we currently do not expect material deliveries to some of our business partners, including the U.S. biotechnology company and the Norwegian automobile distributor.

Our customers place purchase orders taking into account the terms of the relevant framework agreement, if applicable, and the customer's procurement requirements. For passenger-grade AAVs, our customers are generally required to prepay 10% to 40% of the total purchase price soon after a purchase order is placed. Under our standard purchase order, we start production after the prepayment is made, and production is generally expected to take three to six months. As of December 31, 2019, we had unfilled purchase orders for 33 passenger-grade AAVs.

We also explore and pursue suitable strategic partnerships that can strengthen our production and technological capabilities. We may co-develop new AAV models in collaboration with international industry leaders. Under a strategic partnership established in October 2019 with Vodafone GmbH, or Vodafone, the German affiliate of Vodafone Group, a mobile telecommunications conglomerate, Vodafone intends to exclusively provide 5G connectivity to EHang AAVs for urban air mobility applications in Europe, and the parties will cooperate in the development of an urban air mobility ecosystem in Europe. In addition, we collaborate with business partners to provide trial logistics services. For example, in February 2019, we entered into a comprehensive unmanned delivery service contract with DHL-Sinotrans, a joint venture of DHL Express and Chinese logistics company Sinotrans. Pursuant to this contract, we provide DHL-Sinotrans with a set of tailored software products, hardware products and services to complete the unmanned deliveries designated by DHL-Sinotrans. For products and services provided for each delivery route, DHL-Sinotrans agreed to make progressive payments to us, including a 30% prepayment before our production, a 65% payment within 30 days after the installment of our equipment and a 5% payment after the one-year warranty period.

**Competition**

We operate in the UAV industry, and provide various commercial solutions, including air mobility, smart city management and aerial media solutions. In addition, we compete with traditional industry players providing similar solutions, such as helicopter and ground transportation service providers. We believe the primary competitive factors in our markets include technological innovation, safety, quality, user experience, and operational and manufacturing efficiency.

We believe we are a leader in passenger air mobility solutions. A number of other companies are also developing passenger-grade AAVs, but to our knowledge, none of these companies have delivered passenger-grade AAVs as of the date of this annual report. In other areas of our business, including logistics, smart city management and aerial media solutions, we also face several major competitors. We believe that we are strategically positioned in the commercial UAV market with exceptional technology, innovation capabilities and leading positions in providing integrated smart city management solutions and aerial media solutions.

54

45

**Table of Contents**

**Intellectual Property**

We have significant capabilities in the areas of AAVs engineering, development and design and we have developed a number of proprietary systems and technologies. Our success depends in part on our ability to protect our core technology and intellectual property. We rely on a combination of patents, patent applications, trade secrets, know-how, copyrights, trademarks, intellectual property licenses and other contractual rights to establish and protect our proprietary rights in our technology. In addition, we have entered into confidentiality and non-disclosure agreements with our employees and business partners. The agreements we entered into with our employees provide that all software, inventions, developments, works of authorship and trade secrets created by them during the course of their employment are our property.

As of March 31, 2020, we had 153 issued patents in China and 123 pending patent applications, 358 registered trademarks and 21 registered copyrights in relation to our technology in China. We intend to continue to file additional intellectual property applications with respect to our technology.

**Seasonality**

Because of our rapid growth, our overall business has not experienced a significant pattern of seasonality in 2019. However, some of our specific business segments such as aerial media solutions have started to show seasonality in which we may receive more revenues from such business in major Chinese holidays. We may also have a lower number of deliveries of EHang 216 in the first quarter of each fiscal year due to the holiday season of our suppliers. We may experience more pronounced seasonality as our business continues to expand.

**PRC Regulation**

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China.

*General Administration of Civil Aviation and Airspace Control*

On October 30, 1995, the National People's Congress of the PRC adopted the *Civil Aviation Law of the PRC*, or the Civil Aviation Law, which was subsequently amended on April 24, 2015, November 7, 2016, November 4, 2017 and December 29, 2018. The Civil Aviation Law sets forth the general principle and rules for administration of civil aviation as well as for domestic airspace control. Pursuant to this law, the CAAC, which is a State Council department, is currently in charge of civil aviation and has the general authority to supervise and administer civil aviation activities nationwide. The CAAC may promulgate regulations concerning civil aviation activities in accordance with laws enacted and decisions issued by the State Council and within the limits of the CAAC's authority. According to the Civil Aviation Law, the state has complete and exclusive sovereignty over the airspace above its territory. The division of airspace must take account of the needs of civil aviation, national defense and security, as well as the interests of the public, so as to ensure the reasonable, sufficient and efficient use of airspace. Detailed measures for airspace control will be formulated by the State Council and the Central Military Commission, or the CMC. In addition, pursuant to the Civil Aviation Law, the detailed rules of UAVs promulgated by the State Council and the CMC shall be followed.

*Design, Manufacturing and Airworthiness Standard for UAVs*

The Civil Aviation Law contains rules and regulations on airworthiness for all civil aircrafts other than those used for flight missions by the military force, customs offices and police departments. The law mandates that the design of engines, screw propellers and apparatuses used in civil aircrafts must be approved with a Model Certificate, whereas the production and maintenance of engines, screw propellers and apparatuses used in civil aircrafts require a Production Certificate and a Maintenance Certificate, respectively. While the CAAC has laid out specific approval procedures to give substance to the airworthiness standard prescribed by the Civil Aviation Law, none of these procedures is currently applicable to or carried out for UAVs. Consequently, there is no practicable means for us to submit any application for airworthiness approval from the CAAC under the Civil Aviation Law.

55

46

Table of Contents

The nascent status of the UAV industry is accompanied by a lack of targeted laws and regulations and the relevant legislative and administrative bodies are in the process of laying the first brick for a future regulatory framework governing, among others, the design, manufacturing and the overall airworthiness of UAVs. On January 25, 2019, the CAAC published the Guidance on UAV Airworthiness Assessment Based on Operational Risks, or the UAV Airworthiness Guidance, pursuant to which we are one of the airworthiness assessment pilot programs and would help the CAAC in developing UAV airworthiness standards and assessment rules. According to the UAV Airworthiness Guidance, the UAV airworthiness framework will be based on the assessment, classification and management of operational risks. Operational risks will be categorized into three levels: low, medium and high. UAV operational risks contemplate predominantly the risk of collision in the event of loss of control, including (1) damage resulting from UAV crashes or collisions with any individual or object on the ground; (2) in-air collisions, such as with aircrafts or other UAVs; and (3) other risks or damage, such as property losses or any adverse effect on the environment or humans. The UAV Airworthiness Guidance envisages that the UAV airworthiness framework will initially be established in 2019. Detailed rules, procedures and standards relating to the assessment of UAV airworthiness are currently being researched and drafted. The test flights of our passenger-grade AAVs have been supported with approvals obtained from the Aircraft Certificate Department of the CAAC based on the UAV Airworthiness Guidance. The initial approval allowed us to conduct test flights to collect the relevant supporting data and expired on December 31, 2019. The UAV airworthiness pilot programs of the CAAC are ongoing. As the only passenger-grade AAV pilot company in China, we continue to conduct AAV flights to accumulate more pilot data and experience. We plan to apply for a formal certificate relating to airworthiness as soon as the CAAC publishes the UAV Airworthiness Certification Standards.

