# Exhibit 3

**Table of Contents**

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-234411**

*3,200,000 American Depositary Shares*

**EHANG**

## EHang Holdings Limited

*Representing 6,400,000 Class A Ordinary Shares*

*This is an initial public offering of American depositary shares, or ADSs, representing Class A ordinary shares of EHang Holdings Limited.*

*We are offering 3,200,000 ADSs. Each ADS represents two Class A ordinary shares, par value US$0.0001 per share.*

*Prior to this offering, there has been no public market for the ADSs or our shares. The ADSs have been approved for listing on the Nasdaq Global Market, under the symbol "EH."*

*Upon the completion of this offering, our issued and outstanding share capital will consist of Class A ordinary shares and Class B ordinary shares. Our founder, Mr. Huazhi Hu, who is also our director and chief executive officer, will beneficially own all of our then issued and outstanding Class B ordinary shares and will be able to exercise 88.2% of the total voting power of our issued and outstanding share capital immediately following the completion of this offering assuming the underwriters do not exercise their over-allotment option, or 88.1% of the total voting power of our issued and outstanding share capital immediately following the completion of this offering if the underwriters exercise their over-allotment option in full. Holders of Class A ordinary shares and Class B ordinary shares have the same rights except for voting and conversion rights. Each Class A ordinary share is entitled to one vote, and each Class B ordinary share is entitled to ten votes and is convertible into one Class A ordinary share. Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale, transfer, assignment or disposition of Class B ordinary shares by their holder or a change of ultimate beneficial ownership of any Class B ordinary share to any person other than our founder or an affiliate controlled by our founder, such Class B ordinary shares are automatically and immediately converted into the same number of Class A ordinary shares.*

*We are an "emerging growth company" under applicable U.S. federal securities laws and are eligible for reduced public company reporting requirements. Following the completion of this offering, we will be a "controlled company" as defined under the Nasdaq Stock Market Rules because our founder will beneficially own all of our issued Class B ordinary shares, representing more than 50% of our total voting power.*

**Investing in the ADSs involves risks. See "Risk Factors" beginning on page 16.**

*PRICE US$12.50 PER ADS*

|  | Price to Public | Underwriting Discounts and Commissions[1] | Proceeds to us |
|---|---|---|---|
| Per ADS | US$12.50 | US$0.875 | US$11.625 |
| Total | US$40,000,000 | US$2,800,000 | US$37,200,000 |

(1)   See "Underwriting" for a description of the compensation payable to the underwriters.

*We have granted the underwriters the right to purchase up to an additional 480,000 ADSs to cover over-allotments at the initial public offering price, less underwriting discounts and commissions.*

*Mr. Huazhi Hu and entities affiliated with GGV have subscribed for and been allocated by the underwriters 400,000 ADSs and 160,000 ADSs, respectively, in this offering at the initial public offering price, representing 12.5% and 5.0%, respectively, of the ADSs being offered in this offering, assuming the underwriters do not exercise their over-allotment option. Mr. Hu is our founder, director and chief executive officer and one of our principal shareholders. Entities affiliated with GGV are collectively our principal shareholders and affiliates of one of our directors. The underwriters will receive the same underwriting discounts and commissions on any ADSs purchased by these shareholders as they will on any other ADSs sold to the public in this offering.*

*Neither the United States Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities, or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.*

*The underwriters expect to deliver the ADSs against payment in U.S. dollars in New York, New York on or about December 16, 2019.*

*MORGAN STANLEY*

*NEEDHAM & COMPANY*        *TIGER BROKERS*        *PRIME NUMBER CAPITAL*

*December 11, 2019.*

1

Table of Contents

**PROSPECTUS SUMMARY**

*The following summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements appearing elsewhere in this prospectus. In addition to this summary, we urge you to read the entire prospectus carefully, especially the risks of investing in the ADSs discussed under "Risk Factors," before deciding whether to invest in the ADSs. This prospectus contains information from an industry report commissioned by us and prepared by Frost & Sullivan, an independent market research firm, to provide information regarding our industry and our market position in China and globally.*

**Our Mission**

Our mission is to make safe, autonomous and eco-friendly air mobility accessible to everyone.

**Overview**

We are an autonomous aerial vehicle technology platform company. We are pioneering the future of transportation through our proprietarily developed autonomous aerial vehicles, or AAVs, and related commercial solutions. We believe we are the first in the world to launch passenger-grade AAVs, setting a new milestone in the deployment and proliferation of AAV technology.

In today's increasingly populated and interconnected world, traditional modes of urban transportation continue to contribute to congestion and pollution, and they are largely confined to land-based infrastructure. Mobility for the future requires a revolutionary solution. While the sky above has always been a possibility, we brought a safe, cost-effective and easy-to-use air mobility solution one step closer to reality when we unveiled our first passenger-grade AAV in 2016. Our AAVs require minimal space for vertical take-off and landing, enabling urban travel to expand to the three-dimensional space. We believe AAV technology will transform the future of transportation, improving lives and creating new industries.

We design, develop, manufacture, sell and operate AAVs and their supporting systems and infrastructure for a broad range of industries and applications, including passenger transportation, logistics, smart city management and aerial media solutions. We aim to make it safe and convenient for both passengers and goods to take to the air.


Passenger Transportation


Logistics


Smart City Management


Aerial Media

We are the first mover in AAV technology. In January 2016, we unveiled the world's first passenger-grade AAV, EHang 184, a single-seat model, at CES. In March 2018, we delivered a unit of our dual-seat EHang 216 to a customer for testing, training and demonstration purposes. We believe this was the world's first delivery of a passenger-grade AAV. In addition, we have developed a number of non-passenger-grade AAV models suitable for a variety of industrial and commercial applications.

Unlike manually controlled UAVs, our intelligent AAVs can fly and operate autonomously. Our proprietary in-flight operating systems and on-the-ground infrastructure enable reliable and simultaneous control of a large

1

2

Table of Contents

number of AAVs. The operating systems installed on each AAV consist of an autopilot and flight control system, communication systems, a battery management system and a safety management system. Our on-the-ground infrastructure consists primarily of command-and-control systems, handheld and computer-based control units and AAV charging equipment.

Our strong in-house research and development capabilities underpin our leadership and support our innovation. As of September 30, 2019, our 125-member research and product development team represented more than half of our total employees. Our research and development efforts are led by our founder, chairman and chief executive officer, Mr. Huazhi Hu, one of the pioneers and leaders in the global AAV industry. Our key research and development team includes personnel with strong backgrounds in electrical engineering, aerospace engineering, mechanical engineering, automation, material engineering and software development. As of September 30, 2019, we had 138 issued patents in China, many of which relate to our core technologies, such as flight control and command-and-control systems.

We are collaborating with a number of global industry leaders to develop and commercialize urban air mobility solutions. Our strategic partners include DHL-Sinotrans in last-mile delivery in China, Vodafone GmbH in 5G connectivity and AAV technology innovation in Europe, and FACC in AAV production in Europe.

We strive to design safe, reliable and functional products. At our design and testing center, we have established a multitude of AAV flight tests, including climbing flight tests, high maneuverability tests, speed tests, night flying tests, as well as flight tests in harsh weather conditions. We have conducted over 2,000 passenger-grade AAV flight tests, including in winds of up to 70 kilometers per hour and in fog with a visibility of approximately 50 meters.

**Orders, Delivery and Financial Results**

As of December 5, 2019, we had cumulatively delivered 38 passenger-grade AAVs for testing, training and demonstration purposes and developed two command-and-control centers for smart city management. As of December 5, 2019, we had unfilled purchase orders for 48 passenger-grade AAVs.

Our core business, air mobility solutions, grew significantly in the first nine months of 2019. Since early 2019, we have accelerated the commercialization of our passenger-grade AAVs in air mobility solutions. In the third quarter of 2019, we sold 18 passenger-grade AAVs, compared with 17 in the first two quarters of 2019 combined.

Our revenues increased by 109.8% from RMB31.7 million in 2017 to RMB66.5 million (US$9.3 million) in 2018. Our net loss decreased by 7.1% from RMB86.6 million in 2017 to RMB80.5 million (US$11.3 million) in 2018. Our revenues increased by 19.9% from RMB56.0 million in the nine months ended September 30, 2018 to RMB67.1 million (US$9.4 million) in the nine months ended September 30, 2019, and our net loss decreased by 3.9% from RMB49.8 million in the nine months ended September 30, 2018 to RMB47.8 million (US$6.7 million) in the nine months ended September 30, 2019. In 2018, revenues generated by air mobility solutions, smart city management solutions and aerial media solutions were RMB3.1 million (US$0.4 million), RMB30.5 million (US$4.3 million) and RMB31.3 million (US$4.4 million), representing 4.7%, 45.8% and 47.0% of our total revenues, respectively. In the nine months ended September 30, 2019, revenues generated from air mobility solutions, our core business, increased significantly to RMB48.8 million (US$6.8 million), representing 72.7% of our total revenues.

2

Table of Contents



Table of Contents

**Our Strengths**

We believe that the following strengths contribute to our success and differentiate us from our competitors:
- pioneer and leader in urban air mobility;
- revolutionary autonomous aerial vehicle technology;
- sophisticated command-and-control system enabling large-fleet operation;
- innovative AAV commercial solutions;
- strong in-house research and development capabilities; and
- visionary, tech-savvy and experienced management team.

**Our Strategies**

We intend to grow our business by pursuing the following key strategies:
- extend our technological leadership;
- expand development and manufacturing capabilities;
- expand our AAV portfolio and strengthen our platform;
- continue commercialization and promote adoption;
- explore new monetization opportunities; and
- pursue strategic partnerships in production and technology.

We expect China to be the world's largest AAV market in the foreseeable future, and as such it is our primary focus. At the same time, we plan to cooperate with strategic partners or serve customers in other jurisdictions, such as the United States and Europe.

**Our Challenges**

Our business and successful execution of our strategies are subject to challenges, risks and uncertainties related to our business and our industry, regulation of our business and corporate structure and doing business in China.

Of critical importance is our ability to comply with, and help formulate, applicable legal and regulatory requirements as well as industrial and safety standards that are rapidly evolving. In China, the United States and other jurisdictions relevant to us, the commercial use of our passenger-grade AAVs, and in some cases our non-passenger grade AAVs, is subject to an uncertain or lengthy approval process. We are unable to estimate the average length of time required to obtain the applicable regulatory approvals due to the nascent nature of AAV-related regulations and the lack of relevant precedents. We also cannot be sure that we or our business partners will obtain the required approvals in a timely manner, or at all. We are not aware of any operator having been granted all required approvals for the commercial operations of passenger-grade AAVs in China or the United States. Nor can we predict when these regulations will change, and any new regulations may impose onerous requirements and restrictions. Any negative developments, or the lack of positive developments, in relevant regulations may reduce customer demand for our products and impede the growth of our business.

Other challenges, risks and uncertainties we face include, but are not limited to, our ability to:
- generate market demand for and improve customers' willingness to adopt our passenger-grade AAVs and air mobility solutions;
- mitigate delays in and interruptions to our commercialization plans for passenger-grade AAVs and air mobility solutions and make timely product deliveries;

4

5

Table of Contents

- successfully complete material sales of our products under framework and conditional agreements;
- overcome technical challenges and manufacture, launch and sell AAVs that perform in line with customer expectations;
- effectively manage our growth or implement our business strategies;
- compete successfully in our industry;
- maintain and enhance our EHang brand;
- successfully defend ourselves in or insure against product liability claims or warranty claims; and
- effectively manage our international sales and operations.

**Corporate History and Structure**

In December 2014, we incorporated EHang Holdings Limited, or EHang, in the Cayman Islands as our offshore holding company to facilitate offshore financing and listing. In the same month, we established Ehfly Technology Limited, or Ehfly, in Hong Kong, which subsequently became a wholly-owned subsidiary of EHang.

From 2015 to 2018, we established the following significant subsidiaries to conduct our principal business of AAV manufacturing and sales and the provision of AAV commercial solutions and related services.
- In October 2015, Ehfly established a wholly-owned subsidiary in China, EHang Intelligent Equipment (Guangzhou) Co., Ltd., which we refer to as EHang Intelligent or our WFOE in this prospectus. EHang Intelligent is engaged in the research, development, manufacture and sale of AAVs and the research and development of various technologies related to air mobility and intelligent aviation.
- In January 2016, we obtained control over Guangzhou EHang Intelligent Technology Co., Ltd., which we refer to as EHang GZ or the VIE in this prospectus, by entering into a series of contractual arrangements with EHang GZ and its shareholders through EHang Intelligent. EHang GZ is primarily engaged in the research, development, manufacture and sale of AAVs, and the research and development of AAV operating systems and infrastructure.
- In July 2016, EHang GZ established Guangdong EHang Egret Media Technology Co., Ltd., or EHang Egret, to provide aerial media solutions and related services.
- In March 2018, EHang Intelligent established Xi'an EHang Tianyu Intelligent Technology Co., Ltd., or EHang Tianyu, to provide logistics solutions and related services.

As a result of our contractual arrangements with the VIE and its shareholders, EHang is regarded as the primary beneficiary of the VIE, and we treat the VIE and its subsidiaries as our consolidated affiliated entities under U.S. GAAP. We have consolidated the financial results of the VIE and its subsidiaries in our consolidated financial statements in accordance with U.S. GAAP.

Our contractual arrangements with the VIE and its shareholders allow us to (i) exercise effective control over the VIE, (ii) receive substantially all of the economic benefits of the VIE, and (iii) have an exclusive option to purchase or designate any third party to purchase all or part of the equity interests in and assets of the VIE when and to the extent permitted by PRC laws. For more details, including risks associated with the VIE structure, please see "Corporate History and Structure" and "Risk Factors—Risks Relating to Our Corporate Structure."

**Table of Contents**

The chart below summarizes our corporate structure and identifies our significant subsidiaries, the VIE and its significant subsidiaries, as of the date of this prospectus:



Notes:
(1)    Messrs. Huazhi Hu and Derrick Yifang Xiong are directors and beneficial owners of our company and hold 95.0% and 5.0% equity interests in EHang GZ, respectively.
(2)    The remaining 40.0% equity interest in EHang Egret is held by Mr. Lei Shi, an executive officer of EHang Egret.

**Implications of Being an Emerging Growth Company and a Foreign Private Issuer**

As a company with less than US$1.07 billion in revenue for our last fiscal year, we qualify as an "emerging growth company" pursuant to the Jumpstart Our Business Startups Act of 2012, as amended, or the JOBS Act. An emerging growth company may take advantage of specified reduced reporting and other requirements compared to those that are otherwise applicable generally to public companies. These provisions include exemption from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002 in the assessment of the emerging growth company's internal control over financial reporting. The JOBS Act also provides that an emerging growth company does not need to comply with any new or revised financial accounting standards until such date that a private company is otherwise required to comply with such new or revised accounting standards. We do not plan to opt out of such exemptions afforded to an emerging growth company.

We will remain an emerging growth company until the earliest of (a) the last day of the fiscal year during which we have total annual gross revenues of at least US$1.07 billion; (b) the last day of our fiscal year following the fifth anniversary of the completion of this offering; (c) the date on which we have, during the preceding three-year period, issued more than US$1.0 billion in non-convertible debt; or (d) the date on which

6

**Table of Contents**

## RISK FACTORS

*An investment in the ADSs involves significant risks. You should consider carefully all of the information in this prospectus, including the risks and uncertainties described below, before making an investment in the ADSs. Any of the following risks could have a material and adverse effect on our business, financial condition and results of operations. In any such case, the market price of the ADSs could decline, and you may lose all or part of your investment.*

**Risks Relating to Our Business and Industry**

***Our future growth depends on the demand for, and customers' willingness to adopt, our passenger-grade AAVs and air mobility solutions.***

We operate in the new and evolving AAV industry. Our business and operating results depend in large part on the acceptance of and demand for our passenger-grade AAVs and air mobility solutions. The success of these products and services are and will be subject to risks, including with respect to:

- the extent of market reception and adoption of AAVs as transportation and logistics solutions;
- our navigating a new and evolving regulatory environment;
- our timely fulfillment of product orders;
- our ability to produce safe, high-quality and cost-effective AAVs on an ongoing basis;
- the performance of our AAVs relative to customer expectations and customers' interest in and demand for our passenger-grade AAVs and air mobility solutions; and
- our building a well-recognized and respected brand.

Our failure to manage the risks described above may discourage current or potential customers from purchasing our passenger-grade AAVs or using our AAV commercial solutions, and there may be downward price pressure on our AAVs and commercial solutions. If the market for passenger-grade AAVs or air mobility solutions does not develop as we expect or develops more slowly than we expect, our business, prospects, financial condition and operating results will be materially and adversely affected.

***In the jurisdictions where we sell and plan to sell our products, the commercial use of our passenger-grade AAVs, and in some cases our non-passenger-grade AAVs, is subject to an uncertain or lengthy approval process; we cannot predict when regulations will change, and any new regulations may impose onerous requirements and restrictions with which we, our AAVs and our potential customers may be unable to comply. As a result, we may be limited in, or completely restricted from, growing our business in the foreseeable future.***

We operate in a new and rapidly evolving industry, which is subject to extensive legal and regulatory requirements. As described below, in the jurisdictions relevant to us, the commercial use and delivery of our passenger-grade AAVs is and in the near future is expected to continue to be subject to an uncertain or lengthy approval process. We are unable to estimate the average length of time required to obtain the applicable regulatory approvals due to the nascent nature of AAV-related regulations and the lack of relevant precedents. For example, we are not aware of any operator having been granted all required approvals for the commercial operations of passenger-grade AAVs in China, the United States or elsewhere. In addition, PRC and U.S. regulations impose significant restrictions on our non-passenger-grade AAVs. We cannot predict when these regulations will change, and any new regulations may impose onerous requirements and restrictions.

In China, the Civil Aviation Administration of China, or CAAC, has recently published the Guidance on UAV Airworthiness Assessment Based on Operation Risks, or the UAV Airworthiness Guidance, which is based

16

Table of Contents

on the assessment classification and management of operational risks of UAVs. For our passenger-grade AAVs, we have obtained written approval issued by the CAAC for trial flights in certain locations in China for the purpose of evaluating their airworthiness and formulating industry standards on airworthiness of passenger-grade AAVs. However, we are not allowed to engage in commercial operation or pilot operation of our passenger-grade AAVs merely with this approval. In addition, detailed rules or regulations with respect to the airworthiness of AAVs may be promulgated by the end of 2019. We cannot assure you that we will be able to obtain any of the certificates of airworthiness as required under the detailed rules and regulations in a timely manner or that we can satisfy the relevant requirements or standards under the detailed rules or regulations to be promulgated in the future.

Under the *Pilot Operation Rules (Interim) for Specific Unmanned Aircraft issued by the CAAC* on February 1, 2019, or Interim Rules, to start any specific pilot operation, the prospective operator of certain classes of UAVs must submit an application and be approved by the CAAC. In February 2019, we submitted an application to the CAAC for pilot operation in relation to a customer's use of our EHang 216, a type of our passenger-grade AAVs, in its logistics business. As we have passed the CAAC's preliminary examination and received the notification of acceptance for this application from the CAAC, we currently expect this application to be approved by the end of 2019. However, we cannot assure you that the approval will be granted in time as we expect, or at all. Even if this approval is granted by the CAAC, it cannot be extended to the operations of other customers.

In addition, under the Interim Rules, we may be required to obtain a pilot operation approval for our non-passenger-grade AAVs. In February 2019, we voluntarily submitted an application to the CAAC for pilot operation in relation to two customers' use of our non-passenger-grade AAVs for logistic purposes. We cannot assure you that we will be able to obtain such approval. Even if this approval is granted by the CAAC, it cannot be extended to the operations of other customers or the same customer for other purposes.

Further, we are required to obtain approvals from local divisions of the People's Liberation Army Air Force, or PLAAF for proposed flight routes in connection with our business. As the approvals from the PLAAF are usually granted on a one-off basis or are only valid for a limited period of time and the local divisions of PLAAF may exercise air traffic control under certain circumstances which may restrict us from operating our AAVs from time to time, we cannot assure you that we will be able to obtain such approval for each matter on which we will work on with our customers or partners in the future. If such approval is not granted in a timely manner, we, our customers or partners will not be able to fly the AAVs in the proposed flight routes.

In the United States, the Federal Aviation Administration, or the FAA, is the regulatory agency that oversees the safety of aircraft operations, including unmanned aircraft systems, or UAS, in the national airspace system of the United States, or the NAS. A UAS is any aircraft and its associated elements that are operated without the possibility of direct human intervention from within or on the aircraft. All of our AAVs qualify as UAS.

- *Large UAS.* FAA regulations define a "large UAS" as any UAS that weighs 55 pounds or more. Presently FAA regulations do not permit the operation of large UAS in the NAS unless the operator obtains both UAS airworthiness approval as well as operational approval through: (1) a special experimental airworthiness certificate, or SAC, under FAA Order 8130.34D (for the purpose of testing) or (2) an exemption pursuant to the Special Authority for Certain Unmanned Systems located in 49 U.S.C. § 44807, or a Section 44807 Exemption (for testing purposes or commercial operations). If the FAA determines that a proposal to operate a large UAS does not present an unreasonable safety risk, the FAA may issue an SAC or Section 44807 Exemption, as applicable, subject to appropriate limitations determined by the FAA. However, obtaining a SAC can be a lengthy process. In addition, carrying persons or property for hire is prohibited.

  We believe that FAA Order 8130.34D provides a path for an operator to begin testing our passenger AAVs and related systems in the United States. Before granting a SAC, the FAA reviews all aspects of the AAV and related systems to help ensure that the AAV can be operated safely, and as part of this

17

Table of Contents

process the FAA may request design, manufacturing, operational or other changes. Notably, carrying persons or property for hire is prohibited. Thus, an SAC may potentially be used to test proposed operational concepts, but would not authorize the carriage of goods or persons for hire. Further, obtaining an SAC can be a lengthy process, and we cannot estimate how long this may take.

The Section 44807 Exemption grants the FAA the authority to use a risk-based approach to determine whether a UAS can operate safely in the NAS with respect to a specific proposed operation without complying with those certain operational and airworthiness requirements for which the Section 44807 Exemption is sought. Under this authority, the FAA may grant exemptions to the applicable operating rules, airworthiness requirements and pilot requirements for a specific operation on a case-by-case basis. Note that the FAA has indicated that it may require a UAS to have a type certificate under 49 CFR Part 21 prior to issuing an exemption for a specific operation pursuant to Section 44807. To use our large AAVs for commercial purposes, an operator would require a Section 44807 Exemption that specifically permits such use. We believe that because of the FAA's concern for the safety of users of the NAS and the public, as well as FAA's regard for the privacy-related concerns of the general public, an exemption for commercial use of our passenger AAVs over populated areas may not be granted in the near future until laws and regulations change to permit such use.

- *Small UAS.* FAA regulations define a "small UAS" as any UAS that weighs less than 55 pounds. Part 107 of Title 14 of the Code of Federal Regulations, or Part 107, permits the operation of small UAS for commercial purposes, including transporting goods for hire (but not across state lines), provided certain conditions are satisfied, including that the UAS must remain within the visual line of the sight of the pilot, and that the UAS not be operated over persons not involved in the UAS operation (for example, over populated urban areas). Part 107 allows a UAS operator to apply for a waiver of some of the restrictions contained in Part 107, including the restrictions noted above, but does not permit a waiver of the line-of-sight requirement to allow the carriage of property for hire. Thus, under Part 107, an operator may, without seeking any government approvals or waivers, use our small AAVs to conduct the intrastate transportation of goods for hire (i.e., logistics), over unpopulated areas within the line of sight of the pilot. A waiver may be available to allow the delivery of goods for hire over populated areas, but it is uncertain how long it may take to obtain a waiver or whether the FAA would grant one at all.

  Although transporting goods for hire beyond the line of sight of the pilot is not permitted under Part 107, an operator could seek a Section 44807 Exemption to operate under Part 135, for example, as Section 44807 Exemptions are not limited to large UAS. The FAA has granted at least one Section 44807 Exemption for this type of operation using a small UAS. However, it is uncertain how long it may take to obtain an exemption.

  As a result of the forgoing, we and our customers may not be able to commercialize our products, which could limit our sales and our ability to grow our business.

  Note that the description of the regulation of UAS in the United States as provided herein reflects the regulatory landscape with respect to the approval of UAS and UAS operations current as of the date of this prospectus. The FAA's authority, processes and methodologies for the evaluation of UAS operations in the NAS continue to rapidly evolve, and the regulation and processes described herein are subject to change.

As we sell our AAV products internationally, we face challenges in quickly and sufficiently familiarizing ourselves with foreign regulatory environments and policy frameworks. If any new regulation is put in place, or a different interpretation of existing regulation is adopted, our ability to manufacture, market, sell or operate our AAVs or to advertise or deliver air mobility solutions in general may be limited or otherwise affected. Failure to comply with applicable regulations or to obtain, maintain or renew the necessary permits, licenses, registrations or certificates could cause delays in, or prevent us from, manufacturing, marketing, selling and operating our AAV products, meeting product demand and expectations, introducing new products or expanding our service

18

Table of Contents

coverage, and could materially and adversely affect our operation results. If we are found to be in violation of applicable laws or regulations, we could be subject to administrative punishment, including fines, injunctions, recalls or asset seizures, as well as potential criminal sanctions, any of which could have a material adverse effect on our business, financial condition, results of operations and prospects.

### *We may be unable to make timely product deliveries due to limited production capacity.*

As of December 5, 2019, we had unfilled purchase orders for 48 passenger-grade AAVs. Commercial production of our passenger-grade AAVs requires timely and adequate supply of various types of raw materials and components, as well as mass production capacity and efficient manufacturing and assembly. We have limited experience in high-volume manufacturing of our AAVs. We cannot assure you that we will be able to expand our production capacity efficiently and cost-effectively, or to procure sufficient raw materials and components to meet our production volume. While we are looking into expanding our manufacturing capacity through partnerships, such partnerships may not be successful, or we may not be able to do so in a timely manner to fulfill our backlog orders. While we obtain components from multiple sources whenever possible, some of the components used in our AAVs are currently purchased from a single source to improve cost-efficiency. Disruption in the supply of components, whether or not from a single-source supplier, could temporarily disrupt commercial production of our AAVs. We also outsource certain manufacturing activities to third party contract manufacturers. We may experience operational difficulties with our contract manufacturers, including reductions in the availability of production capacity, failure to comply with product specifications, insufficient quality control, failure to meet production deadlines, increases in manufacturing costs and longer lead time.

Any of the foregoing could result in our failure to make timely deliveries to our customers. Such failure would materially and adversely affect our business, results of operations, financial condition and prospects.

### *Our framework and conditional agreements may not result in material sales of our products*

We have entered into a number of long-term agreements with customers and partners relating to the sale of our passenger-grade AAVs. Some of these agreements are conditional, and our counterparty is not obligated to purchase our products unless a number of conditions are satisfied. Under our agreement with a U.S. biotechnology customer, the customer is not required to purchase our AAVs unless our AAVs achieve a number of performance milestones and it obtains required approvals from the FAA and FDA for the commercial operation of our AAVs. We have yet to achieve the performance milestones, which allows the customer to terminate the agreement. Further, it may be time-consuming for the customer to obtain the required approvals, if they are able to do so at all. Some other agreements are framework agreements containing sales targets, but that does not obligate our counterparties to purchase our products at all. We expect the number of orders we receive under these framework agreements to depend on a number of factors, including changes in the regulatory environment, customers' acceptance of and demand for our products and services and our production capacity. For the foregoing reasons, we may not receive any substantial orders from our current or potential customers, and we currently do not expect material deliveries to some of our business partners, including the U.S. biotechnology company and a Norwegian automobile distributor. As our long-term agreements may not result in material sales of our products, our future results of operations may not scale or otherwise meet our current expectations.

### *We have substantial customer concentration and we have experienced a significant increase in accounts receivable.*

Due to the short history of our business and that we have not achieved significant scale, we had and expect to continue to have customer concentration. In 2018, our largest customer accounted for 30% of our revenues. In the first nine months of 2019, our largest customer accounted for 44% of our revenues. There are inherent risks whenever a large percentage of revenues are concentrated with a limited number of customers. We are unable to predict the future level of demand for our services that will be generated by these customers. In addition, our

19

Table of Contents

accounts receivable balance significantly increased from RMB2.5 million (US$0.3 million) as of December 31, 2018 to RMB36.9 million (US$5.2 million) as of September 30, 2019. As of September 30, 2019, accounts receivable from top two customers accounted for 77% of our total accounts receivable balance. The credit period for some of our customers, including the largest customer of our AAVs, can be as long as 180 days. If our major customers were to cease purchasing our products or services, cancel existing orders or fail to make payments to us in a timely fashion, our business and results of operation will be materially and adversely affected.

