# Exhibit 6

Table of Contents

As confidentially submitted to the Securities and Exchange Commission on September 10, 2019

Registration No. 333-

## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM F-1
## REGISTRATION STATEMENT
### *UNDER*
### *THE SECURITIES ACT OF 1933*

# EHang Holdings Limited

**(Exact name of Registrant as specified in its charter)**

**Not Applicable**
**(Translation of Registrant's name into English)**

| | | |
|---|---|---|
| **Cayman Islands** | **7372** | **Not Applicable** |
| **(State or other jurisdiction of** | **(Primary Standard Industrial** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Classification Code Number)** | **Identification Number)** |

**Building C, Yixiang Technology Park**
**No.72 Nanxiang Second Road, Huangpu District**
**Guangzhou, 510700**
**People's Republic of China**
**020-29028899**

**(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)**

**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| | |
|---|---|
| **Will H. Cai, Esq.** | **Benjamin Su, Esq.** |
| **Charlie Kim, Esq.** | **Dominik Sklenar, Esq.** |
| **David Peinsipp, Esq.** | **Latham & Watkins LLP** |
| **Cooley LLP** | **18th Floor, One Exchange Square** |
| **c/o Suite 1601, Two ChinaChem Central** | **8 Connaught Place, Central** |
| **26 Des Voeux Road Central** | **Hong Kong** |
| **Hong Kong** | **+852 2912 2500** |
| **+852 3758 1200** | |

**Approximate date of commencement of proposed sale to the public: as soon as practicable after the effective date of this registration statement.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933.

Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

**CALCULATION OF REGISTRATION FEE**

| Title of each class of securities to be registered | Proposed maximum aggregate offering price(2)(3) | Amount of registration fee |
|---|---|---|
| Ordinary Shares, par value US$0.0001 per share(1) | US$ | US$ |

(1) American depositary shares issuable upon deposit of ordinary shares registered hereby will be registered under a separate registration statement on Form F-6 (Registration No. 333- ). Each American depositary share represents ordinary shares.

(2) Includes ordinary shares that are issuable upon the exercise of the underwriters' over-allotment option. Also includes ordinary shares initially offered and sold outside the United States that may be resold from time to time in the United States either as part of their distribution or within 40 days after the later of the effective date of this registration statement and the date the shares are first bona fide offered to the public. These ordinary shares are not being registered for the purpose of sales outside the United States.

(3) Estimated solely for the purpose of determining the amount of registration fee in accordance with Rule 457(o) under the Securities Act of 1933.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

**The information in this preliminary prospectus is not complete and may be changed. We [and the selling shareholder[s]] may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any state where the offer or sale is not permitted.**

*PROSPECTUS*

*(Subject to Completion) Dated , 2019.*

## *American Depositary Shares*

# *EHang Holdings Limited*

*Representing Ordinary Shares*

*EHang Holdings Limited is offering American depositary shares, or ADSs, [and the selling shareholder[s] identified in this prospectus are offering ADSs]. This is our initial public offering and no public market exists for our ADSs or ordinary shares. [We will not receive any proceeds from the sale of ADSs by the selling shareholder[s].] Each ADS represents ordinary share, par value US$0.0001 per share.*

*The ADSs have been approved for listing on the [New York Stock Exchange/Nasdaq Global Market] under the symbol "[EH]."*

*We are an "emerging growth company" under applicable U.S. federal securities laws and are eligible for reduced public company reporting requirements.*

*Investing in our ADSs involves risks. See "Risk Factors" beginning on page 15.*

**PRICE US$ PER ADS**

|  | Price to Public | Underwriting Discounts and Commissions(1) | Proceeds to us | [Proceeds to Selling Shareholder[s]] |
|---|---|---|---|---|
| Per ADS | US$ | US$ | US$ | US$ |
| Total | US$ | US$ | US$ | US$ |

*(1)    See "Underwriting" for a description of the compensation payable to the underwriters.*

*We [and the selling shareholder[s]] have granted the underwriters the right to purchase up to an additional ADSs to cover over-allotments at the initial public offering price, less underwriting discounts and commissions.*

**Neither the United States Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities, or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

*The underwriters expect to deliver the ADSs against payment in U.S. dollars in New York, New York on or about , 2019.*

### *MORGAN STANLEY*          *CREDIT SUISSE*          *CICC*

*, 2019.*

**Exhibit 10.15**

**SALES CONTRACT**

Contract No.:

**Party A (Seller): EHang Intelligent Equipment (Guangzhou) Co., Ltd.**

**Party B (Buyer): Shanghai Kunxiang Intelligent Technology Co., Ltd.**

The Contract is made by and between Party A and Party B on <u>February 1, 2019</u> in Guangzhou, whereby Party A agrees to sell and Party B agrees to buy the following products.