According to the Guideline for the Standardization of UAV Systems (2017 to 2018) jointly issued by the National Standardization Administration, the Ministry of Science and Technology, the Ministry of Industry and Information Technology, or the MIIT, the Ministry of Public Security, the Ministry of Agriculture, the General Administration of Sport, the National Energy Administration and the CAAC on June 13, 2017, the development of non-military use UAV systems standard will be staggered into two phases. In the first phase, from 2017 to 2018, the focus is on answering market demand for UAV systems, providing support to industry-wise supervision, and initiating the development of standards for UAV systems. The second phase, from 2019 to 2020, envisions an incremental development of more than 300 UAV system standards. A range of standards in the regulatory pipeline under this guideline, includes safety standards, research and development standards and operational standards, as well as standards for systems, infrastructure, subassemblies and components of non-military use UAV.

The State Council and the Central Military Commission have also published a draft bill of the *Interim Measures for Flight Administration of Unmanned Aerial Vehicl*e on January 26, 2018, setting out airworthiness requirements for medium-sized and large UAVs. A medium-sized UAV refers to a vehicle with a take-off weight between 25 kilograms and 150 kilograms, or an empty weight of more than 15 kilograms. A large UAV refers to a vehicle with a take-off weight of more than 150 kilograms. Based on the draft bill, our passenger-grade and non-passenger grade AAVs will likely be categorized as medium-sized or large UAVs and the relevant airworthiness requirements will be mandatorily applied. In such event, we will be required to apply for relevant airworthiness approvals in accordance with procedures to be specified by the CAAC. It is nevertheless still unclear in what form and when such draft bill will come into effect. Further, the MIIT published a draft bill of the *Unmanned Aerial Vehicle Manufacture Enterprise Requirements* on November 23, 2018 for public consultation, which is intended to regulate enterprises that manufacture UAVs. According to this draft, a manufacturer of UAVs shall, among others, ensure safe production in accordance with law, maintain in possession intellectual property rights in respect of the manufactured UAVs, and produce UAVs that are capable of automatic landing, returning or taking other emergency measures in case of malfunction.

On May 14, 2019, CAAC published a discussion draft of the *Guideline for the Promotion of the Development of Civil Use Unmanned Aviation*, or the Draft UA Guideline, for public review and comments. The Draft UA Guideline encourages test and demonstration operations based on demands from different areas and also encourages the UAV companies to expand the business models of unmanned aviation and the scope of business licenses based on safe operation. The Draft UA Guideline also stipulates that, in order to set standards and rules for airworthiness and air traffic management, key research related to planning and operation of public flight routines in low airspace for UAVs will be conducted and pilot operations will be organized for vertical take-off and landing passengers and logistics UAVs.

**Table of Contents**

On March 20, 2020, the MIIT published a discussion draft of the *Administrative Measures on the Production and Manufacturing of Civil Use Unmanned Aerial Vehicles (Trial),* or the Draft Production and Manufacturing Standards of UAVs, for public review and comments. The Draft Production and Manufacturing Standards of UAVs classifies UAVs into five types, namely, micro, light, small, medium, and large. Each UAV should have a unique product identification number. The MIIT is responsible for formulating relevant standards and regulations on the unique product identification codes of UAVs. UAV manufacturers shall enter the product identification code on the chip of a UAV in an inerasible storage area and also mark it on the body and outer package of the UAV.

On March 27, 2020, the CAAC published a discussion draft of the *Construction Work Guideline for Unmanned Aerial Test Base (Draft)*, or the Draft Test Base Guideline, for public review and comments. The Draft Test Base Guideline provides that the purpose of a test zone is to carry out in-depth pilot work for unmanned aerial vehicles, provide a trial operation platform for theoretical research, risk assessment and technical application of unmanned aviation operations, accumulate operational data and experience in practice, explore the development rules of civil aviation, and formulate replicable standards and market access rules for airworthiness, air traffic control, and so on. In the construction and operation of a test area, the relevant work tasks and output of results should be clarified, and breakthroughs should be made in the areas of, for example, in-depth trial operations of specific types of unmanned aerial vehicles, research on airworthiness technology for unmanned aerial vehicles, exploration on regulation and service mechanisms, operational technical verification, experiments on support factors, and experiments on market ecology.

Pending the enactment of the foregoing bills and the necessary judiciary and administrative interpretations and clarifications on some of the existing guidelines, the CAAC has put in place interim measures to allow for and regulate the testing of various forms of UAVs, including both our passenger-grade and non-passenger grade AAVs.

### Real-Name Registration of UAVs

As a manufacturer and seller of UAVs, we are also required to collect certain information relating to our products and our customers and to submit such information to the relevant regional authorities pursuant to the *Circular of the General Office of the Ministry of Industry and Information Technology on Information Filing for Civil Unmanned Aerial Vehicle Production Enterprise and Products*, which took effect on May 22, 2017. We are currently working with the regional authorities to complete the required procedure for both our passenger-grade and non-passenger-grade AAVs. We are also obligated to provide information relating to our AAV products and purchasers starting from June 2017 and pursuant to the *Administrative Provisions on the Real-name Registration of Private Unmanned Aerial Vehicles* issued by the CAAC. Information to be reported includes (i) the name, registered address and contact information of us as the manufacturer; (ii) the name and model detail of our AAV products; (iii) the empty weight and maximum take-off weight of our AAV products; (iv) the categorization of our AAV products in accordance with the CAAC guidelines, and (v) the name and contact information of purchasers of our AAVs. These administrative provisions regulate the use of private UAVs with a maximum take-off weight of 0.25 kilograms and above within the territory of the PRC, and direct owners of such private UAVs to register their UAVs on a real-name basis. Non-compliance will result in restrictions on the use of the relevant UAVs and penalties. We have historically complied with these requirements for both our passenger-grade and non-passenger-grade AAVs.

### Operations of AAVs

#### Airspace Control

According to the *General Flight Rules* issued by the State Council and the CMC on October 18, 2007 and took effect on November 22, 2007, the overall flight control within the territory of the PRC is under the unified organization of and enforcement by the People's Liberation Army Air Force, and the various flight control departments shall exercise air traffic control in accordance with their respective responsibilities. Prior application must be filed and approval be obtained before any flight can be conducted within the PRC territory, including test flights for our passenger-grade AAVs, and take-offs relating to our aerial media solutions and logistics services.

Table of Contents

We are required to obtain clearance from the local counterpart of the People's Liberation Army Air Force for the flight route for our AAVs. Subject to any difference in policies adopted by the local authorities, approval for airspace and flight plan is normally granted by the local flight control department of the military. The flight plan shall also be filed with the local public security department and the CAAC. As an example of the general observations above, on November 19, 2018, the CAAC issued the *Flight Management Implementing Rule for UAVs in the Shenzhen Area*, under which the South Military Zone Air Force is responsible for the piloting of UAVs within the municipal area of Shenzhen. An enterprise or individual who seeks a flight task approval shall file the application with the flight control department of the South Military Zone Air Force five days prior to such flight. The flight control department of the South Military Zone Air Force, after consulting the CAAC and the public security department, may grant its approval two days prior to the flight. After such approval and except for certain flights of mini-UAV with an empty weight of less than 0.25 kilogram, subject to certain other conditions, or small-UAV with an empty weight of less than 4 kilograms, subject to certain other conditions, a flight plan must be submitted via a designated reporting platform no later than 3:00 pm on the day prior to the flight and the flight control department of the South Military Zone Air Force will respond no later than 9:00 pm on the same day of filing and will distribute the relevant information to the public security department and the CAAC. Generally, for the flight of our AAVs, we have established prior communications with the local flight control department, the public security authority and the local counterpart of the CAAC in seeking the necessary approvals and have ensured compliance with their respective instructions in all material respects.