*Our technology platform may not perform in line with customer specifications or expectations.*

Our technology platform, consisting of our AAVs, in-flight operating systems and on-the-ground infrastructure, may not perform in line with customers' expectations. For example, our AAVs may not be as easy to operate or maintain as customers expect. In addition, certain orders of our passenger-grade AAVs are conditioned on their meeting defined technical specifications (such as a specified cruising speed, operational range and payload capacity) according to agreed-upon delivery timetables. See "Business—Our AAV Commercial Solutions" for further details. Future customers may also require performance specifications that we are unable to deliver. Some of these target specifications, such as those dependent on battery technology, are constrained by the pace of general technological advancement and the capabilities of our suppliers, which are largely beyond our control.

Our technology platform may contain design or manufacturing defects that result in unsatisfactory performance or require repair. Our technology platform uses a substantial amount of algorithms and software to operate. Software products are inherently complex and often contain defects and errors, especially when first introduced. While we have performed extensive internal testing on our AAV software and hardware systems, we have a limited frame of reference by which to evaluate the long-term performance of our technology platform. There can be no assurance that we will be able to detect and fix any defects in our technology platform before we sell products and services to customers.

If our technology platform is defective or otherwise fails to perform as expected or in accordance with prescribed technical specifications and timetable, our AAVs may experience accidents and we may suffer adverse publicity, order cancellations, revenue declines, delivery delays, product recalls, product liability claims, and significant warranty and other expenses. These consequences could have a material adverse impact on our business, financial condition, operating results and prospects.

*We are a relatively young company with a short operating history, and we may not be able to sustain our rapid growth, effectively manage our growth or implement our business strategies.*

We have been providing AAV commercial solutions for approximately three years. Although we have experienced growth, our historical performance may not be indicative of our future performance due to our limited operating history. We are currently commercializing our AAVs and air mobility solutions, and have just started accepting orders for our AAVs and delivering them to customers for testing purposes. There is no historical basis for making judgments on the demand for our products and services or our ability to produce and deliver AAVs and air mobility solutions, or to become profitable in the future.

You should consider our business and future prospects in light of the risks and challenges we face as a new entrant to a nascent industry and to overseas markets, including risks and challenges associated with our ability to:
- provide safe, convenient and effective air mobility solutions;
- maintain reliable, secure, high-performance and scalable infrastructure;
- identify suitable facilities to expand manufacturing capacity;
- navigate the evolving and complex regulatory environment across all the markets in which we operate;

20

Table of Contents

- anticipate and adapt to changing market conditions, including technological developments and changes in the competitive landscape, and adjust, manage and execute our marketing and sales activities to cater to local economic and demographic conditions, cultural differences and customer preferences across all our current and future markets;
- successfully market our AAV commercial solutions;
- improve and maintain our operational efficiency; and
- attract, retain and motivate talented employees.

If we fail to address any or all of these risks and challenges, our business may be materially and adversely affected.

As our business grows, we may adjust our product and service offerings. These adjustments may not bring about expected results and may instead have a material and adverse impact on our financial condition and results of operations. For example, we historically manufactured and sold consumer drones while we were developing our passenger-grade AAVs and AAV commercial solutions. Our consumer drone business was not successful. We gradually phased out this business to focus on more innovative products and services. Our revenue structure may continue to evolve in response to market demand. In particular, we expect the relative revenue contribution from air mobility solutions to increase and that from aerial media solutions to decrease in the foreseeable future. Our growth is dependent on the development of such new products and services. We may not accurately identify market needs before we invest in the development of a new product or a new service. In addition, we might face difficulties or delays in the development process, which may result in losses in our market share and competitive advantages.

In pursuit of our growth strategy, we may enter into new strategic relationships to further penetrate our targeted markets. Should these relationships fail to materialize and develop into demand or orders for our products and services, or should we fail to work effectively with these companies, we may lose opportunities to generate sales growth and our business, results of operations and financial condition could be adversely affected.

### Our AAVs and AAV commercial solutions are subject to safety standards, and the failure to satisfy such mandated safety standards or failure to design, manufacture and operate safe and high-performance AAVs and related operating systems and infrastructure would have a material adverse effect on our business and operating results.

Sales of our AAVs, including our passenger-grade AAVs and non-passenger-grade AAVs, must comply with applicable standards in the market where they are sold, including standards on design, manufacturing and operation. In China, for example, certain components of our AAVs must pass various tests and undergo a certification process and be affixed with a China Compulsory Certificate, or CCC, before they can be installed on our AAVs. We cannot assure you that we have obtained the CCC for all the components of our AAVs that are listed in the CCC Product Catalogue. Failure to install components with a CCC may prevent us from selling the affected products and negatively affect our manufacturing and sales of AAVs. In the United States, the FAA oversees the safety of aircraft operations in the national airspace system and has the authority to grant airworthiness certificates and related exemptions to AAV products. See "Regulation" for further details. If we fail to have our AAVs satisfy applicable aerial vehicle standards in any jurisdiction where we operate, our business and operating results would be adversely affected. To achieve a high level of safety assurance, we have also established our own AAV safety standards. While we are committed to producing safe and high-quality products, there can be no assurance that our safety technology will be effective in preventing incidents related to product safety, such as accidents involving our AAVs. Failure to ensure the safe operation of our AAVs will affect our reputation and the sales of our AAVs, which will ultimately adversely affect our business operation and financial results.

21

13

**Table of Contents**

*We have incurred, and in the future may continue to incur, net losses.*

We have incurred net losses in the past. In 2017 and 2018, we had net losses of RMB86.6 million and RMB80.5 million (US$11.3 million), respectively, and we had net operating cash outflows of RMB38.4 million and RMB43.4 million (US$6.1 million), respectively. In the first nine months of 2019, we had net loss of RMB47.8 million (US$6.7 million) and net operating cash outflows of RMB70.2 million (US$9.8 million). We expect our costs to increase in future periods as we continue to expand our business and operations. We also expect to incur substantial costs and expenses as a result of being a public company.

We cannot assure you that we will be able to generate net profits or positive operating cash flows in the future. Our ability to achieve profitability depends in large part on, among other factors, our ability to increase orders and sales of our AAVs and AAV commercial solutions, achieve economies of scale, establish effective pricing strategies, effectively navigate the regulatory environments in different jurisdictions, and increase operational efficiency. If we are unable to generate adequate revenues or effectively manage our expenses, we may continue to incur significant losses in the future and may not be able to achieve or subsequently maintain profitability.

*We may not be successful in competing in the UAV industry.*

We operate in the UAV industry and provide various commercial solutions, including air mobility, smart city management and aerial media solutions. In addition to competing with other UAV companies, we compete with traditional industry players providing similar solutions, such as aircraft and ground transportation service providers. Many of our current and potential competitors, particularly international competitors, have significantly greater financial, technical, manufacturing, marketing and other resources than we do and may be able to devote greater resources to the design, development, manufacturing, distribution, promotion, sale and support of their products.

We expect competition in our industry to intensify in the future in light of increased demand for alternative transportation, continuing globalization and consolidation in the global UAV industry. Factors affecting competition include, among others, ability to innovate, development speed, product quality, reliability, safety and features, pricing and customer service. Increased competition may lead to lower AAV unit sales and increased inventory, which may result in downward price pressure and adversely affect our business, financial condition, operating results and prospects.

Our ability to successfully compete in our industry will be fundamental to our future success in existing and new markets and will affect our market share. If our competitors introduce AAVs or services that are superior in quality or performance and/or lower in price compared with our offerings, we may lose existing customers or be unable to attract new customers at prices that would allow us to generate attractive rates of return on our investment, if at all.

*Any significant cybersecurity incident or disruption to our operating systems or our command-and-control centers could subject us to significant reputational, financial, legal and operational consequences.*

We depend on our integrated in-flight operating systems and on-the-ground infrastructure to operate our products and services. Any material disruption to or slowdown of our operating systems or infrastructure could cause our AAVs to malfunction or result in outages or delays in our services, which could harm our brand and adversely affect our operating results.

Our command-and-control centers rely on our proprietary cloud database, which stores all of the data we collect. Problems with our command-and-control centers or our telecommunications network providers could adversely affect our services and products. Our telecommunications network providers could decide to cease providing services to us without adequate notice. Any change in service levels of our telecommunications

**Table of Contents**

network or any errors, defects, disruptions or other performance problems with our operating systems or infrastructure could harm our brand and potentially affect our user data. If changes in technology cause our operating systems or infrastructure to become obsolete, or if our operating systems or command-and-control centers are inadequate to support our growth, we could lose customers, and our business and operating results could be adversely affected.

We could be subject to breaches of security by hackers. Although we proactively employ multiple measures to defend our systems against intrusions and attacks, our measures may not prevent unauthorized access or use of sensitive data. A breach of our AAV operating systems or command-and-control systems may result in product damages, data losses and, in extreme cases, AAV accidents or hijacking of our AAVs to perform unlawful activities. A cybersecurity breach could harm our reputation and deter our customers and potential customers from using our AAVs. In addition, any such breach could cause us to incur costs to correct the breaches or failures, expose us to uninsured liability, increase our risk of regulatory scrutiny, subject us to lawsuits and result in the imposition of material penalties and fines.

*An accident involving an AAV provided by us or another manufacturer could harm the AAV industry.*

An accident involving an AAV provided by us or another manufacturer could cause regulatory agencies around the world to tighten restrictions on the use of AAVs, particularly over populated areas, and could cause the public to lose confidence in our products and AAVs generally. There are risks associated with autopilot, flight control, communications and other advanced technologies, and, from time to time, there have been accidents associated with these technologies. The safety of certain cutting-edge technologies depends in part on user interaction, and users may not be accustomed to using such technologies. We could face unfavorable and tightened regulatory control and intervention on the use of autopilot and other advanced technologies and be subject to liability and government scrutiny to the extent accidents associated with our autonomous navigation systems occur. Should a high-profile accident occur resulting in substantial casualty or damages, either involving our AAVs or products offered by other companies, public confidence in and regulatory attitudes toward AAVs could deteriorate. Any of the foregoing could materially and adversely affect our results of operations, financial condition and growth prospects.

*We may be compelled to undertake product recalls or take other actions, which could adversely affect our brand image and results of operations.*

Our AAVs may not perform in line with customers' expectations. Any product defects, accidents or any other failure of our AAVs to perform as expected could harm our reputation and result in adverse publicity, revenue loss, delivery delays and product recalls, which could harm our brand and reputation. Any product recall or lawsuit seeking significant monetary damages either in excess of or outside of our insurance coverage may have a material adverse effect on our business and financial condition. In the future, we may, voluntarily or involuntarily, initiate a recall if any of our AAVs, including any systems or components sourced from our suppliers, prove to be defective or noncompliant with applicable laws and regulations. Such recalls, whether voluntary or involuntary and whether caused by systems or components engineered or manufactured by us or our suppliers, could incur significant expenses and adversely affect our brand image in our target markets. They may also inhibit or prevent commercialization of our current and future product candidates.

*We may become subject to product liability claims or warranty claims, which could harm our financial condition and liquidity if we are not able to successfully defend or insure against such claims.*

We may be exposed to significant product liability claims if our AAVs do not perform as expected or malfunction. Any defects, errors, or failures in our products or the misuse of our AAVs, operating systems and infrastructure could also result in injury, death or property damage. Our risks in this area are particularly pronounced given we have limited field experience in the operation of our AAVs. A successful product liability claim against us could require us to pay a substantial monetary award. Moreover, a product liability claim could

Table of Contents

generate substantial negative publicity about our AAVs and business and inhibit or prevent commercialization of our current and future AAV models. Our insurance coverage might not be sufficient to cover all potential product liability claims. In addition, the same level of insurance coverage may not be available in the future at economical prices, or at all. Even if we are fully insured as it relates to a claim, the claim could nevertheless diminish our brand and divert management's attention and resources, which could have a negative impact on our business, financial condition and result of operations.

We generally provide standard warranties on our AAVs. The term of a warranty is between six months to three years, depending on the product line and the specific part or component. The occurrence of any material defects in our AAVs could make us liable for damages and warranty claims. In addition, we could incur significant costs to correct any defects or other problems, including costs related to product recalls. Warranty claims may also lead to litigation. Any negative publicity related to the perceived quality of our AAVs could affect our brand image, decrease retailer, distributor and customer demand, and adversely affect our operating results and financial condition.

*If we fail to successfully develop and commercialize new products, services and technologies that are well received by customers, our operating results may be materially and adversely affected.*

Our future growth depends on whether we can continually develop and introduce new generations of our existing AAV product lines and update our operating systems and infrastructure with enhanced functionalities and value-added services. This is particularly important in the current industry landscape where technologies and consumer preferences evolve rapidly, which may shorten the lifecycles of our existing products. We plan to upgrade our current AAV models and introduce new models in order to continue to provide AAVs with the latest technologies. As technological advancements can be complex and costly, we could experience delays in the development and introduction of new products and services in the future.

Our ability to roll out new and innovative products and services depends on a number of factors, including significant investments in research and development, quality control of our products and services and effective management of our supply chain. We may need to devote more resources to the research and development of new or enhanced products, services and technologies, which may reduce our profitability. In addition, our research and development efforts may not yield the benefits we expect to achieve in a timely manner, or at all. To the extent that we are unable to execute our strategy of continuously introducing new and innovative products, diversifying our product portfolio and satisfying consumers' changing preferences, we may not be able to grow our user base, and our competitive position and results of operations may be adversely affected. Even if we are able to keep up with technological changes and develop new models, our prior models may as a result become obsolete sooner than expected, potentially reducing our return on investment.

*We have limited experience in managing sales to multiple countries and we are subject to a variety of costs and risks due to our continued international expansion.*

In 2018, two of our passenger-grade AAVs were delivered abroad. We have entered into sales contracts with customers outside China. As international expansion is one of our core strategies, we expect our international sales to increase in the future. In markets outside China, we generally have limited or no experience in marketing, selling and deploying our AAVs. International expansion has required and will continue to require us to invest significant capital and other resources, and our efforts may not be successful. International sales and operations are subject to risks such as:

- limited brand recognition;
- costs associated with establishing new distribution networks;
- difficulty in finding qualified partners for overseas distribution;
- inability to anticipate changes in local market conditions, economic landscapes, and consumers' preferences and customs;

24

16

**Table of Contents**

- difficulties in staffing and managing foreign operations;
- lack of familiarity with and understanding of the local legal, regulatory and policy frameworks, as well as burdens of complying with a wide variety of local laws and regulations, including those governing personal data protection and safety control;
- political and economic instability;
- trade restrictions;
- differing employment laws and practices, as well as potential labor disruptions;
- the imposition of government controls;
- lesser degrees of intellectual property protection;
- tariffs and customs duties and the classifications of our goods by applicable governmental bodies; and
- a legal system subject to undue influence or corruption.

Additionally, to export our AAVs to certain jurisdictions, we may face challenges in coordinating with both PRC and the applicable foreign governments and regulatory authorities. If we cannot export our AAVs to such jurisdictions, our business, prospects, financial condition and operating results may be materially and adversely impacted.

The failure to manage any of these risks could negatively affect our international business and consequently our overall business and operating results. In addition, the concern over these risks may also prevent us from entering into, or marketing, selling or releasing certain of our AAVs and AAV commercial solutions in, certain markets.

***We rely on some third-party distributors for sales, marketing and distribution activities relating to our AAVs.***

Some of our business partners are acting as third-party distributors that sell, market and distribute our AAVs to their customers. Accordingly, we may be subject to a number of risks associated with third-party distributors, including a lack of day-to-day control over the activities of third-party distributors selling or using our products and solutions; third-party distributors may terminate their arrangements with us on limited or no notice, or may change the terms of these arrangements in a manner that is unfavorable to us for reasons outside of our control; and any disagreements with our third-party distributors could lead to costly and time-consuming litigation or arbitration. If we fail to establish and maintain satisfactory relationships with our third-party distributors, we may not able to sell, market and distribute our AAVs according to our internal budget and plans, our future revenues and market share may not grow at a pace that we expect, and we could be subject to increases in sales and marketing and other costs which would harm our results of operations and financial condition.

***Our operations may be interrupted by production difficulties or delays due to mechanical failures, utility shortages or stoppages, fire, natural disaster or other calamities at or near our facilities.***

Production difficulties, such as capacity constraints, mechanical and systems failures and the need for equipment upgrades, may suspend our production and/or reduce our output. There can be no assurance that we will not experience problems with our production facilities in the future or that we will be able to address any such problems in a timely manner. Problems with key equipment in one or more of our production facilities may affect our ability to produce our AAVs or cause us to incur significant expenses to repair or replace such equipment. Scheduled and unscheduled maintenance programs may affect our production output. Any of these could have a material adverse effect on our business, financial condition, results of operations and prospects.

We depend on a continuous supply of utilities, such as electricity and water, to operate our production facilities. Any disruption to the supply of electricity or other utilities may disrupt our production, or cause the

25

**Table of Contents**

deterioration or loss of our inventory. This could adversely affect our ability to fulfill our sales orders and consequently may have an adverse effect on our business and results of operations. In addition, fire, natural disasters, pandemics or extreme weather, including droughts, floods, typhoons or other storms, or excessive cold or heat, could cause power outages, fuel shortages, water shortages, damage to our production, processing or distribution facilities or disruption of transportation channels, any of which could impair or interfere with our operations. We cannot assure you that such events will not happen in the future or that we will be able to take adequate measures to mitigate the likelihood or potential impact of such events, or to effectively respond to such events if they occur.

*Our consumers may experience service failures or interruptions due to defects in the software, infrastructure, components or engineering system that compromise our products and services, or due to errors in product installation, any of which could harm our business.*

Our products and services may contain undetected defects in the software, infrastructure, components or engineering system. Sophisticated software and applications, such as those adopted and offered by us, often contain "bugs" that can unexpectedly interfere with the software and applications' intended operations. Our internet services may from time to time experience outages, service slowdowns or errors. Defects may also occur in components or processes used in our products or for our services.

There can be no assurance that we will be able to detect and fix all defects in the hardware, software and services we offer. Failure to do so could result in decreases in sales of our products and services, lost revenues, significant warranty and other expenses, decreases in customer confidence and loyalty, losing market share to our competitors, and harm to our reputation.

*Our success depends on the continuing efforts of our key employees, including our senior management members and other key personnel. If we fail to hire, retain and motivate our key employees, we could lose the innovation, collaboration and focus that contribute to our business.*

We believe that our success depends substantially on the continued efforts of our key employees, including our senior management members and other qualified and key personnel. We rely on our executive officers, senior management and key employees to generate business and execute programs successfully. In addition, the relationships and reputation that members of our management and key employees have established and maintain with government personnel contribute to our ability to maintain good customer relations and to identify new business opportunities. The loss of any key personnel or our failure to attract additional talent could reduce our employee retention, disrupt our research and development activities and operations, and impair our revenue growth and competitiveness. If one or more of our executive officers or key employees were unable or unwilling to continue their services with us, we might not be able to replace them easily, in a timely manner, or at all, and we might lose the innovation, collaboration and focus that contribute to our business.

*Our business and prospects depend significantly on our ability to build our EHang brand.*

Our business and prospects are heavily dependent on our ability to build, maintain and strengthen the EHang brand. If we do not continue to establish, maintain and strengthen our brand, we may lose the opportunity to build a critical mass of customers. Promoting and positioning our brand will likely depend significantly on our ability to provide high-quality AAVs and AAV commercial solutions and engage with our customers as intended. In addition, we expect that our ability to develop, maintain and strengthen the EHang brand will also depend heavily on the success of our user development and branding efforts. Such efforts mainly include building a community of engaged online and offline users as well as other branding initiatives, such as AAV shows and events. To promote our brand, we may be required to change our user development and branding practices, which could result in substantially increased expenses. If we do not develop and maintain a strong brand, our business, prospects, financial condition and operating results will be materially and adversely impacted.

26

Table of Contents

Our EHang brand could be subject to adverse publicity if incidents related to our products occur or are perceived to have occurred, whether or not we are at fault. In particular, given the popularity of social media, including WeChat and Weibo in China, any negative publicity, regardless of its truthfulness, could quickly proliferate and harm consumer perceptions of and confidence in our brand. Furthermore, we may be affected by adverse publicity related to our manufacturing or other partners, whether or not such publicity is related to their collaboration with us. Our ability to successfully position our brand could also be adversely affected by perceptions of the quality of our partners' products and services. In addition, from time to time, our AAVs and AAV commercial solutions are evaluated and reviewed by third parties. Any unfavorable reviews could adversely affect consumer perceptions of our AAVs and AAV commercial solutions.

### *Weather and seasonality may have a material adverse effect on our operations.*

Our sales of AAVs and AAV commercial solutions may be affected by weather and seasonality. Our AAV commercial solutions are mainly delivered outdoor. Customers may choose alternative transportation in severe weather conditions in consideration of safety factors, even if our AAVs are able to endure such conditions. As a result, our business, financial condition and operating results may be materially and adversely impacted by the weather conditions. Our operating results may vary from period to period due to many factors, including seasonal factors that may have an effect on the demand for our AAV commercial solutions in the future. As a result, our quarterly results of operations and financial position at the end of a particular quarter may not necessarily be representative of the results we expect at year-end or in other quarters of a year. Our operating results would suffer if we did not achieve revenues consistent with our expectations due to seasonal demand and weather changes because many of our expenses are based on anticipated levels of annual revenues.

### *Any deterioration of our relationship with our strategic business partners could have a material adverse effect on our operating results.*

We collaborate with various business partners to promote our AAVs and AAV commercial solutions. For example, we collaborate with several companies including Yonghui Group to provide logistics services for last-mile delivery. There can be no guarantee that those business partners will continue to collaborate with us in the future. If we are unable to maintain good relationships with our business partners, or the business of our business partners declines, the reach of our products and services may be adversely affected and our ability to maintain and expand our user base may decrease.

Most of the agreements with our business partners do not prohibit them from working with our competitors or from offering competing services. If our partners change their standard terms and conditions in a manner that is detrimental to our business, or if our business partners decide not to continue working with us, or choose to devote more resources to supporting our competitors or their own competing products, we may not be able to find a substitute on commercially favorable terms, or at all, and our competitive advantages may diminish.

### *We rely on external suppliers for raw materials and certain components and parts used in our AAVs, and do not have control over the quality of these components and parts.*

We purchase certain key components and raw materials, such as computers chips, batteries, motors and electronic displays, from external suppliers for use in our operations and production of AAVs. A continuous and stable supply of components and raw materials that meet our standards is crucial to our operations and production. We cannot assure you that we will be able to maintain our existing relationships with our suppliers and continue to be able to stably source key components and raw materials at reasonable prices, or at all. We have integrated our suppliers' technologies within our products such that having to change to an alternative supplier may cause significant disruption to our operations. The supply of key components could be interrupted for any reason, or there could be significant increases in the prices of these key components. Additionally, changes in business conditions, force majeure, governmental changes and other factors beyond our control, or that we do not presently anticipate, could also affect our suppliers' ability to deliver components to us on a timely

27

19

Table of Contents

basis. If any of these events occurs, our business, financial condition, results of operations and prospects may be materially and adversely affected.

We cannot guarantee that the quality of components and parts manufactured by external suppliers will be consistent and maintained at a high standard. Any defects of or quality issues with these components or any noncompliance incidents associated with these third-party suppliers could result in quality issues with our AAVs and hence compromise our brand image and results of operations. In extreme situations, we may be exposed to liabilities as a result of significant damages caused by certain components from external suppliers and we cannot assure you that we will be able to obtain sufficient insurance coverage at an acceptable cost in the future. A successful claim brought against us in excess of our available insurance coverage may have a material adverse effect on our business, financial condition and operating results.

***Safety issues or public perceptions of safety issues concerning lithium-ion batteries could have a material adverse impact on our business.***

The battery packs installed on our AAVs make use of lithium-ion cells. On rare occasions, lithium-ion cells can rapidly release the energy they contain by venting smoke and flames in a manner that can ignite nearby materials as well as other lithium-ion cells. While the battery packs used for our AAVs are designed to passively contain any single cell's release of energy without spreading to neighboring cells, a field or testing failure of our AAVs could occur, which could result in accidents, casualty or damages, and subject us to lawsuits, product recalls, or redesign efforts. Also, negative public perceptions regarding the suitability of lithium-ion cells for AAV applications or any future incident involving lithium-ion cells, even if such incident does not involve our AAVs, could seriously harm our business. In addition, we store a significant number of lithium-ion cells at our facilities. Any mishandling of battery cells may cause disruption to the operation of our facilities. While we have implemented safety procedures related to the handling of the cells, a safety issue or fire related to the cells could disrupt our operations. Such damage or injury could lead to adverse publicity and potentially a safety recall.

***We rely on third-party logistics providers to deliver our domestic sales orders and certain overseas orders. Inadequate third-party logistics services or failure to mitigate the risks of damage or disruption to our distribution logistics could adversely affect our business.***

Our ability to transport and sell our AAVs is critical to our success across our operations. We typically rely on third-party logistics service providers to deliver our domestic sales orders and certain overseas orders. Damage or disruption to our distribution logistics due to disputes, weather, natural disasters, fire, explosions, terrorism, pandemics or labor strikes could impair our ability to distribute or sell our AAVs. Inadequate third-party logistics services could also potentially disrupt our distribution and sales and compromise our business reputation. Failure to take adequate steps to mitigate the likelihood or potential impact of such events, or to effectively manage such events if they occur, could adversely affect our business, financial condition and results of operations, as well as require additional resources to restore our supply chain.

***If our business partners, contractors, suppliers, sales agents, dealers or third-party logistics services providers fail to use ethical business practices and comply with applicable laws and regulations, our brand image could be harmed due to negative publicity beyond our own control.***

Our reputation is sensitive to allegations of unethical business practices. We do not control the business practices of our business partners, independent contractors and suppliers, sales agents, dealers or third-party logistics services providers. Accordingly, we cannot guarantee their compliance with ethical business practices, such as environmental responsibilities, fair wage practices, and compliance with child labor laws, among others. A lack of demonstrated compliance could lead us to seek alternative suppliers, sales agents or dealers, which could increase our costs and result in delayed delivery of our products, product shortages or other disruptions of our operations. Violation of labor or other laws by our suppliers, business partners, sales agent, dealers or third-party logistics services suppliers or the divergence of their labor or other practices from those generally

28

20

Table of Contents

accepted as ethical in the markets in which we do business could also attract negative publicity, diminish our brand image and reduce demand for our AAVs and AAV commercial solutions.

### *If customers modify our AAVs or operating systems, the AAVs may not operate properly, which may cause damage, create negative publicity and harm our business.*

Our customers may try to modify our AAVs or operating systems for various reasons, which could compromise the performance and safety of our AAVs, as well as the safety of their passengers. During such modifications, they may use third-party parts that may not be compatible with our products. We do not test, nor do we endorse, such modification. In addition, the use of improper external cabling or unsafe charging outlets can expose our customers to injury from AAV malfunctioning. Any injuries or damages resulting from such modifications or misuses could result in adverse publicity, which would negatively affect our brand and harm our business, prospects, financial condition and operating results.

### *Our business could be adversely affected by security-related concerns of the United States and other countries against Chinese companies and products.*

Due to security-related concerns, U.S. government actions targeting exports of certain technologies to China are becoming more pervasive. The U.S. government has in the past issued export restrictions that effectively banned U.S. companies from selling products to ZTE Corporation, and in May 2019 imposed a similar ban on sales of all products to Huawei. In 2018, the U.S. adopted new laws designed to address concerns about the export of emerging and foundational technologies to China. In addition, in May 2019, President Trump issued an executive order that invoked national emergency economic powers to implement a framework to regulate the acquisition or transfer of information communications technology in transactions that imposed undue national security risks. These actions could lead to additional restrictions on the export of products that include or enable technologies on which we rely. Such restrictions imposed by the United States or any other countries may make it more difficult us to procure or license technological products from these countries, or affect the ability of our PRC suppliers to manufacture and provide us with advanced components, which may increase our costs, impair our products' competitiveness, and have a material adverse effect on our business.

Similar security-related concerns may affect our ability to export our products to the United States and other countries. In May 2019, the US Department of Homeland Security advised American companies about the inherent security risks associated with Chinese-made drones. In a related development, the US government was also reportedly considering placing Chinese surveillance systems providers, including Hikvision Digital Technology and Dahua Technology, on a trade blacklist that would cut off their access to American hi-tech suppliers. We cannot assure you that our AAVs will not be placed on such trade blacklist in the future. If that event occurs, our ability to export our products to the United States will be adversely affected.