**ARTICLE 1. Ordered Products**

| No. | Description of Ordered Products | Unit Price (RMB) (tax included) | Quantity(sets) | Total Price (RMB) |
|---|---|---|---|---|
| 1 | EHANG Passenger-grade Autonomous Aerial Vehicle (hereinafter abbreviated as "EHANG AAV") | ****** | 3 | ****** |
| **Total price (RMB): Four Hundred and Fifty Million** | | | | ****** |

Note: The Ordered Products include hardware, software, technical services (installation, training, etc.); See Annex A for the Product List.

**ARTICLE 2. Quality Requirements and Technical Standards**

In accordance with the Ordered Products described under Article 1, the quality standards are based on the technical standards adopted by Party A.

**ARTICLE 3. Delivery Time and Method**

1. Delivery time: Party A shall delivery the Ordered Products as agreed within <u>1</u> month upon receiving the full payment made by Party B.

1

3

2. Delivery method: Party A shall deliver the Ordered Products to the place designated by Party B after Party B has confirmed the quality standard through factory acceptance test.

3. The two Parties shall be entitled to change the delivery time and place upon mutual agreement and consent.

**ARTICLE 4. Terms of Trade and Payment**

1. Unless otherwise stated herein or agreed by both Parties, <u>Party A shall deliver the Ordered Products to the place designated by Party B</u>.

2. Terms of payment: Party B shall make an advance payment of <u>RMB\*\*\*\*\*\*</u> (\*\*\*\*\*\*), i.e. \*\*% of the total price, for the Ordered Products to Party A within 3 working days following the execution of this Contract (\*\*% of the total price is RMB\*\*\*\*\*\*, as a deposit of RMB\*\*\*\*\*\* (RMB\*\*\*\*\*\*/unit) for 3 units has already been paid, so the remaining balance to be paid is RMB\*\*\*\*\*\*). And Party B shall pay the remaining balance of <u>RMB\*\*\*\*\*\*</u> (\*\*\*\*\*\*) before delivery of the Ordered Products by Party A.

3. The payment shall be made to the bank account designated by Party A via bank transfer. Any loss caused by failure to make the payment to the designated bank account shall be borne by Party B.

4. The bank account designated by Party A is as follows:

Account name: EHang Intelligent Equipment (Guangzhou) Co., Ltd

Account No.: \*\*\*\*\*\*

Bank: Guangzhou Capital Mall Branch of China Construction Bank Co., Ltd

**ARTICLE 5. Terms of Goods Receipt and Acceptance**

1. Acceptance standards: in accordance with the quality requirements and technical standards specified in Article 2 of this Contract.

2. For any postponement of the delivery date by Party B, Party B shall issue a prior written notice to Party A 30 days before such postponement.

2

4

3. Party B shall arrange receipt and acceptance of the Ordered Products in Party A's designated place, and shall make inspection of the amount, model and surface intactness of the Ordered Products in accordance with Annex A and issue a voucher of receipt. Any unrecoverable packing problem caused by the product inspection of Party B shall be addressed and handled by Party B and shall not constitute a reason from Party B to require return or replacement of the Ordered Products. If there is any quality defect identified, Party B should communicate with Party A within three (3) days upon receipt of the Order Product, and Party A will attempt to correct such quality defect including replacement of the Ordered Product or accessories at Party A's discretion.

4. Any product damage or shortage of the Ordered Products amount detected by Party B or a third party authorized by Party B before the voucher of receipt is issued shall be noted in the outbound delivery list, which shall be confirmed by signatures of both Party A and Party B, otherwise Party B shall be deemed to have accepted all the Ordered Products. Party B must accept all the Ordered Products except for damaged products or shortage of products. Other than aforementioned reasons, any loss caused by unilateral rejection of receipt of the Ordered Products by Party B in the delivery place without prior negotiation or confirmation shall be compensated by Party B to Party A.

**ARTICLE 6. After-sale Services and Technical Support**

1. Party A will provide Party B with free installation service and 10 days, in aggregate, training support for the Contract starting after the delivery of the Ordered Products.

2. The terms of maintenance shall be in accordance with the Maintenance Manual or the Product Manual provided by Party A. And Party A shall provide after-sale services and technical supports to Party B based on the prescription of the aforementioned documents.

3. Party A will provide Party B with a life-long maintenance tracking service and maintenance remainder service for the Ordered Products; the specific terms shall be agreed separately by executing a Maintenance Service Contract.

4. Within the warranty period, in case of any man-made damage of product accessories, Party B shall repair the damage on its own or request the paid service from Party A.

5. Provided that there is any product quality problem after the product is delivered to Party B, Party B bears the obligation to timely contact and notify Party A or the service point of Party A to solve such problem.

3

6. For any inherent product defects confirmed by Party A, Party A shall provide after-sale services in compliance with relevant national regulations based on the following provisions:

 a) During the Warranty period, Party A guarantees the quality of the Ordered Products and provides necessary technical support, including but not limited to repair services for the Ordered Products free of charge if the Ordered Products malfunction or fail during normal use due to their inherent defects;

 b) Upon the expiration of the Warranty period, all shipping costs and other costs in relation to such repair services shall be borne by the Buyer; and

 c) For any malfunction or failure caused by human error or improper operation or natural wearing/disaster, Party B shall bear all costs related with the repair services provided by Party A or any losses incurred thereby.