### Electronic Fence

The electronic fence of UAVs is of great significance for the development of the industry. Currently, there is no effective unified standard for electronic fences of UAVs in the world and various countries are in the exploration stage. In China, the CAAC issued the *Standard of Fence of Unmanned Aircraft System* in 2017.

Both our passenger-grade AAVs and non-passenger-grade AAVs have passed the tests of electronic fence by the Civil UAS Inspection Center of China Academy of Civil Aviation Science and Technology (CAST), and obtained the certificate from the China National Accreditation Service for Conformity Assessment (CNAS) and ILAC-MRA in July 2019, which is internationally recognized.

### Pilot Operations

The Flight Standard Department, the Aircraft Certificate Department and the Airspace Control Industry Administration Office of the CAAC, jointly issued the *Pilot Operation Rules (Interim) for Specific Unmanned Aircraft*, or the Interim Rules, on February 1, 2019, pursuant to which, unmanned aircrafts are classified into nine categories based on their empty weight and takeoff gross weight. In particular, Class I captures unmanned aircrafts with empty weight and takeoff gross weight between 0 to 1.5 kg (including 1.5 kg); Class II captures unmanned aircrafts with empty weight between 1.5 kg and 4 kg (including 4 kg) and takeoff gross weight between 1.5 kg and 7 kg (including 7 kg); Class III captures unmanned aircrafts with empty weight between 4 kg and 15 kg (including 15 kg) and takeoff gross weight between 7 kg and 25 kg (including 25 kg); Class IV captures unmanned aircrafts with empty weight between 15 kg and 116 kg (including 116 kg) and takeoff gross weight between 25 kg and 150 kg (including 150 kg); Class XI captures unmanned aircrafts with empty weight between 116 kg and 5,700 kg (including 5,700 kg) and takeoff gross weight between 150 kg and 5,700 kg (including 5,700 kg); Class XII captures unmanned aircrafts with empty weight and takeoff gross weight in excess of 5,700 kg. The Interim Rules are applicable to Class IV unmanned aircrafts, Class III unmanned aircrafts with high risks and the pilot operation of which would need a pre-assessment in the belief of the authority, Class XI and Class XII unmanned aircrafts with low risks and in relation to which the authority believes a pilot operation assessment is sufficient. According to the classification above, our passenger-grade AAV belongs to Class XI and Falcon B of non-passenger grade AAV belongs to Class III. According to the Interim Rules, the applicant for the pilot operation of any UAV that falls within any of the foregoing applicable classes shall first submit a proposal for initial discussion and application with the CAAC and shall then conduct a pre-pilot operation safety evaluation based on specific operation risk assessment. The applicant shall subsequently verify the operation risks based on its initial operation, following which the CAAC shall issue the relevant approval if its assessment team confirms that the risks of pilot operation can be appropriately controlled and are acceptable. Upon its receipt, the applicant shall maintain the approval, together with the operation rules and a complete manual for the CAAC's inspection and supervision. The pilot operation will be suspended or terminated under certain circumstances, such as any non-compliance with the approved letter, the presence of uncontrollable operation risks and the voluntary surrender by the applicant. Operation records relating to pilot operations shall be maintained, including operation manual, list of unmanned aircraft, maintenance record of aircraft, and qualification of personnel. The applicant shall also purchase insurance policy for third party liabilities. In addition, "risks" is defined under the Interim Rules to take into account both the frequencies (or probabilities) of the events and the level of severity. It also includes both ground risks and risks in air. We are the first applicant for the pilot operation of certain types of our passenger-grade AAVs in relation to a customer's use for logistics purpose. We have passed preliminary assessment carried out by CAAC and CAAC has issued the notification of acceptance for the application, which means that our application is currently under review. A formal approval for specific unmanned aircraft pilot operation will be issued at a later stage.

58

49

Table of Contents

In addition, test flights of our passenger-grade AAVs must be and have been supported with approvals obtained from the Aircraft Certificate Department of the CAAC, despite an unclear legislative source for such requirement. We are approved under these approvals to conduct flight trials for the purpose of evaluating the airworthiness of our EHang 216, assessing their operational risks, as well as improving experience with and developing proper airworthiness standard for passenger-grade AAVs. We are allowed to continue our testing as the CAAC UAV Airworthiness pilot program is ongoing and will be submitting testing results and outcomes to the Aircraft Certificate Department, the submission of which may potentially be necessary to renew our testing permits or to apply for the relevant certificate related to airworthiness pursuant to the then applicable laws and regulations. The CAAC confirms that we are involved in the procedure above evaluating the airworthiness of passenger-grade AAVs, assessing their operational risks, as well as improving experience with and developing proper airworthiness standard for passenger-grade AAVs.

### UAV Commercial Operation License

*The Administrative Measures for Commercial Flight Activities of Unmanned Aerial Vehicle for Civil Use (Interim)* promulgated by CAAC on March 21, 2018 and taking effect on June 1, 2018, asserts jurisdiction over the commercial operation of any UAV with empty weight of more than 0.25 kilograms and regulates a broad range of UAV activities including aerial spraying, photography, aerial performance flight and UAV operator training. The company operating the regulated activities must first obtain an UAV Commercial Operation License from CAAC for using UAVs in such activities, and the applicant shall meet certain criteria including (a) the applicant shall be a corporation having a PRC national as its legal representative; (b) the applicant shall possess at least one (1) UAV and shall have completed registration of such UAV(s) with CAAC; and (c) the applicant shall have purchased third party liability insurance policy for the relevant UAVs. We have obtained the necessary operation licenses for aerial media solutions purpose while our AAVs for logistic services and passengers transportation do not come under the jurisdiction of the *Administrative Measures for Operational Flight Activities of Civil Unmanned Aerial Vehicle (Interim)*. However, in the northwest region of China, the *Administrative Measures for Logistics Services of Civil Unmanned Aerial Vehicle in Northwest Region (Interim)* promulgated by CAAC Northwest Regional Administration on April 3, 2019, stipulates that the company operates logistic services in Shaanxi Province, Gansu Province, Ningxia Province and Qinghai Province by UAVs shall obtain an operating license for logistic service from CAAC Northwest Regional Administration. Other local CAAC administrations in other regions of China have not issued relevant rules yet. We are not operating logistic services in northwest region of China at the current stage. We may be required to obtain the Commercial Operation License for logistic service if we operate logistic services in Northwest region in the future.

### Pilot and Operator License

On August 31, 2018, the Flight Standard Department of the CAAC issued the *Regulations on the Administration of Civil Unmanned Aerial Vehicles Pilots*, according to which a UAV pilot must obtain the relevant UAV pilot license depending on the type and specifications of the UAV operated. In relation to the operation of UAV systems and that of UAVs in clusters, at scale or otherwise in a distributed manner, the operator itself is exempted from the need of a UAV pilot license, pending the stipulation of separate and specific management measures. Distributed operation refers to the mode of operating UAV systems through a collection of multiple sub-units and communication nodes and their deployment to multiple sites or terminals for collaborative operation. Three of our employees have obtained UAV class III pilot licenses and class IV pilot licenses, which satisfied the requirement to operate our non-passenger grade AAVs. However, to the extent our AAVs are operated and controlled through distributed operation (such as during the delivery of our aerial media and smart management solutions), we are not required to obtain any official pilot license issued by the CAAC according to the *Regulations on the Administration of Civil Unmanned Aerial Vehicles Pilots*. The pilots who operate our AAV flights also completed the AAV training on the basis of the CAAC UAV Pilot Licenses.