### *We may need to defend ourselves against claims of intellectual property infringement, which may be time-consuming and costly.*

Companies, organizations or individuals, including our competitors, may hold or obtain patents, trademarks or other proprietary rights that would prevent, limit or interfere with our ability to make, use, develop, sell or market our AAVs, AAV operating systems and infrastructure or their components, which could make it more difficult for us to operate our business. Companies holding patents or other intellectual property rights may bring suits alleging infringement of such rights by us or otherwise assert their rights against us. Moreover, our applications and uses of trademarks relating to our design, software or artificial intelligence technologies could be found to infringe upon existing trademark ownership and rights. We may also fail to apply for key trademarks in a timely manner. For example, we discovered some precedent registrations by several other Chinese companies of the trademark " 亿航 " (the Chinese characters for our brand, "EHang") for vehicles and bicycles, which fall into the same class of products as remote aerial vehicles and aerospace transportation. Although we received a favorable judgement in a proceeding relating to such precedent registrations, we may continue to face intellectual property infringement claims in the future.

29

Table of Contents

If we are determined to have infringed upon a third party's intellectual property rights, we may be required to do one or more of the following:

- cease selling, incorporating certain components into, or using AAVs or offering goods or services that incorporate or use the challenged intellectual property;
- pay substantial damages;
- seek a license from the holder of the infringed intellectual property right, which license may not be available on reasonable terms or at all;
- redesign our AAVs, AAV operating systems and infrastructure, components or services; or
- establish and maintain alternative branding for our products and services.

In the event of a successful claim of infringement against us and our failure or inability to obtain a license to the infringed technology or other intellectual property right, our business, prospects, operating results and financial condition could be materially and adversely affected. In addition, any litigation or claims, even if frivolous, could result in substantial costs, negative publicity and diversion of resources and management attention.

### Our intellectual property rights may not protect us effectively.

As of September 30, 2019, we had 138 issued patents and 134 pending patent applications in China, 302 registered trademarks and 122 pending trademark applications in China, and 21 registered copyrights in China in relation to our technologies. We cannot assure you that our pending patent and trademark applications will be granted. Even if our applications are successful, patents may be contested, circumvented or invalidated in the future.

In addition, the rights granted under any issued patents may not provide us with proprietary protection or competitive advantages. The claims under any patents that issue from our patent applications may not be broad enough to prevent others from developing technologies that are similar or that achieve results similar to ours. It is also possible that the intellectual property rights of others could bar us from licensing and exploiting any patents that are issued from our pending applications. Numerous patents and pending patent applications owned by others exist in the fields in which we have developed and are developing our technology. These patents and patent applications might have priority over our patent applications and could subject our patent applications to invalidation. Finally, in addition to those who may claim priority, any of our existing or pending patents may also be challenged by others on the basis that they are otherwise invalid or unenforceable.

Implementation and enforcement of PRC laws on intellectual property rights have historically been deficient and ineffective. Accordingly, protection of intellectual property rights in China may not be as effective as in the United States or other developed countries. Furthermore, policing unauthorized use of proprietary technology is difficult and expensive. We rely on a combination of patent, copyright, trademark and trade secret laws and restrictions on disclosure to protect our intellectual property rights. Despite our efforts to protect our proprietary rights, third parties may attempt to copy or otherwise obtain and use our intellectual property or seek court declarations that they do not infringe upon our intellectual property rights. Any unauthorized use of our intellectual property by third parties may adversely affect our current and future revenues and our reputation. Monitoring unauthorized use of our intellectual property is difficult and costly, and we cannot assure you that the steps we have taken or will take will prevent misappropriation of our intellectual property. From time to time, we may have to resort to litigation to enforce our intellectual property rights, which could result in substantial costs and diversion of our resources.

30

22

Table of Contents

*Failure to safeguard personal information could subject us to penalties, damage our reputation and brand, and harm our business and results of operations.*

Through our AAVs, EHang Play app and command-and-control centers, we log information about each AAV's use, such as charge time, battery usage, mileage and location information, in order to aid us in vehicle diagnostics, repair and maintenance, as well as to help us customize and optimize the flying experience. Images and videos captured by cameras attached to our AAVs are stored on our servers, servers of third-party cloud storage providers or other servers designated by our customers. Possession and use of our users' flying behavior and data in conducting our business may subject us to legislative and regulatory oversight in China and other jurisdictions, such as the European Union and the United States. For example, in January 2018, the European Union promulgated the General Data Protection Regulation to further protect fundamental rights in privacy and personal information so that members of the general public have more control over their personal information. Regulations in relevant jurisdictions may require us to obtain user consent for the collection of personal information, restrict our use of such personal information and hinder our ability to expand our user base. In the event of a data breach or other unauthorized access to our user data, we may have obligations to notify users about the incident and we may need to provide some form of remedy for the individuals affected by the incident.

If users allege that we have improperly used, released or disclosed their personal information, we could face legal claims and reputational damage. We may incur significant expenses to comply with privacy, consumer protection and security standards and protocols imposed by law, regulation, industry standards or contractual obligations. A major breach of our network security and systems could create serious negative consequences for our business and future prospects, including possible fines, penalties, reduced customer demand for our AAVs, and harm to our reputation and brand. See "Regulation" for further details.

*The execution of our business plans requires a significant amount of capital. In addition, our future capital needs may require us to sell additional equity or debt securities that may dilute the equity interests of our shareholders or introduce covenants that may restrict our operations or our ability to pay dividends.*

We will need significant capital to, among other things, conduct research and development, expand our manufacturing capacity and roll out new products. We may also need significant capital to maintain our existing property, plant and equipment. Our expected sources of capital include both equity and debt financing. However, financing might not be available to us in a timely manner or on acceptable terms, or at all.

Our ability to obtain the necessary financing to carry out our business plan is subject to a number of factors, including general market conditions and investor acceptance of our business plans. These factors may make the timing, amount, terms and conditions of such financing unattractive or unavailable to us. If we are unable to raise sufficient funds, we will have to significantly reduce our spending, delay or cancel our planned activities, substantially change our current corporate structure, or even curtail or discontinue our operations.

In addition, our future capital needs and other business concerns could require us to sell additional equity or debt securities or obtain a credit facility. The sale of additional equity or equity-linked securities could dilute the equity interests of our shareholders. Additional indebtedness would increase our debt-service obligations and may be accompanied by covenants that would restrict our operations or our ability to pay dividends to our shareholders.

*We are subject to risks associated with strategic alliances or acquisitions. If we cannot manage the growth of our business or execute our strategies effectively, our business and prospects may be materially and adversely affected.*

We have entered into strategic alliances with various business partners, such as Yonghui Group and DHL-Sinotrans, and may in the future enter into joint research and development agreements or co-branding agreements with third parties to further our business purpose from time to time. These alliances could subject us

31

23

Table of Contents

to a number of risks, including risks associated with sharing proprietary information, non-performance by the third parties and increased expenses in establishing new strategic alliances, any of which may materially and adversely affect our business. We may have limited ability to monitor or control the actions of these third parties. If any of these strategic third parties suffers negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with any such third party.

Although we currently do not have any specific acquisition plans, if appropriate opportunities arise, we may acquire additional assets, products, technologies or businesses that are complementary to our existing business. In addition to any required shareholders' approval, we may also have to obtain approvals and licenses from relevant government authorities for the acquisitions and to comply with any applicable PRC laws and regulations, which could result in delays and increased costs, and may derail our business strategy if we fail to do so. Furthermore, past and future acquisitions and the subsequent integration of new assets and businesses into our own require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our business operations. Acquired assets or businesses may not generate the financial results we expect. Acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant.

*Our business could be adversely affected by trade tariffs or other trade barriers.*

Starting from early 2018, the U.S. President announced the imposition of tariffs on certain Chinese goods entering the United States and recently both China and the United States have each imposed additional tariffs. The United States may also in the future impose tariffs on the importation of consumer products related to our business, such as AAVs. In addition, the European Union has recently imposed tariffs on imports of AAVs originating from the PRC. We plan to export our AAVs to the United States and the European Union. Any new tariffs on AAVs or other relevant products imposed by the United States or the European Union may significantly increase our costs. It is not yet clear what impact these tariffs may have or what actions other governments, including the Chinese government, may take in retaliation. In addition, these developments could have a material adverse effect on global economic conditions and the stability of global financial markets. Any of these factors could have a material adverse effect on our business, financial condition and results of operations.

*We have limited insurance coverage, which could subject us to significant costs and business disruption.*

We have limited liability insurance coverage for our products and business operations. We may not be able to secure additional product liability insurance coverage on acceptable terms or at reasonable costs when needed. A successful liability claim against us due to injuries or damages suffered by our users could materially and adversely affect our financial conditions, results of operations and reputation. Even if unsuccessful, such a claim could cause us adverse publicity, require substantial costs to defend, and divert the time and attention of our management. In addition, we do not have any business disruption insurance. Any business disruption could result in substantial cost to us and diversion of our resources. Furthermore, China, the United States or any other jurisdiction relevant to our business may impose requirements for maintaining certain minimum liability or other insurance relating to the operation of AAVs. Such insurance policies could be costly, which would reduce the demand for our AAVs. Alternatively, certain insurance products that would be desirable to AAV operators may not be commercially available, which would increase the risks of operating our AAVs and also reduce the demand for them.

*The ongoing bankruptcy proceedings of our former subsidiaries could subject us to adverse consequences.*

Two of our former subsidiaries, one in the United States and one in Germany, were established as regional sales offices for our consumer drone business in September 2014 and February 2016, respectively. Due to intense

32

24

Table of Contents

competition in the consumer drone business at the time, we decided to exit the consumer drone markets in these two countries. Both of these entities filed for voluntary bankruptcy as part of the winding up process, and the U.S. entity was deconsolidated from our group in December 2017 and the German entity was deconsolidated from our group in October 2017. The bankruptcy proceedings for both of these entities are still ongoing. Based on the claims registers for these bankruptcy proceedings, these entities are subject to various creditors' claims, which include employment litigation, lease, tax and insurance claims. As these entities were deconsolidated since 2017 and are limited liability companies, our group companies have no direct liability for these claims.

The bankruptcy proceedings are still ongoing. If claimants or trustees decide to assert claims against us to satisfy, among other things, the debt of our former subsidiaries' creditors and any such claims were to prevail, they could have an adverse effect on our results of operations and cash flows. Even if these claims do not result in a liability to us, they could subject us to negative publicity and harm the perception and confidence of our customers and suppliers in our brand and financial condition, which in turn could have a negative effect on our results of operations and cash flows.

*We are subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws, and noncompliance with such laws can subject us to administrative, civil and criminal fines and penalties, collateral consequences, remedial measures and legal expenses, all of which could adversely affect our business, results of operations, financial condition and reputation.*

We are subject to anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations in various jurisdictions in which we conduct our business or sell our products, including the PRC anti-corruption laws and regulations, the U.S. Foreign Corrupt Practices Act, or the FCPA, the U.K. Bribery Act 2010, and other anti-corruption laws and regulations. The FCPA and the UK Bribery Act 2010 prohibit us and our officers, directors, employees and business partners acting on our behalf, including agents, from corruptly offering, promising, authorizing or providing anything of value to a "foreign official" for the purposes of influencing official decisions or obtaining or retaining business or otherwise obtaining favorable treatment. The FCPA also requires companies to make and keep books, records and accounts that accurately reflect transactions and dispositions of assets and to maintain a system of adequate internal accounting controls. The UK Bribery Act 2010 also prohibits non-governmental "commercial" bribery and soliciting or accepting bribes. The PRC anticorruption laws and regulations prohibit bribery to government agencies, state or government owned or controlled enterprises or entities, to government officials or officials that work for state or government owned enterprises or entities, as well as bribery to non-government entities or individuals. There is uncertainty in connection with the implementation of PRC anti-corruption laws. A violation of these laws or regulations could adversely affect our business, results of operations, financial condition and reputation.

We have direct or indirect interactions with officials and employees of government agencies and state-owned affiliated entities in the ordinary course of business. We have also entered into joint ventures and/or other business partnerships with government agencies and state-owned or affiliated entities. These interactions subject us to an increased level of compliance-related concerns. We are in the process of implementing policies and procedures designed to ensure compliance by us and our directors, officers, employees, representatives, consultants, agents and business partners with applicable anti-corruption, anti-bribery, anti-money laundering, financial and economic sanctions and similar laws and regulations. However, our policies and procedures may not be sufficient and our directors, officers, employees, representatives, consultants, agents, and business partners could engage in improper conduct for which we may be held responsible.

Non-compliance with anti-corruption, anti-bribery, anti-money laundering or financial and economic sanctions laws could subject us to whistleblower complaints, adverse media coverage, investigations, and severe administrative, civil and criminal sanctions, collateral consequences, remedial measures and legal expenses, all of which could materially and adversely affect our business, results of operations, financial condition and reputation. In addition, changes in economic sanctions laws in the future could adversely impact our business and investments in our shares.

33

25

**Table of Contents**

*We are involved in litigation from time to time and, as a result, we could incur substantial judgments, fines, legal fees or other costs.*

We may be the subject of complaints or litigation from customers, employees or other third parties for various actions. The damages sought against us in some of these litigation proceedings could be substantial. In addition, our subsidiaries in the United States and Germany are currently undergoing bankruptcy proceedings, as we discontinued our consumer drone business in these markets. We may be involved in litigation relating to such bankruptcy proceedings from time to time and we cannot assure you that we will always have meritorious defenses to the plaintiffs' claims. While the ultimate effect of these legal actions cannot be predicted with certainty, our reputation and the result of operations could be negatively impacted. The proceedings we may be involved in from time to time, including the aforementioned bankruptcy proceedings, could incur substantial judgments, fines, legal fees or other costs and have a material adverse effect on our business, financial condition, results of operations and cash flows.

*Any financial or economic crisis or perceived threat of such a crisis may materially and adversely affect our business, financial condition and results of operations.*

The global financial markets experienced significant disruptions in 2008. The recovery since then has been geographically uneven. New challenges have also emerged, including the escalation of the European sovereign debt crisis since 2011, the hostilities in the Ukraine, the end of quantitative easing by the U.S. Federal Reserve and the economic slowdown in the Eurozone in 2014. It is unclear whether these challenges will be contained and what effects they each may have. There is considerable uncertainty over the long-term effects of the expansionary monetary and fiscal policies that have been adopted by the central banks and financial authorities of some of the world's leading economies, including China's. Economic conditions in China are sensitive to global economic conditions. Recently there have been signs that the rate of China's economic growth is declining. Any prolonged slowdown in China's economic development might lead to tighter credit markets, increased market volatility, sudden drops in business and customer confidence and dramatic changes in business and customer behaviors.

*We face risks related to natural disasters, health epidemics and other outbreaks, which could significantly disrupt our operations.*

Our business could be adversely affected by epidemics. In recent years, there have been outbreaks of epidemics in China and globally. Our business operations could be disrupted if any of our employees are suspected of having H1N1 flu, avian flu or another epidemic, since it could require our employees to be quarantined and/or our offices to be disinfected. In addition, our results of operations could be adversely affected to the extent that the outbreak harms the Chinese economy in general and the UAV industry in particular.

We are also vulnerable to natural disasters and other calamities such as hurricanes, tornadoes, floods, earthquakes and other adverse weather and climate conditions. Although we have servers that are hosted in an offsite location, our backup system does not capture data on a real-time basis and we may be unable to recover certain data in the event of a server failure. We cannot assure you that any backup systems will be adequate to protect us from the effects of fire, floods, typhoons, earthquakes, power loss, telecommunications failures, break-ins, war, riots, terrorist attacks or similar events. Any of the foregoing events may give rise to interruptions, breakdowns, system failures, technology platform failures or internet failures, which could cause the loss or corruption of data or malfunctions of software or hardware as well as adversely affect our ability to provide services on our platform.

*We have granted, and may continue to grant, restricted share units and other types of awards under our share incentive plan, which may result in increased share-based compensation expenses.*

We adopted a share incentive plan, or the 2015 Plan, to incentivize our employees, directors and consultants and align their interests with ours. We recognize expenses in our consolidated statement of loss in accordance

34

26

Table of Contents

with U.S. GAAP. Under our 2015 Plan, we are authorized to grant restricted share units and other types of awards. Under the 2015 Plan, the maximum number of ordinary shares that may be issued pursuant to all awards is 8,867,053. As of September 30, 2019, 3,910,505 restricted share units had been granted and were outstanding, including vested and unvested restricted share units. As of September 30, 2019, our unrecognized share-based compensation expenses relating to unvested awards, amounted to RMB19.5 million (US$2.7 million).

We believe the granting of share-based awards is of significant importance to our ability to attract and retain key personnel and employees, and we will continue to grant share-based awards to employees in the future. However, the number of shares reserved for issuance under our share incentive plan may not be sufficient to recruit new employees and to compensate existing employees. Furthermore, prospective candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. Thus, our ability to attract or retain highly skilled employees may be adversely affected by declines in the perceived value of our equity or equity awards. To attract and retain qualified employees, our expenses associated with share-based compensation may increase, which may have an adverse effect on our results of operations.

***If we fail to implement and maintain an effective system of internal controls to remediate our material weaknesses over financial reporting, we may be unable to accurately report our results of operations, meet our reporting obligations or prevent fraud, and investor confidence in our company and the market price of the ADSs may be materially and adversely affected.***

Prior to this offering, we have been a private company with limited accounting and financial reporting personnel and other resources with which we address our internal control over financial reporting. In connection with the audits of our consolidated financial statements as of and for the years ended December 31, 2017 and 2018, we and our independent registered public accounting firm identified two material weaknesses in our internal control over financial reporting. As defined in the standards established by the U.S. Public Company Accounting Oversight Board, or PCAOB, a "material weakness" is a deficiency, or combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

The material weaknesses that have been identified relate to our lack of sufficient accounting and financial reporting personnel with requisite knowledge of and experience in application of U.S. GAAP and SEC rules, and lack of financial reporting policies and procedures that are commensurate with U.S. GAAP and SEC reporting and compliance requirements. We are in the process of implementing a number of measures to address the material weaknesses and deficiencies that have been identified. See "Management's Discussion and Analysis of Financial Condition and Results of Operations— Internal Control Over Financial Reporting." However, we cannot assure you that these measures may fully address the material weaknesses and deficiencies in our internal control over financial reporting or that we may conclude that they have been fully remediated.

Upon completion of this offering, we will become subject to the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act, or Section 404, will require that we include a report from management on the effectiveness of our internal control over financial reporting in our annual report on Form 20-F beginning with our annual report in our second annual report on Form 20-F after becoming a public company. In addition, once we cease to be an "emerging growth company" as such term is defined in the JOBS Act, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue an adverse opinion on the effectiveness of internal control over financial reporting because of the existence of a material weakness if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. In addition, after we become a public company, our reporting obligations may place a significant strain on our management, operational and financial resources and systems for the foreseeable future. We may be unable to timely complete our evaluation testing and any required remediation.

Table of Contents

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify other weaknesses and deficiencies in our internal control over financial reporting. If we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. Generally speaking, if we fail to achieve and maintain an effective internal control environment, it could result in material misstatements in our financial statements and could also impair our ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis. As a result, our businesses, financial condition, results of operations and prospects, as well as the trading price of the ADSs, may be materially and adversely affected. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. We may also be required to restate our financial statements from prior periods.

**Risks Relating to Our Corporate Structure**

***If the PRC government finds that the agreements that establish the structure for operating some of our operations in China do not comply with PRC regulations relating to the relevant industries, or if these regulations or the interpretation of existing regulations change in the future, we could be subject to severe penalties or be forced to relinquish our interests in those operations.***

We are a Cayman Islands company and our PRC subsidiaries are currently considered to be foreign-invested enterprises. In December 2014, we incorporated EHang in the Cayman Islands as our offshore holding company to facilitate financing and offshore listing. In the same month, we established Ehfly in Hong Kong, which subsequently became our wholly-owned subsidiary. In October 2015, we established EHang Intelligent, our WFOE, wholly owned by Ehfly. In January 2016, we obtained control over EHang GZ through our WFOE by entering into a series of contractual arrangements with EHang GZ, our VIE, and its shareholders, which enable us to (i) exercise effective control over EHang GZ, (ii) receive economic benefits from the VIE that potentially could be significant to our VIE, and (iii) have an exclusive option to purchase all or part of the equity interests and assets in EHang GZ, when and to the extent permitted by PRC laws. As a result of these contractual arrangements, we have control over and are the primary beneficiary of our VIE and hence consolidate their financial results under U.S. GAAP. See "Corporate History and Structure" for further details.

Our PRC legal counsel, Allbright Law Offices, based on its understanding of the relevant laws and regulations, is of the opinion that (i) the ownership structure of our WFOE, our VIE and its subsidiaries are in compliance with applicable PRC laws or regulations and (ii) such contractual arrangements constitute valid, legal and binding obligations enforceable against each party of such agreements in accordance with the terms of each agreement, and will not result in any violation of PRC laws or regulations currently in effect. However, our PRC legal counsel has also advised us that there are substantial uncertainties regarding the interpretation and application of current and future PRC laws, regulations and rules. Accordingly, the PRC regulatory authorities may take a view that is contrary to the opinion of our PRC legal counsel.

If we or our VIE are found to be in violation of any existing or future PRC laws or regulations, or fail to obtain or maintain any of the required permits or approvals, the relevant PRC regulatory authorities would have broad discretion to take action in dealing with such violations or failures, including:
- revoking the business licenses and/or operating licenses of such entities;
- shutting down our servers or blocking our website, or discontinuing or placing restrictions or onerous conditions on our operation through any transactions between our WFOE and our VIE;
- imposing fines, confiscating the income from our WFOE or our VIE, or imposing other requirements with which we or our VIE may not be able to comply;

36

28

**Table of Contents**

- requiring us to restructure our ownership structure or operations, including terminating the contractual arrangements with our VIE and deregistering the equity pledges of our VIE, which in turn would affect our ability to consolidate, derive economic interests from, or exert effective control over our VIE;
- restricting or prohibiting our use of the proceeds of this offering to finance our business and operations in China, and taking other regulatory or enforcement actions that could be harmful to our business;
- confiscating any of our income deemed to be obtained through illegal operations;
- discontinuing or placing restrictions or onerous conditions on our operations;
- imposing additional conditions or requirements with which we may not be able to comply; or
- taking other regulatory or enforcement actions against us that could be harmful to our business.

The imposition of any of these penalties would result in a material and adverse effect on our ability to conduct our business. In addition, it is unclear what impact the PRC government actions would have on us and on our ability to consolidate the financial results of our VIE in our consolidated financial statements, if the PRC government authorities were to find our legal structure and contractual arrangements to be in violation of PRC laws and regulations. If the imposition of any of these government actions causes us to lose our right to direct the activities of our VIE or our right to receive substantially all the economic benefits and residual returns from our VIE and we are not able to restructure our ownership structure and operations in a satisfactory manner, we would no longer be able to exert effective control over or consolidate the financial results of our VIE in our consolidated financial statements. Either of these results, or any other significant penalties that might be imposed on us in this event, would have a material adverse effect on our financial condition and results of operations.

*Our business may be significantly affected by the newly enacted Foreign Investment Law.*

On March 15, 2019, the National People's Congress promulgated the Foreign Investment Law, which will take effect on January 1, 2020 and replace the trio of existing laws regulating foreign investment in China, namely, the PRC Equity Joint Venture Law, the PRC Cooperative Joint Venture Law and the Wholly Foreign-owned Enterprise Law, together with their implementation rules and ancillary regulations. Since the Foreign Investment Law is newly enacted, uncertainties still exist in relation to its interpretation and implementation. The Foreign Investment Law does not explicitly classify whether variable interest entities that are controlled via contractual arrangements would be deemed as foreign invested enterprises if they are ultimately "controlled" by foreign investors. However, it has a catch-all provision under definition of "foreign investment" to include investments made by foreign investors in China through means stipulated by laws or administrative regulations or other methods prescribed by the State Council. Therefore, it still leaves leeway for future laws, administrative regulations or provisions to provide for contractual arrangements as a form of foreign investment.

The Foreign Investment Law grants national treatment to foreign invested entities, except for those foreign invested entities that operate in industries deemed to be either "restricted" or "prohibited" in the "negative list" to be published. Because the "negative list" has yet to be published, it is unclear as to whether it will differ from the Negative List currently in effect. The Foreign Investment Law provides that only foreign invested entities operating in foreign restricted or prohibited industries will require entry clearance and other approvals that are not required by PRC domestic entities or foreign invested entities operating in other industries. In the event that our VIE and its subsidiaries through which we operate our business are not treated as domestic investment and our operations carried out through such VIE and its subsidiaries are classified in the "restricted" or "prohibited" industry in the "negative list" under the Foreign Investment Law, such contractual arrangements may be deemed as invalid and illegal, and we may be required to unwind such contractual arrangements and/or dispose of such business.

Furthermore, if future laws, administrative regulations or provisions mandate further actions to be taken by companies with respect to existing contractual arrangements, we may face substantial uncertainties as to whether

37

29

Table of Contents

we can complete such actions in a timely manner, or at all. In addition, the Foreign Investment Law provides that existing foreign invested enterprises established according to the existing laws regulating foreign investment may maintain their structure and corporate governance within five years after the implementation of the Foreign Investment Law, which means that we may be required to adjust the structure and corporate governance of certain of our PRC entities then. Failure to take timely and appropriate measures to cope with any of these or similar regulatory compliance challenges could materially and adversely affect our current corporate structure, corporate governance and business operations.

*We rely on contractual arrangements with our VIE and its shareholders for a large portion of our business operations, which may not be as effective as direct ownership in providing operational control.*

Our VIE contributed 74.9% and 95.4% of our consolidated revenues for the years ended December 31, 2017 and 2018, respectively. It contributed 95.6% and 26.5% of our consolidated revenues for the nine months ended September 30, 2018 and 2019, respectively. We have relied on and expect to continue to rely on contractual arrangements with our WFOE, our VIE and its shareholders to conduct certain of our key businesses. These contractual arrangements may not be as effective as direct ownership in providing us with control over our VIE. For example, our WFOE, our VIE and its shareholders could breach their contractual arrangements with us by, among other things, failing to conduct the operations of our VIE in an acceptable manner or taking other actions that are detrimental to our interests.

If we had direct ownership of our VIE, we would be able to exercise our rights as shareholders to effect changes in the directors and senior management of our VIE, which in turn could implement changes, subject to any applicable fiduciary obligations, at the management and operational level. However, under the current contractual arrangements, we rely on the performance by our VIE and its respective shareholders of their obligations under the contracts to exercise control over our VIE. However, the shareholders of our consolidated VIE may not act in the best interests of our company or may not perform their obligations under these contracts. Such risks exist throughout the period in which we intend to operate certain portions of our business through the contractual arrangements with our VIE. If any dispute relating to these contracts remains unresolved, we will have to enforce our rights under these contracts through the operations of PRC laws and arbitrations, litigations and other legal proceedings and therefore will be subject to uncertainties in the PRC legal system. See "—Any failure by our VIE or its shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business." Therefore, our contractual arrangements with our VIE may not be as effective in ensuring our control over the relevant portion of our business operations as direct ownership would be.

*Any failure by our VIE or its shareholders to perform their obligations under our contractual arrangements with them would have a material and adverse effect on our business.*

EHang Intelligent has entered into a series of contractual arrangements with our VIE and its shareholders. For a description of these contractual arrangements, see "Corporate History and Structure." If our VIE or its shareholders fail to perform their respective obligations under the contractual arrangements, we may have to incur substantial costs and expend additional resources to enforce such arrangements. We may also have to rely on legal remedies under PRC laws, including seeking specific performance or injunctive relief, and claiming damages, the effectiveness of which may not be enforceable under PRC laws. For example, if the shareholders of our VIE refuse to transfer their equity interest in our VIE to us or our designee if we exercise the purchase option pursuant to these contractual arrangements, or if they otherwise act in bad faith toward us, then we may have to take legal actions to compel them to perform their contractual obligations.

All of the agreements under our contractual arrangements are governed by PRC laws and provide for the resolution of disputes through arbitration in China. Accordingly, these contracts would be interpreted in accordance with PRC laws and any disputes would be resolved in accordance with PRC legal procedures. The legal system in the PRC is not as developed as in some other jurisdictions, such as the United States. As a result,

38

Table of Contents

uncertainties in the PRC legal system could limit our ability to enforce these contractual arrangements. See "—Risks Relating to Doing Business in China —Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us." Meanwhile, there are very few precedents and little formal guidance as to how contractual arrangements in the context of a VIE should be interpreted or enforced under PRC laws. There remain significant uncertainties regarding the ultimate outcome of such arbitration should legal action become necessary. In addition, under PRC laws, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and if the losing parties fail to carry out the arbitration awards within a prescribed time limit, the prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would require additional expenses and delays. In the event we are unable to enforce these contractual arrangements, or if we suffer significant delays or other obstacles in the process of enforcing these contractual arrangements, we may not be able to exert effective control over our VIE, and our ability to conduct our business may be negatively affected.