7. Party A shall provide training to Party B on the Ordered Products. Party B shall be responsible for onwards explaining and illustrating the correct operations and uses of the Ordered Products to all end users. Otherwise, Party A shall not be liable for any property damage or any personal injury, illness or death caused by the uses of the Ordered Products due to the Buyer's demonstration or improper guidance.

8. Party A shall be exempted from any liability arising from the Ordered Products under the following circumstances:

 a) The Ordered Product has not been officially sold;

 b) The defect does not exist when the Ordered Product is sold; and

 c) Current science and technology cannot detect the existence of the defect when the Ordered Product is sold.

9. Party A shall not be liable for any personal injury, illness, death or property damage caused by the uses of the Ordered Products under the following circumstances:

 a) The Ordered Product is used or combined with other equipment, software or data which are not provided by Party A;

 b) Party B, the end user or a third party have modified the Ordered Product (even if such modification has been approved by Party A);

c)   The Ordered Product is used in any way to perform operations outside the scope of the product design, failing to follow the current product specifications, or to perform inconsistencies with those specified in the Product Manual; and

d)   Other activities or behaviors are conducted in which the Ordered Product is not used in accordance with Party A's demonstrations, operating instructions, product manuals, etc.

**ARTICLE 7. Intellectual Property**

Party A shall ensure that the technology, products and equipment provided during the performance of this Contract do not infringe the legal rights of any third party. In the event of a third party accusing Party B of technology, products or equipment infringement, Party A shall bear all economic and legal responsibilities, including but not limited to compensation for the litigation costs and lawyer fees of Party B for participating in such allegations of infringement.

Both Parties agree that the Ordered Products and the intellectual property rights generated during the performance of this Contract are owned by Party A, and Party B guarantees that no reverse engineering will be carried out on any of the Ordered Products.

**ARTICLE 8. Default Liability**

1. For any delay of payment of Party B, the delivery time of Party A can also be postponed accordingly. Party B shall pay a default fee to Party A of <u>0.5%</u> of the delayed payment per day until the payment is completed. Provided the payment is delayed more than 30 days, Party A reserves the right to terminate this Contract, Party B shall pay a default fee to Party A following the requirements set forth in this Contract (until the date when Party A proposes to terminate this Contract), and shall return the delivered product to Party A and make the already fulfilled payment as compensation to Party A. Provided such compensation fails to offset the loss of Party A, Party B shall make further compensation to Party A.

2. Should Party B fail to receive the Ordered Products or refuse to receive the Ordered Products without justified or valid reason, the day when the Ordered Products shipped to the stipulated location shall be considered as the day of reception and acceptance, and Party B is responsible for the payment for the Purchase Price and any loss or damage caused.

5

7

**ARTICLE 9. Force Majeure**

1. The force majeure includes but is not limited to war, unrest, plague, earthquake, typhoon, flood, falling objects or any other explosion, fire, accidents, natural disasters, etc.

2. Should one Party be unable to fulfill this Contract due to the Force Majeure, such Party shall inform the other Party in 5 days from the date of such event and try all means to reduce loss caused.

3. The damage caused by the Force Majeure should be borne by each party at its own risk.

**ARTICLE 10. Dispute Resolution**

1. The laws of the People's Republic of China, without regard to its conflict of law principles, shall govern all matters arising out of or relating to this Contract and the transactions it contemplates, including without limitation, interpretation, performance, breach, termination and validity of this Contract.

2. Any dispute arising from, out of or in connection with this Contract shall be settled through amicable negotiations between the Parties.

3. If the dispute cannot be settled through negotiations, the two parties agree that the court of the place where Party A is located shall be the governing court.

**ARTICLE 11. Miscellaneous Provision**

1. The two Parties shall assume the confidentiality obligations regarding the technical information and trade secrets involved during the fulfillment of this Contract. Any economic losses caused by lack of fulfillment of such obligations should be compensated by the Party concerned.

2. The risk of loss and the benefit related to and the title of the Ordered Products will be transferred to Party B upon delivery to and acceptance by Party B. Party B shall complete the full payment according to the Contract.

6

8

3. The Parties hereto may enter into supplementary contract for matters unmentioned in this Contract or any modification of this Contract. Such supplementary contract has the same valid effect with this Contract.

4. This Contract is executed in two counterparts, each party holds one counterpart. This Contract becomes valid upon the signatures or stamps are made by the two Parties. The electronic and fax copy has the same valid effect as the original copy.

**Party A (Seal): EHang Intelligent Equipment (Guangzhou) Co., Ltd.**

/s/ Seal of EHang Intelligent Equipment (Guangzhou) Co., Ltd.
Authorized representative (Signature): /s/ Biao Luo

**Party B (Seal): Shanghai Kunxiang Intelligent Technology Co., Ltd.**

/s/ Seal of Shanghai Kunxiang Intelligent Technology Co., Ltd.
Authorized representative (Signature): /s/ Ming Di