59

50

Table of Contents

In addition, the draft bill of the *Interim Measures for Flight Administration of Unmanned Aerial Vehicle* published by the CAAC on January 26, 2018 stipulates that any unit or individual that organizes UAV flight activities in a distributed manner shall be subject to safety review and obtain a safe operation license. The individual operator of UAV systems or clusters or distributed operations are however exempted for such licensing requirement. We may be required to obtain the safe operation license for certain component of our business once the above draft bill comes into effect.

Operators of our AAVs may be subject to additional licensing requirements. On December 29, 2015, the CAAC issued the *Rules on Operation of Light and Small Unmanned Aircraft (Pilot)*, pursuant to which, pilot of specified UAVs shall meet certain qualification, and are prohibited from consumption of alcohol and drugs as well as careless piloting. Our pilots have complied with all the above requirements.

### Import and Export

On December 31, 2005, the Ministry of Commerce and the General Administration for Customs jointly issued the *Measures for the Administration on Import and Export License for Dual-use Items and Technologies*, pursuant to which a license is required for the exportation of any dual-use goods, products and technologies of the PRC included in a control list issued by the Ministry of Commerce on December 28, 2017. Notably, certain types of UAVs are subject to the foregoing export license requirements, such as UAVs with (a) a maximum endurance time of 1 hour, (b) maximum endurance time of half an hour and the ability to take-off and conduct stable flight against a wind speed of no less than 46.3 kilometer/hour; (c) aircraft range equal to or higher than 300 kilometers; (d) automatic controlling system and navigation capability containing aerosol preparation for planting with volume of 20 liters or being capable of installing aerosol preparation system for planting with volumes of 20 liters after designing and modification. We may be required to obtain the necessary license for the exportation of certain of our AAVs.

### Wireless Communication

Our AAVs and command-and-control centers have installed certain radio transmission equipment and telecommunication equipment. For radio transmission equipment, pursuant to the Regulations on the Administration of Radio in the PRC promulgated by the State Council and CMC, with effect from December 1, 2016, radio transmission equipment produced or imported for the purpose of sale and use in the PRC shall comply with laws and regulations in respect of product quality and administration of state radio, as well as other applicable national standards. Except for micro power short-distance radio transmission equipment, for any production or import of other radio transmission equipment for domestic sale and use, an application for model confirmation shall be filed with the radio regulatory authority of the state. According to Telecommunications Regulation of PRC promulgated by State Counsel on September 25, 2000, amended in July 2014 and February 2016, the government stipulates a network connection licensing system for telecommunications equipment. The telecommunications equipment accessing a public telecommunications network shall comply with the national standards, and obtain a network access certificate. We purchase certain equipment and models with Transmission Equipment Type Approval Certificate and Network Access Certificate from our supplier.

### Bidding and Construction

Our undertaking of the development of command-and-control centers is subject to bidding laws and constructions laws.

On December 27, 2017, the Standing Committee of the National People's Congress promulgated the *Bidding Law of the PRC*. The Bidding Law provides that two or more legal persons or other organizations may form a consortium to bid jointly as one bidder. Each member of a consortium shall have the relevant capability to undertake the bidding project; where the qualification criteria for bidders are imposed either by State regulations or terms of the bidding documents, each member of a consortium shall satisfy the corresponding qualification criteria. The consortium members shall each sign a joint bidding agreement to clearly specify the work and responsibilities to be undertaken by each party, and submit the joint bidding agreement to the bid inviter together with the bid.

Table of Contents

*Work Safety*

Under relevant construction safety laws and regulations, including the *Work Safety Law of the PRC* which was promulgated by the SCNPC on June 29, 2002, amended on August 27, 2009, August 31, 2014, and effective as of December 1, 2014, production and operating business entities must establish objectives and measures for work safety and improve the working environment and conditions for workers in a planned and systematic way. A work safety protection scheme must also be set up to implement the work safety job responsibility system. In addition, production and operating business entities must arrange work safety training and provide the employees with protective equipment that meets the national standards or industrial standards. Automobile and components manufacturers are subject to the aforementioned environment protection and work safety requirements.

*Fire Control*

Pursuant to the *Fire Safety Law of the PRC* promulgated by the SCNPC on April 29, 1998, amended on October 28, 2008 and April 23, 2019 and which became effective on April 23, 2019 and the *Provisions on Supervision and Administration of Fire Protection of Construction Projects* promulgated by the Ministry of Public Security of the PRC on April 30, 2009, implemented on May 1, 2009 and later amended on July 17, 2012, which became effective on November 1, 2012, the construction entity of a large-scale crowded venue (including the construction of a manufacturing factory that is over 2,500 square meters) and other special construction projects must apply for fire prevention design review with fire control authorities, and complete fire assessment inspection and acceptance procedures after the construction project is completed. The construction entity of other construction projects must complete the filing for fire prevention design and the fire safety completion inspection and acceptance procedures within seven business days after obtaining the construction work permit and passing the construction completion inspection and acceptance. If the construction entity fails to pass the fire safety inspection before such venue is put into use, or fails to conform to the fire safety requirements after such inspection, it shall be subject to (i) orders to suspend the construction of projects, use of such projects or operation of relevant business; and (ii) a fine ranging between RMB30,000 and RMB300,000.

**U.S. Regulation**

The Federal Aviation Administration, or the FAA, one of several modal organizations within the Department of Transportation, or the DOT, is the regulatory agency in the United States with authority to oversee the safety of aircraft operations in the national airspace system of the United States, or the NAS. By statute, the Congress of the United States, or the US Congress, has vested the FAA with authority to regulate airspace use, management and efficiency, air traffic control, safety, navigational facilities, and aircraft. By contrast, the DOT retains regulatory control over all economic authority granted to commercial operations of aircraft (including for goods or passenger transportation for hire) within the United States. Thus, in addition to any FAA approvals and authorization required for operation of aircraft within the NAS, each aircraft operator conducting commercial operations must also be issued and hold economic authority (or an exemption) from the DOT. Unmanned aircraft systems, or UAS, are considered a category of aircraft for purposes of regulation by the FAA and the DOT. Our AAVs are classified as UAS and their operations are therefore subject to the approval by both the FAA and the DOT.

With respect to UAS operations in the NAS, the FAA currently has the authority to promulgate and enforce restrictions regarding (i) the types of flights that may be conducted; (ii) the equipment that may be used to conduct those flights; and (iii) the training required. The regulatory framework applicable to a particular UAS operation is determined by whether (a) the UAS is used by a government agency, for commercial purposes, or as a model aircraft; and (b) whether at takeoff the UAS (including any attachments) weighs less than 55 pounds (Small UAS), or equal to or more than 55 pounds (Large UAS). Our passenger-grade AAVs are classified as Large UAS.

In the United States, the commercial use and delivery of our passenger-grade AAVs is and in the near future is expected to continue to be subject to an uncertain or lengthy approval process. We are unable to estimate the average length of time required to obtain the applicable regulatory approvals due to the nascent nature of AAV-related regulations and the lack of relevant precedents. We are not aware of any operator having been granted all required approvals for the commercial operations of passenger-grade AAVs in the United States. U.S. regulations also impose significant restrictions on our non-passenger-grade AAVs. We cannot predict when these regulations will change, and any new regulations may impose onerous requirements and restrictions.

71

Table of Contents

In January 2020, we obtained the first special flight permit for EHang 216 from the FAA and conducted our first AAV demo flight in North Carolina of the United States. Although it was a non-passenger demo flight, we expect to continue to work with the FAA for the approval of passenger trial flights of EHang AAVs.