*The shareholders of our VIE may have potential conflicts of interest with us, which may materially and adversely affect our business and financial condition.*

The shareholders of our VIE include Mr. Huazhi Hu and Mr. Derrick Yifang Xiong, who are also directors, officers and beneficial owners of our company. Conflicts of interest may arise from them in their roles as directors, officers and beneficial owners of our company and as shareholders of our consolidated affiliated entity. These shareholders may breach, or cause our VIE to breach, or refuse to renew, the existing contractual arrangements we have with them and our VIE, which would have a material and adverse effect on our ability to effectively control our VIE and receive economic benefits from them. For example, the shareholders may be able to cause our agreements with our VIE to be performed in a manner adverse to us by, among other things, failing to remit payments due under the contractual arrangements to us on a timely basis. We cannot assure you that when conflicts of interest arise any or all of these shareholders will act in the best interests of our company or such conflicts will be resolved in our favor.

Currently, we do not have any arrangements to address potential conflicts of interest between these shareholders and our company, except that we could exercise our purchase option under the exclusive option agreements with these shareholders to request them to transfer all of their equity interests in our VIE to a PRC entity or individual designated by us, to the extent permitted by PRC laws. For the shareholders who are also our directors and executive officers, we rely on them to abide by the laws of the Cayman Islands and China, which provide that directors owe a fiduciary duty to the company that requires them to act in good faith and in what they believe to be the best interests of the company and not to use their position for personal gain. There is currently no specific and clear guidance under PRC laws that addresses any conflict between PRC laws and laws of Cayman Islands in respect of any conflict relating to corporate governance. The shareholders of our VIE have executed powers of attorney to appoint our WFOE to vote on their behalf and exercise voting rights as shareholders of our VIE, and such rights were reassigned to us in February 2019. If we cannot resolve any conflicts of interest or disputes between us and the shareholders of our VIE, we would have to rely on legal proceedings, which may be expensive, time-consuming and disruptive to our operations. There is also substantial uncertainty as to the outcome of any such legal proceedings.

The shareholders of our VIE may be involved in personal disputes with third parties or other incidents that may have an adverse effect on their respective equity interests in our VIE and the validity or enforceability of our contractual arrangements with its shareholders. For example, in the event that any of the shareholders of our VIE divorces his or her spouse, the spouse may claim that the equity interest of our VIE held by such shareholder is part of their community property and should be divided between such shareholder and his or her spouse. If such claim is supported by the court, the relevant equity interest may be obtained by the shareholder's spouse or another third party who is not subject to obligations under our contractual arrangements, which could result in a loss of the effective control over our VIE by us. Similarly, if any of the equity interests of our VIE is inherited by a third party with whom the current contractual arrangements are not binding, we could lose our control over our VIE or have to maintain such control by incurring unpredicted costs, which could cause significant disruption to our business and operations and harm our financial condition and results of operations.

39

31

Table of Contents

*Contractual arrangements in relation to our VIE may be subject to scrutiny by the PRC tax authorities and they may determine that we or our VIE and their subsidiaries, owe additional taxes, which could negatively affect our financial condition and the value of your investment.*

Under applicable PRC laws and regulations, arrangements and transactions among related parties may be subject to audit or challenge by the PRC tax authorities. The Enterprise Income Tax Law requires every enterprise in China to submit its annual enterprise income tax return together with a report on transactions with its related parties to the relevant tax authorities. The tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's length principles. We may face material and adverse tax consequences if the PRC tax authorities determine the contractual arrangements among EHang Intelligent, EHang GZ and shareholders of EHang GZ were not entered into on an arm's length basis in such a way as to result in an impermissible reduction in taxes under applicable PRC laws, rules and regulations, and adjust the income of our VIE in the form of a transfer pricing adjustment. A transfer pricing adjustment could, among other things, result in a reduction of expense deductions recorded by our VIE for PRC tax purposes, which could increase our tax expenses. In addition, the PRC tax authorities may impose late payment fees and other penalties on our VIE for the adjusted but unpaid taxes according to the applicable regulations. Our financial position could be materially and adversely affected if our VIE's tax liabilities increase or if it is required to pay late payment fees and other penalties.

*We may lose the ability to use and enjoy assets held by our VIE that are material to the operation of certain portion of our business if the VIE goes bankrupt or becomes subject to a dissolution or liquidation proceeding.*

As part of our contractual arrangements with our VIE, our VIE and its subsidiaries hold certain assets that are material to the operation of certain portion of our business, including permits, domain names and most of our IP rights. If our VIE goes bankrupt and all or part of its assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. Under the contractual arrangements, our VIE may not, in any manner, sell, transfer, mortgage or dispose of its assets or legal or beneficial interests in the business without our prior consent. If our consolidated affiliated entity undergoes a voluntary or involuntary liquidation proceeding, the independent third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

**Risks Relating to Doing Business in China**

*Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business, financial conditions and results of operations.*

A majority of our revenues are expected to be derived in China in the near future and most of our operations, including all of our manufacturing, is conducted in China. Accordingly, our business, prospects, financial condition and results of operations may be influenced to a significant degree by political, economic and social conditions in China generally and by continued economic growth in China as a whole. The Chinese economy differs from the economies of most developed countries in many respects, including the degree of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the PRC government has implemented measures emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the government. In addition, the Chinese government continues to play a significant role in regulating industry development by imposing industrial policies. The Chinese government also exercises significant control over China's economic growth through strategically allocating resources, controlling the payment of foreign currency-denominated obligations, setting monetary policy and providing preferential treatment to particular industries or companies.

Table of Contents

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy, and the rate of growth has been slowing since 2012. Any adverse changes in economic conditions in China, in the policies of the Chinese government or in the laws and regulations in China could have a material adverse effect on the overall economic growth of China. As a result, changes in economic conditions and government policies could adversely affect our business and operating results, lead to reduction in demand for our services and adversely affect our competitive position.

*Uncertainties in the interpretation and enforcement of PRC laws and regulations could limit the legal protections available to you and us.*

The PRC legal system is a civil law system based on written statutes. Unlike the common law system, prior court decisions may be cited for reference but have limited precedential value in China. Our PRC legal system is evolving rapidly, but its current slate of laws may not be sufficient to cover all aspects of the economic activities in China, including such activities that relate to or have an impact on our business. Implementation and interpretations of laws, regulations and rules are not always undertaken in a uniform matter and enforcement of these laws, regulations and rules involves uncertainties.

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of protection we enjoy than in more developed legal systems. Furthermore, the PRC legal system is based in part on government policies and internal rules (some of which are not published in a timely manner or at all) that may have a retroactive effect. As a result, we may not always be aware of any potential violation of these policies and rules until sometime after the violation. Such uncertainties, including unpredictability towards the scope and effect of our contractual, property (including intellectual property) and procedural rights, and any failure to respond to changes in the regulatory environment in China could materially and adversely affect our business and impede our ability to continue our operations.

*We may be adversely affected by the complexities, uncertainties and changes in PRC regulations on technology companies.*

The PRC government imposes licensing and permit requirements for companies in the technology industry. These laws, regulations and even such announcements are relatively new and evolving, and their interpretation and enforcement involve significant uncertainties. As a result, in certain circumstances it may be difficult to determine what actions or omissions may be deemed to be in violation of applicable laws and regulations.

In addition, our mobile application, EHang Play is regulated by the Administrative Provisions on Mobile Internet Applications Information Services, or the App Provisions, promulgated by the Cyberspace Administration of China, or the CAC, effective on August 1, 2016. According to the App Provisions, the providers of mobile applications shall not create, copy, publish or distribute information and content that is prohibited by laws and regulations. However, we cannot assure that all the information or content displayed on, retrieved from or linked to our mobile applications complies with the requirements of the App Provisions at all times. If our mobile applications were found to be violating the App Provisions, we may be subject to administrative penalties, including warnings, service suspensions or removal of our mobile applications from relevant mobile application stores, which may materially and adversely affect our business and operating results.

The interpretation and application of existing PRC laws, regulations and policies and possible new laws, regulations or policies relating to the technology industry, particularly the policies relating to new energy vehicles, have created substantial uncertainties regarding the legality of existing and future foreign investments in, and the businesses and activities of, internet businesses in China, including our business. We cannot assure you that we have obtained all the permits or licenses required for conducting our business in China or will be able to maintain or renew our existing licenses or obtain new ones.

41

33

Table of Contents

*Increases in labor costs and enforcement of stricter labor laws and regulations in the PRC may adversely affect our business and our profitability.*

China's overall economy and the average wage level in China have increased in recent years and are expected to continue to grow. The average wage level for our employees has also increased in recent years. We expect that our labor costs, including wages and employee benefits, will continue to increase. Unless we are able to pass on these increased labor costs to our customers, our profitability and results of operations may be materially and adversely affected.

In addition, we have been subject to stricter regulatory requirements in terms of entering into labor contracts with our employees and paying various statutory employee benefits, including pensions, housing funds, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to designated government agencies for the benefit of our employees. Pursuant to the PRC Labor Contract Law and its implementation rules, employers are subject to stricter requirements in terms of signing labor contracts, minimum wages, paying remuneration, determining the term of employee's probation and unilaterally terminating labor contracts. In the event that we decide to terminate some of our employees or otherwise change our employment or labor practices, the PRC Labor Contract Law and its implementation rules may limit our ability to effect those changes in a desirable or cost-effective manner, which could adversely affect our business and results of operations.

In October 2010, the Standing Committee of the National People's Congress promulgated the PRC Social Insurance Law, which came into effect on July 1, 2011. In April 1999, the State Council promulgated the Regulations on the Administration of Housing Funds, which was amended in March 2002. Companies registered and operating in China are required under the Social Insurance Law and the Regulations on the Administration of Housing Funds to, apply for social insurance registration and housing fund deposit registration within 30 days of their establishment and, to pay for their employees different social insurance including pension insurance, medical insurance, work-related injury insurance, unemployment insurance and maternity insurance to the extent required by law. Recently, the PRC government enhanced its measures relating to social insurance collection, which lead to stricter enforcement. We could be subject to orders by the competent labor authorities for rectification and failure to comply with the orders which may further subject us to administrative fines.

As the interpretation and implementation of labor-related laws and regulations are still evolving, we cannot assure you that our employment practices do not and will not violate labor-related laws and regulations in China, which may subject us to labor disputes or government investigations. We cannot assure you that we have complied or will be able to comply with all labor-related laws and regulations including those relating to obligations to make social insurance payments and contribute to the housing provident funds. We have not fully paid the social insurance payment and housing provident funds for all of our employees as required by applicable PRC regulations. In addition, we have made social insurance payments and contribute to the housing provident funds for some of our employees through the third party agents, which should be paid by us directly under the applicable PRC regulations We may be required to make up the contributions for our employees, and may be further subjected to late fees payment and administrative fines, resulting in financial conditions and results of operations to be adversely affected.

*We rely on dividends and other distributions on equity paid by our PRC subsidiaries to fund any cash and financing requirements we may have, and any limitation on the ability of our PRC subsidiaries to make payments to us could have a material adverse effect on our ability to conduct our business.*

We are a holding company, and we rely on dividends and other distributions on equity paid by our PRC subsidiaries for our cash and financing requirements, including the funds necessary to pay dividends and other cash distributions to our shareholders and service any debt we may incur. If our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing the debt may restrict its ability to pay dividends or make other distributions to us.

42

Table of Contents

Under PRC laws and regulations, wholly foreign-owned enterprises in China, such as EHang Intelligent, may pay dividends only out of their respective accumulated after-tax profits as determined in accordance with PRC accounting standards and regulations. In addition, a wholly foreign-owned enterprise is required to set aside at least 10% of its accumulated after-tax profits each year, if any, to fund certain statutory reserve funds, until the aggregate amount of such funds reaches 50% of its registered capital. At its discretion, a wholly foreign-owned enterprise may allocate a portion of its after-tax profits based on PRC accounting standards to staff welfare and bonus funds. These reserve funds and staff welfare and bonus funds are not distributable as cash dividends.

Our ability to pay dividends is primarily dependent on receiving distributions of funds from our PRC subsidiaries, our VIE and its subsidiaries. Relevant PRC statutory laws and regulations permit payments of dividends by our PRC subsidiaries, our VIE and its subsidiaries only out of their retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the consolidated financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of our PRC subsidiaries, our VIE and its subsidiaries.

In response to the persistent capital outflow and the Renminbi's depreciation against the U.S. dollar, the People's Bank of China and the State Administration of Foreign Exchange, or SAFE, have implemented a series of capital control measures, including stricter vetting procedures for China-based companies to remit foreign currency for overseas acquisitions, dividend payments and shareholder loan repayments. The PRC government may continue to strengthen its capital controls and EHang Intelligent dividends and other distributions may be subjected to tighter scrutiny in the future. Any limitation on the ability of our PRC subsidiaries to pay dividends or make other distributions to us could materially and adversely limit our ability to grow, make investments or acquisitions that could be beneficial to our business, pay dividends, or otherwise fund and conduct our business.

*PRC regulation of loans to and direct investment in PRC entities by offshore holding companies and governmental control of currency conversion may delay or prevent us from using the proceeds of our offshore offerings to make loans to or make additional capital contributions to our PRC subsidiaries, our VIE and its subsidiaries, which could materially and adversely affect our liquidity and our ability to fund and expand our business.*

We are an offshore holding company conducting our operations in China through our PRC subsidiaries, VIE and its subsidiaries. We may make loans to our PRC subsidiaries, VIE and its subsidiaries, or we may make additional capital contributions to our PRC subsidiaries, or we may establish new PRC subsidiaries and make capital contributions to these new PRC subsidiaries, or we may acquire offshore entities with business operations in China in an offshore transaction.

Most of these activities are subject to PRC regulations and approvals. For example, loans by us to our wholly owned PRC subsidiaries to finance their activities cannot exceed statutory limits and must be registered with the local counterpart of the State Administration of Foreign Exchange, or SAFE. If we decide to finance our wholly owned PRC subsidiaries by means of capital contributions, these capital contributions are subject to the requirement of making necessary filings in the Foreign Investment Comprehensive Management Information System and registration with other governmental authorities in China. Due to the restrictions imposed on loans in foreign currencies extended to any PRC domestic companies, we are not likely to make such loans to the VIE, which is a PRC domestic company. SAFE promulgated Circular on the Reforming of the Management Method of the Settlement of Foreign Currency Capital of Foreign-invested Enterprises, or SAFE Circular 19, effective on June 1, 2015, in replacement of the Circular on the Relevant Issues Concerning the Launch of Reforming Trial of the Administration Model of the Settlement of Foreign Currency Capital of Foreign-Invested Enterprises, the Notice From the State Administration of Foreign Exchange on Relevant Issues Concerning Strengthening the Administration of Foreign Exchange Businesses, and the Circular on Further Clarification and Regulation of the Issues Concerning the Administration of Certain Capital Account Foreign Exchange Businesses. According to SAFE Circular 19, the flow and use of the RMB capital converted from foreign currency-denominated registered capital of a foreign-invested company is regulated such that RMB capital may not be used for the issuance of

43

Table of Contents

RMB entrusted loans, the repayment of inter-enterprise loans or the repayment of banks loans that have been transferred to a third party. Although SAFE Circular 19 allows RMB capital converted from foreign currency-denominated registered capital of a foreign-invested enterprise to be used for equity investments within China, it also reiterates the principle that RMB capital converted from the foreign currency-denominated capital of a foreign-invested company may not be directly or indirectly used for purposes beyond its business scope. Thus, it is unclear whether SAFE will permit such capital to be used for equity investments in China in actual practice. SAFE promulgated the Notice of the State Administration of Foreign Exchange on Reforming and Standardizing the Foreign Exchange Settlement Management Policy of Capital Account, or SAFE Circular 16, effective on June 9, 2016, which reiterates some of the rules set forth in SAFE Circular 19, but changes the prohibition against using RMB capital converted from foreign currency-denominated registered capital of a foreign-invested company to issue RMB entrusted loans to a prohibition against using such capital to issue loans to non-associated enterprises. Violations of SAFE Circular 19 and SAFE Circular 16 could result in administrative penalties. SAFE Circular 19 and SAFE Circular 16 may significantly limit our ability to transfer any foreign currency we hold, including the net proceeds from this offering, to our PRC subsidiaries, which may adversely affect our liquidity and our ability to fund and expand our business in China.

In light of the various requirements imposed by PRC regulations on loans to and direct investment in PRC entities by offshore holding companies, we cannot assure you that we will be able to complete the necessary government registrations or obtain the necessary government approvals on a timely basis, if at all, with respect to future loans by us to our PRC subsidiaries or with respect to future capital contributions by us to our PRC subsidiary. If we fail to complete such registrations or obtain such approvals, our ability to use the proceeds we received from our initial public offering and to capitalize or otherwise fund our PRC operations may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

*PRC regulations relating to the establishment of offshore special purpose vehicles by PRC residents may subject our PRC resident beneficial owners or our PRC subsidiaries to liabilities or penalties, limit our ability to inject capital into our PRC subsidiaries, limit the ability of our PRC liabilities to increase its registered capital or distribute profits to us, or may otherwise adversely affect us.*

The SAFE promulgated the Circular on Relevant Issues Relating to Domestic Resident's Investment and Financing and Round-Trip Investment through Special Purpose Vehicles, or SAFE Circular 37, in July 2014 that requires PRC residents or entities to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas investment or financing with such PRC residents or entities' legally owned assets or equity interests in domestic enterprises or offshore assets or interests. On February 13, 2015, SAFE issued SAFE Circular No. 13, which took effect on June 1, 2015, pursuant to which, the power to accept SAFE registration was delegated from local SAFE to local qualified banks where the assets or interest in the domestic entity was located. SAFE Circular 37 is issued to replace the Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents Engaging in Financing and Roundtrip Investments via Overseas Special Purpose Vehicles, or SAFE Circular 75.

If our shareholders who are PRC residents or entities do not complete their registration pursuant to SAFE Circular 37 as required, our PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to us, and we may be restricted in our ability to contribute additional capital to our PRC subsidiaries. Moreover, failure to comply with the SAFE registration described above could result in liability under PRC laws for evasion of applicable foreign exchange restrictions.

We have used our best efforts to notify PRC residents or entities who directly or indirectly hold shares in our Cayman Islands holding company and who are known to us as being PRC residents to complete the foreign exchange registrations. However, we may not be informed of the identities of all the PRC residents or entities holding direct or indirect interest in our company, nor can we compel our beneficial owners to comply with SAFE registration requirements. We cannot assure you that all other shareholders or beneficial owners of ours

44

Table of Contents

who are PRC residents or entities have complied with, and will in the future make, obtain or update any applicable registrations or approvals required by, SAFE regulations. Failure by such shareholders or beneficial owners to comply with SAFE regulations, or failure by us to amend the foreign exchange registrations of our PRC subsidiaries, could subject us to fines or legal sanctions, restrict our overseas or cross-border investment activities, limit the ability of our PRC subsidiaries to make distributions or pay dividends to us or affect our ownership structure, which could adversely affect our business and prospects.

*The M&A Rules and certain other PRC regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.*

The Regulations on Mergers and Acquisitions of Domestic Companies by Foreign Investors, or the M&A Rules, adopted by six PRC regulatory agencies in August 2006 and amended in September 2009, and some other regulations and rules concerning mergers and acquisitions established additional procedures and requirements that could make merger and acquisition activities by foreign investors more time consuming and complex, including requirements in some instances that shall obtained an approval from the MOFCOM in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. Moreover, the Anti-Monopoly Law requires that the MOFCOM shall be notified in advance of any concentration of undertaking if certain thresholds are triggered. In addition, the security review rules issued by the MOFCOM that became effective in September 2011 specify that mergers and acquisitions by foreign investors that raise "national defense and security" concerns and mergers and acquisitions through which foreign investors may acquire de facto control over domestic enterprises that raise "national security" concerns are subject to strict review by the MOFCOM, and the rules prohibit any activities attempting to bypass a security review, including by structuring the transaction through a proxy or contractual control arrangement. In the future, we may grow our business by acquiring complementary businesses. Complying with the requirements of the above-mentioned regulations and other relevant rules to complete such transactions could be time consuming, and any required approval processes, including obtaining approval from the MOFCOM or its local counterparts may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

*Fluctuations in exchange rates could have a material and adverse effect on our results of operations and the value of your investment.*

The value of the Renminbi against the U.S. dollar and other currencies may fluctuate and is affected by, among other things, changes in political and economic conditions in China and by China's foreign exchange policies. On July 21, 2005, the PRC government changed its decade-old policy of pegging the value of the Renminbi to the U.S. dollar, and the Renminbi appreciated more than 20% against the U.S. dollar over the following three years. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, the Renminbi has fluctuated against the U.S. dollar, at times significantly and unpredictably. On November 30, 2015, the Executive Board of the International Monetary Fund (IMF) completed the regular five-year review of the basket of currencies that make up the Special Drawing Right, or the SDR, and decided that with effect from October 1, 2016, Renminbi is determined to be a freely usable currency and will be included in the SDR basket as a fifth currency, along with the U.S. dollar, the Euro, the Japanese yen and the British pound. With the development of the foreign exchange market and progress towards interest rate liberalization and Renminbi internationalization, the PRC government may in the future announce further changes to the exchange rate system and we cannot assure you that the Renminbi will not appreciate or depreciate significantly in value against the U.S. dollar in the future. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

Significant revaluation of the Renminbi may have a material and adverse effect on your investment. For example, to the extent that we need to convert U.S. dollars we receive from this offering into Renminbi for our

45

37

Table of Contents

operations, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we would receive from the conversion. Conversely, if we decide to convert our Renminbi into U.S. dollars for the purpose of making payments for dividends on our ordinary shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the Renminbi would have a negative effect on the U.S. dollar amount available to us.

Very limited hedging options are available in China to reduce our exposure to exchange rate fluctuations. To date, we have not entered into any material hedging transactions in an effort to reduce our exposure to foreign currency exchange risk. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of these hedges may be limited and we may not be able to adequately hedge our exposure or at all. In addition, our currency exchange losses may be magnified by PRC exchange control regulations that restrict our ability to convert Renminbi into foreign currency.

*Governmental control of currency conversion may limit our ability to utilize our operating revenues effectively and affect the value of your investment.*

The PRC government imposes controls on the convertibility of the Renminbi into foreign currencies and, in certain cases, the remittance of currency out of China. We receive substantially all of our revenues in Renminbi. Under our current corporate structure, our Cayman Islands holding company may rely on dividend payments from our PRC subsidiaries to fund any cash and financing requirements we may have. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and trade and service-related foreign exchange transactions, can be made in foreign currencies without prior approval of SAFE if certain procedural requirements are complied with. Specifically, under the existing exchange restrictions, without prior approval of SAFE, cash generated from the operations of our PRC subsidiaries in China may be used to pay dividends to our company. However, approval from or registration with appropriate government authorities is required where Renminbi is to be converted into foreign currency and remitted out of China to pay capital expenses, such as the repayment of loans denominated in foreign currencies. As a result, we need to obtain SAFE approval to use cash generated from the operations of our PRC subsidiaries and consolidated affiliated entities to pay off their respective debt in a currency other than Renminbi owed to entities outside China, or to make other capital expenditure payments outside China in a currency other than Renminbi.

The PRC government has imposed more restrictive foreign exchange policies and stepped up scrutiny of major outbound capital movements including overseas direct investments. More restrictions and substantial vetting processes are put in place by SAFE to regulate cross-border transactions falling under the capital account. For example, if a person (i) uses Renminbi to pay amounts due that should be settled in a foreign currency or (ii) makes payments in Renminbi on behalf of a third party in exchange for repayments in a foreign currency, such person may be subject to a fine of not more than 30% of the illegal payment. In severe cases, the fine could be increased to 100% of the illegal payment. If any of our shareholders or affiliates to whom SAFE regulations are applicable violates any of the foreign exchange policies, it may be subject to penalties from the relevant PRC authorities. Historically, certain minority shareholders invested in our company through payments in Renminbi to our VIE in lieu of payments in U.S. dollars outside of the PRC. In an uncertain event that we are deemed to have participated in our shareholders' actions that are not in compliance with the relevant foreign exchange policies by the PRC regulatory authorities, we could be subject to restrictions on our ability to convert foreign currencies into Renminbi or vice versa, as well as monetary penalties. If the PRC foreign exchange control system prevents us from converting foreign currencies into Renminbi or vice versa, our ability to obtain sufficient foreign currencies to satisfy our foreign currency demands may be materially and adversely affected. For example, we may not be able to pay dividends in foreign currencies to our shareholders, including holders of our ADSs, and we may also encounter difficulties in remitting proceeds from our overseas financings and our revenue from the transactions with our overseas customers.

Table of Contents

***Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.***

Pursuant to SAFE Circular 37, PRC residents who participate in share incentive plans in overseas non-publicly-listed companies may submit applications to SAFE or its local branches for the foreign exchange registration with respect to offshore special purpose companies. In the meantime, our directors, executive officers and other employees who are PRC citizens or who are non-PRC residents residing in the PRC for a continuous period of not less than one year, and who have been granted incentive share awards by us, may follow the Notices on Issues Concerning the Foreign Exchange Administration for Domestic Individuals Participating in Stock Incentive Plan of Overseas Publicly-Listed Company, promulgated by the SAFE in 2012. Pursuant to the 2012 SAFE notices, PRC citizens and non-PRC citizens who reside in China for a continuous period of not less than one year who participate in any stock incentive plan of an overseas publicly listed company, are required to register with SAFE through a domestic qualified agent, which could be the PRC subsidiary of such overseas listed company, and complete certain other procedures. In addition, an overseas entrusted institution must be retained to handle matters in connection with the exercise or sale of stock options and the purchase or sale of shares and interests. We and our executive officers and other employees who are PRC citizens or who reside in the PRC for a continuous period of not less than one year and who have been granted restricted share units will be subject to these regulations when our company becomes an overseas listed company upon the completion of this offering. Failure to complete the SAFE registrations may subject us to fines, and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiaries and limit the ability of our PRC subsidiaries to distribute dividends to us. We also face regulatory uncertainties that could restrict our abilities to adopt additional incentive plans for our directors, executive officers and employees under PRC laws.

The State Administration of Taxation, or SAT, has issued certain circulars concerning employee share options and restricted shares. If our employees fail to pay or we fail to withhold their income taxes according to relevant laws and regulations, we may face sanctions imposed by the tax authorities or other PRC governmental authorities.

***Discontinuation of any of the preferential tax treatments and government subsidies or imposition of any additional taxes and surcharges could adversely affect our financial condition and results of operations.***

Each of EHang Intelligent, EHang GZ and EHang Egret was qualified as a high and new technology enterprise, or HNTE, in November 2016, November 2018 and December 2017, respectively, and is eligible for a 15% preferential tax rate, which will expire in November 2019, November 2021 and December 2020 accordingly. The discontinuation of any of the preferential income tax treatment that we currently enjoy could have a material and adverse effect on our result of operations and financial condition. We cannot assure you that we will be able to maintain or lower our current effective tax rate in the future.

Our PRC subsidiaries have received various financial subsidies from PRC local government authorities. The financial subsidiaries result from discretionary incentives and policies adopted by PRC local government authorities. The discontinuation of such financial subsidies or imposition of any additional taxes could adversely affect our financial condition and results of operations.

***If we are classified as a PRC resident enterprise for PRC income tax purposes, such classification could result in unfavorable tax consequences to us and our non-PRC shareholders or ADS holders.***

Under the PRC Enterprise Income Tax Law and its implementation rules, an enterprise established outside of the PRC with its "de facto management body" within the PRC is considered a "resident enterprise" and will be subject to PRC enterprise income tax on its global income at the rate of 25%. The implementation rules define the term "de facto management body" as the body that exercises full and substantial control and overall management over the business, production, personnel, accounts and properties of an enterprise. In 2009, the State

47

Table of Contents

Administration of Taxation issued a circular, known as SAT Circular 82, which provides certain specific criteria for determining whether the "de facto management body" of a PRC-controlled enterprise that is incorporated offshore is located in China. Although this circular only applies to offshore enterprises controlled by PRC enterprises or PRC enterprise groups, not those controlled by PRC individuals or foreigners, the criteria set forth in the circular may reflect the State Administration of Taxation's general position on how the "de facto management body" text should be applied in determining the tax resident status of all offshore enterprises. According to SAT Circular 82, an offshore incorporated enterprise controlled by a PRC enterprise or a PRC enterprise group will be regarded as a PRC tax resident by virtue of having its "de facto management body" in China and will be subject to PRC enterprise income tax on its global income only if all of the following conditions are met: (i) the primary location of the day-to-day operational management is in the PRC; (ii) decisions relating to the enterprise's financial and human resource matters are made or are subject to approval by organizations or personnel in the PRC; (iii) the enterprise's primary assets, accounting books and records, company seals, and board and shareholder resolutions, are located or maintained in the PRC; and (iv) at least 50% of voting board members or senior executives habitually reside in the PRC.