We participated in the public consultation of two draft UAS rules published by the FAA, including the *14 CFR Part 21 Type Certification of Unmanned Aircraft Systems* and the *14 CFR Parts 1, 47, 48, 89, 91, and 107 Remote Identification of Unmanned Aircraft Systems*, as an industry representative, and submitted our comments on the draft rules.

**European Regulation**

The main regulation of the European Union, or the EU, in the field of aviation is Regulation (EU) 2018/1139, which is generally referred to as the Basic Regulation by the European Union Aviation Safety Agency, or EASA. It was adopted by the European Parliament and the European Council on July 4, 2018 and entered into force on September 11, 2018. It repealed and replaced the previous Basic Regulation, Regulation (EC) No 216/2008.

Under the previous Basic Regulation, civil UAS with an operating mass of no more than 150 kg were regulated by each EU member state. On December 22, 2017, the member states endorsed an agreement reached with the European Parliament for the revision of the previous Basic Regulation, extending the competence of the EU to all UAS, except those used for state operations, such as military, customs, police and firefighting, and defining the essential requirements to ensure the safety of UAS. The agreement led to the adoption of the current Basic Regulation. The current Basic Regulation includes a new mandate for EASA in the domain of UAS and urban air mobility. It enables EASA to prepare rules for all sizes of civil UAS and harmonize standards for the commercial market across Europe.

Pursuant to the Basic Regulation, the EU has established a regulatory framework that divides UAS operations into three categories according to the level of risks involved: "open," "specific," and "certified." Operations in the "open" category are those considered to impose low safety risks. If UAS operations fall into the "open" category, they can be conducted without any operational authorization. Operations in the "specific" category are those considered to impose medium safety risks. For operations falling into the "specific" category, a UAS operator is generally required to obtain an operational authorization from the competent authority in the EU member state where it is registered. Operations in the "certified" category are those considered to impose higher safety risks than the other categories. Our passenger-grade AAVs fall in to the "certified" category because they have a large characteristic dimension and/or are designed for transporting people. For operations falling into the "certified" category, classical aviation rules apply. In other words, the UAS involved are treated similarly as manned aircraft. They are certified for their airworthiness and have more stringent operational restrictions. The processing time for applications for approvals under classical aviation rules varies among the EU member states.

In February, 2020, we obtained the flight permit from the Civil Aviation Authority of Norway approving a series of test flights of EHang 216 in Norway, paving the way for us to expand test flights and operations in other European countries.

Table of Contents

Revenues from air mobility solutions significantly increased from RMB3.1 million in 2018 to RMB85.9 million (US$12.3 million) in 2019, as we continued to commercialize our passenger-grade AAVs and air mobility solutions. We sold 61 passenger-grade AAVs in 2019, compared with three in 2018.

Revenues from smart city management solutions decreased by 85.4% from RMB30.5 million in 2018 to RMB4.4 million (US$0.6 million) in 2019. We provided smart city management solutions in two major command-and-control center projects in 2018 but were only engaged in the initial stage of one such project in 2019. As we provide smart city management solutions on a project basis with high individual transaction values, revenues from smart city management solutions may be more concentrated in certain years or periods, and therefore are subject to greater period-to-period fluctuations.

Revenues from aerial media solutions decreased by 1.7% from RMB31.3 million in 2018 to RMB30.7 million (US$4.4 million) in 2019, primarily due to the smaller average scale of our aerial media solution projects in 2019. The largest order in 2018 accounted for 30% of our revenues from aerial media solutions during that year. The decrease in revenues was also in part due to increasing competition in China's aerial media market.

### Costs of revenues

Our costs of revenues increased by 54.5% from RMB32.7 million in 2018 to RMB50.6 million (US$7.3 million) in 2019, primarily due to a significant increase in costs arising from the rapid growth of our air mobility solutions business, partially offset by a substantial decrease in costs related to our smart city management solutions business.

### Gross profit and gross profit margin

As a result of the foregoing, our gross profit increased by 111.0% from RMB33.7 million in 2018 to RMB71.2 million (US$10.2 million) in 2019. Our gross profit margin increased from 50.8% in 2018 to 58.5% in 2019 primarily due to the rapid growth of our air mobility solutions business, which had a relatively higher gross profit margin. We believe that our first-mover advantage in the global urban air mobility industry has provided us with pricing power in selling passenger-grade AAV products and related air mobility solutions.

### Operating expenses

Our operating expenses increased by 3.9% from RMB116.4 million in 2018 to RMB121.0 million (US$17.4 million) in 2019, primarily due to an increase in sales and marketing expenses.

*Sales and marketing expenses.* Sales and marketing expenses increased by 33.1% from RMB20.2 million in 2018 to RMB26.9 million (US$3.9 million) in 2019, primarily due to increases in advertising and promotion expenses, employee compensation and travel expenses related to our increased marketing efforts to promote our air mobility solutions globally.

*General and administrative expenses.* General and administrative expenses increased slightly by 2.8% from RMB35.9 million in 2018 to RMB36.9 million (US$5.3 million) in 2019 despite the significant increase in our revenues, primarily as a result our efforts in maximizing our operating leverage.

*Research and development expenses.* Research and development expenses decreased by 5.2% from RMB60.3 million in 2018 to RMB57.2 million (US$8.2 million) in 2019, as we concluded the initial product development phase of our flagship product, EHang 216, and focused more on its commercialization.

### Other operating income

Other operating income decreased by 58.9% from RMB8.3 million in 2018 to RMB3.4 million (US$0.5 million) in 2019, primarily due to a decrease in government subsidies.

### Interest income

We recorded interest income of RMB0.9 million (US$0.1 million) in 2019 and RMB1.1 million in 2018, both of which consisted primarily of interest earned from our cash and cash equivalents and short-term investments.

**Table of Contents**

*Operating Activities*

Net cash used in operating activities in 2019 was RMB55.5 million (US$8.0 million). This amount was primarily attributable to net loss of RMB48.0 million (US$6.9 million), adjusted to add back certain non-cash expenses, principally share-based compensation of RMB14.7 million (US$2.1 million) and depreciation and amortization of RMB5.7 million (US$0.8 million), and further adjusted downwards due to changes in operating assets and liabilities. The changes in operating assets and liabilities primarily included an increase of RMB39.0 million (US$5.6 million) in accounts receivable, an increase of RMB12.3 million (US$1.8 million) in inventories, an increase of RMB5.7 million (US$0.8 million) in prepayments and other current assets, and an increase of RMB4.8 million (US$0.7 million) in unbilled revenue, and partially offset by an increase of RMB14.0 million (US$2.0 million) in accrued expenses and other liabilities, an increase of RMB10.4 million (US$1.5 million) in accounts payable, a decrease of RMB4.2 million (US$0.6 million) in cost and estimated earnings in excess of billings, and an increase of RMB4.0 million (US$0.6 million) in advances from customer. The increases in accounts receivable, inventories, prepayments and other current assets, advances from customers, accounts payable and accrued expenses and other liabilities were all primarily due to the growth of our air mobility solutions business. The decrease in cost and estimated earnings in excess of billings was primarily due to incremental billings made in connection with two completed smart city management projects. The increase in unbilled revenue was primarily due to certain services provided but unbilled.