We believe none of our entities outside of China is a PRC resident enterprise for PRC tax purposes. However, the tax resident status of an enterprise is subject to determination by the PRC tax authorities and uncertainties remain with respect to the interpretation of the term "de facto management body." If the PRC tax authorities determine that we are a PRC resident enterprise for enterprise income tax purposes, we will be subject to the enterprise income tax on our global income at the rate of 25% and we will be required to comply with PRC enterprise income tax reporting obligations. In addition, gains realized sale or other disposition of the ADSs or ordinary shares may be subject to PRC tax at a rate of 10% (in the case of non-PRC enterprise) or 20% in the case of non-PRC individuals (in each case, subject to the provisions of any applicable tax treaty), if such gains are deemed to be from PRC sources. These rates may be reduced by an applicable tax treaty, but it is unclear whether non-PRC shareholders of EHang Intelligent would be able to claim the benefits of any tax treaties between their country of tax residence and the PRC in the event that EHang Intelligent is treated as a PRC resident enterprise. Any such PRC tax may reduce the returns on your investment in the ADSs.

*We may not be able to obtain certain benefits under the relevant tax treaty on dividends paid by our PRC subsidiaries to us through our Hong Kong subsidiary.*

We are a holding company incorporated under the laws of the Cayman Islands and as such rely on dividends and other distributions on equity from our PRC subsidiaries to satisfy part of our liquidity requirements. Pursuant to the PRC Enterprise Income Tax Law, a withholding tax rate of 10% currently applies to dividends paid by a PRC "resident enterprise" to a foreign enterprise investor, unless any such foreign investor's jurisdiction of incorporation has a tax treaty with China that provides for preferential tax treatment. Pursuant to the Arrangement between the Mainland China and the Hong Kong Special Administrative Region for the Avoidance of Double Taxation and Tax Evasion on Income, such withholding tax rate may be lowered to 5% if a Hong Kong resident enterprise owns no less than 25% of a PRC enterprise. Furthermore, the Administrative Measures for Non-Resident Enterprises to Enjoy Treatments under Tax Treaties, which became effective in August 2015, require non-resident enterprises to determine whether they are qualified to enjoy the preferential tax treatment under the tax treaties and file relevant report and materials with the tax authorities. There are also other conditions for enjoying the reduced withholding tax rate according to other relevant tax rules and regulations. See "Taxation—People's Republic of China Taxation." As of September 30, 2019, our PRC subsidiaries and the VIE located in the PRC reported accumulated loss and therefore they had no retained earnings for offshore distribution. In the future, we intend to re-invest all earnings, if any, generated from our PRC subsidiaries for the operation and expansion of our business in China. Should our tax policy change to allow for offshore distribution of our earnings, we would be subject to a significant withholding tax. We cannot assure you that our determination regarding our qualification to enjoy the preferential tax treatment could be challenged by the relevant tax authority and we may be unable to complete the necessary filings with the relevant tax authority and enjoy the preferential withholding tax rate of 5% under the arrangement with respect to dividends to be paid by our PRC subsidiary to our Hong Kong subsidiary.

48

Table of Contents

*We face uncertainty with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies.*

In February 2015, the State Administration of Taxation issued the Public Notice Regarding Certain Enterprise Income Tax Matters on Indirect Transfer of Properties by Non-Resident Enterprises, or SAT Public Notice 7. SAT Public Notice 7 extends its tax jurisdiction to not only indirect transfers but also transactions involving transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. In addition, SAT Public Notice 7 provides certain criteria on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. SAT Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets must report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may disregard the existence of the overseas holding company if it lacks a reasonable commercial purpose and was established for the purpose of reducing, avoiding or deferring PRC tax. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of 10% (subject to available preferential tax treatment under applicable tax treaties or similar arrangements) for the transfer of equity interests in a PRC resident enterprise. On October 17, 2017, the SAT issued the Announcement of the State Administration of Taxation on Issues Concerning the Withholding of Non-resident Enterprise Income Tax at Source, or SAT Bulletin 37, which came into effect on December 1, 2017. The SAT Bulletin 37 further clarifies the practice and procedure of the withholding of nonresident enterprise income tax.

We face uncertainties on the reporting and consequences of future private equity financing transactions, share exchanges or other transactions involving the transfer of shares in our company by investors that are non-PRC resident enterprises. The PRC tax authorities may pursue such non-resident enterprises with respect to a filing or the transferees with respect to withholding obligation, and request our PRC subsidiaries to assist in the filing. As a result, we and non-resident enterprises in such transactions may risk being subject to filing obligations or being taxed under SAT Public Notice 7 and SAT Bulletin 37, and may be required to expend valuable resources to comply with them or to establish that we and our non-resident enterprises should not be taxed under these regulations, which may have a material adverse effect on our financial condition and results of operations.

*If the custodians or authorized users of controlling non-tangible assets of our company, including our corporate chops and seals, fail to fulfill their responsibilities, or misappropriate or misuse these assets, our business and operations could be materially and adversely affected.*

Under PRC law, legal documents for corporate transactions are executed using the chops or seal of the signing entity or with the signature of a legal representative whose designation is registered and filed with the relevant branch of the Administration of Industry and Commerce.

Although we usually utilize chops to enter into contracts, the designated legal representatives of each of our PRC subsidiaries, VIE and its subsidiaries have the apparent authority to enter into contracts on behalf of such entities without chops and bind such entities. All designated legal representatives of our PRC subsidiaries, variable interest entity and its subsidiaries are members of our senior management team who have signed employment agreements with us or our PRC subsidiaries, VIE and its subsidiaries under which they agree to abide by various duties they owe to us. In order to maintain the physical security of our chops and chops of our PRC entities, we generally store these items in secured locations accessible only by the authorized personnel in the legal or finance department of each of our subsidiaries, VIE and its subsidiaries. Although we monitor such authorized personnel, there is no assurance such procedures will prevent all instances of abuse or negligence.

Table of Contents

Accordingly, if any of our authorized personnel misuse or misappropriate our corporate chops or seals, we could encounter difficulties in maintaining control over the relevant entities and experience significant disruption to our operations. If a designated legal representative obtains control of the chops in an effort to obtain control over any of our PRC subsidiaries, VIE or its subsidiaries, we or our PRC subsidiaries, VIE and its subsidiaries would need to pass a new shareholders or board resolution to designate a new legal representative and we would need to take legal action to seek the return of the chops, apply for new chops with the relevant authorities, or otherwise seek legal redress for the violation of the representative's fiduciary duties to us, which could involve significant time and resources and divert management attention away from our regular business. In addition, the affected entity may not be able to recover corporate assets that are sold or transferred out of our control in the event of such a misappropriation if a transferee relies on the apparent authority of the representative and acts in good faith.

### Our leased property interest may be defective and our right to lease the properties may be challenged, which could cause significant disruption to our business.

We lease all the premises used in our operations from third parties. We require the landlords' cooperation to effectively manage the condition of such premises, buildings and facilities. In the event that the condition of the office premises, buildings and facilities deteriorates, or if any or all of our landlords fail to properly maintain and renovate such premises, buildings or facilities in a timely manner or at all, the operation of our offices could be materially and adversely affected.

Moreover, certain lessors have not provided us with valid ownership certificates or authorization of sublease for our leased properties. Under the relevant PRC laws and regulations, if the lessors are unable to obtain certificate of title because such properties were built illegally or failed to pass the inspection or other reasons, such lease contracts may be recognized as void and as a result, we may be required to vacate the relevant properties. In addition, if our lessors are not the owners of the properties and they have not obtained consents from the owners or their lessors or permits from the relevant government authorities, our leases could be invalidated. If this occurs, we may have to renegotiate the leases with the owners or the parties who have the right to lease the properties, and the terms of the new leases may be less favorable to us, or we may be required to vacate the relevant properties if the terms of the new leases are not reached. Furthermore, certain leased properties may be recalled anytime by the lessors, and we may not pursue any recovery from such lessors due to the agreed terms between the company and the lessors, which may cause monetary lost to the company.

Under PRC laws, all lease agreements are required to be registered with the local housing authorities. We have not registered certain of our lease agreements with the relevant government authorities. Failure to complete these required registrations may expose our landlords, lessors and us to potential monetary fines.

### The audit report included in this prospectus is prepared by an auditor who is not inspected by the Public Company Accounting Oversight Board and, as such, our investors are deprived of the benefits of such inspection.

Our independent registered public accounting firm that issues the audit report included in this prospectus, as auditors of companies that are traded publicly in the United States and a firm registered with the U.S. Public Company Accounting Oversight Board, or the PCAOB, is required by the laws of the United States to undergo regular inspections by the PCAOB to assess its compliance with U.S. laws and professional standards. Because our auditors are located in China, a jurisdiction where the PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, our auditors are not currently inspected by the PCAOB. On December 7, 2018, the SEC and the PCAOB issued a joint statement highlighting continued challenges faced by the U.S. regulators in their oversight of financial statement audits of U.S.-listed companies with significant operations in China. The joint statement reflects a heightened interest in an issue that has vexed U.S. regulators in recent years. However, it remains unclear what further actions the SEC and PCAOB will take to address the problem.

Table of Contents

Inspections of other firms that the PCAOB has conducted outside China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. This lack of PCAOB inspections in China prevents the PCAOB from regularly evaluating our auditor's audits and its quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

The inability of the PCAOB to conduct inspections of auditors in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures as compared to auditors outside of China that are subject to PCAOB inspections. Investors may lose confidence in our reported financial information and procedures and the quality of our consolidated financial statements.

***Proceedings instituted by the SEC against the "big four" PRC-based accounting firms, including our independent registered public accounting firm, could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act.***

Starting in 2011 the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, were affected by a conflict between U.S. and Chinese law. Specifically, for certain U.S.-listed companies operating and audited in mainland China, the SEC and the PCAOB sought to obtain from the Chinese firms access to their audit work papers and related documents. The firms were, however, advised and directed that under Chinese law, they could not respond directly to the U.S. regulators on those requests, and that requests by foreign regulators for access to such papers in China had to be channeled through the CSRC.

In late 2012, this impasse led the SEC to commence administrative proceedings under Rule 102(e) of its Rules of Practice and also under the Sarbanes-Oxley Act of 2002 against the Chinese accounting firms, including our independent registered public accounting firm. A first instance trial of the proceedings in July 2013 in the SEC's internal administrative court resulted in an adverse judgment against the firms. The administrative law judge proposed penalties on the firms including a temporary suspension of their right to practice before the SEC, although that proposed penalty did not take effect pending review by the Commissioners of the SEC. On February 6, 2015, before a review by the Commissioner had taken place, the firms reached a settlement with the SEC. Under the settlement, the SEC accepts that future requests by the SEC for the production of documents will normally be made to the CSRC. The firms will receive matching Section 106 requests, and are required to abide by a detailed set of procedures with respect to such requests, which in substance require them to facilitate production via the CSRC. If they fail to meet specified criteria, the SEC retains authority to impose a variety of additional remedial measures on the firms depending on the nature of the failure. Remedies for any future noncompliance could include, as appropriate, an automatic six-month bar on a single firm's performance of certain audit work, commencement of a new proceeding against a firm, or in extreme cases the resumption of the current proceeding against all four firms. If additional remedial measures are imposed on the Chinese affiliates of the "big four" accounting firms, including our independent registered public accounting firm, in administrative proceedings brought by the SEC alleging the firms' failure to meet specific criteria set by the SEC with respect to requests for the production of documents, we could be unable to timely file future financial statements in compliance with the requirements of the Exchange Act.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about any such future proceedings against these audit firms may cause investor uncertainty regarding China-based, U.S.-listed companies and the market price of our common stock may be adversely affected.

If our independent registered public accounting firm was denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an

51

43

**Table of Contents**

opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination could ultimately lead to the delisting of the ADSs from Nasdaq Stock Market or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of the ADSs in the United States.

**Risks Relating to the ADSs and This Offering**

*An active trading market for our ordinary shares or the ADSs may not develop and the trading price of the ADSs may fluctuate significantly.*

The ADSs have been approved for listing on the Nasdaq Stock Market. Prior to the completion of this offering, there has been no public market for the ADSs or our ordinary shares, and we cannot assure you that a liquid public market for the ADSs will develop. If an active public market for the ADSs does not develop following the completion of this offering, the market price and liquidity of the ADSs may be materially and adversely affected. The initial public offering price for the ADSs will be determined by negotiation between us and the underwriters based upon several factors, and the trading price of the ADSs after this offering could decline below the initial public offering price. As a result, investors in our securities may experience a significant decrease in the value of their ADSs.

*Participation in this offering by our existing shareholders would reduce the available public float for our ADSs.*

Mr. Huazhi Hu and entities affiliated with GGV have subscribed for and been allocated by the underwriters 400,000 ADSs and 160,000 ADSs, respectively, in this offering at the initial public offering price, representing 12.5% and 5.0%, respectively, of the ADSs being offered in this offering, assuming the underwriters do not exercise their over-allotment option. Mr. Hu is our founder, director and chief executive officer and one of our principal shareholders. Entities affiliated with GGV are collectively our principal shareholders and affiliates of one of our directors. Such purchase may reduce the available float for our ADSs for other public investors. As a result, any purchase of our ADSs by these shareholders in this offering may reduce the liquidity of our ADSs relative to what it would have been had these ADSs been purchased by other investors.

*The trading price of the ADSs is likely to be volatile, which could result in substantial losses to investors.*

The trading price of the ADSs is likely to be volatile and could fluctuate widely due to multiple factors, some of which are beyond our control. This may happen because of broad market and industry factors, including the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. In addition to market and industry factors, the price and trading volume for the ADSs may be highly volatile for factors specific to our own operations, including the following:

- variations in our revenues, earnings and cash flows;
- regulatory developments affecting us, our customers, or our industry;
- announcements of studies and reports relating to the quality of our products and service offerings or those of our competitors;
- announcements of new investments, acquisitions, strategic partnerships or joint ventures by us or our competitors;
- announcements of new products or service offerings and expansions by us or our competitors;
- changes in financial estimates by securities analysts;
- detrimental adverse publicity about us, our products or services or our industry;
- additions or departures of key personnel;

52

44

Table of Contents

- detrimental negative publicity about us, our management or our industry;
- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities; and
- actual or potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which the ADSs will trade.

In the past, shareholders of public companies have often brought securities class action suits against companies following periods of instability in the market price of their securities. If we were involved in a class action suit, it could divert a significant amount of our management's attention and other resources from our business and operations and require us to incur significant expenses to defend the suit, which could harm our results of operations. Any such class action suit, whether or not successful, could harm our reputation and restrict our ability to raise capital in the future. In addition, if a claim is successfully made against us, we may be required to pay significant damages, which could have a material adverse effect on our financial condition and results of operations.

***Our proposed dual-class share structure with different voting rights will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A ordinary shares and ADSs may view as beneficial.***

Immediately prior to the completion of this offering, we expect to create a dual-class structure such that our ordinary shares will consist of Class A ordinary shares and Class B ordinary shares. In respect of matters requiring the votes of shareholders, holders of Class B ordinary shares will be entitled to ten votes per share, while holders of Class A ordinary shares will be entitled to one vote per share based on our proposed dual-class share structure. We will sell Class A ordinary shares represented by the ADSs in this offering. Each Class B ordinary share is convertible into one Class A ordinary share at any time by its holder, while Class A ordinary shares are not convertible into Class B ordinary shares under any circumstances. Upon any sale of Class B ordinary shares by their holder or a change of ultimate beneficial ownership of any Class B ordinary share to any person other than our founder, Mr. Huazhi Hu, or an affiliate controlled by our founder, such Class B ordinary shares are automatically and immediately converted into the same number of Class A ordinary shares.

Immediately prior to the completion of this offering, our founder will beneficially own all of our issued Class B ordinary shares. These Class B ordinary shares will constitute approximately 42.8% of our total issued and outstanding share capital immediately after the completion of this offering and 88.2% of the aggregate voting power of our total issued and outstanding share capital immediately after the completion of this offering due to the disparate voting powers associated with our dual-class share structure, assuming the underwriters do not exercise their over-allotment option. See "Principal Shareholders."

Although we have no current plan to issue additional Class B ordinary shares after the completion of this offering, our board of directors will have the authority without further action by our shareholders to issue additional Class B ordinary shares, which will further dilute the voting power of our Class A ordinary shareholders. As a result of the dual-class share structure and the concentration of ownership, our founder will have considerable influence over matters such as mergers, consolidations and the sale of all or substantially all of our assets, election of directors, amendments to organizational documents and other significant corporate actions. Our founder may take actions that are not in the best interest of our other shareholders. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could have the effect of depriving our other shareholders of the opportunity to receive a premium for their shares as part of a sale of our company and may reduce the price of our ADSs. This concentrated control will limit your ability to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A ordinary shares and ADSs may view as beneficial.

53

45

Table of Contents

In addition, our founder will continue to be able to control all matters submitted to our shareholders for approval even if his share holdings represent substantially less than a majority of our outstanding common shares. This concentrated control will limit your ability to influence corporate matters for the foreseeable future, and, as a result, the market price of our Class A common shares could be adversely affected.

In July 2017, FTSE Russell and Standard & Poor's announced that they would cease to allow most newly public companies utilizing dual- or multi-class capital structures to be included in their indices. Affected indices include the Russell 2000 and the S&P 500, S&P MidCap 400 and S&P SmallCap 600, which together comprise the S&P Composite 1500. Under the announced policies, our dual-class share structure would make us ineligible for inclusion in any of these indices, and as a result, mutual funds, exchange-traded funds and other investment vehicles that attempt to passively track these indices will not be investing in our shares. These policies are new, and it is as of yet unclear what effect, if any, they will have on the valuations of publicly traded companies excluded from these indices, but it is possible that they may depress these valuations or depress our trading volume compared to those of other similar companies that are included in these indices.

### We will be a "controlled company" within the meaning of the Nasdaq Stock Market Rules and, as a result, may rely on exemptions from certain corporate governance requirements that provide protection to shareholders of other companies.

Following the completion of this offering, we will be a "controlled company" as defined under the Nasdaq Stock Market Rules because our founder, chairman of the board of directors and chief executive officer, Mr. Huazhi Hu, will own more than 50% of our total voting power. For so long as we remain a controlled company under that definition, we may rely on certain exemptions from corporate governance rules, including the rule that a majority of our board of directors must be independent directors and that we have to establish a nominating committee and a compensation committee composed entirely of independent directors. As a result, you will not have the same protection afforded to shareholders of companies that are subject to these corporate governance requirements. We currently do not plan to rely on these exemptions.

### If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding the ADSs, the market price for the ADSs and trading volume could decline.

The trading market for the ADSs will be influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade the ADSs, the market price for the ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which in turn could cause the market price or trading volume of the ADSs to decline.

### The sale or availability for sale of substantial amounts of the ADSs could adversely affect their market price.

Sales of substantial amounts of the ADSs in the public market after the completion of this offering, or the perception that these sales could occur, could adversely affect the market price of the ADSs and could materially impair our ability to raise capital through equity offerings in the future. The ADSs sold in this offering will be freely tradable without restriction or further registration under the Securities Act of 1933, as amended, or the Securities Act, and shares held by our existing shareholders may also be sold in the public market in the future subject to the restrictions in Rule 144 and Rule 701 under the Securities Act and the applicable lock-up agreements. There will be 3,200,000 ADSs (equivalent to 6,400,000 Class A ordinary shares) outstanding immediately after this offering, or 3,680,000 ADSs (equivalent to 7,360,000 Class A ordinary shares) if the underwriters exercise their option to purchase additional ADSs in full. In connection with this offering, we, our officers, directors and existing shareholders have agreed not to sell any ordinary shares or ADSs for 180 days after the date of this prospectus without the prior written consent of the underwriters, subject to certain exceptions. However, the underwriters may release these securities from these restrictions at any time, subject to

54

46

Table of Contents

applicable regulations of the Financial Industry Regulatory Authority, Inc. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of the ADSs. See "Underwriting" and "Shares Eligible for Future Sale" for a more detailed description of the restrictions on selling our securities after this offering.

### *Because we do not expect to pay dividends in the foreseeable future after this offering, you must rely on price appreciation of the ADSs for a return on your investment.*

We currently intend to retain most, if not all, of our available funds and any future earnings after this offering to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in the ADSs as a source for any future dividend income.

Our board of directors has discretion as to whether to distribute dividends, subject to certain restrictions under Cayman Islands law, namely that our company may only pay dividends out of profits or share premium, and provided always that in no circumstances may a dividend be paid if this would result in our company being unable to pay its debts as they fall due in the ordinary course of business. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our board of directors. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in the ADSs will likely depend entirely upon any future price appreciation of the ADSs. There is no guarantee that the ADSs will appreciate in value after this offering or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in the ADSs and you may even lose your entire investment in the ADSs.

### *We have not determined a specific use for a portion of the net proceeds from this offering and we may use these proceeds in ways with which you may not agree.*

We have not determined a specific use for a portion of the net proceeds of this offering, and our management will have considerable discretion in deciding how to apply these proceeds. You will not have the opportunity to assess whether the proceeds are being used appropriately before you make your investment decision. You must rely on the judgment of our management regarding the application of the net proceeds of this offering. We cannot assure you that the net proceeds will be used in a manner that would improve our results of operations or increase our ADS price, nor that these net proceeds will be placed only in investments that generate income or appreciate in value.

### *The approval of the China Securities Regulatory Commission may be required in connection with this offering under PRC law.*

The M&A Rules, which were adopted in August 2006 by six PRC regulatory agencies, including the CSRC, and amended in September 2009, purport to require offshore special purpose vehicles that are controlled by PRC companies or individuals and that have been formed for the purpose of seeking a public listing on an overseas stock exchange through acquisitions of PRC domestic companies or assets to obtain CSRC approval prior to publicly listing their securities on an overseas stock exchange. The interpretation and application of the regulations remain unclear, and if CSRC approval is required, it is uncertain whether it would be possible for us to obtain the approval and any failure to obtain or delay in obtaining CSRC approval for this offering would subject us to sanctions imposed by the CSRC and other PRC regulatory agencies.

Our PRC counsel, Allbright Law Offices, has advised us that, based on its understanding of the current PRC laws and regulations, we will not be required to submit an application to the CSRC for the approval of the listing

55

47

Table of Contents

and trading of the ADSs on Nasdaq Stock Market because (i) the CSRC currently has not issued any definitive rule or interpretation concerning whether offerings like ours under this prospectus are subject to this regulation, (ii) the Company established EHang Intelligent, as foreign-invested enterprises by means of direct investment and not through a merger or requisition of the equity or assets of a "PRC domestic company" as such term is defined under the M&A Rule, and (iii) no explicit provision in the M&A Rules classifies the respective contractual arrangements among our PRC subsidiaries, our consolidated affiliated entity and its respective shareholders as a type of acquisition transaction falling under the M&A Rules.

However, we cannot assure you that relevant PRC government agencies, including the CSRC, would reach the same conclusion as our PRC counsel, and hence we may face regulatory actions or other sanctions from the CSRC or other PRC regulatory agencies. If the CSRC or other relevant PRC regulatory authorities subsequently determine that a prior CSRC approval is required, we may face regulatory actions or other sanctions from the CSRC or other PRC regulatory authorities. These regulatory agencies may impose fines and penalties on our operations in China, limit our ability to pay dividends outside of China, limit our operating privileges in China, delay or restrict the repatriation of the proceeds from this offering into China or take other actions that could have a material adverse effect on our business, financial condition, results of operations and prospects, as well as the trading price of the ADSs. The CSRC or other PRC regulatory agencies also may take actions requiring us, or making it advisable for us, to halt this offering before settlement and delivery of the ADSs offered hereby. Consequently, if you engage in market trading or other activities in anticipation of and prior to settlement and delivery, you do so at the risk that settlement and delivery may not occur. In addition, if the CSRC or other regulatory agencies later promulgate new rules or explanations requiring that we obtain their approvals for this offering, we may be unable to obtain a waiver of such approval requirements, if and when procedures are established to obtain such a waiver. Any uncertainties and/or negative publicity regarding such approval requirement could have a material adverse effect on the trading price of the ADSs.

### Our post-offering memorandum and articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our ordinary shares and ADSs.

We have adopted a post-offering memorandum and articles of association that will become effective immediately prior to the completion of this offering. Our post-offering memorandum and articles of association will contain provisions which could limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders and ADS holders of an opportunity to sell their shares or ADSs at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transactions. Our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our ordinary shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of the ADSs may fall and the voting and other rights of the holders of our ordinary shares and ADSs may be materially and adversely affected.

### You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, the Companies Law (2018 Revision) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against our directors, actions by our minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the

56

48

Table of Contents

Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the common law of England, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

Shareholders of Cayman Islands exempted companies like us have no general rights under Cayman Islands law to inspect corporate records (other than the memorandum and articles of association and any special resolutions passed by such companies, and the registers of mortgages and charges of such companies) or to obtain copies of lists of shareholders of these companies. Our directors have discretion under our articles of association to determine whether or not, and under what conditions, our corporate records may be inspected by our shareholders, but are not obliged to make them available to our shareholders. This may make it more difficult for you to obtain the information needed to establish any facts necessary for a shareholder motion or to solicit proxies from other shareholders in connection with a proxy contest.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by our management, members of our board of directors or our controlling shareholders than they would as public shareholders of a company incorporated in the United States. For a discussion of significant differences between the provisions of the Companies Law of the Cayman Islands and the laws applicable to companies incorporated in the United States and their shareholders, see "Description of Share Capital—Differences in Corporate Law."

*Certain judgments obtained against us by our shareholders may not be enforceable.*

We are a Cayman Islands exempted company and substantially all of our assets are located outside of the United States. All of our current operations are conducted in China. In addition, most of our current directors and officers are nationals and residents of countries other than the United States. As a result, it may be difficult or impossible for you to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the U.S. federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers. For more information regarding the relevant laws of the Cayman Islands and China, see "Enforceability of Civil Liabilities."

*The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to direct how the Class A ordinary shares which are represented by your ADSs are voted.*

Holders of ADSs do not have the same rights as our registered shareholders. As a holder of the ADSs, you will not have any direct right to attend general meetings of our shareholders or to cast any votes at such meetings. You will only be able to exercise the voting rights which are carried by the underlying Class A ordinary shares represented by your ADSs indirectly by giving voting instructions to the depositary in accordance with the provisions of the deposit agreement. Under the deposit agreement, you may vote only by giving voting instructions to the depositary. If we instruct the depositary to ask for your instructions, then upon receipt of your voting instructions, the depositary will try, as far as is practicable, to vote the underlying Class A ordinary shares which are represented by your ADSs in accordance with your instructions. If we do not instruct the depositary to ask for your instructions, the depositary may still vote in accordance with instructions you give, but it is not required to do so. You will not be able to directly exercise your right to vote with respect to the underlying Class A ordinary shares represented by your ADSs unless you cancel and withdraw such shares and become the registered holder of such shares prior to the record date for the general meeting.

49

Table of Contents

Under our post-offering memorandum and articles of association that will become effective immediately prior to completion of this offering, the minimum notice period required to be given by our company to our registered shareholders to convene a general meeting will be ten calendar days. When a general meeting is convened, you may not receive sufficient advance notice of the meeting to withdraw the underlying Class A ordinary shares represented by your ADSs and become the registered holder of such shares to allow you to attend the general meeting and to vote directly with respect to any specific matter or resolution to be considered and voted upon at the general meeting. In addition, under our post-offering articles of association that will become effective prior to the completion of this offering, for the purposes of determining those shareholders who are entitled to attend and vote at any general meeting, our directors may close our register of members and/or fix in advance a record date for such meeting, and such closure of our register of members or the setting of such a record date may prevent you from withdrawing the underlying Class A ordinary shares represented by your ADSs and becoming the registered holder of such shares prior to the record date, so that you would not be able to attend the general meeting or to vote directly. If we ask for your instructions, the depositary will notify you of the upcoming vote and will arrange to deliver our voting materials to you. We have agreed to give the depositary at least 45 days' prior notice of shareholder meetings. Nevertheless, we cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote the underlying Class A ordinary shares represented by your ADSs. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. This means that you may not be able to exercise your right to direct how the underlying Class A ordinary shares represented by your ADSs are voted and you may have no legal remedy if the underlying Class A ordinary shares represented by your ADSs are not voted as you requested.