Net cash used in operating activities in 2018 was RMB43.0 million. This amount was primarily attributable to net loss of RMB80.5 million, adjusted to add back certain non-cash expenses, principally share-based compensation of RMB22.3 million, one-time impairment loss relating to an investment of RMB8.0 million and depreciation and amortization of RMB5.6 million, and further adjusted upwards due to changes in operating assets and liabilities. The changes in operating assets and liabilities primarily included a decrease of RMB7.3 million in prepayments and other current assets, an increase of RMB6.0 million in accrued expenses and other liabilities, and an increase of RMB4.7 million in customer advances, and partially offset by an increase of RMB18.4 million in cost and estimated earnings in excess of billings. The increases in cost and estimated earnings in excess of billings, accrued expenses and other liabilities, and customer advances were all primarily due to the growth of our business. The decrease in prepayments and other current assets was primarily due to the refund of recoverable value-added taxes from tax authorities.

Net cash used in operating activities in 2017 was RMB38.4 million. This amount was primarily attributable to net loss of RMB86.6 million, adjusted to add back certain non-cash expenses, principally share-based compensation of RMB32.2 million and depreciation and amortization of RMB4.4 million, and further adjusted upwards due to changes in operating assets and liabilities. The changes in operating assets and liabilities primarily included a decrease of RMB25.6 million in inventories, a decrease of RMB7.3 million in prepayments and other current assets, and an increase of RMB4.9 million in unrecognized tax benefit, partially offset by a decrease of RMB18.4 million in accounts payable and a decrease of RMB8.8 million in accrued expenses and other liabilities. The decreases in inventories, prepayments and other current assets, accounts payable, and accrued expenses and other liabilities were all primarily due to the gradual discontinuation of our consumer drone business. The increase in unrecognized tax benefit was due to accrued withholding taxes for services we provided to a third party in its acquisition of certain land use right in 2017.

*Investing Activities*

Net cash used in investing activities in 2019 was RMB11.0 million (US$1.6 million), consisting of net purchase of short-term investments of RMB7.7 million (US$1.1 million) and purchase of property, plant and equipment of RMB2.7 million (US$0.4 million).

Net cash provided by investing activities in 2018 was RMB25.3 million, consisting primarily of proceeds from short-term investments on maturity, net of new purchase of short-term investments, of RMB39.0 million, partially offset by an investment as passive investor of RMB8.0 million and purchase of property and equipment of RMB4.9 million.

Net cash used in investing activities in 2017 was RMB51.1 million, consisting of net purchase of short-term investments of RMB39.0 million and purchase of property and equipment of RMB11.8 million.

*Financing Activities*

Net cash provided by financing activities in 2019 was RMB325.3 million (US$46.7 million), primarily attributable to net proceeds of RMB252.9 million (US$36.3 million) from our initial public offering, proceeds of RMB47.4 million (US$6.8 million) from issuance of series C redeemable convertible preferred shares in February 2019 and proceeds of RMB30.0 million (US$4.3 million) from a loan from a third party.

87

**Table of Contents**

EHANG HOLDINGS LIMITED

CONSOLIDATED BALANCE SHEETS

(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

| | Notes | As of December 31, | | |
| | | 2018 | 2019 | |
| | | RMB | RMB | US$ |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 61,519 | 321,662 | 46,204 |
| Short-term investments | 4 | — | 7,674 | 1,102 |
| Accounts receivable, net of allowance of RMB392 and RMB862 (US$124) as of December 31, 2018 and 2019, respectively | 5 | 2,538 | 41,103 | 5,905 |
| Unbilled revenue | | — | 4,807 | 690 |
| Cost and estimated earnings in excess of billings | | 18,411 | 14,212 | 2,041 |
| Inventories | 6 | 3,917 | 18,490 | 2,656 |
| Prepayments and other current assets | 7 | 15,369 | 20,565 | 2,954 |
| **Total current assets** | | **101,754** | **428,513** | **61,552** |
| **Non-current assets:** | | | | |
| Property, plant and equipment, net | 8 | 19,058 | 16,272 | 2,337 |
| Intangible assets, net | | 395 | 1,209 | 174 |
| Long-term investments | | 3,057 | 2,983 | 428 |
| Deferred tax assets | 14 | 135 | 184 | 26 |
| Other non-current assets | | 272 | 252 | 36 |
| **Total non-current assets** | | **22,917** | **20,900** | **3,001** |
| **Total assets** | | **124,671** | **449,413** | **64,553** |

F-3

56

Table of Contents

EHANG HOLDING LIMITED
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

| | For the years ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | |
| | RMB | RMB | RMB | US$ |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Net loss | (86,575) | (80,463) | (47,994) | (6,894) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | | | |
| Depreciation and amortization | 4,441 | 5,601 | 5,673 | 815 |
| Deferred income tax expense (benefit) | 292 | (135) | (49) | (7) |
| Share-based compensation | 32,164 | 22,300 | 14,747 | 2,118 |
| Loss on disposal of property, plant and equipment | 169 | 159 | 28 | 4 |
| Non-cash consideration for services provided | (2,919) | — | — | — |
| Loss on deconsolidation of subsidiaries | 45 | — | — | — |
| Share of net loss from an equity investee | — | 162 | 74 | 11 |
| Impairment of film investment as passive investor | — | 8,000 | — | — |
| Allowance for doubtful accounts | (140) | 231 | 619 | 89 |
| Changes in operating assets and liabilities: | | | | |
| Accounts receivable | 2,193 | 3,442 | (39,035) | (5,608) |
| Unbilled revenue | | | (4,807) | (690) |
| Cost and estimated earnings in excess of billings | — | (18,411) | 4,199 | 603 |
| Inventories | 25,595 | (2,519) | (12,305) | (1,768) |
| Prepayments and other current assets | 7,304 | 7,344 | (5,771) | (829) |
| Other non-current assets | — | (272) | 20 | 3 |
| Accounts payable | (18,386) | 917 | 10,358 | 1,488 |
| Contract liabilities | 916 | 4,699 | 4,011 | 576 |
| Income taxes payable | — | — | 5 | 1 |
| Deferred government subsidies | 380 | (80) | (80) | (11) |
| Unrecognized tax benefits | 4,892 | — | 602 | 86 |
| Accrued expenses and other liabilities | (8,803) | 6,040 | 14,187 | 2,038 |
| **Net cash flow used in operating activities** | **(38,432)** | **(42,985)** | **(55,518)** | **(7,975)** |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Deconsolidation of subsidiaries | (258) | — | — | — |
| Acquisition of intangible assets | — | (19) | (999) | (143) |
| Purchase of short-term investments | (47,000) | (110,510) | (113,404) | (16,289) |
| Proceeds from maturity of short-term investments | 8,000 | 149,510 | 105,730 | 15,187 |
| Purchase of property and equipment | (11,810) | (4,930) | (2,740) | (394) |
| Purchase of long-term investment | — | (300) | — | — |
| Loan to a related party | — | (425) | (425) | (61) |
| Repayment of loan from a related party | — | — | 850 | 122 |
| Film investment as passive investor | — | (8,000) | — | — |
| **Net cash flow (used in)/provided by investing activities** | **(51,068)** | **25,326** | **(10,988)** | **(1,578)** |

F-10

57

**Table of Contents**

EHANG HOLDINGS LIMITED
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

**1.   Organization and Basis of Presentation**

EHang Holdings Limited (the ''Company'') was incorporated in the Cayman Islands on December 23, 2014 under the Cayman Islands Companies Law as an exempted company with limited liability. The Company through its consolidated subsidiaries, variable interest entity (the ''VIE'') and the subsidiaries of the VIE (collectively, the ''Group'') are principally engaged in the manufacturing and sales of intelligent aerial vehicles. Due to the People's Republic of China (the ''PRC'' or ''China'') legal restrictions on foreign ownership and investment in such business, the Company conducts its primary business operations through its subsidiaries, VIE and subsidiaries of the VIE in the PRC.