*The depositary for the ADSs will give us a discretionary proxy to vote our Class A ordinary shares underlying your ADSs if you do not vote at shareholders' meetings, which could adversely affect your interests.*

Under the deposit agreement for the ADSs, if you do not vote, the depositary may give us a discretionary proxy to vote the Class A ordinary shares underlying your ADSs at shareholders' meetings if:

- we have timely provided the depositary with notice of meeting and related voting materials;
- we have instructed the depositary that we wish a discretionary proxy to be given;
- we have informed the depositary that there is no substantial opposition as to a matter to be voted on at the meeting; and
- a matter to be voted on at the meeting would not have a material adverse impact on shareholders.

The effect of this discretionary proxy is that if you do not vote at shareholders' meetings, you cannot prevent the Class A ordinary shares underlying your ADSs from being voted, except under the circumstances described above. This may make it more difficult for shareholders to influence the management of our company. Holders of our ordinary shares are not subject to this discretionary proxy.

*You may not receive dividends or other distributions on our ordinary shares and you may not receive any value for them, if it is illegal or impractical to make them available to you.*

The depositary of the ADSs has agreed to distribute, subject to the terms of the deposit agreement, the cash dividends or other distributions it or the custodian receives on our Class A ordinary shares or other deposited securities underlying the ADSs, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A ordinary shares your ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed under an applicable exemption from registration. The depositary may also determine that it is not feasible to distribute certain property. Additionally, the value of certain distributions may be less than the cost of distribution. In these cases,

58

Table of Contents

the depositary may determine not to distribute such property. We have no obligation to register under U.S. securities laws any ADSs, ordinary shares, rights or other securities received through such distributions. We also have no obligation to take any other action to permit the distribution of ADSs, ordinary shares, rights or anything else to holders of ADSs. This means that you may not receive distributions we make on our ordinary shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may cause a material decline in the value of the ADSs.

*You may experience dilution of your holdings due to inability to participate in rights offerings.*

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result.

*You may be subject to limitations on transfer of your ADSs.*

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events, such as a rights offering, or "for record date or processing purposes" in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of the ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

*ADSs holders may not be entitled to a jury trial with respect to claims arising under the deposit agreement, which could result in less favorable outcomes to the plaintiffs in any such action.*

The deposit agreement governing the ADSs representing our Class A ordinary shares provides that, to the fullest extent permitted by law, ADS holders waive the right to a jury trial of any claim they may have against us or the depositary arising out of or relating to our shares, the ADSs or the deposit agreement, including any claim under the U.S. federal securities laws.

If we or the depositary opposed a jury trial demand based on the waiver, the court would determine whether the waiver was enforceable based on the facts and circumstances of that case in accordance with the applicable state and federal law. To our knowledge, the enforceability of a contractual pre-dispute jury trial waiver in connection with claims arising under the federal securities laws has not been finally adjudicated by the United States Supreme Court. However, we believe that a pre-dispute contractual waiver of jury trial is generally enforceable, including under the laws of the State of New York, which govern the deposit agreement, by a federal or state court in the City of New York, which has non-exclusive jurisdiction over matters arising under the deposit agreement. In determining whether to enforce a pre-dispute contractual waiver of jury trial, courts will generally consider whether a party knowingly, intelligently and voluntarily waived the right to a jury trial. We believe that this is the case with respect to the deposit agreement and the ADSs. It is advisable that you consult legal counsel regarding the jury waiver provision before entering into the deposit agreement.

If you or any other holders or beneficial owners of ADSs bring a claim against us or the depositary in connection with matters arising under the deposit agreement or the ADSs, including claims under federal

59

51

Table of Contents

securities laws, you or such other holder or beneficial owner may not be entitled to a jury trial with respect to such claims, which may have the effect of limiting and discouraging lawsuits against us and the depositary. If a lawsuit is brought against either or both of us and the depositary under the deposit agreement, it may be heard only by a judge or justice of the applicable trial court, which would be conducted according to different civil procedures and may result in different outcomes than a trial by jury would have, including results that could be less favorable to the plaintiffs in any such action.

Nevertheless, if this jury trial waiver provision is not permitted by applicable law, an action could proceed under the terms of the deposit agreement with a jury trial. No condition, stipulation or provision of the deposit agreement or ADSs serves as a waiver by any holder or beneficial owner of ADSs or by us or the depositary of compliance with any substantive provision of the U.S. federal securities laws and the rules and regulations promulgated thereunder.

*We are a foreign private issuer within the meaning of the rules under the Exchange Act, and as such we are exempt from certain provisions applicable to United States domestic public companies.*

Because we are a foreign private issuer under the Exchange Act, we are exempt from certain provisions of the securities rules and regulations in the United States that are applicable to U.S. domestic issuers, including:

- the rules under the Exchange Act requiring the filing of quarterly reports on Form 10-Q or current reports on Form 8-K with the SEC;
- the sections of the Exchange Act regulating the solicitation of proxies, consents, or authorizations in respect of a security registered under the Exchange Act;
- the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and liability for insiders who profit from trades made in a short period of time; and
- the selective disclosure rules by issuers of material nonpublic information under Regulation FD.

We will be required to file an annual report on Form 20-F within four months of the end of each fiscal year. In addition, we intend to publish our results on a quarterly basis through press releases, distributed pursuant to the rules and regulations of the Nasdaq Stock Market. Press releases relating to financial results and material events will also be furnished to the SEC on Form 6-K. However, the information we are required to file with or furnish to the SEC will be less extensive and less timely compared to that required to be filed with the SEC by U.S. domestic issuers. As a result, you may not be afforded the same protections or information which would be made available to you were you investing in a U.S. domestic issuer.

*We are an emerging growth company within the meaning of the Securities Act and may take advantage of certain reduced reporting requirements.*

We are an "emerging growth company," as defined in the JOBS Act, and we may take advantage of certain exemptions from requirements applicable to other public companies that are not emerging growth companies including, most significantly, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002 for so long as we remain an emerging growth company. As a result, if we elect not to comply with such auditor attestation requirements, our investors may not have access to certain information they may deem important.

The JOBS Act also provides that an emerging growth company does not need to comply with any new or revised financial accounting standards until such date that a private company is otherwise required to comply with such new or revised accounting standards.

60

52

Table of Contents

*We will incur increased costs as a result of being a public company, particularly after we cease to qualify as an "emerging growth company."*

Upon completion of this offering, we will become a public company and expect to incur significant legal, accounting and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act of 2002, as well as rules subsequently implemented by the SEC and the Nasdaq Stock Market, impose various requirements on the corporate governance practices of public companies. As a company with less than US$1.07 billion in revenues for our last fiscal year, we qualify as an "emerging growth company" pursuant to the JOBS Act. An emerging growth company may take advantage of specified reduced reporting and other requirements that are otherwise applicable generally to public companies. These provisions include exemption from the auditor attestation requirement under Section 404 of the Sarbanes-Oxley Act of 2002 in the assessment of the emerging growth company's internal control over financial reporting. The JOBS Act also permits an emerging growth company to delay adopting new or revised accounting standards until such time as those standards apply to private companies. We will rely on such exemption provided by the JOBS Act. As a result, our financial statements may not be comparable to companies that comply with public company effective dates.

We expect these rules and regulations to increase our legal and financial compliance costs and to make some corporate activities more time-consuming and costly. After we are no longer an "emerging growth company," we expect to incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002 and the other rules and regulations of the SEC. For example, as a result of becoming a public company, we will need to increase the number of independent directors and adopt policies regarding internal controls and disclosure controls and procedures. We also expect that operating as a public company will make it more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. In addition, we will incur additional costs associated with our public company reporting requirements. It may also be more difficult for us to find qualified persons to serve on our board of directors or as executive officers. We are currently evaluating and monitoring developments with respect to these rules and regulations, and we cannot predict or estimate with any degree of certainty the amount of additional costs we may incur or the timing of such costs.

*As a company incorporated in the Cayman Islands, we are permitted to adopt certain home country practices in relation to corporate governance matters that differ significantly from the Nasdaq Stock Market corporate governance listing standards; these practices may afford less protection to shareholders than they would enjoy if we comply fully with the Nasdaq Stock Market corporate governance listing standards.*

As a Cayman Islands company listed on Nasdaq Global Market, we are subject to the Nasdaq Stock Market corporate governance listing standards. However, Nasdaq Stock Market rules permit a foreign private issuer like us to follow the corporate governance practices of its home country. Certain corporate governance practices in the Cayman Islands, which is our home country, may differ significantly from the Nasdaq Stock Market corporate governance listing standards. If we choose to follow home country practice in the future, our shareholders may be afforded less protection than they would otherwise enjoy under the Nasdaq Stock Market corporate governance listing standards applicable to U.S. domestic issuers.

*We may be a passive foreign investment company, which could result in adverse U.S. federal income tax consequences to U.S. investors owning the ADSs or Class A ordinary shares.*

A non-U.S. corporation, such as our company, will be considered a passive foreign investment company, or "PFIC," for any taxable year if either (i) at least 75% of its gross income is passive income or (ii) at least 50% of the value of its assets (based on an average of the quarterly values of the assets during a taxable year) is attributable to assets that produce or are held for the production of passive income. A separate determination must be made after the close of each taxable year as to whether a non-U.S. corporation is a PFIC for that year. Although the law in this regard is not entirely clear, we treat our VIE and its subsidiaries as being owned by us

61

53

Table of Contents

for U.S. federal income tax purposes because we control its management decisions and are entitled to substantially all of the economic benefits associated with it. As a result, we consolidate its results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of our consolidated affiliated entity for U.S. federal income tax purposes, we would likely be treated as a PFIC for the current taxable year and any subsequent taxable year.

Assuming that we are the owner of our consolidated affiliated entity for U.S. federal income tax purposes, and based upon our current and projected income and assets, including the proceeds from this offering, and projections as to the value of our assets, we do not expect to be a PFIC for the current taxable year or the foreseeable future. However, no assurance can be given in this regard because the determination of whether we will be or will become a PFIC is a factual determination made annually that will depend, in part, upon the composition of our income and assets. Fluctuations in the market price of the ADSs may cause us to be a PFIC for the current or future taxable years because the value of our assets for purposes of the asset test, including the value of our goodwill and unbooked intangibles, may be determined by reference to the market price of the ADSs from time to time (which may be volatile). If our market capitalization subsequently declines, we may be or become a PFIC for the current taxable year or future taxable years. Furthermore, the composition of our income and assets may also be affected by how, and how quickly, we use our liquid assets and the cash raised in this offering. Under circumstances where our revenue from activities that produce passive income significantly increases relative to our revenue from activities that produce non-passive income, or where we determine not to deploy significant amounts of cash for active purposes, our risk of becoming a PFIC may substantially increase.

If we are a PFIC for any taxable year during which a U.S. Holder (as defined in "Taxation—United States Federal Income Tax Considerations—General") holds an ADS or a Class A ordinary share, certain adverse U.S. federal income tax consequences could apply to the U.S. Holder. See "Taxation—United States Federal Income Tax Considerations—Passive Foreign Investment Company Considerations."

62

**Table of Contents**

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains forward-looking statements that reflect our current expectations and views of future events. The forward-looking statements are contained principally in the sections entitled "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Business." Known and unknown risks, uncertainties and other factors, including those listed under "Risk Factors," may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify some of these forward-looking statements by words or phrases, such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "is/are likely to," "potential," "continue" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include statements relating to:

- our goals and strategies;
- our future business development, financial conditions and results of operations;
- the expected growth of the PRC and global UAV industry;
- our expectations regarding the demand for and market acceptance of our products and services;
- our expectations regarding our relationships with distributors, customers, component suppliers, strategic partners and other stakeholders;
- our expectations regarding our capacity to develop, manufacture and delivery AAV products in fulfilment of our contractual commitments;
- competition in our industry;
- our proposed use of proceeds; and
- relevant government policies and regulations relating to our industry.

These forward-looking statements involve various risks and uncertainties. Although we believe that our expectations expressed in these forward-looking statements are reasonable, our expectations may later be found to be incorrect. Our actual results could be materially different from our expectations. Important risks and factors that could cause our actual results to be materially different from our expectations are generally set forth in "Prospectus Summary—Our Challenges," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business," "Regulation" and other sections in this prospectus. You should read thoroughly this prospectus and the documents that we refer to with the understanding that our actual future results may be materially different from and worse than what we expect. We qualify all of our forward-looking statements by these cautionary statements.

This prospectus contains certain data and information that we obtained from various government and private publications. Statistical data in these publications also include projections based on a number of assumptions. The markets for UAVs and related commercial solutions may not grow at the rate projected with currently available data and information, or at all. Failure to grow at the projected rate may have a material and adverse effect on our business and the market price of the ADSs. In addition, the rapidly evolving nature of this industry results in significant uncertainties for any projections or estimates relating to the growth prospects or future condition of our market. Furthermore, if any one or more of the assumptions underlying the relevant statistical data are later found to be incorrect, actual results may differ from the projections based on these assumptions. You should not place undue reliance on these forward-looking statements.

The forward-looking statements made in this prospectus relate only to events or information as of the date on which the statements are made in this prospectus. Except as required by law, we undertake no obligation to

63

55

**Table of Contents**

update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, after the date on which the statements are made or to reflect the occurrence of unanticipated events. You should read this prospectus and the documents that we refer to in this prospectus and have filed as exhibits to the registration statement, of which this prospectus is a part, completely and with the understanding that our actual future results may be materially different from what we expect.

Table of Contents

**INDUSTRY**

**Overview of Commercial UAV Market**

A UAV is an aircraft without a human pilot aboard. Commercial uses for UAVs include urban air mobility, smart city management, aerial media and other applications, such as inspection services for agriculture and the oil and gas industry. The diagram below illustrates the different categories of commercial uses for UAVs:



Most UAVs are ground-piloted by human operators, but the push for UAVs to fulfill large commercial scale applications has led to the development of AAVs, autonomous UAVs that fly by autopilot or are remotely controlled by computers beyond the visual line of sight, using autopilot and flight control systems, deep learning based object detection systems, advanced artificial intelligence algorithms and other technologies.

101

57

**Table of Contents**

According to Frost & Sullivan, the global commercial UAV market was US$3.7 billion in 2018 and is expected to grow to US$103.7 billion in 2023, representing a CAGR of 95%. China is leading the commercial UAV market and is expected to account for 48% of the global market in 2023. The chart below sets forth the commercial UAV market size for China and the rest of the world:

**Commercial UAV Market Size**
(US$ in billions)



## Urban Air Mobility

Urban air mobility is an emerging form of air transportation service that uses UAVs to provide passenger transportation and logistics services in low-altitude airspace within or around an urban area.

### *Passenger Transportation*

Passenger-grade AAVs have the potential to provide an alternate, fast, safe, efficient and environmentally-friendly means of transportation, particularly for short- to medium-distance travel. According to Frost & Sullivan, the global passenger urban air mobility market is expected to grow at a CAGR of 531% from US$0.3 million in 2018 to US$3.0 billion in 2023. Passenger-grade AAVs are expected to be used in a wide variety of scenarios, such as daily commuting, sightseeing, search and rescue, and emergency and disaster response.

102

**Table of Contents**

**Global Passenger Urban Air Mobility Market Size(1)**
(US$ in millions)



Note:

(1)    Includes the sale of hardware and supporting software, and the provision of passenger-grade AAV related services.

The key drivers for the future growth of the passenger urban air mobility market include:
- Increasing traffic congestion;
- Advancement of technologies in aviation and battery;
- Increasing public acceptance of urban air mobility;
- Developing telecommunication and ground infrastructure; and
- Increasing public awareness of environmental protection.

*Logistics*

UAVs are ideal for short- to medium-distance logistics delivery and potentially long-haul transportation. The logistics urban air mobility market is at a nascent stage, with several companies having successfully completed their first pilot delivery programs. With rising labor costs related to ground transportation and the continued advancement in AAV technology, logistics solutions based on AAVs are expected to become more popular in the future.

According to Frost & Sullivan, the global logistics urban air mobility market is expected to reach US$46.0 billion by 2023 and China is projected to be the largest logistics urban air mobility market in the world in 2023, accounting for 45% of the global logistics UAV market.

103

59

**Table of Contents**

**Logistics Urban Air Mobility Market Size**



The key drivers of the logistics urban air mobility market include:
- Growing prevalence of e-commerce;
- Unmet logistics demands in remote areas;
- Technological upgrades in key components and control systems;
- Increasing traffic congestion; and
- Developing telecommunication and ground infrastructure support.

**Smart City Management Solutions**

UAVs can be deployed to perform various tasks in city management. Governments in China and overseas have applied UAVs in fire control, environmental monitoring, power line inspection, traffic management and others. As technology continues to advance, UAVs are expected to have broader applications in city management.

According to Frost & Sullivan, the market size of UAV-based smart city management solutions in China is expected to increase from US$788.8 million in 2018 to US$16.9 billion in 2023, and the corresponding global market size is expected to increase from US$1.1 billion in 2018 to US$27.7 billion 2023, representing a CAGR of 90%.

104

60

**Table of Contents**

**Smart City Management Market Size**



The growth of the smart city management solutions market is mainly driven by the following factors:
- Increasing demand for higher-quality public services;
- Governmental cost-saving and efficiency initiatives; and
- Continuous technological upgrades in internet of things, or IoT, cloud computing, battery technology, calculation speed of chips, intelligent sensors, embedded software and smart recognition technology, among others.

Governments have shown growing demand for more automated, one-stop solutions that integrate UAV applications in various public services, enabling centralized management, cost reduction and higher operating efficiency.

**Aerial Media Solutions**

Aerial media solutions, also known as fleet formation performances, refer to using large fleets of light-emitting UAVs, to create dynamic 2D or 3D choreographed light shows in the sky. Aerial media is an innovative way of delivering original advertising and entertainment with minimal environmental impact. Aerial media has been used in advertisements and large-scale celebratory events. Compared to traditional firework performances, aerial media is more original, versatile and environmentally friendly.

The aerial media solutions market is expanding rapidly, especially in China. According to Frost & Sullivan, the global aerial media solutions market reached US$18.1 million in 2018 and is expected to increase to US$334.3 million in 2023, representing a CAGR of 79%. China is expected to account for 68.4% of the global aerial media solutions market in 2023.

105

61

**Table of Contents**

**Aerial Media Solutions Market Size**

(US$ in millions)

**Expected Global Market CAGR:**
2018 – 2023: 79.2%

| | 2018 | 2019E | 2020E | 2021E | 2022E | 2023E |
|---|---|---|---|---|---|---|
| Total | 18.1 | 35.0 | 64.7 | 112.9 | 194.8 | 334.3 |
| Rest of World | 3.5 | 7.7 | 15.7 | 30.1 | 56.7 | 105.6 |
| China | 14.5 | 27.3 | 49.0 | 82.8 | 138.1 | 228.7 |

■ China          ■ Rest of World

The growth of the aerial media solutions market is mainly driven by the following factors:
- Continued advancement in UAV technologies that enable complex, large-scale UAV fleet formations;
- Growing public environmental awareness; and
- Demands for more innovative, novel, impactful form of advertisement and entertainment.

Aerial media solutions require advanced technology, particularly on the capability to program and control a large fleet of UAVs simultaneously. Other core technological requirements for aerial media solutions include precise positioning, safety mechanisms, diverse formation patterns, electronic fences, communication redundancy, remote control and battery life.

**Other Applications**

Commercial UAVs have a variety of other potential applications that will continue to expand as technology advances. Some of the more prevalent applications include oil pipeline inspection, forest inspection, and agricultural applications. According to Frost & Sullivan, the global market for these other applications reached US$2.6 billion in 2018 and is expected to increase to US$26.6 billion in 2023, representing a CAGR of 59%.

106

**Table of Contents**

**Commercial UAV in Other Applications Market Size**
(US$ in millions)



**Expected Global Market CAGR:**
2018 – 2023: 59.3%

107

63

**Table of Contents**

**BUSINESS**

**Mission**

Our mission is to make safe, autonomous and eco-friendly air mobility accessible to everyone.

**Overview**

We are an autonomous aerial vehicle technology platform company. We are pioneering the future of transportation through our proprietarily developed AAVs and related commercial solutions. We believe we are the first in the world to launch passenger-grade AAVs, setting a new milestone in AAV technology.

In today's increasingly populated and interconnected world, traditional modes of urban transportation continue to contribute to congestion and pollution, and they are largely confined to land-based infrastructure. Mobility for the future requires a revolutionary solution. While the sky above has always been a possibility, we brought a safe, cost-effective and easy-to-use air mobility solution one step closer to reality when we unveiled our first passenger-grade AAV in 2016. Our AAVs require minimal space for vertical take-off and landing, enabling urban travel to expand to the three-dimensional space. We believe AAV technology will transform the future of transportation, improving lives and creating new industries.

We design, develop, manufacture, sell and operate AAVs and their supporting systems and infrastructure for a broad range of industries and applications, including passenger transportation, logistics, smart city management and aerial media solutions. We aim to make it safe and convenient for both passengers and goods to take to the air.



Passenger Transportation



Logistics



Smart City Management



Aerial Media Solutions

We are the first mover in AAV technology. In January 2016, we unveiled the world's first passenger-grade AAV, EHang 184, a single-seat model, at CES. In March 2018, we delivered a unit of our dual-seat EHang 216

108

64

**Table of Contents**

to a customer for testing, training and demonstration purposes. We believe this was the world's first delivery of a passenger-grade AAV. In addition, we have developed a number of non-passenger-grade AAV models suitable for a variety of industrial and commercial applications.

Unlike manually controlled UAVs, our intelligent AAVs can fly and operate autonomously. Our proprietary in-flight operating systems and on-the-ground infrastructure enable reliable and simultaneous control of a large number of AAVs. The operating systems installed on each AAV consist of an autopilot and flight control system, communication systems, a battery management system and a safety management system. Our on-the-ground infrastructure consists primarily of command-and-control systems, handheld and computer-based control units and AAV charging equipment.

We strive to design safe, reliable and functional products. At our design and testing center, we have established a multitude of AAV flight tests, including climbing flight tests, high maneuverability tests, speed tests, night flying tests, as well as flight tests in harsh weather conditions. We have conducted over 2,000 passenger-grade AAV flight tests, including in winds of up to 70 kilometers per hour and in fog with a visibility of approximately 50 meters.

*Significant Market Opportunities*

The market opportunities created by our technology are significant. According to Frost & Sullivan, the nascent global passenger-grade AAV market is expected to grow from US$0.3 million in 2018 to US$3.0 billion in 2023, and the global addressable market for AAV commercial solutions is expected to grow from US$3.7 billion in 2018 to US$103.7 billion in 2023. To capture the significant growth potential in the AAV market, we strive to continue to innovate and expand the boundaries for air-based mobility.

*Orders, Delivery and Financial Results*

As of December 5, 2019, we had cumulatively delivered 38 passenger-grade AAVs for testing, training and demonstration purposes, developed two command-and-control centers for smart city management, and completed over 80 aerial media performances. As of December 5, 2019, we had unfilled purchase orders for 48 passenger-grade AAVs.

Our core business, air mobility solutions, grew significantly in the first nine months of 2019. Since early 2019, we have accelerated the commercialization of our passenger-grade AAVs in air mobility solutions. In the third quarter of 2019, we sold 18 passenger-grade AAVs, compared with 17 in the first two quarters of 2019 combined.

Our revenues increased by 109.8% from RMB31.7 million in 2017 to RMB66.5 million (US$9.3 million) in 2018. Our net loss decreased by 7.1% from RMB86.6 million in 2017 to RMB80.5 million (US$11.3 million) in 2018. Our revenues increased by 19.9% from RMB56.0 million in the nine months ended September 30, 2018 to RMB67.1 million (US$9.4 million) in the nine months ended September 30, 2019, and our net loss decreased by 3.9% from RMB49.8 million in the nine months ended September 30, 2018 to RMB47.8 million (US$6.7 million) in the nine months ended September 30, 2019. In 2018, revenues generated by air mobility solutions, smart city management solutions and aerial media solutions were RMB3.1 million (US$0.4 million), RMB30.5 million (US$4.3 million) and RMB31.3 million (US$4.4 million), representing 4.7%, 45.8% and 47.0% of our total revenues, respectively. In the nine months ended September 30, 2019, revenues generated from air mobility solutions, our core business, increased significantly to RMB48.8 million (US$6.8 million), representing 72.7% of our total revenues.

**What Sets Us Apart**

We believe the following characteristics set us apart:

*Pioneer and Leader in Urban Air Mobility*

We are a pioneer in AAV technology. We unveiled the world's first passenger-grade AAV in January 2016 and reached a commercialization milestone by delivering the world's first passenger-grade AAV in March 2018.

109

Table of Contents

We strive to design safe, reliable and functional AAVs. We adopt aerodynamic designs in our AAV construction to reduce wind resistance and to maximize safety. Our AAVs are constructed using carbon fiber, composite materials and aviation-grade aluminum alloy to ensure strength, safety and high-level performance. For our passenger-grade AAVs, we adopt a distributed electric propulsion configuration with 16 independent motors and propellers coaxially mounted on eight arms. We have designed a modularized structure with an upper cabin for passengers and goods and a lower compartment to house major components and sub-systems to ensure structural safety and ease of customization for different applications.

*Passenger-grade AAVs*

We have developed three models of passenger-grade AAVs, EHang 184, EHang 216 and EHang 116. In January 2016, we announced EHang 184, a single-seat model and the world's first passenger-grade AAV. In 2018, we announced EHang 216, our dual-seat passenger-grade AAV model, and EHang 116, our enhanced single-seat passenger-grade AAV model, which replaced the EHang 184. Our passenger-grade AAVs can also be customized for large-payload logistics services to meet market demand.

The following table sets forth selected information about our passenger-grade AAVs that are currently in production:



| | **EHang 216** | **EHang 116** |
|---|---|---|
| **Commercialization Status** | As of December 5, 2019, we had cumulatively delivered 37 units to customers for testing, training and demonstration purposes. Currently we are working to obtain regulatory approvals for commercial operations in China, and are assisting a customer in Europe in taking steps toward applying for such approvals. However, we are unable to predict the timing of such approvals. | As of December 5, 2019, we had cumulatively delivered one unit to a customer for testing and training purposes. Currently we are working to obtain regulatory approvals for commercial operations in China, and are assisting a customer in Europe in taking steps toward applying for such approvals. However, we are unable to predict the timing of such approvals. |
| **Design** | Dual seats, 16 independent motors and propellers over eight arms | Single seat, 16 independent motors and propellers over eight arms |
| **Applications** | Passenger transportation, logistics and others | Passenger transportation, logistics and others |
| **Specifications** | | |
| Maximum speed | 130 km/h | 130 km/h |
| Cruising speed | 100 km/h | 100 km/h |
| Designed flight time with maximum payload | 21 minutes | 19 minutes |
| Designed flight distance with maximum payload | 35 km | 31 km |
| Maximum payload | 220 kg | 140 kg |
| Maximum altitude (above sea level) | 3,000 meters | 3,000 meters |
| Time to full charge (standard charging) | ≤ 120 minutes | ≤ 120 minutes |

112

66

Table of Contents

Each of our streamlined passenger-grade AAVs is equipped with a large panoramic windshield for wide vision and two gull-wing doors. The interior design of our AAVs boasts simplicity, comfort and convenience. Passengers can select their destinations from several pre-programmed options through an intuitive operating interface embedded in a 12-inch control panel in front of their seats.



Passenger Cabin



Operating Interface

### Non-passenger-grade AAVs

We offer small and medium-sized non-passenger-grade multi-rotor AAVs, including Falcon B, GD 2.0X, and V100. They are designed to operate below 1,000 meters, are capable of resisting unfavorable environmental conditions and fulfilling a variety of commercial missions. We are also developing large non-passenger grade AAVs with fixed wings, such as EH580 and FS200, which are designed for long-distance and heavy-payload applications.

The following table sets forth selected information about our non-passenger-grade AAVs that are currently in production:

|  | Falcon B | GD 2.0X | V100 |
| --- | --- | --- | --- |
| Design | Four-arm co-axial octorotor configuration | Quadrotor configuration | Quadrotor & fixed-wing hybrid configuration |
| Applications | Surveillance, fire extinguishment, and last-mile delivery | Surveillance and last-mile delivery | Surveillance, power line inspection and medium-range delivery |
| Operating modes | Standalone operations; command-and-control center operated | Standalone operations; command-and-control center operated | Standalone operations; command-and-control center operated |
| **Specifications** | | | |
| Maximum speed | 80 km/h | 40 km/h | 100 km/h |
| Designed flight time with maximum payload | 17 minutes | 19 minutes | 1 hour |
| Designed flight distance with maximum payload | 19 km | 10 km | 80 km |
| Maximum payload | 5 kg | 0.45 kg | 2 kg |
| Time to full charge | ≤ 90 minutes | ≤ 90 minutes | ≤ 90 minutes |

113

67

Table of Contents

Non-passenger-grade AAVs are used in our smart city management and aerial media solutions. We sell non-passenger-grade AAVs on a standalone basis or together with our command-and-control centers in our smart city management solutions.