As of December 31, 2019, the Company's major subsidiaries, VIE and the subsidiaries of the VIE are as follows:

| Entities | Date of incorporation/ establishment | Place of incorporation/ establishment | Percentage of direct or indirect ownership | | Principal activities |
|---|---|---|---|---|---|
| | | | Direct | Indirect | |
| Subsidiaries: | | | | | |
| Ehfly Technology Limited ("Ehfly") | December 5, 2014 | Hong Kong | 100% | — | Product sales investment holding |
| EHang Intelligent Equipment (Guangzhou) Co., Ltd. ("EHang Intelligent" or the "WFOE") | October 15, 2015 | PRC | 100% | — | Research and development, manufacturing and product sales |
| Xi'an EHang Tianyu Intelligent Technology Co., Ltd. ("EHang Tianyu") | March 8, 2018 | PRC | 100% | — | Logistics solutions and related services |
| Variable Interest Entity | | | | | |
| Guangzhou EHang Intelligent Technology Co., Ltd. ("EHang GZ" or the "VIE") | August 8, 2014 | PRC | — | 100% | Research and development, manufacturing and product sales |

F-12

58

Table of Contents

EHANG HOLDINGS LIMITED
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

**1.  Organization and Basis of Presentation (Continued)**

| Entities | Date of incorporation/ establishment | Place of incorporation/ establishment | Percentage of direct or indirect ownership | | Principal activities |
|---|---|---|---|---|---|
| | | | Direct | Indirect | |
| VIE's Subsidiaries: | | | | | |
| Guangdong EHang Egret Media Technology Co. Ltd. ("EHang Egret GD") | July 6, 2016 | PRC | — | 60% | Aerial media solutions and related services |
| Kashi EHang Egret Media Technology Co. Ltd. ("EHang Egret KS") | November 3, 2017 | PRC | — | 60% | Aerial media solutions and related services |

In 2014 and 2015, EHang US and EHang Germany were established as the distribution arms of the Group for its consumer drones in the US and Europe, respectively. The Group decided to exit the consumer drone market in these countries in late 2016. As a result, EHang GmbH filed for bankruptcy in October 2017 and EHang US filed for Chapter 7 bankruptcy in December 2017. A deconsolidation loss of RMB45 was recognized in "other income/(expense)" for the year ended December 31, 2017. The disposal of EHang US and EHang Germany did not meet the definition of a discontinued operation per ASC Subtopic 205-20, *Presentation of Financial Statements—Discontinued Operations*, as the divestiture did not represent a shift in strategy nor had a major impact to the Group's operation and financial results.

**The VIE agreements**

The Group conducts all of its business in China through its subsidiaries, the VIE and subsidiaries of the VIE in the PRC. Despite the lack of technical majority ownership, the Company has effective control of the VIE through a series of contractual arrangements (the "Contractual Agreements") and a parent-subsidiary relationship exists between the Company and the VIE. The equity interests of the VIE are legally held by Mr. Huazhi Hu and Mr. Derrick Yifang Xiong, directors and shareholders of the Company (the "Nominee Shareholders"). Through the Contractual Agreements, the Nominee Shareholders of the VIE effectively assigned all of their voting rights underlying their equity interests in the VIE to the WFOE, which is a wholly-owned entity by the Company; who further assigned the voting rights underlying their equity interests in the VIE to the Company. Therefore, the Company has the power to direct the activities of the VIE that most significantly impact their economic performance. The Company also has the right to receive economic benefits via the WFOE, and the obligation to absorb losses of the VIE, that potentially could be significant to the VIE. Based on the above, the Company consolidates the VIE in accordance with SEC Regulation SX-3A-02 and ASC810-10, *Consolidation: Overall*.

The following is a summary of the Contractual Agreements:

*Loan Agreement*

The WOFE has granted interest-free loans with an aggregate amount of RMB60,000 to the Nominee Shareholders of the VIE for the sole purpose of providing funds necessary for the capital injection of the VIE. The loans are repayable by such Nominee Shareholder through a transfer of their equity interests in the VIE to the WFOE, in proportion to the amount of the loans to be repaid.

F-13

Table of Contents

EHANG HOLDINGS LIMITED
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

1. **Organization and Basis of Presentation (Continued)**

**The VIE agreements (Continued)**
*Power of Attorney and Shareholders Voting Proxy*

Pursuant to the Power of Attorney and Shareholders Voting Proxy entered into between the Nominee Shareholders, the VIE and the WFOE, the Nominee Shareholders authorized the WFOE to act on behalf of the Nominee Shareholders as exclusive agent and attorney with respect to all matters concerning the VIE's equity interests, including but not limited to: (1) attend shareholders' meetings of the VIE; (2) exercise all the shareholders' rights, including voting rights; and (3) designate and appoint the senior management members of the VIE. The proxy is irrevocable and continuously valid from the date of execution. The WFOE is entitled to re-authorize or assign its rights related to the equity interest to any other person or entity at its own discretion and without giving prior notice to the Nominee Shareholders or obtaining their consents. In 2019, the WFOE reassigned its rights under the Power of Attorney and Shareholders Voting Proxy to the Company, pursuant to the Commitment Letter below.

*Exclusive Option Agreements*

Pursuant to the Exclusive Option Agreements entered into amongst the Nominee Shareholders, the VIE and WFOE, the Nominee Shareholders granted to WFOE or their designees an irrevocable and exclusive right to purchase all or part of the equity interests held by the Nominee Shareholders in the VIE at the WFOE's sole discretion, to the extent permitted under the PRC laws, at an amount equal to the minimum consideration permitted under the applicable PRC law and administrative regulations. Any proceeds received by the Nominee Shareholders from the exercise of the options shall be remitted to the WFOE or its designated party, to the extent permitted under PRC laws. In addition, the VIE and the Nominee Shareholders have agreed that without prior written consent of the WFOE, they will not create any pledge or encumbrance on their equity interests in the VIE, or transfer or otherwise dispose of their equity interests in the VIE. The term of the agreement remains effective as long as each Nominee Shareholder remains a shareholder of the VIE. The WFOE may terminate the agreement at its sole discretion, whereas under no circumstances may the VIE or the Nominee Shareholders terminate the agreement.

*Exclusive Consulting and Service Agreement*

Pursuant to the Exclusive Consulting and Service Agreement between the WFOE and the VIE, the WFOE has the exclusive right to provide services to the VIE related to the VIE's and the VIE's subsidiaries' business, including but not limited to the development, manufacturing and sales of intelligent aerial vehicles. In return, the VIE agrees to pay a service fee equal to 100% of the consolidated net profits of the VIE after the VIE turns cumulative profitable and after certain expenses. The WFOE has sole discretion in determining the service fee charged to the VIE under this agreement. Without the WFOE's prior written consent, the VIE shall not, directly and indirectly, obtain the same or similar services as provided under this agreement from any third party. The WFOE will have the exclusive ownership of all intellectual property rights developed by performance of this agreement. The Exclusive Consulting and Service Agreement is valid for 10 years and renewable at the WFOE's option. This agreement can be terminated by the WFOE with 30 days notice at any time but cannot be terminated by the VIE unless the WFOE is found to be in gross negligence.