**Our AAV Operating Systems and Infrastructure**

We have proprietary in-flight operating systems installed in our AAVs and on-the-ground infrastructure that we have designed to allow our AAVs to operate in various scenarios. Our AAV operating systems and infrastructure for different AAV commercial solutions share the same underlying technological architecture.

Our AAV operating systems include an autopilot and flight control system, a communication system, a battery management system and a safety management system, among other things. The AAV operating systems are installed on each of our AAVs to enable autopilot, navigation, real-time control and performance adjustment. Human control can be exercised from the ground using smartphones, tablets or computers as well as through our command-and-control system, meeting the varied demands of our customers.

- *Autopilot and Flight Control System, Including Course Correction and Traffic Avoidance.* The autopilot and flight control system enables the autonomous operation of our AAVs without a human operator and helps to ensure that our AAVs fly in a pre-determined inverted U-shape path from the origin to the destination with precise vertical take-off and landing. Our autopilot and flight control system collects and analyzes data from sensors installed on our AAVs, including accelerometers, gyroscopes, magnetic compass, barometers, visual sensors, Global Navigation Satellite System (GNSS) receivers and millimeter wave radars. Informed by the extensive data collected by these sensors, our AAVs use advanced algorithms to make intelligent navigation decisions, including correcting courses, adapting to weather conditions and avoiding obstacles during flight.
- *Communication System.* We have developed proprietary network protocols based on advanced communication technologies to support cloud-based information exchanges between our AAVs and ground control. We install our proprietary communication module with LTE transceivers on our AAVs to take full advantage of high-speed wireless networks. We use an ultra-long-distance transmission link for the communication of controls and flight data between our AAV and command-and-control centers in real time.

  Our communication system is secured with data-encryption technologies for data security. We also use redundant data transmission links, which enable us to switch to a backup communication system if the primary system is breached.
- *Battery Management System.* Our intelligent battery management system, or BMS, is an industrial-grade solution that monitors all parameters of AAV batteries, including temperature, capacity and voltage. The core of our BMS is the self-adaptive smart battery management algorithm that optimizes the balance between performance and battery life and provides accurate predictions based on data and analysis of flight status. To ensure effective management of battery performance and battery life, an onboard battery management unit transmits real-time BMS data to the flight control system and command-and-control centers.
- *Safety Management System.* Our AAVs use full-redundancy safety technology in their flight control systems, sensors, propulsion systems and battery management systems. Our proprietary redundancy control algorithms are based on a real-time voting mechanism. Our passenger-grade AAVs are designed with distributed electric propulsion, or DEP, an advanced propulsion technology defined by NASA with an aim of achieving the highest level of safety through redundancy and efficiency. In the event of malfunction of certain parts of our AAVs, the operating systems automatically activate the backup components to ensure proper functioning and performance of our AAVs.

Our infrastructure consists of command-and-control centers, handheld and computer-based control units, and AAV charging equipment, among other things. Although some of our non-passenger-grade AAVs can be

114

68

Table of Contents

operated on a standalone basis, the full functionalities of our AAVs require the support of our infrastructure. For early adopters of our air mobility solutions, we generally provide them with the required software free of charge. We may start charging customers for such software and related services in the future. For smart city management, we can provide customers with all required software and hardware products as a turnkey solution.

- *Command-and-Control System.* We have extensive expertise in command-and-control systems. According to Frost & Sullivan, we were the first company to successfully build an integrated command-and-control center for smart city operation and management that centrally coordinates a wide range of AAV applications. Powered by advanced low-altitude AAV control technology, our command-and-control systems allow for adaptability and scalability. Through continuous uplinks maintained between AAVs and the command-and-control center, our system can simultaneously control more than 1,000 non-passenger-grade AAVs with precision and accuracy to complete pre-defined actions and movements.

  Our command-and-control system can accurately monitor flight status, dispatch air traffic, effect pre-warning and contingency measures, control the AAV network and record flight data. The system ensures that our AAVs fly in predetermined routes and maintain smooth and efficient operation even in extreme weather. It also has the capability to monitor and detect irregularity in the status and operation of our AAVs and to activate contingency measures to restrict and limit actions or movements of our AAVs in emergency situations.

- *EHang Play App.* For standalone operations, some of our non-passenger-grade AAVs, such as GD 2.0X, can also be individually controlled by our smartphone- or tablet-based controller app.

- *Charging Equipment.* Our passenger-grade AAVs can be charged with our charging stations. We have also developed a charging platform powered by fast charging technology for our non-passenger-grade AAVs. The waterproof and dustproof charging platform can monitor real-time charging status and battery health. Our charging platform is expected to be put into service as a part of our smart city management solutions and we plan to initially deploy these platforms in Chinese cities, such as Lianyungang and Shaoguan, in 2019.


Command-and-Control System


Command-and-Control Center


Charging Platform

**Our AAV Commercial Solutions**

*Urban Air Mobility*

*Passenger Transportation*

Our passenger-grade AAVs offer a safe and efficient option for short- to medium-distance transportation. They fly autonomously and land with precision. With an intuitive and user-friendly application system on board, passengers can select their destinations from several pre-programmed options.

115

Table of Contents

and plan to sell our products, the commercial use of our passenger-grade AAVs, and in some cases our non-passenger-grade AAVs, is subject to an uncertain or lengthy approval process. In order for our customers to use our passenger-grade AAVs, we are working on obtaining, or working closely with our customers, to obtain relevant approvals and permits in the jurisdictions where we sell and plan to sell our products. We are unable to estimate the average length of time required to obtain the applicable regulatory approvals due to the nascent nature of AAV-related regulations and the lack of relevant precedents. For example, we are not aware of any operator having been granted all required approvals for the commercial operations of passenger-grade AAVs in China or the United States. See "Risk Factors—Risks Relating to Our Business and Industry—In the jurisdictions where we sell and plan to sell our products, the commercial use of our passenger-grade AAVs, and in some cases of our non-passenger-grade AAVs, is subject to an uncertain or lengthy approval process; we cannot predict when regulations will change, and any new regulations may impose onerous requirements and restrictions with which we, our AAVs and our potential customers may be unable to comply. As a result, we may be limited in, or completely restricted from, growing our business in the foreseeable future."

In China, with respect to our passenger-grade AAV business, currently, certain approvals from the CAAC and the PLAAF are required for the operation of certain AAVs. However, it is unclear whether we would be allowed to engage in commercial operation of our passenger-grade AAVs merely with these approvals. Please see below the approvals that are material to our operations in China.

*Approval on airworthiness.* The UAV Airworthiness Guidance recently published by the CACC has established a UAV airworthiness framework that is based on the assessment, classification and management of operational risks of UAVs. Under this framework, we have obtained written approval issued by the CAAC for trial flights of passenger-grade AAVs in certain locations in China for the purpose of evaluating their airworthiness and formulating industry standards on airworthiness of passenger-grade AAVs. The approval will expire on December 31, 2019. However, currently there are no detailed rules or regulations with respect to the airworthiness of AAVs. According to the UAV Airworthiness Guidance, the detailed rules and regulations on airworthiness are expected to be promulgated by the end of 2019. As advised by our PRC legal adviser, if detailed rules or regulations are promulgated in the future, we may be required to obtain a certificate of airworthiness pursuant to the relevant requirements and standards thereof.

*Approval for AAV pilot operation.* Pursuant to the Interim Rules, a prospective operator of certain classes of UAVs must submit an application for pilot operation. Our passenger-grade AAVs fall within these UAV classes. In February 2019, we submitted an application for pilot operation in relation to a customer's use of our EHang 216 for logistics purposes in Taizhou, Zhejiang Province and have passed the preliminary examination carried out by the CAAC. If such application is approved by the CAAC, we plan to provide logistics solutions for this customer in connection with the AAVs which were purchased or will be purchased by this customer from us. We also plan to apply for pilot operations for our other customers' use of our passenger-grade AAVs in China and provide them with urban air mobility solutions as and when appropriate. As our passenger-grade AAVs gradually gain market acceptance and regulatory acknowledgement, we may encourage our customers to apply for pilot operations on their own in the future.

*Approval for airspace.* We are required to obtain approvals from local divisions of the PLAAF for proposed flight routes in connection with our business. The approvals from the PLAAF are usually granted on a one-off basis or are only valid for a limited period of time.

*Approval for commercial operation of AAVs.* Currently there are no detailed rules or regulations with respect to commercial operations of passenger-grade AAVs, and as advised by our PRC legal advisor, it is unclear whether the relevant regulators in China would permit commercial operations of passenger-grade AAVs under the current regulatory framework. We are closely monitoring the regulatory developments, if any, in this area. In the event that any detailed rules or regulations are promulgated in the future, we will use our best endeavors to comply with the requirements thereof.

See "Regulation—PRC Regulation" for further details.

Table of Contents

Our direct sales force utilizes marketing initiatives to create awareness of the benefits of our AAVs and AAV commercial solutions. We intend to make investments to build and expand our sales and marketing organization by increasing the number of sales representatives in existing and new markets. We are also in discussion with existing and potential business partners in the PRC and abroad to complement our direct sales efforts with sales to distributors and franchise arrangements.

On top of our sales in the PRC, we have exported our AAVs to the European Union and the Middle East. We strive to ensure that our exported products comply with the regulatory and safety standards of the local markets.

### Contracts with Our Customers and Partners

We have entered into a number of long-term framework and conditional agreements with our business partners relating to the sale of passenger-grade AAVs. These business partners include several PRC AAV distributors, a U.S. biotechnology company, a Norwegian automobile distributor, and a Taiwanese yacht manufacturer and operator. Each framework or conditional agreement generally sets forth a target or expected sale quantity over a multi-year period. There is one agreement, the one with a U.S. biotechnology company and the only one among our agreements with customers, pursuant to which purchases are explicitly conditioned on our meeting certain deadlines for specified performance milestones and the receipt of applicable regulatory approvals. We have yet to achieve the performance milestones, which allows the customer to terminate the agreement. In some other agreements, the sales targets are non-binding. See "Risk Factors—Risks Relating to Our Business and Industry—Our framework and conditional agreements may not result in material sales of our products." Specifically, currently in China, the United States and other jurisdictions relevant to us, the commercial use of our passenger-grade AAVs, and in some cases our non-passenger grade AAVs, is subject to an uncertain or lengthy approval process. None of our business partners has obtained the regulatory approval for the commercial operations of our passenger-grade AAVs. We are unable to estimate the average length of time required to obtain the applicable regulatory approvals due to the nascent nature of AAV-related regulations and the lack of relevant precedents. We also cannot be sure that we or our business partners will obtain the required approvals in a timely manner, or at all. We are not aware of any operator having been granted all required approvals for the commercial operations of passenger-grade AAVs in China, the United States or elsewhere. Nor can we predict when these regulations will change, and any new regulations may impose onerous requirements and restrictions. Before regulatory approvals for the commercial operations of our passenger-grade AAVs have been obtained in China and/or other relevant jurisdictions, customer demand will likely be limited in volume. For the foregoing reasons, we may not receive any substantial orders from our current or potential customers, and we currently do not expect material deliveries to some of our business partners, including the U.S. biotechnology company and the Norwegian automobile distributor.

Our customers place purchase orders taking into account the terms of the relevant framework agreement, if applicable, and the customer's procurement requirements. For passenger-grade AAVs, our customers are generally required to prepay 10% to 40% of the total purchase price soon after a purchase order is placed. Under our standard purchase order, we start production after the prepayment is made, and production is generally expected to take three to six months. Upon completion of production, we will deliver the AAVs when we receive the full payment from the customer. As of December 5, 2019, we had unfilled purchase orders for 48 passenger-grade AAVs.

In addition, we collaborate with business partners to provide trial logistics services. As of September 30, 2019, major contracts relating to our logistics services included:

- *Cooperation Agreement with Yonghui Group.* In June 2018, we entered into a cooperation agreement with Yonghui Superstores, or Yonghui Group, one of China's largest supermarket chains, for a pilot project on smart retailing and aerial grocery delivery services. Under the cooperation agreement, we provide Yonghui Group with non-passenger-grade AAVs, training and technical support, whereas Yonghui Group operates the delivery services using our AAVs and services. The pilot project was successfully completed in September 2018, after which we formed a formal one-year cooperation with Yonghui Group for its delivery services. We charge Yonghui services fees based on the number of deliveries made, subject to a minimum monthly fee.

124

71

**Table of Contents**

## REGULATION

This section sets forth a summary of the most significant rules and regulations that affect our business activities in China and the United States.

### PRC Regulation

#### *General Administration of Civil Aviation and Airspace Control*

On October 30, 1995, the National People's Congress of the PRC adopted the *Civil Aviation Law of the PRC*, or the Civil Aviation Law, which was subsequently amended on April 24, 2015, November 7, 2016, November 4, 2017 and December 29, 2018. The Civil Aviation Law sets forth the general principle and rules for administration of civil aviation as well as for domestic airspace control. Pursuant to this law, the CAAC, which is a State Council department, is currently in charge of civil aviation and has the general authority to supervise and administer civil aviation activities nationwide. The CAAC may promulgate regulations concerning civil aviation activities in accordance with laws enacted and decisions issued by the State Council and within the limits of the CAAC's authority. According to the Civil Aviation Law, the state has complete and exclusive sovereignty over the airspace above its territory. The division of airspace must take account of the needs of civil aviation, national defense and security, as well as the interests of the public, so as to ensure the reasonable, sufficient and efficient use of airspace. Detailed measures for airspace control will be formulated by the State Council and the Central Military Commission, or the CMC. In addition, pursuant to the Civil Aviation Law, the detailed rules of UAVs promulgated by the State Council and the CMC shall be followed.

#### *Design, Manufacturing and Airworthiness Standard for UAVs*

The Civil Aviation Law contains rules and regulations on airworthiness for all civil aircrafts other than those used for flight missions by the military force, customs offices and police departments. The law mandates that the design of engines, screw propellers and apparatuses used in civil aircrafts must be approved with a Model Certificate, whereas the production and maintenance of engines, screw propellers and apparatuses used in civil aircrafts require a Production Certificate and a Maintenance Certificate, respectively. While the CAAC has laid out specific approval procedures to give substance to the airworthiness standard prescribed by the Civil Aviation Law, none of these procedures is currently applicable to or carried out for UAVs. Consequently, there is no practicable means for us to submit any application for airworthiness approval from the CAAC under the Civil Aviation Law.

The nascent status of the UAV industry is accompanied by a lack of targeted laws and regulations and the relevant legislative and administrative bodies are in the process of laying the first brick for a future regulatory framework governing, among others, the design, manufacturing and the overall airworthiness of UAVs. On January 25, 2019, the CAAC published the *Guidance on UAV Airworthiness Assessment Based on Operational Risks,* or the UAV Airworthiness Guidance, pursuant to which we are one of the airworthiness assessment pilots and would help the CAAC in developing UAV airworthiness standards and assessment rules. According to the UAV Airworthiness Guidance, the UAV airworthiness framework will be based on the assessment, classification and management of operational risks. Operational risks will be categorized into three levels: low, medium and high. UAV operational risks contemplate predominantly the risk of collision in the event of loss of control, including (1) damage resulting from UAV crashes or collisions with any individual or object on the ground; (2) in-air collisions, such as with aircrafts or other UAVs; and (3) other risks or damage, such as property losses or any adverse effect on the environment or humans. The UAV Airworthiness Guidance envisages that the UAV airworthiness framework will initially be established in 2019. Detailed rules, procedures and standards relating to the assessment of UAV airworthiness are currently being researched and drafted. The test flights of our passenger-grade AAVs have been supported with approvals obtained from the Aircraft Certificate Department of the CAAC based on the UAV Airworthiness Guidance. The approval will expire on December 31, 2019. A formal certificate relating to airworthiness will be awarded if the relevant UAV satisfies the requirement of the airworthiness assessment framework.

128

Table of Contents

According to the *Guideline for the Standardization of UAV Systems (2017 to 2018)* jointly issued by the National Standardization Administration, the Ministry of Science and Technology, the Ministry of Industry and Information Technology, or the MIIT, the Ministry of Public Security, the Ministry of Agriculture, the General Administration of Sport, the National Energy Administration and the CAAC on June 13, 2017, the development of non-military use UAV systems standard will be staggered into two phases. In the first phase, from 2017 to 2018, the focus is on answering market demand for UAV systems, providing support to industry-wise supervision, and initiating the development of standards for UAV systems. The second phase, from 2019 to 2020, envisions an incremental development of more than 300 UAV system standards. A range of standards in the regulatory pipeline under this guideline, includes safety standards, research and development standards and operational standards, as well as standards for systems, infrastructure, subassemblies and components of non-military use UAV.

The CAAC has also published a draft bill of the *Interim Measures for Flight Administration of Unmanned Aerial Vehicle* on January 26, 2018, setting out airworthiness requirements for medium-sized and large UAVs. A medium-sized UAV refers to a vehicle with a take-off weight between 25 kilograms and 150 kilograms, or an empty weight of more than 15 kilograms. A large UAV refers to a vehicle with a take-off weight of more than 150 kilograms. Based on the draft bill, our passenger-grade and non-passenger grade AAVs will likely be categorized as medium-sized or large UAVs and the relevant airworthiness requirements will be mandatorily applied. In such event, we will be required to apply for relevant airworthiness approvals in accordance with procedures to be specified by the CAAC. It is nevertheless still unclear in what form and when such draft bill will come into effect. Further, the MIIT published a draft bill of the *Unmanned Aerial Vehicle Manufacture Enterprise Requirements* on November 23, 2018 for public consultation, which is intended to regulate enterprises that manufacture UAVs. According to this draft, a manufacturer of UAVs shall, among others, ensure safe production in accordance with law, maintain in possession intellectual property rights in respect of the manufactured UAVs, and produce UAVs that are capable of automatic landing, returning or taking other emergency measures in case of malfunction.

On May 14, 2019, CAAC published a discussion draft of the *Guideline for the Promotion of the Development of Civil Use Unmanned Aviation*, or the Draft UA Guideline, for public review and comments. The Draft UA Guideline encourages test and demonstration operations based on demands from different areas and also encourages the UAV companies to expand the business models of unmanned aviation and the scope of business licenses based on safe operation. The Draft UA Guideline also stipulates that, in order to set standards and rules for airworthiness and air traffic management, key research related to planning and operation of public flight routines in low airspace for UAVs will be conducted and pilot operations will be organized for vertical take-off and landing passengers and logistics UAVs.

Pending the enactment of the foregoing bills and the necessary judiciary and administrative interpretations and clarifications on some of the existing guidelines, the CAAC has put in place interim measures to allow for and regulate the testing of various forms of UAVs, including both our passenger-grade and non-passenger grade AAVs.

***Real-Name Registration of UAVs***

As a manufacturer and seller of UAVs, we are also required to collect certain information relating to our products and our customers and to submit such information to the relevant regional authorities pursuant to the *Circular of the General Office of the Ministry of Industry and Information Technology on Information Filing for Civil Unmanned Aerial Vehicle Production Enterprise and Products*, which took effect on May 22, 2017. We are currently working with the regional authorities to complete the required procedure for both our passenger-grade and non-passenger-grade AAVs. We are also obligated to provide information relating to our AAV products and purchasers starting from June 2017 and pursuant to the *Administrative Provisions on the Real-name Registration of Private Unmanned Aerial Vehicles* issued by the CAAC. Information to be reported includes (i) the name, registered address and contact information of us as the manufacturer; (ii) the name and model detail of our AAV

129

73

**Table of Contents**

products; (iii) the empty weight and maximum take-off weight of our AAV products; (iv) the categorization of our AAV products in accordance with the CAAC guidelines, and (v) the name and contact information of purchasers of our AAVs. These administrative provisions regulate the use of private UAVs with a maximum take-off weight of 0.25 kilograms and above within the territory of the PRC, and direct owners of such private UAVs to register their UAVs on a real-name basis. Non-compliance will result in restrictions on the use of the relevant UAVs and penalties. We have historically complied with these requirements for both our passenger-grade and non-passenger-grade AAVs.

## Operations of AAVs

### Airspace Control

According to the *General Flight Rules* issued by the State Council and the CMC on October 18, 2007 and took effect on November 22, 2007, the overall flight control within the territory of the PRC is under the unified organization of and enforcement by the People's Liberation Army Air Force, and the various flight control departments shall exercise air traffic control in accordance with their respective responsibilities. Prior application must be filed and approval be obtained before any flight can be conducted within the PRC territory, including test flights for our passenger-grade AAVs, and take-offs relating to our aerial media solutions and logistics services.

We are required to obtain clearance from the local counterpart of the People's Liberation Army Air Force for the flight route for our AAVs. Subject to any difference in policies adopted by the local authorities, approval for airspace and flight plan is normally granted by the local flight control department of the military. The flight plan shall also be filed with the local public security department and the CAAC. As an example of the general observations above, on November 19, 2018, the CAAC issued the *Flight Management Implementing Rule for UAVs in the Shenzhen Area*, under which the South Military Zone Air Force is responsible for the piloting of UAVs within the municipal area of Shenzhen. An enterprise or individual who seeks a flight task approval shall file the application with the flight control department of the South Military Zone Air Force five days prior to such flight. The flight control department of the South Military Zone Air Force, after consulting the CAAC and the public security department, may grant its approval two days prior to the flight. After such approval and except for certain flights of mini-UAV with an empty weight of less than 0.25 kilogram, subject to certain other conditions, or small-UAV with an empty weight of less than 4 kilograms, subject to certain other conditions, a flight plan must be submitted via a designated reporting platform no later than 3:00 pm on the day prior to the flight and the flight control department of the South Military Zone Air Force will respond no later than 9:00 pm on the same day of filing and will distribute the relevant information to the public security department and the CAAC. Generally, for the flight of our AAVs, we have established prior communications with the local flight control department, the public security authority and the local counterpart of the CAAC in seeking the necessary approvals and have ensured compliance with their respective instructions in all material respects.

### Pilot Operations

The Flight Standard Department, the Aircraft Certificate Department and the Airspace Control Industry Administration Office of the CAAC, jointly issued the *Pilot Operation Rules (Interim) for Specific Unmanned Aircraft*, or the Interim Rules, on February 1, 2019, pursuant to which, unmanned aircrafts are classified into nine categories based on their empty weight and takeoff gross weight. In particular, Class I captures unmanned aircrafts with empty weight and takeoff gross weight between 0 to 1.5 kg (including 1.5 kg); Class II captures unmanned aircrafts with empty weight between 1.5 kg and 4 kg (including 4 kg) and takeoff gross weight between 1.5 kg and 7 kg (including 7 kg); Class III captures unmanned aircrafts with empty weight between 4 kg and 15 kg (including 15 kg) and takeoff gross weight between 7 kg and 25 kg (including 25 kg); Class IV captures unmanned aircrafts with empty weight between 15 kg and 116 kg (including 116 kg) and takeoff gross weight between 25 kg and 150 kg (including 150 kg); Class XI captures unmanned aircrafts with empty weight between 116 kg and 5,700 kg (including 5,700 kg) and takeoff gross weight between 150 kg and 5,700 kg (including 5,700 kg); Class XII captures unmanned aircrafts with empty weight and takeoff gross weight in

130

Table of Contents

excess of 5,700 kg. The Interim Rules are applicable to Class IV unmanned aircrafts, Class III unmanned aircrafts with high risks and the pilot operation of which would need a pre-assessment in the belief of the authority, Class XI and Class XII unmanned aircrafts with low risks and in relation to which the authority believes a pilot operation assessment is sufficient. According to the classification above, our passenger-grade AAV belongs to Class XI and Falcon B of non-passenger grade AAV belongs to Class III. According to the Interim Rules, the applicant for the pilot operation of any UAV that falls within any of the foregoing applicable classes shall first submit a proposal for initial discussion and application with the CAAC and shall then conduct a pre-pilot operation safety evaluation based on specific operation risk assessment. The applicant shall subsequently verify the operation risks based on its initial operation, following which the CAAC shall issue the relevant approval if its assessment team confirms that the risks of pilot operation can be appropriately controlled and are acceptable. Upon its receipt, the applicant shall maintain the approval, together with the operation rules and a complete manual for the CAAC's inspection and supervision. The pilot operation will be suspended or terminated under certain circumstances, such as any non-compliance with the approved letter, the presence of uncontrollable operation risks and the voluntary surrender by the applicant. Operation records relating to pilot operations shall be maintained, including operation manual, list of unmanned aircraft, maintenance record of aircraft, and qualification of personnel. The applicant shall also purchase insurance policy for third party liabilities. In addition, "risks" is defined under the Interim Rules to take into account both the frequencies (or probabilities) of the events and the level of severity. It also includes both ground risks and risks in air. We are the first applicant for the pilot operation of certain types of our passenger-grade AAVs in relation to a customer's use for logistics purpose. We have passed preliminary assessment carried out by CAAC and CAAC has issued the notification of acceptance for the application, which means that our application is currently under review. A formal approval for specific unmanned aircraft pilot operation will be issued at a later stage.

In addition, test flights of our passenger-grade AAVs must be and have been supported with approvals obtained from the Aircraft Certificate Department of the CAAC, despite an unclear legislative source for such requirement. We are approved under these approvals to conduct flight trials for the purpose of evaluating the airworthiness of our EHang 216, assessing their operational risks, as well as improving experience with and developing proper airworthiness standard for passenger-grade AAVs. We are allowed to continue our testing until December 31, 2019 and will be submitting testing results and outcomes to the Aircraft Certificate Department, the submission of which may potentially be necessary to renew our testing permits or to apply for the relevant certificate related to airworthiness pursuant to the then applicable laws and regulations. The CAAC confirms that we are involved in the procedure above evaluating the airworthiness of passenger-grade AAVs, assessing their operational risks, as well as improving experience with and developing proper airworthiness standard for passenger-grade AAVs.

### UAV Commercial Operation License

The *Administrative Measures for Commercial Flight Activities of Unmanned Aerial Vehicle for Civil Use (Interim)* promulgated by CAAC on March 21, 2018 and taking effect on June 1, 2018, asserts jurisdiction over the commercial operation of any UAV with empty weight of more than 0.25 kilograms and regulates a broad range of UAV activities including aerial spraying, photography, aerial performance flight and UAV operator training. The company operating the regulated activities must first obtain an UAV Commercial Operation License from CAAC for using UAVs in such activities, and the applicant shall meet certain criteria including (a) the applicant shall be a corporation having a PRC national as its legal representative; (b) the applicant shall possess at least one (1) UAV and shall have completed registration of such UAV(s) with CAAC; and (c) the applicant shall have purchased third party liability insurance policy for the relevant UAVs. We have obtained the necessary operation licenses for aerial media solutions purpose while our AAVs for logistic services and passengers transportation do not come under the jurisdiction of the *Administrative Measures for Operational Flight Activities of Civil Unmanned Aerial Vehicle (Interim).* However, in the northwest region of China, the *Administrative Measures for Logistics Services of Civil Unmanned Aerial Vehicle in Northwest Region (Interim)* promulgated by CAAC Northwest Regional Administration on April 3, 2019, stipulates that the company operates logistic services in Shaanxi Province, Gansu Province, Ningxia Province and Qinghai Province by

131

75

Table of Contents

UAVs shall obtain an operating license for logistic service from CAAC Northwest Regional Administration. Other local CAAC administrations in other regions of China have not issued relevant rules yet. We are not operating logistic services in northwest region of China at the current stage. We may be required to obtain the Commercial Operation License for logistic service if we operate logistic services in Northwest region in the future.

### Pilot and Operator License

On August 31, 2018, the Flight Standard Department of the CAAC issued the *Regulations on the Administration of Civil Unmanned Aerial Vehicles Pilots*, according to which a UAV pilot must obtain the relevant UAV pilot license depending on the type and specifications of the UAV operated. In relation to the operation of UAV systems and that of UAVs in clusters, at scale or otherwise in a distributed manner, the operator itself is exempted from the need of a UAV pilot license, pending the stipulation of separate and specific management measures. Distributed operation refers to the mode of operating UAV systems through a collection of multiple sub-units and communication nodes and their deployment to multiple sites or terminals for collaborative operation. Three of our employees have obtained class III pilot licenses and class IV pilot licenses, which satisfied the requirement to operate our non-passenger grade AAVs. However, to the extent our AAVs are operated and controlled through distributed operation (such as during the delivery of our aerial media and smart management solutions), we are not required to obtain any pilot license.