F-14

**Table of Contents**

EHANG HOLDINGS LIMITED
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

1.    **Organization and Basis of Presentation (Continued)**

    **The VIE agreements (Continued)**
    *Share Pledge Agreements*

Pursuant to the Share Pledge Agreements entered into amongst the WFOE and the Nominee Shareholders, the Nominee Shareholders pledged all of their equity interests in the VIE to the WFOE in favor of the WFOE to secure the VIE and their obligations under the various contractual agreements, including the Exclusive Consulting and Service Agreements and Exclusive Option Agreements described above. The WFOE shall have the right to collect dividends generated by the pledged equity interests during the term of the pledge. If the Nominee Shareholders breach their respective contractual obligations under the Share Pledge Agreements, the WFOE, as pledgee, will be entitled to rights, including the right to dispose the pledged equity interests entirely or partially. The Nominee Shareholders of the VIE agree not to create any encumbrance on or otherwise transfer or dispose of their respective equity interests in the VIE, without the prior consent of the WFOE. The Share Pledge Agreements will remain effective until all the contractual obligations have been satisfied in full under all the agreements mentioned above. In February 2019, the Company has completed the registration of the share pledge with the relevant office of Administration for the Industry and Commerce in accordance with the PRC Property Rights Law.

    **Commitment Letter**

Pursuant to the Commitment Letter, the WFOE irrevocably and unconditionally commits to execute its rights and obligations under the Power of Attorney and Shareholders Voting Proxy under the instruction of the Company. In addition, the Company is obligated and undertakes to provide unlimited financial support to the VIE, to the extent permissible under applicable PRC laws and regulations.

Based on the opinion of the Company's PRC legal counsel, (i) the ownership structure of the WFOE, the VIE and the subsidiaries of the VIE are in compliance with applicable PRC laws and regulations, (ii) such Contractual Agreements constitute valid, legal and binding obligations enforceable against each party of such agreements in accordance with the terms of each agreement, and will not result in any violation of PRC laws or regulations currently in effect.

However, uncertainties in the PRC legal system could cause the relevant regulatory authorities to find the current Contractual Agreements and businesses to be in violation of any existing or future PRC laws or regulations. If the Company, the WFOE or any of their current or future VIE are found in violation of any existing or future laws or regulations, or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion in dealing with such violations, which may include, but not limited to, revocation of business and operating licenses, being required to discontinue or restrict its business operations, restriction of the Group's right to collect revenues, being required to restructure its operations, imposition of additional conditions or requirements with which the Group may not be able to comply, or other regulatory or enforcement actions against the Group that could be harmful to its business. The imposition of any of these or other penalties may result in a material and adverse effect on the Group's ability to conduct its business. In addition, if the imposition of any of these penalties causes the Company to lose the rights to direct the activities of the VIE or the right to receive their economic benefits, the Company would no longer be able to consolidate the VIE.

F-15

Table of Contents

EHANG HOLDINGS LIMITED
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

1. **Organization and Basis of Presentation (Continued)**

The following financial statement balances and amounts of the Group's VIE and the VIE's subsidiaries were included in the accompanying consolidated financial statements:

| | As of December 31, | | |
|---|---|---|---|
| | 2018 | 2019 | |
| | RMB | RMB | US$ |
| **ASSETS** | | | |
| **Current assets:** | | | |
| Cash and cash equivalents | 20,140 | 12,599 | 1,810 |
| Accounts receivable, net | 2,372 | 4,499 | 647 |
| Unbilled revenue | — | 4,807 | 690 |
| Cost and estimated earnings in excess of billings | 18,411 | 14,212 | 2,041 |
| Inventories | 11 | 1,799 | 258 |
| Amount due from the Company's subsidiaries | 4,754 | 11,263 | 1,618 |
| Prepayments and other current assets | 7,061 | 8,686 | 1,248 |
| **Total current assets** | **52,749** | **57,865** | **8,312** |
| **Non-current assets:** | | | |
| Property, plant and equipment, net | 9,129 | 5,837 | 838 |
| Intangible assets, net | 210 | 272 | 39 |
| Long-term investment | 138 | 64 | 9 |
| Deferred tax assets | 135 | 184 | 26 |
| Other non-current assets | 272 | 214 | 31 |
| **Total non-current assets** | **9,884** | **6,571** | **943** |
| **Total assets** | **62,633** | **64,436** | **9,255** |
| **LIABILITIES** | | | |
| **Current liabilities:** | | | |
| Short-term bank loan | 5,000 | 5,000 | 718 |
| Accounts payable | 7,812 | 8,727 | 1,254 |
| Contract liabilities | 1,186 | 1,982 | 285 |
| Accrued expenses and current liabilities | 9,705 | 14,482 | 2,080 |
| Income taxes payable | — | 5 | 1 |
| Amounts due to the Company and its subsidiaries | 85,602 | 78,100 | 11,218 |
| **Total current liabilities** | **109,305** | **108,296** | **15,556** |
| **Total liabilities** | **109,305** | **108,296** | **15,556** |

F-16

62

**Table of Contents**

EHANG HOLDINGS LIMITED
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)
(Amounts in thousands of Renminbi ("RMB") and U.S. dollars ("US$"),
except for number of shares and per share data)

**21.    Commitments and Contingencies (Continued)**

**(a)    Operating lease commitments (continued)**

Total rental expenses for all operating leases amounted to RMB9,753, RMB9,492 and RMB8,455 (US$1,214), for the years ended December 31, 2017, 2018 and 2019, respectively.

**(b)    Contingencies**

From time to time, the Group is subject to legal proceedings, investigations, and claims incidental to the conduct of its business. The Group is currently not involved in any legal or administrative proceedings that may have a material adverse impact on the Group's business, financial position or results of operations.

**22.    Subsequent Events**

In January 2020, the Group entered into a three-year loan agreement with a third-party supplier of key AAV components with a principal amount of RMB52,000 (US$7,469) and an annual interest rate of 3%. The use of loan proceeds is limited to expanding the supplier's production capacity. This long-term loan can be prepaid by the borrower and the balance is guaranteed by the shareholder and her spouse of the borrower. In March 2020, RMB10,000 (US$1,436) was repaid.

On January 15, 2020, the Company issued 170,062 Class A ordinary shares (equivalent to 85,031 American Depositary Shares) for net proceeds of US$983 (equivalent to RMB6,772) as a result of the over-allotment option exercised by the underwriters of the Company's IPO.

Beginning in January 2020, the recent outbreak of Coronavirus (COVID-19) has negatively impacted and disrupted the Group's business operations, supply chain and some of the customers' industries. Consequently, the COVID-19 outbreak may adversely affect the Group's business operations, financial condition and operating results for 2020, including but not limited to, a decline in revenues, slower collection of accounts receivable and additional allowance for doubtful accounts. Given the uncertainty surrounding the COVID-19 outbreak, the extent of the business disruption and its related financial impact cannot be reasonably estimated at this time.

F-51

**Exhibit 12.1**

**Certification by the Principal Executive Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Huazhi Hu, certify that:

1.  I have reviewed this annual report on Form 20-F of EHang Holdings Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the company and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  [intentionally omitted]

    (c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 20, 2020

By:      /s/ Huazhi Hu
Name:   Huazhi Hu
Title:    Chief Executive Officer

64

**Exhibit 12.2**

**Certification by the Principal Financial Officer**
**Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Richard Jian Liu, certify that:

1.  I have reviewed this annual report on Form 20-F of EHang Holdings Limited;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.  The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the company and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  [intentionally omitted]

    (c)  Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.  The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

Date: April 20, 2020

By:     /s/ Richard Jian Liu
Name:   Richard Jian Liu
Title:  Chief Financial Officer