In addition, the draft bill of the *Interim Measures for Flight Administration of Unmanned Aerial Vehicle* published by the CAAC on January 26, 2018 stipulates that any unit or individual that organizes UAV flight activities in a distributed manner shall be subject to safety review and obtain a safe operation license. The individual operator of UAV systems or clusters or distributed operations are however exempted for such licensing requirement. We may be required to obtain the safe operation license for certain component of our business once the above draft bill comes into effect.

Operators of our AAVs may be subject to additional licensing requirements. On December 29, 2015, the CAAC issued the *Rules on Operation of Light and Small Unmanned Aircraft (Pilot)*, pursuant to which, pilot of specified UAVs shall meet certain qualification, and are prohibited from consumption of alcohol and drugs as well as careless piloting. Our pilots have complied with all the above requirements.

### Import and Export

On December 31, 2005, the Ministry of Commerce and the General Administration for Customs jointly issued the *Measures for the Administration on Import and Export License for Dual-use Items and Technologies*, pursuant to which a license is required for the exportation of any dual-use goods, products and technologies of the PRC included in a control list issued by the Ministry of Commerce on December 28, 2017. Notably, certain types of UAVs are subject to the foregoing export license requirements, such as UAVs with (a) a maximum endurance time of 1 hour, (b) maximum endurance time of half an hour and the ability to take-off and conduct stable flight against a wind speed of no less than 46.3 kilometer/hour; (c) aircraft range equal to or higher than 300 kilometers; (d) automatic controlling system and navigation capability containing aerosol preparation for planting with volume of 20 liters or being capable of installing aerosol preparation system for planting with volumes of 20 liters after designing and modification. We may be required to obtain the necessary license for the exportation of certain of our AAVs.

### Wireless Communication

Our AAVs and remote control center has installed certain radio transmission equipment and telecommunication equipment. For radio transmission equipment, pursuant to the Regulations on the Administration of Radio in the PRC promulgated by the State Council and CMC, with effect from December 1, 2016, radio transmission equipment produced or imported for the purpose of sale and use in the PRC shall

132

Table of Contents

gases, radioactive substances, noise vibrations, electromagnetic radiation and other hazards produced during such activities.

Environmental protection authorities impose various administrative penalties on persons or enterprises in violation of the *Environmental Protection Law*. Such penalties include warnings, fines, orders to rectify within the prescribed period, orders to cease construction, orders to restrict or suspend production, orders to make recovery, orders to disclose relevant information or make an announcement, imposition of administrative action against relevant responsible persons, and orders to shut down enterprises. Any person or entity that pollutes the environment resulting in damage could also be held liable under the *Tort Law of the PRC*. In addition, environmental organizations may also bring lawsuits against any entity that discharges pollutants detrimental to the public welfare.

### Work Safety

Under relevant construction safety laws and regulations, including the *Work Safety Law of the PRC* which was promulgated by the SCNPC on June 29, 2002, amended on August 27, 2009, August 31, 2014, and effective as of December 1, 2014, production and operating business entities must establish objectives and measures for work safety and improve the working environment and conditions for workers in a planned and systematic way. A work safety protection scheme must also be set up to implement the work safety job responsibility system. In addition, production and operating business entities must arrange work safety training and provide the employees with protective equipment that meets the national standards or industrial standards. Automobile and components manufacturers are subject to the aforementioned environment protection and work safety requirements.

### Fire Control

Pursuant to the *Fire Safety Law of the PRC* promulgated by the SCNPC on April 29, 1998, amended on October 28, 2008 and April 23, 2019 and which became effective on April 23, 2019 and the *Provisions on Supervision and Administration of Fire Protection of Construction Projects* promulgated by the Ministry of Public Security of the PRC on April 30, 2009, implemented on May 1, 2009 and later amended on July 17, 2012, which became effective on November 1, 2012, the construction entity of a large-scale crowded venue (including the construction of a manufacturing factory that is over 2,500 square meters) and other special construction projects must apply for fire prevention design review with fire control authorities, and complete fire assessment inspection and acceptance procedures after the construction project is completed. The construction entity of other construction projects must complete the filing for fire prevention design and the fire safety completion inspection and acceptance procedures within seven business days after obtaining the construction work permit and passing the construction completion inspection and acceptance. If the construction entity fails to pass the fire safety inspection before such venue is put into use, or fails to conform to the fire safety requirements after such inspection, it shall be subject to (i) orders to suspend the construction of projects, use of such projects or operation of relevant business; and (ii) a fine ranging between RMB30,000 and RMB300,000.

### U.S. Regulation

The Federal Aviation Administration, or the FAA, one of several modal organizations within the Department of Transportation, or the DOT, is the regulatory agency in the United States with authority to oversee the safety of aircraft operations in the national airspace system of the United States, or the NAS. By statute, the Congress of the United States, or the US Congress, has vested the FAA with authority to regulate airspace use, management and efficiency, air traffic control, safety, navigational facilities, and aircraft. By contrast, the DOT retains regulatory control over all economic authority granted to commercial operations of aircraft (including for goods or passenger transportation for hire) within the United States. Thus, in addition to any FAA approvals and authorization required for operation of aircraft within the NAS, each aircraft operator conducting commercial operations must also be issued and hold economic authority (or an exemption) from the DOT. Unmanned aircraft systems, or UAS, are considered a category of aircraft for purposes of regulation by the FAA and the DOT. Our

144

Table of Contents

AAVs are classified as UAS and their operations are therefore subject to the approval by both the FAA and the DOT.

Note that the description of the regulation of UAS in the United States as provided herein reflects the regulatory landscape with respect to the approval of UAS and UAS operations current as of the date of this document. FAA's authority, processes and methodologies for the evaluation of UAS operations in the NAS continues to rapidly evolve, and the regulation and processes described herein are subject to change.

### *FAA Regulation of UAS*

With respect to UAS operations in the NAS, the FAA currently has the authority to promulgate and enforce restrictions regarding (i) the types of flights that may be conducted; (ii) the equipment that may be used to conduct those flights; and (iii) the training required. The regulatory framework applicable to a particular UAS operation is determined by whether (a) the UAS is used by a government agency, for commercial purposes, or as a model aircraft; and (b) whether at takeoff the UAS (including any attachments) weighs less than 55 pounds (Small UAS), or equal to or more than 55 pounds (Large UAS). Importantly, FAA currently considers AAVs to be UAS – the remote pilot requirement for UAS can be satisfied by a person who supervises an autonomous operation but who does not physically guide the aircraft. Our passenger-grade AAVs are classified as Large UAS.

#### *Small UAS*

Small UAS can be operated for commercial purposes under the recently enacted Part 107 of Title 14 of the Code of Federal Regulations, or Part 107. Importantly, Part 107 explicitly does not permit "air carrier operations," meaning generally the transport of property over state borders (i.e. interstate operations). However, under Part 107, property can be transported within state borders. UAS operations under Part 107 are subject to a number of operational limitations, including, for example, that the UAS: (i) must remain within the visual line of sight of either the pilot in command or a visual observer, if any; (ii) may not be operated over persons not involved in the UAS operation; (iii) may not be operated at night, and (iv) not be operated within certain restricted airspace (e.g. airspace in close proximity to airports, public stadiums, national parks, etc.). However, §107.200 of Part 107 provides for a mechanism whereby a potential UAS operator can apply to the FAA for a waiver of some of the restrictions described in Part 107, including the restrictions listed in this paragraph. While exemptions to certain restrictions and limitation under Part 107 may be applied for and granted by FAA, Part 107 expressly provides that the beyond visual line of sight restriction cannot be waived if the purpose of the authorized operation is to transport goods.

It should also be noted that certain other restrictions do apply, and the FAA will not waive these restrictions. For example, the UAS must be operated by a pilot holding a remote pilot airman certificate. This certificate can be obtained by demonstrating aeronautical knowledge by either (i) passing an initial aeronautical knowledge test; or (ii) holding a Part 61 pilot certificate, completing a flight review once every 24 months, and completing a UAS training course. Pilots must also be at least 16 years of age and vetted by the United States Transportation Security Administration.

The FAA has also been directed by the US Congress, and is actively engaged in the rulemaking process required, to revise Part 107 to expand the scope of permissible commercial operations by Small UAS without the need to apply to the FAA for a waiver under §107.200. See "—Recent and Pending Federal Legislation and Regulation" below.

#### *Large UAS*

Large UAS can be operated in the NAS for testing purposes by obtaining authority from FAA pursuant to a special airworthiness certificate in the experimental category, or an SAC. The specific requirements and process

**Table of Contents**

for obtaining an SAC are described in FAA Order 8130.34D – Airworthiness Certification of Unmanned Aircraft Systems and Optionally Piloted Aircraft. If the FAA determines the proposed operation does not present an unreasonable safety risk, the FAA will issue an SAC with operating limitations applicable to the particular UAS or the proposed operation, as applicable. With respect to operational authority, it is important to note that the FAA will only grant an SAC for the purposes of research and development (R&D), showing compliance with regulations, crew training, exhibition, and/or market survey. Carrying persons or property for compensation or hire is prohibited. Thus, an SAC might be beneficial for the purposes of obtaining authority to test proposed operational concepts, but would not ultimately authorize the carriage of packages or persons for compensation.

By contrast, Large UAS can be operated in the NAS for commercial purposes by obtaining two types of authority addressed below.

First, a manufacturer must obtain a type certificate (and ultimately a production certificate and airworthiness certificate) from the FAA pursuant to 14 CRF Part 21 with respect to the UAS.

Alternatively, if the FAA will consent, the operator may obtain an exemption to all type certification and airworthiness requirements pursuant to an exemption granted under the Special Authority for Certain Unmanned Systems located in 49 U.S.C. § 44807, or a Section 44807 Exemption. By way of background, the Section 44807 Exemption grants the FAA the authority to use a risk-based approach to determine whether a UAS can operate safely in the NAS with respect to a specific proposed operation without complying with those certain airworthiness and operational requirements for which the Section 44807 Exemption is sought. As recently as December 2018, the FAA strongly encourages allowing 90 days for processing of applicable waivers and exemptions. It should also be noted here that the FAA will only grant Section 44807 exemptions for UAS under the operational control of the petitioner (person or organization). Exemptions to operate a UAS will not be granted to a UAS manufacturer unless the manufacturer intends to maintain operational control of the UAS. To receive this type of exemption, the operator must demonstrate that the applicable aircraft can be safely operated in the NAS.

Second, an operator must obtain FAA approval for a specific proposed operation, such as the provision of urban air mobility services. In general, the FAA will issue such approval in the form of a Section 44807 Exemption. To obtain a Section 44807 Exemption, an applicant must submit a description of the precise scope of operations to be conducted, the UAS the applicable petitioner intends to use, the flight and communication procedures that will be used, the safety procedures that will be implemented, and training for all personnel involved in the UAS operations.

Lastly, in addition to the authority obtained pursuant to either an SAC or a Section 44807 Exemption, petitioners pursuing authority to either test a UAS or operate a UAS commercially must also obtain authority from the FAA to conduct operations in specific airspace within the NAS. All petitioners who are granted either a SAC or a Section 44807 Exemption by the FAA also simultaneously receive a Blanket Certificate of Authorization, or the Blanket COA. This Blanket COA gives an operator the authority to operate Small UAS under daytime Visual Flight Rule conditions at specific altitudes (such as below 400 feet) and outside of certain distances from airports and heliports. Blanket COAs are valid for a set period of time, typically two years. Operators holding either a SAC or a Section 44807 Exemption, and seeking to conduct operations which have been approved by the FAA, but which are in airspace that is outside of the limited scope permitted by the Blanket COA, such as operations above 400 feet, by Large UAS or within close proximity to an airport or other controlled or restricted airspace, will need to apply to the FAA for a Standard Certificate of Authorization, or the Standard COA. The provision of air mobility solutions does not fall within the permitted scope of the Blanket COA and will require a Standard COA alongside an SAC or a Section 44807 Exemption, as applicable.

The process and requirements for submitting a petition to the FAA in order to obtain a Standard COA are set forth in FAA Joint Order 7200.23A: Unmanned Aircraft Systems (UAS) Operations in the National Airspace System (NAS), or the Joint Order. According to the Joint Order, electronic applications should be submitted at

146

79

Table of Contents

least 60 business days before the proposed start of UAS operations requiring a Standard COA. The proponent must submit an application for a Standard COA using the online application system. Waiver processing times will vary depending on the complexity of the request. The Standard COA will typically describe the airspace and geographic location in which the proposed operations are permitted, as well as the duration of its effectiveness, which is commonly two years.

### Registration

Both Small UAS and Large UAS operating in the NAS must be registered with the FAA. Operators of UAS conducting flights under Part 107 can register their UAS through the FAA's "FAADroneZone" website. Operators of Large UAS can register their UAS by filing FAA Form 8050-1 with the FAA.

### Airspace Considerations

Within the NAS, the FAA has created two categories of airspace: regulatory and non-regulatory, and each category can be further classified into four types: controlled, uncontrolled, special use, and other airspace. The categories and types of airspace are dictated by the complexity or density of aircraft movements, nature of the operations conducted within the airspace, the level of safety required, and national and public interest. The permissibility of UAS operations and the regulations that apply vary with respect to each category and type of airspace.

### UAS Traffic Management

The FAA, the National Aeronautics and Space Administration, or NASA, and other federal partner agencies are collaborating on two related efforts to create and fully implement a framework to manage UAS operations in the NAS. First, the FAA and NASA are developing the Unmanned Aircraft System Traffic Management, which is a "traffic management" ecosystem for UAS operations that is separate from, but complementary to, the FAA's Air Traffic Management system. Research and testing will identify airspace operations requirements to enable safe visual and beyond visual line-of-sight UAS flights in low-altitude airspace.

As part of this effort, the FAA has developed an internet-based platform known as the Low Altitude Authorization and Notification Capability, or the LAANC. The purpose of the LAANC platform is to automate and thus expedite the process for UAS operators to both notify the FAA of flights within five miles of an airport and submit requests to obtain FAA authorization to fly in restricted classes of airspace. This platform, which is already partially implemented, will ultimately enable the FAA to more rapidly issue requested authorizations and waivers.

### UAS Test Sites

In response to direction from the US Congress in the FAA Modernization and Reform Act of 2012, the FAA ultimately selected seven applicants to establish Test Sites to support UAS integration into the NAS. While they are not the mandatory experimental sites for UAS commercial operators, the Test Sites provide an avenue and a venue to conduct more advanced UAS research and test operational concepts. Data and other information related to the operation of UAS generated by the Test Sites will ultimately enable the FAA to develop regulations and operational procedures for future commercial and civil use of the NAS.

Each Test Site has established relationships with the FAA and an existing facility or location that can host the testing of proposed UAS operations. Each Test Site has established credibility with the FAA and may prove helpful in facilitating and expediting the FAA's validation and evaluation of any data produced during testing.

### UAS Integration Pilot Program

The DOT first announced the creation of the UAS Integration Pilot Program (IPP) in October 2017 consistent with a Presidential Memorandum directing the DOT to create the program. The IPP objectives include

147

80

Table of Contents

accelerating the safe integration of low altitude operations of UAS into the NAS by testing and validating new concepts with respect to beyond visual line of sight operations in a controlled environment, focusing on detect and avoid technologies, command and control links, navigation, weather and human factors. In particular, the DOT has explained that the FAA will use the data provided by the IPP "to advance the overall state of the industry, including the development of enabling regulations that will increase other types of routine UAS operations, such as: (1) beyond line-of-sight flights; (2) operations over people; and (3) package delivery. Consistent with this direction, the FAA has indicated that it will rely on the IPP to provide data and insight on expanded UAS operations that will help the agency continue its regulatory agenda to allow expanded operations through incremental rulemakings.

### DOT Regulatory Overview

In order to engage directly or indirectly in air transportation, and in addition to the FAA authority described above, each UAS operator is required to hold economic authority granted by the DOT, either in the form of a "certificate of public convenience and necessity" or in the form of an exemption from the certificate requirement. Air transportation includes transportation of property by aircraft for compensation across state boundaries.

In May 2018, the DOT announced procedures to streamline the grant of economic authority to UAS operators proposing to deliver "goods" as an "air taxi." Under these simplified procedures, UAS operators seeking goods delivery authority must: (1) be a U.S. citizen; (2) maintain liability insurance as required by FAA rules; and (3) register with the DOT. As of the date of this prospectus, the DOT has not pronounced any guidance regarding UAS-based passenger transportation for compensation.

### Federal Communications Commission (FCC)

The FCC governs and regulates radio frequency spectrum. Both the ground-based control transmitter and the airborne video transmitter of UAS come under FCC regulation. Any petition for exemption submitted to the FAA must also describe the radio frequency spectrum used for control of the UAS and associated equipment that is part of the UAS, such as sensors, cameras, and whether it complies with FCC or other appropriate government oversight agency requirements. Thus, before submitting any petition to the FAA, an applicant should ensure that its UAS use certified radio frequencies in the proper strength as specified by the FCC. Furthermore, the security of the communication links between the ground station and the AAV shall be ensured so that unauthorized persons are prevented from gaining control of the AAVs.

### State/Local Law

Though the FAA establishes the applicable rules and regulations with respect to the operation of UAS in the NAS, operators must still comply with state and local laws regarding privacy and public safety. As an example of the type of law that must be followed, in June 2018 the Colorado legislature passed, and the governor signed, HB18-1314 prohibiting a UAS operator from "knowingly" obstructing a peace officer, firefighter, or emergency medical services provider in the performance of their duties. Other state and local entities may try to regulate takeoff and landing areas, noise abatement and other aspects of operating UAS within their jurisdictions. Many of these state and local laws or regulations may however be in conflict with the federal laws and regulations which govern all operations of aircraft (and therefore UAS) in the NAS, and, therefore may be unenforceable in whole or in part.

### Recent and Pending Federal Legislation and Regulation

The FAA has continued to develop regulations to expand the scope of permitted UAS operations in the NAS. The FAA has made public two draft documents according to the announcement by U.S. Secretary of Transportation Elaine L. Chao on January 15, 2019, which were published in the Federal Register on February 13, 2019. The first of these documents is a draft notice of a proposed rulemaking that would

148

81

Table of Contents

significantly expand the scope of permitted commercial UAS operations under Part 107 by allowing operations at night and over people without first obtaining a waiver from the FAA. In the second, the FAA published an Advance Notice of Proposed Rulemaking on the "Safe and Secure Operations of Small Unmanned Aircraft Systems." Additionally, the 2018 Act specifically required the FAA to release new regulations authorizing for-profit package delivery by Small UAS on or before October 4, 2019, but the FAA has yet to promulgate such regulations as of the date of this prospectus. The 2018 Act also provided that while the new rules are pending, UAS operators may avail themselves of existing processes to obtain authority for the delivery of goods, which presumably includes the air taxi exemption process, as described above, that the DOT is currently using for UAS. Finally, please note that the FAA has recently announced that its remote identification rulemaking for UAS, originally scheduled for publication in July 2019, will now be published in December 2019.

In 2018, H.R. 7395 attempted to facilitate the delivery of medical supplies by UAS for the purposes of improving medical care for rural populations and for patients in need of immediate attention. Although this bill did not ultimately become law in 2018, it is possible that similar legislation may be introduced in the future.

### Import of AAVs into the United States

In general, the importation of our AAVs into the United States should comply with the normal importation and customs procedures, while some unique aspect of the AAVs may require additional analysis and/or licenses, such as the AAVs containing banned or otherwise restricted materials or technology or constituting a product that could be considered as munitions, etc.

### European Regulation

### European Union Regulation Related to UAS

The main regulation of the European Union, or the EU, in the field of aviation is Regulation (EU) 2018/1139, which is generally referred to as the Basic Regulation by the European Union Aviation Safety Agency, or EASA. It was adopted by the European Parliament and the European Council on July 4, 2018 and entered into force on September 11, 2018. It repealed and replaced the previous Basic Regulation, Regulation (EC) No 216/2008.

Under the previous Basic Regulation, civil UAS with an operating mass of no more than 150 kg were regulated by each EU member state. On December 22, 2017, the member states endorsed an agreement reached with the European Parliament for the revision of the previous Basic Regulation, extending the competence of the EU to all UAS, except those used for state operations, such as military, customs, police and firefighting, and defining the essential requirements to ensure the safety of UAS. The agreement led to the adoption of the current Basic Regulation. The current Basic Regulation includes a new mandate for EASA in the domain of UAS and urban air mobility. It enables EASA to prepare rules for all sizes of civil UAS and harmonize standards for the commercial market across Europe.

Pursuant to the Basic Regulation, the European Commission published a delegated act, Regulation (EU) 2019/945, and an implementing act, Regulation (EU) 2019/947, on June 11, 2019. These regulations aim to protect the safety and privacy of EU citizens while enabling the free circulation of UAS and a level playing field within the EU. They include technical as well as operational requirements for UAS. Both regulations entered into force on July 1, 2019, although Regulation (EU) 2019/947 will not become applicable until July 1, 2020 to give member states and operators time to prepare for and implement it.

With the recent regulations described above, the EU has established a regulatory framework that divides UAS operations into three categories according to the level of risks involved: "open," "specific," and "certified."

149

Table of Contents

### The "Open" Category

Operations in the "open" category are those considered to impose low safety risks. To be classified in the "open" category, operations must meet certain technical requirements, including, among others:

- the unmanned aircraft must have a maximum take-off mass, or MTOM, of less than 25 kg;
- the remote pilot must ensure that the unmanned aircraft is kept at a safe distance from people and that it is not flown over assemblies of people;
- with limited exceptions, the remote pilot must keep the unmanned aircraft in visual line of slight, or VLOS, at all times;
- the unmanned aircraft is generally required to be maintained within 120 meters from the closest point of the surface of the earth; and
- the unmanned aircraft may not carry dangerous goods or drop any material.

If UAS operations fall into the "open" category, they can be conducted without any operational authorization.

### The "Specific" Category

Operations in the "specific" category are those considered to impose medium safety risks. When operations do not meet the requirements to be classified in the "open" or the "certified" category (described below), they fall into the "specific" category.

For operations falling into the "specific" category, a UAS operator is generally required to obtain an operational authorization from the competent authority in the EU member state where it is registered. To apply for such authorization, the operator must perform a risk assessment and submit it together with the application, including adequate mitigating measures. Ground risks that must be considered include, among others, VLOS or beyond visual line of sight, or BVLOS, population density of the overflown areas, flying over an assembly of people, and the dimension characteristics of the unmanned aircraft. Air risks that must be considered include, among others, the airspace volume used for the operation, the class of the airspace, and the impact on other air traffic and air traffic management. If the competent authority considers the operational risks are adequately mitigated, it shall issue an operational authorization.

However, for operations that comply with certain defined standard scenarios, the operator does not need to obtain an operational authorization, but only needs to submit an operational declaration of such compliance to the competent authority of the member state. EASA is expected to publish guidance material and a proposal for two standard scenarios (urban VLOS and rural BVLOS) in October 2019.

In addition, UAS operators meeting certain requirements are eligible to apply for a light UAS operator certificate, or LUC. These requirements include, among others, maintaining a safety management system corresponding to the size of the organization, to the nature and complexity of its activities, taking into account the hazards and associated risks inherent in these activities. If an LUC is granted, the holder will not be required to apply for an operational authorization or submit an operational declaration for operations falling into the "specific" category.

### The "Certified" Category

Operations in the "certified" category are those considered to impose higher safety risks than the other categories. The design, production and maintenance of UAS shall be certified if the UAS

- has a characteristic dimension of three meters or more, and is designed to be operated over assemblies of people;

150

83

**Table of Contents**

- is designed for transporting people; or
- is designed for the purpose of transporting dangerous goods and requiring a high level of robustness to mitigate the risks for third parties in case of accident.

If the UAS is certified pursuant to the criteria above and the operation does involve flying over assemblies of people, the transport of people or carriage of dangerous goods that may result in high risk for third parties in case of accident, then the operation falls into the "certified" category. In addition, UAS operations shall be classified as "certified" if the competent authority, in evaluating an application for operational authorization for operations in the "specific" category, considers that the risk of the operation cannot be adequately mitigated without the certification of the UAS and of the UAS operator and, where applicable, without the licensing of the remote pilot.

For operations falling into the "certified" category, classical aviation rules apply. In other words, the UAS involved are treated similarly as manned aircraft. They are certified for their airworthiness and have more stringent operational restrictions. The processing time for applications for approvals under classical aviation rules varies among the EU member states. EASA plans to develop amendments to the existing regulations applicable to manned aviation for UAS operations in the "certified" category. The future EASA rules are expected to provide all the requirements to allow UAS operations with comparable procedures applied today to manned aircraft without increasing the level of risk to third parties on the ground and in the air.

### *Registration of UAS and UAS Operators*

Under Regulation (EU) 2019/947, which will become applicable from July 1, 2020, EU member states shall establish and maintain accurate registration systems for UAS whose design is subject to certification and for UAS operators whose operations may present a risk to safety, security, privacy, and protection of personal data or environment. In addition, UAS operators must also register themselves when operating in the "specific" category and, if certain types of unmanned aircraft are used, in the "open" category.

In registration of UAS whose design is subject to certification, information solicited include the manufacturer's name, the manufacturer's designation of the unmanned aircraft, the unmanned aircraft's serial number, and the name and contact information of the person under whose name the unmanned aircraft is registered. The owner of an unmanned aircraft whose design is subject to certification shall register the unmanned aircraft. An unmanned aircraft cannot be registered in more than one member state at a time.

In registration of UAS operators, information solicited include names and identification information, contact information, an insurance policy number if required by law, a confirmation by legal persons as to the competency of operational personnel, and, as applicable, operational authorizations, LUCs, or operational declarations with confirmation by the competent authority. UAS operators shall register themselves in the member state where they have their residence for natural persons or where they have their principal place of business for legal persons. A UAS operator cannot be registered in more than one member state at a time.

### *Norwegian Regulation Related to UAS*

Norway is not an EU member state. However, as a member of the European Economic Area, Norway implements relevant EU legislation in its domestic regulations. Norway is also an EASA member state.

Before July 1, 2020, UAS operations in Norway are governed by the Act of 11 June 1993 No 101 on aviation, or the Norwegian Aviation Act, and the Regulation on aircraft that do not have a pilot on board etc. ("Forskrift om luftfartøy som ikke har fører om bord mv."), or the Norwegian UAS Regulation. Under the Norwegian UAS Regulation, UAS undertakings are divided into three categories, RO 1, RO 2 and RO 3.

**Table of Contents**

An RO 1 undertaking is an undertaking in which aircraft with an MTOM of up to 2.5 kg and a maximum speed of up to 60 knots will be operated exclusively within VLOS during daylight hours and subject to fixed safety distances. RO 1 operators must notify the Civil Aviation Authority – Norway, or CAA Norway, before starting up any new undertaking. Such notification shall contain information about the undertaking's name, address and contact information, as well as information about the type of aircraft that will be used.

An RO 2 undertaking is an undertaking in which aircraft with an MTOM of up to 25 kg and a maximum speed of up to 80 knots will be used for VLOS or extended visual line of sight, or EVLOS, operations during daylight hours and subject to fixed safety distances. RO 2 operators must obtain a license from CAA Norway before starting up an undertaking. The application must be accompanied by a risk analysis and an operations manual.

An RO 3 undertaking is an undertaking in which the aircraft a) have an MTOM of 25 kg or more, or b) have a maximum speed of over 80 knots, or c) is operated by a turbine engine, or d) will be used for BVLOS operations at altitudes of more than 120 meters, or e) will operate in controlled airspace at altitudes of more than 120 meters, or f) will operate over or in the vicinity of crowds of people with certain exceptions for aircraft with an MTOM of 250 grams or less. RO 3 operators must obtain a license from the CAA Norway before starting up an undertaking. The application must be accompanied by a risk analysis and an operations manual.

The operator may only use aircraft or systems approved by CAA Norway for the relevant type of operation. The operator must document the aircraft's airworthiness. The application must be accompanied by documentation of the system design, control system, type of components, technical safety systems and completed test programs that show that the aircraft and system can carry out the relevant type of operation. CAA Norway may recognize aircraft, systems and components approved or certified by other aviation authorities. Based on a consultation with CAA Norway, in general the processing time for applications for approval for RO 3 operators is four weeks provided that all required documentation is included in the application.

The goal of the CAA Norway is to implement the new EU UAS regulations, including Regulation (EU) 2019/945 and Regulation (EU) 2019/947, in Norway from July 1, 2020. CAA Norway estimates that the new set of rules will not limit the scope of drone operations in Norway, but there will be new and additional requirements for registration, documentation and competence for operators. The new EU rules will replace the categories of RO 1, RO 2 and RO 3. Registered operators will however be able to operate under these categories until July 1, 2021.