# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE: EHANG HOLDINGS, LTD. SECURITIES LITIGATION | Case No. 21 Civ. 1392 (GBD) |

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS LEAD PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

FACTUAL ALLEGATIONS ................................................................................................. 4

    A.   The Wolfpack Report Reveals the Truth to the Market .................................................. 5

    B.   The Wolfpack Report is Credible ................................................................................ 6

ARGUMENT .......................................................................................................................... 8

    I.    PLEADING STANDARDS ........................................................................................ 8

    II.   DEFENDANT XIONG IS SUBJECT TO THIS COURT'S JURISDICTION
        BASED ON HIS PARTICIPATION IN EHANG'S FRAUDULENT SCHEME ............. 9

    III.  THE COMPLAINT SATISFIES THE PSLRA AND STATES A VALID CLAIM ....... 10

        A.   The Amended Complaint is not a "Puzzle Pleading" ..................................................... 11

        B.   The Wolfpack Report and The Complaint's Allegations Are Reliable ........................ 13

        C.   The Complaint Alleges False and Misleading Statements and Omissions of Material
            Facts ......................................................................................................................... 15

    IV.  THE COMPLAINT PLEADS FACTS GIVING RISE TO A STRONG
        INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER ............................... 27

        A.   Defendants' Contemporaneous Knowledge and Reckless Disregard for the Truth of
            their Statements Support a Strong Inference of Scienter ........................................... 27

        B.   Defendants Had Both the Motive and Opportunity to Commit Fraud ........................ 31

        C.   A Strong Inference of Scienter is More Compelling Than the Opposing Inference
            Offered by Defendants ............................................................................................. 33

    V.   THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION ...................... 34

CONCLUSION...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d. Cir. 2020).............................................................................................. 26

*Acticon AG v. China Ne. Petroleum Holdings Ltd.*,
615 F. App'x 44 (2d. Cir. 2015). ....................................................................................... 33

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F. 4th, 343 (2d Cir. 2022) ............................................................................................. 33

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d. Cir. 2012) ........................................................................................ 12

*Bond v. Clover Health Investments, Corp.*,
2022 WL 602432 (M.D. Tenn. February 28, 2022)..................................................... 7, 13

*Construction Laborers Pension Trust for Southern California v. CBS Corporation*,
433 F.Supp.3d 515 (S.D.N.Y. 2020)................................................................................. 11

*Dean v. China Agritech, Inc.*,
2011 WL 5148598 (C.D. Cal. Oct. 27, 2011).................................................................. 30

*Freudeberg v. E\*Trade Financial Corp.*,
713 F.Supp.2d 171 (S.D.N.Y 2010).................................................................................. 19

*Ho v. Duoyan Global Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012).......................................................... 3, 4, 29, 35

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ............................................................................................... 31

*In re Aprhia Inc. Sec. Litig.*,
2020 WL 5819548 (S.D.N.Y. September 30, 2020)........................................... 8, 17, 20

*In re Atlas Air Worldwide holdings, Inc., Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)............................................................................... 30

*In re Avon Sec. Litig.*,
No. 19-cv-01420-CM, 2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)........................... 26

*In re Bear Stearns Companies Inc., Sec. Derivative, and ERISA Litig.*,
763 F.Supp.2d 423 (S.D.N.Y. 2011)................................................................................. 18

*In re CenturyLink Sales Practices and Sec. Litig.,*
MDL No. 17-2795, 2019 WL 3431600 (D. Minn. July 30, 2019) .................................................. 9

*In re China Educ. Alliance, Inc., Sec. Litig.*,
2011 WL 4978483 (C.D. Cal. Oct. 11, 2011) ................................................................................ 31

*In re Complete Management Inc. Sec. Litig.*,
153 F. Supp. 2d 314 (S.D.N.Y. 2001) ........................................................................................... 31

*In re Facebook, Inc. IPO Securities and Derivative Litigation*,
986 F.Supp.2d 487 (S.D.N.Y 2013) .............................................................................................. 18

*In re Ideanomics, Inc. Sec. Litig.*,
2022 WL 784812 (S.D.N.Y. March 15, 2022) ....................................................................... passim

*In re Keyspan Corp. Securities Litigation*,
383 F.Supp.2d 358 (E.D.N.Y. 2003) ............................................................................................ 16

*In re Longwei Petroleum Inv. Holding Ltd. Securities Litig.*,
2014 WL 285103 (S.D.N.Y. January 27, 2014) ................................................................ 14, 29, 35

*In re MF Global Limited Securities Litigation,*
982 F.Supp.2d 277 (S.D.N.Y. 2013) ............................................................................................ 12

*In re Nektar Therapeutics Sec. Litig.*,
34 F. 4th 828 (9th Cir. 2022) ........................................................................................................ 35

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) .......................................................................................................... 34

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 449 (S.D.N.Y. 2005) ............................................................................................ 9

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63 (2d Cir. 2001) ........................................................................................................ 8, 31

*In re Signet Jewelers Ltd. Sec. Litig.*,
389 F.Supp.3d 221 (S.D.N.Y. 2019) ............................................................................................ 17

*In re Sketchers USA, Inc., Securities Litigation*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020) .......................................................................................... 33

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ....................................................................................................... 8, 9

*Lea v. TAL Educ. Grp.*,
837 F. App'x 20 (2d Cir. 2020) ................................................................................... 35

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ....................................................................................... 34

*Lewy v. SkyPeople Fruit Juice, Inc.*,
2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ............................................... 4, 13, 29, 35

*Long Miao v. Fanhua, Inc.*
442 F.Supp.3d 774 (S.D.N.Y. 2020) ................................................................... 13, 14

*Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) .................................................................. 4

*Lorenzo v. Sec. & Exch. Comm'n*,
139 S. Ct. 1094 (2019) ........................................................................................... 9, 16

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013) ............................................................... passim

*Nektar Therapeutics Sec. Litig.*,
34 F. 4th, 828 (9th Cir. 2022) ...................................................................................... 3

*New Orleans Employees Retirement System v. Celestica, Inc.*,
455 Fed. Appx. 10 (2d. Cir. 2011) .............................................................................. 30

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*
300 F.Supp.3d 551 (S.D.N.Y. 2018) ........................................................................... 21

*SEC v. Straub*,
921 F. Supp. 2d 244 (S.D.N.Y. 2013) ........................................................................ 10

*Seibert v. Sperry Rand Corp.*,
586 F.2d 949 (2d. Cir. 1978) ....................................................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S.Ct. 2499 L.Ed.2d 179 (2007) ............................................... 28, 32

**Rules**

17 C.F.R. §229.403(b) ................................................................................................ 32

**INTRODUCTION**

EHang Holdings, Ltd. ("EHang" or the "Company") is a Chinese company that told its investors that it was the first "company to achieve global commercialization of its passenger-grade" autonomous aerial vehicles ("AAV"). ¶159.[1] It claimed that "in 2020" it "made great regulatory breakthroughs by obtaining flight permits for the EH216 from the civil aviation authorities of Norway and Austria," *Id*; on top of claiming to have obtained "the world's first commercial pilot operational approval of passenger-grade AAVs for air logistics uses" from the Civil Aeronautics Administration of China (CAAC). ¶120. These claims were false and misleading. Indeed, as EHang recently admitted in its 2021 Form 20-F, filed on April 28, 2022, "our AAVs are currently mainly operated on a limited trial basis by our customers in tourism locations in China and are not in broad, mainstream commercial operations." Block Decl. Ex. 1, at 15.[2]

EHang misrepresented that it received "long-term" approvals for its EH216 from China, the US, Canada, Norway, Austria, and Spain. ¶4. In fact, the only regulatory approvals it received were limited approvals for single test flights of its EH216. As alleged, EHang described its regulatory approvals differently depending on the audience it was targeting and where the approval was obtained. EHang described approvals purportedly obtained in China in its English press release in far broader terms than its Chinese language press releases, and described approvals purportedly obtained outside China in far broader terms in Chinese than in English. ¶¶8, 14, 65, 70.

EHang sought an air of legitimacy by claiming to have a research and development facility and a manufacturing plant where it was building its AAVs. The representations were false, as there was no research and development facility where claimed but, instead, a stretch of concrete at an

---

[1] References to "¶ _" are to the Amended Class Action Complaint (the "Complaint"). ECF No. 79.
[2] The Court may take judicial notice of filings required by the SEC. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 629 (S.D.N.Y. 2017).

abandoned amusement park. ¶¶9, 62, 77. Its claimed manufacturing plant in Yunfu was an empty warehouse, except for areas set up as a staged backdrop for promotional videos. ¶9.

EHang claimed to have significant sales contracts to sell its EH216 to Shanghai Kunxiang Intelligent Technology Co., Ltd. ("Kunxiang"), purportedly entering into a contract a mere nine days after it was established, and which invested a significant amount of money in EHang, pre-IPO, reaping a large profit after the IPO. ¶68. Kunxiang's pre-IPO investment was never disclosed and Kunxiang appears to be a small company lacking the resources to execute on its purported contracts. Finally, the EH216 did not, as EHang claimed, use proprietary technology developed by EHang but, instead, operated by using off-the-shelf "hobby-grade motors" made by Chinese hobby motor company T-Motor. ¶¶10, 73.

Wolfpack Research issued a short report on February 16, 2021, exposing EHang as "A Stock Promotion Destined to Crash and Burn." Wolfpack wrote that EHang was "built on largely fabricated revenues based on sham sales contracts," its vehicles relied on off-the-shelf hobby grade motors, its manufacturing facility was an empty shell, its planned "E-Port" for AAV services non-existent, its research and development facility was a single dilapidated stretch of concrete at an abandoned amusement park, its claims about vehicles operating "autonomously" were doubtful, and the Company had deliberately misled investors by making substantively different statements about the Company's prospects for regulatory approval for commercial operations in English versus Chinese versions of the same press releases. ¶74.

EHang's stock plummeted on the release of the Wolfpack Report, plunging from its closing price of $124.09 per share on Friday February 12, 2021, to close at $46.30 per share on February 16, 2021, a $77.79 one day drop, or 62.7% to close at $46.30 per share. ¶199. Since publication of

2

the Wolfpack report, the stock has never recovered, trading above $50 per share for a few days in March 2021, and consistently below $25 a share since November 2021.

Defendants request for dismissal lacks merit. Their chief argument is that in the Ninth Circuit a short seller report cannot, as a matter of law, form the basis for a corrective disclosure and support a claim for securities fraud. *Nektar Therapeutics Sec. Litig.*, 34 F. 4th, 828, 839-40 (9th Cir. 2022). Even if this were correct, it is not the law in this Circuit. As this Court found in *Ho v. Duoyan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012), "[e]ven though Defendants question the reliability of an anonymously written report … an analyst's report does not implicate the same skepticism as a traditional anonymous source." (internal quotations omitted).

Defendants also mistakenly rely on risk disclosures in EHang's *December 11, 2019* initial public offering prospectus in which it purportedly warned that no operator of an AAV had "been granted all required approvals for commercial operations of passenger-grade AAVs," that the CAAC had only granted it approval for "trial flights" and that it was "not allowed to engage in commercial operation or pilot operation of [its] passenger-grade AAVs." Memo at 5. After the IPO, however, EHang represented in a press release dated *May 27, 2020,* that it "obtained the world's first commercial pilot operation approval from the CAAC to use EHang 216 passenger-grade AAVs . . . Thus, EHang became the world's first AAV company approved by a national aviation authority to carry out commercial pilot operations. . . ." ¶119. By *January 21, 2021,* EHang claimed it was the "first publicly-listed UAM *to* **achieve commercialization of its passenger-grade AAVs**." ¶159 (emphasis added). Defendants risk disclosures became stale during the Class Period as Defendants represented that they had secured the very kind of regulatory approvals they had previously purportedly warned it had not yet been granted.

3

Defendants' contention that the Complaint is a "puzzle pleading" as it "requires enormous effort to identify and match up the challenged statements with the reasons why they are supposedly misleading" is makeweight. Paragraphs 93 through 163 specify each statement alleged to be false and misleading and, after each statement, the reason(s) alleged as to why the statement is false or misleading is pled. There is no "puzzle" here.

The argument that the Complaint fails to plead a strong inference of scienter also lacks merit as Defendants altered press releases to change the import of the disclosure depending on what language it was being issued in, supports that they intentionally misrepresented the true facts. Plus, their undisclosed margin loans also support scienter.

Finally, this Court has repeatedly found that short-seller reports can form the basis for a securities fraud claim. *In re Ideanomics, Inc. Sec. Litig.*, 2022 WL 784812 at *7 (S.D.N.Y. March 15, 2022) ("The J Capital Report, Hindenberg Tweets, and Plaintiff's Own Investigation are Reliable."); *Duoyuan Global Water, Inc.*, 887 F. Supp. 2d at 564 (finding "the reliability of the report is a question of fact.")[3]

## FACTUAL ALLEGATIONS

The class period begins with EHang completing its initial public offering in the United States on December 12, 2019. ¶45. EHang represented throughout the class period (which runs from December 12, 2019 through February 16, 2021) that it was moving rapidly to achieve

---

[3] *See McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) ("The truth of the Citron Report and the Muddy Waters report is 'a factual dispute not appropriate for resolution at this stage … the Court must accept the factual allegations contained in the … Report as sufficiently reliable as a factual source for Plaintiffs' allegations."); *Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103 at *3-4 (S.D.N.Y. Jan. 27, 2014) (Plaintiffs entitled to rely on short-seller report to allege fraud); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916 at *13-14 (S.D.N.Y. Sept. 10, 2012) ("[N]either the Absaroka Report, authored by Kevin Barnes, nor the GeoInvesting Alert, attributed to the 'GeoTeam' is—or relies upon—a 'confidential' source to a degree that undermines the particularity of plaintiffs' pleadings. . . . Here, to the degree that the [short-seller] reports constitute or contain anonymous sources, they are also described with adequate particularity, and their statements are corroborated by other facts.").

"regulatory breakthroughs" in countries around the world for its "autonomous" "passenger-grade" vehicles using its "proprietary technologies" developed through extensive research and development, while expanding its advanced manufacturing capacities and growing its revenues. ¶48. It eventually claimed that it was the first "company to achieve global commercialization of its passenger-grade AAVs." ¶159.

The Complaint alleges that Defendants made five categories of false and misleading statements: (1) misleading investors as to purported regulatory approvals in China, Europe, and North American for its EH216; (2) misleading descriptions of EHang's vehicles which suggest regulatory approval for passenger operations where none existed; (3) misstating revenues – basing publicly reported figures on a sham sales contract with an affiliated entity; (4) falsely claiming to have engaged in extensive research and development on proprietary intellectual property while, in truth, merely conducting repeated takeoffs in a single location with vehicles relying on off-the-shelf hobby-grade parts; and (5) falsely claiming to have "built" its "manufacturing facility" in Yunfu and proceeding with ramping up production as of December 2020.

A.      The Wolfpack Report Reveals the Truth to the Market

At 1:53 pm on February 16, 2021, analyst Wolfpack issued a Tweet that it published a report entitled: "EHang: A Stock Promotion Destined to Crash and Burn." In Wolfpack's summary of its report, it wrote that EHang:

> [I]s an elaborate stock promotion, built on largely fabricated revenues based on sham sales contracts . . . . EH has perpetuated its story with a collection of lies about its products, manufacturing, revenues, partnerships, and potential regulatory approval of its purported main business, an "autonomous" aerial vehicle ("AAV") ridesharing network.

The Wolfpack Report was based largely on independent on-the-ground investigation, and disclosed research relying on the translation of foreign language documents, a detailed interview with a recognized subject matter expert in aviation, and revealed facts unknown to ordinary

investors. Lead Plaintiff's independent investigation, which also included on-the-ground evaluations of EHang's facilities, corroborated the bulk of Wolfpack's conclusions. ¶¶76-85.

Wolfpack discovered, and Lead Plaintiff's investigation confirmed, that "EH consistently makes different claims regarding regulatory approvals in the English and Chinese versions of its press releases." ¶70. For example, EHang represented to U.S. investors that it received the "World's First Commercial Pilot Operation Approval of Passenger-Grade AAVs for Air Logistics Uses" from China's CAAC. ¶¶70, 119-122. The Chinese language version of the press release, however, stated that EHang obtained a *"special approval letter for trial runs of drones of a specified class."* ¶70(iii) (emphasis added).

The Wolfpack Report claimed that "EH's relationship with its primary purported customer is a sham," designed to benefit EHangs share price based on extensive evidence including behind-the-scenes photographs, recorded phone calls, and videos of on-site visits to EHang's various facilities, and Kunxiang's offices." ¶¶68 – 69.

Wolfpack also found EHang's numerous "regulatory breakthroughs" resulting in "flight certifications" and "long-term" approvals for its "passenger-grade" EH216 in the US, Canada, and various countries throughout Europe were, based on their correspondence with aviation regulators or experts in aviation regulation in the US, Canada, and Europe, in fact, only permits for recreational test flights of drones in a particular area below a specified altitude. ¶70.

## B.    The Wolfpack Report is Credible

Following the publication of the Wolfpack Report, the price of EHang's ADS collapsed, falling 62.7% on February 16, 2021. ¶13. While EHang sought to dispute the Report's allegations, ¶¶169, 174, 176-278, their responses were met with skepticism and the stock price never recovered. *See Bond v. Clover Health Investments, Corp.*, 2022 WL 602432 at *18 (M.D. Tenn.

6

February 28, 2022) (finding short report was credible as stock price would not have dropped "if the Report lacked credibility in the eyes of reasonable, knowledgeable investors.").

EHang's disclosures in its 2021 Form 20-F corroborate much of the Wolfpack Report's central claims: that "[o]ur revenues from air mobility solutions in 2021 were mainly derived from sales of passenger-grade AAVs to customers mainly operated on a limited trial basis in tourism locations in China for testing, training and demonstration purposes. Before regulatory approvals for the commercial operations of our AAVs have been obtained in China and/or other relevant jurisdictions, customer demand will likely be limited in volume." Block Decl. Ex. 1, at 112. In other words, there was and has not been any "commercialization" of the EH216 to transport passengers making EHang's representation that it was the "first to achieve global commercialization of its passenger-grade AAVs" false and misleading. ¶160.

Finally, Defendants attempts to discredit Wolfpack through innuendo and speculation should be disregarded. Defendants disingenuously suggest that because the Department of Justice has sent subpoenas to "short seller outfits" and is investigating "potential manipulative trading around negative reports and the relationship between short-sellers and certain hedge funds," that the Wolfpack Report should be discredited and disregarded. Memo at 10–11. First, Defendants concede that Wolfpack did not receive any subpoena from DOJ. Instead, they assert that because Muddy Waters' Carson Block received a subpoena and because Carson Block has allegedly "backed"[4] Wolfpack, that Wolfpack must be guilty of some type of nefarious conduct. Second, of course, an investigation does not mean any wrongdoing has been committed. Defendants' suggestion of guilt by association would be the equivalent of Lead Plaintiff asking the Court to

---

[4] As support for their innuendo, Defendants rely on a 2019 article in a publication entitled "Institutional Investor" which merely claims, without any support, that Block is backing Wolfpack.

infer that because many Chinese based companies commit securities fraud,[5] and because EHang

is a Chinese company, it too must have committed securities fraud. We would bet that Defendants

would strongly oppose the Court drawing any such inference.

**ARGUMENT**

## I.   PLEADING STANDARDS

"To survive a motion to dismiss, a compliant must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face." *In re Aprhia Inc. Sec. Litig.*,

2020 WL 5819548 at *6 (S.D.N.Y. September 30, 2020). For a securities fraud claim, the

allegations must meet Rule 9(b)'s heightened pleading requirement and the pleading requirements

of the Private Securities Litigation Reform Act (PSLRA). *Id*. "On a motion to dismiss, the Court

accepts the plaintiff's allegations as true and draws all reasonable inferences in the plaintiff's

favor." *Id.* A complaint must "'specify each statement alleged to have been misleading, the reason

or reasons why the statement is misleading,' and 'state with particularity facts giving rise to a

strong inference that the defendant acted with the required state of mind.'" *ECA & Local 134 IBEW*

*Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d. Cir. 2009) (citations

omitted). Despite the heightened pleading standards, however, courts "do not require the pleading

of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d

63, 72 (2d Cir. 2001). Indeed, the Second Circuit recently cautioned that courts "must be careful

not to mistake heightened pleading standards for impossible ones." *In re Synchrony Fin. Sec. Litig.*,

988 F.3d 157, 161 (2d. Cir. 2021).

---

[5]See e.g., https://technode.com/2020/07/02/investors-beware-theres-a-new-china-hustle/;
https://www.jonesday.com/en/insights/2011/01/chinese-companies-trading-in-us-face-increased-scrutiny-by-sec-congress-and-private-plaintiffs;
https://www.jonesday.com/en/insights/2011/01/chinese-companies-trading-in-us-face-increased-scrutiny-by-sec-congress-and-private-plaintiffs.

8

To state a claim under Section 10(b), a complaint must allege that defendants "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Id*. at 167 (quotations and citation omitted). Defendants challenge the falsity, scienter, and causation elements. All three challenges fail.

## II. DEFENDANT XIONG IS SUBJECT TO THIS COURT'S JURISDICTION BASED ON HIS PARTICIPATION IN EHANG'S FRAUDULENT SCHEME

Defendants Xiong is subject to the jurisdiction of this Court. In *Aphria*, this Court dismissed two officers of a Canadian company because plaintiffs there "ha[d] not alleged facts demonstrating that these Canadian residents knew, anticipated or intended that the financial statements they signed would be attached to Aphria's SEC filings in the United States." 2020 WL 5819548 at *8. Here, Xiong signed EHang's SEC filings and both knew and intended that these would be filed in the U.S. ¶25.[6] Xiong's conduct is sufficient to establish personal jurisdiction. *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 456 (S.D.N.Y. 2005) (upholding jurisdiction over Italian auditor in connection with misleading financial statements filed with the SEC).

Defendants also ignore that Xiong's liability is partially predicated on violations of 10b-5(a) and (c) because of his participation in EHang's fraudulent scheme. See ¶¶164, 196-97, 209, 227. Indeed, none of cases cited by Defendants post-date *Lorenzo v. SEC*, which held that where an individual disseminated another's "materially false and misleading information" that person can be found liable for violating 10b-5(a) and (c). 139 S. Ct. 1094, 1100 (2019) (holding that a defendant can be liable for another's misstatements if part of a scheme, even if he did not "make" the statement). Along with the allegations concerning Xiong's participation in EHang's scheme,

---

[6] Defendant's suggestion that signatures made by attorneys-in-fact are sufficient to defeat jurisdiction is risible.

the Court may take judicial notice of the fact of Defendant Xiong's tweets,[7] and LinkedIn posts[8] disseminating a range of EHang's false and misleading statements directed primarily towards investors in the United States, including those about EHang's test flight in North Carolina and the purported approval of the EH-216 by the FAA. *See e.g.*, ¶104. These facts establish that Xiong disseminated Defendants' false and misleading statements and purposely availed himself of the privilege of conducting activities in the forum. Here, as in similar cases, jurisdiction is reasonable to secure relief for investors who were harmed by violations of federal securities laws by officers of foreign corporations that accessed capital markets in the United States. *See, e.g., SEC v. Straub*, 921 F. Supp. 2d 244, 258-59 (S.D.N.Y. 2013).

## III.    THE COMPLAINT SATISFIES THE PSLRA AND STATES A VALID CLAIM

To satisfy the PSLRSA, a complaint must "demonstrate with specificity the why and how" statements are false or misleading. *In re Ideanomics,* 2022 WL 784812 at *7. "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *Id.* Statements of literal truth "can become, through their context and manner of presentation, devices which mislead investors. Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor [,] may properly be considered a material misrepresentation." *Id.*

In *Ideanomics*, this Court found statements such as the Mobile Energy Group (MEG) "has officially launched," "now hosts a full suite of car dealer services" and "attracts a large audience which MEG will leverage," along with statements that the MEG center was "able to expand this week" and was "officially opened up" could plausibly mislead a reasonable investor into believing

---

[7] https://twitter.com/yifangxiong (last accessed August 7, 2022).
[8] https://www.linkedin.com/in/yifang-derrick-xiong-65343720/recent-activity/ (last accessed August 7, 2022).

that by the end of May "the MEG Center had 'expanded', 'officially opened' and was 'up and running.'" *Ideanomics* at *8-9.

Similarly, here, EHang's statements, taken in context, demonstrate their falsity and how they misled investors. Their statements conveyed that EHang developed an AAV to carry passengers and that it achieved "breakthroughs" in regulatory approvals throughout the world, including "the world's first commercial pilot operational approval of passenger-grade AAVs" from the CAAC and that EHang was able "to achieve global commercialization of its passenger-grade AAVs." ¶160. A reasonable investor could plausibly believe that EHang received approvals from different countries for its AAV to carry passengers, that these approvals were "regulatory breakthroughs," and that EHang was commercializing its AAVs in carrying passengers. Instead, EHang obtained routine approvals to test its EH216, it did not operate autonomously, the CAAC never granted it a "commercial pilot operational approval" and the only "commercialization" was selling the EH216s on a limited basis to customers in China. ¶¶62, 63, 71, 118, 133.

### A.    The Amended Complaint is not a "Puzzle Pleading"

The Complaint is not a "puzzle pleading." Paragraphs 93 to 163 set forth each statement alleged to be false or misleading followed by an allegation as to why the statement is false, misleading and/or omitted to disclose material facts. A complaint that "identifies misstatements and omissions, describes relevant predicate events, and alleges how those events make the statements false or misleading" is not a puzzle pleading. *Construction Laborers Pension Trust for Southern California v. CBS Corporation,* 433 F.Supp.3d 515, 530 (S.D.N.Y. 2020). Here, the Complaint "describes what portion of each quotation constitutes a false representation." *Id*. For example, in ¶106, the Complaint quotes from EHang's March 5, 2020 press release in which EHang claims it "obtained operational permit for its two-seater passenger grade AAV, the EHang 216, from the Civil Aviation Authority in Norway. . . . laying the foundation for future urban air

11

mobility (UAM) operations in other EU countries." The Complaint alleges that the "statement was misleading when made. . . . There was nothing in this approval that cleared it for passenger approval in urban environments. Nothing in the approval would lay the foundation for regulatory approval of UAV operation for passenger flight. . . . All certification and regulation of flight in the EU is governed by the European Union Air Safety Agency ("EASA"). Norway is not a member of, nor has any formal ability to influence regulatory decision making by, EASA. Describing a limited approval for a test flight in Norway as 'laying a solid foundation for future urban air mobility (UAM) operations in other EU countries' was false and misleading." ¶107.

Defendants' reliance on *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 – 38 (2d. Cir. 2012) is misplaced. There, the Court of Appeals found a 280-page complaint, consisting of "large part of large block quotations with italicized text, followed by a passage that reads '[t]he statements referenced in the preceding paragraphs were each materially false and misleading when made for the reasons set forth in ¶256 and the factual detail contained throughout this Complaint" failed to meet Rule 9(b)'s particularity requirement. *Id.* The appeals court found the complaint required "the District Court to search the long quotations in the complaint for particular false statements, and then determine on its own initiative how and why the statements were false and how other facts might show a strong inference of scienter." Id.[9] The Complaint here does not come close to this deficiency. *See e.g.*, ¶¶94 – 95, 97, 99, 104 – 105, 107, 109; *see also In re MF Global Limited Securities Litigation,* 982 F.Supp.2d 277, 309 – 310 (S.D.N.Y. 2013) (finding use of bold text to highlight particular aspects of the statements alleged to be misleading supported a finding of sufficient particularity).

---

[9] The Court in *Bahash* noted that paragraphs in the complaint alleged "true facts" that were "then known to or recklessly disregarded by each of the Defendants but these paragraphs do not identify or clearly-cross reference to any facts demonstrating a strong inference of scienter."

**B.** **The Wolfpack Report and The Complaint's Allegations Are Reliable**

Defendants mistakenly assert that the Wolfpack Report is unreliable because it is written by a short seller "motivated to manipulate" the company's stock price, relying on *Long Miao v. Fanhua, Inc*. 442 F.Supp.3d 774, 801 (S.D.N.Y. 2020). Memo at 17. Defendants' erroneously claim the Wolfpack Report "relied on anonymous sources, misinterpretation of publicly available information, speculation, and guesswork." *Id*.

Here, Lead Plaintiff has every right to rely on and this Court should accept the report as true as "the reliability of an analyst's report is a question of fact." *In re Ideanomics* 2022 WL 784812 at *7. As this Court found in *Ideanomics*, "the case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources, without corroboration . . . where courts have found that well-pled independent and particularized facts corroborate those attributed to anonymous sources in short-seller reports, courts have sustained such complaints." *Id*.[10]

The Wolfpack Report is not based on "anonymous sources," but an investigation into facts corroborated by Lead Plaintiff's own investigation. ¶¶76- 85.[11] Wolfpack found that EHang disseminated differing press releases in differing languages–a fact confirmed by Lead Plaintiff's investigation. ¶165. Wolfpack found EHang's so-called research and development and manufacturing facility were essentially non-existent–a fact confirmed by Lead Plaintiff's investigation. ¶¶14, 76 – 85, 132. Wolfpack consulted with an industry expert, Dr. Mark Moore, a

[10] *See Clover Health,* at *18 ("Other courts, however, have found that so-called 'short seller reports' like the Hindenberg Report, if pleaded with sufficient context attesting to their credibility, can appropriately be relied upon in a complaint."); *China Express*, 927 F. Supp. 2d at 123-24("The majority of courts that have addressed the issue have held that a short-seller report . . .'does not implicate the same skepticism as a 'traditional' anonymous source.'").

[11] *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916 at *13-14 (S.D.N.Y. Sept. 10, 2012) ("[N]either the Absaroka Report, authored by Kevin Barnes, nor the GeoInvesting Alert, attributed to the 'GeoTeam' is—or relies upon—a 'confidential' source to a degree that undermines the particularity of plaintiffs' pleadings. . . . Here, to the degree that the [short-seller] reports constitute or contain anonymous sources, they are also described with adequate particularity, and their statements are corroborated by other facts.").

former NASA engineer who stated that, based on his personal evaluation and close inspection of the EH216 for Uber Elevate, the EH216 uses "hobby-grade motors" made by a Chinese hobby motor company, T-Motor. Wolfpack uncovered "Chinese court records" showing that EHang's ADRs were subject to legal issues in China. Lead Plaintiff's investigation uncovered that Defendants obtained personal loans secured by their EHang ADRs before the EHang IPO–which went undisclosed in the IPO. ¶180–181.

Even Defendants own authority, *Long Miao,* provides that a defendant who argues "that a complaint's reliance on a short-seller report inherently requires dismissal . . . is wrong." *Long Miao,* 442 F.Supp.3d at 801. In *Long Miao*, Judge Englemeyer found that "[w]hen properly utilized and suitably corroborated or particularized, factual representations by CWs and in short-seller reports may enable a securities fraud complaint to clear the bar set by the PSLRA. Not so here, [Plaintiff's] FAC instead relies **exclusively** on general statements credited to anonymous interviewees in a secondhand short-seller report which **contains demonstrable errors** uncorroborated by an independent investigation by counsel, if one indeed was even undertaken." *Id* at 804 (emphasis added). Additionally, reports that feature video surveillance, interviews with local residents, and photographs are similarly reliable, especially when corroborated by independent confirmation by plaintiffs after the facts. *Id*. (citing to *In re Longwei Petroleum Inv. Holding Ltd. Securities Litig*., 2014 WL 285103 (S.D.N.Y. January 27, 2014)). Here, the Wolfpack Report involved physical inspection of EHang facilities, consultations with experts in aviation, interviews with confidential witnesses, translation work and investigation into EHang's corporate structure and history. Wolfpack's observations and conclusions were independently confirmed by Lead Plaintiff's own investigation. See ¶¶76–85. These are precisely the indicia of reliability favorably recommended in *Long Miao*. Defendants' attack is baseless.

**C.     The Complaint Alleges False and Misleading Statements and Omissions of Material Facts**

Defendants cherry-pick certain statements and then claim those statements are not false or misleading. For example, Defendants ignore the statement in EHang's IPO Prospectus in which it claimed it "proprietarily developed" AAVs. ¶93.[12] This statement was false as EHang's AAV was not proprietary as its motors were "off the shelf and hobby-grade" and they were not truly autonomous. ¶95. The IPO Prospectus also misrepresented that EHang was "the first in the world to launch passenger-grade AAVs, setting a new milestone in the deployment and proliferation of AAV technology." ¶93. This was false and misleading as the term "passenger-grade" falsely suggests that EHang was able to carry passengers in its AAV; to carry passengers in the United States, EHang need a CoA and EHang has never sought, nor obtained, such an approval. ¶95.

We address the statements challenged by Defendants under subheadings addressing their arguments as to why statements are not actionable.

1.     Actionable False and Misleading Statements

On January 8, 2020, EHang proclaimed that it received "flight approval from the Federal Aviation Administration" for its "first-ever U.S. trial flight of its two-seater passenger-grade AAV. . ." ¶104. This statement was materially misleading as what EHang received was approval for takeoff and landing the EH216 at a specified time and place, the basic approval of any takeoff and landing for any drone. *Id*. Further, the approval was conditioned on control of the EH216 by EHang's ground crew, not operating autonomously, and it could not carry passengers. *Id*.

---

[12] The relevant portion states: "We are pioneering the future of transportation through our proprietarily developed autonomous aerial vehicles, or AAVs . . ." Defendants' erroneously argue that Dr. Moore's observations had nothing to do with EHang's "proprietarily developed a complete suite of intelligent aerial logistics solutions," which they claim related to the ability to fly autonomously. As is typical for their motion, Defendants ignore what the Complaint alleges is misrepresented and, instead, cites to another statement, this one a press release, to claim the press release is not false. *See infra* at p 22-23.

15

On March 16, 2020, EHang issued a press release claiming it had "entered into a cooperation agreement with the city government of Seville, Spain to execute the first Urban Air Mobility pilot program in Spain" and that EHang "will work with the Seville government to develop the urban air mobility including passenger transportation, air logistics and command and control platforms in the city. The city will also collaborate on applications for permission to conduct test flights… and will coordinate with EHang in the planning of flight routes." ¶108. This statement was false and misleading as the European Union does not allow for passenger carrying drones to operate in its airspace and there is no regulatory pathway to allow for such operations. ¶109.[13]

2.    Defendants' "Passenger-Grade" Statements Were False and Misleading

Defendants simultaneously claim that the representation about the EH216 being a "passenger-grade" AAV and having received regulatory approval which allowed EHang to claim it was the "first to achieve global commercialization" was both corporate puffery, Memo at 15, and not misleading. Memo at 19.

The term "passenger-grade" is not puffery. In *Aphria*, this Court found statements such as an asset being touted as "world class" or "repeatedly reference[d] as 'established and successful'" were actionable statements of what might otherwise be considered corporate puffery:

Even assuming that the Defendants' statements included puffery or corporate optimism, when viewed in context, a reasonable investor could rely on their statements. Plainly, such

---

[13] Defendants argue that their press release announcing the "cooperation agreement" with the government of Seville was not misleading as investors should have looked up the relevant aviation regulations of the European Union in general, and Spain in particular, because it is "publicly available information." They mistakenly rely on *In re Keyspan Corp. Securities Litigation*, 383 F.Supp.2d 358, 377 (E.D.N.Y. 2003). Memo. at 21. *Keyspan* relied on *Seibert v. Sperry Rand Corp.*, which found that events that "were reported countrywide in the press and on radio and television, were discussed in Congress, and were analyzed in published administrative and judicial opinions" and involved "a nationwide consumer boycott. . . being conducted against Stevens, accompanied by massive media advertising" could not have misled investors. 586 F.2d 949, 952 (2d. Cir. 1978). The EU's regulations regarding drones carrying passengers clearly did not receive the same wide-spread attention. *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1103 (2019) ("the basic purpose behind [the federal securities] laws" is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry").

16

facts, if known to a reasonable investor, would likely influence one's view of the Company's representations and operations and conditions of these assets, the company's valuation of the same, and the decision as to whether to purchase or sell Aphria securities.

WL 5819548 at * 9. Here, "determining whether certain statements constitute puffery entails looking at 'context,' including the 'specific[ity]' of the statements and whether the statements are 'clearly designed to distinguish the company' to the investing public in some meaningful way." *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F.Supp.3d 221, 229 (S.D.N.Y. 2019) (internal citations omitted).

As used in context here, the phrase is not "empty." Defendants repeatedly referenced receiving regulatory approvals for their "passenger-grade" AAV. This implied that their AAV was approved to carry passengers – which is precisely why Defendants claimed they were the first "company to achieve global commercialization of its passenger-grade" AAVs. ¶160. A reasonable investor would be misled into believing that EHang's "passenger-grade" AAVs were able to carry passengers. In fact, EHang, during the Class Period, never received any approval from any regulator to carry passengers in its AAVs. ¶¶87, 95, 126, 143, 154. Defendants claim that "passenger-grade" is puffery as it is a "vacuous (i.e., empty) term (¶14), with no fixed industry definition.' (¶87)," Memo at 15, simply lacks merit.

Defendants assert that no investor could have been misled by their representation regarding regulatory approvals of their "passenger-grade AAVs" and particularly claim that no investor could have reasonably believed EHang received a CoA from the FAA. Memo at 17. They point to their risk disclosure that it was "not aware of any operator having been granted all required approvals of passenger-grade AAVs in China or the United States." *Id.* This risk disclosure appeared in the IPO Prospectus dated *December 11, 2019* (Ex. 3 to the Lightdale Decl. ECF No. 89-3) and in its Form 20-F filed with the SEC on *April 20, 2020* (Ex. 1 to the Lightdale Decl. ECF No. 89-1.)

17

*After* this risk disclosure was made, however, EHang made a number of bold statements concerning its regulatory approvals around the world including misrepresenting to US investors the scope of an approval actually received. On May 27, 2020, EHang issued a press release in English it which it proclaimed it "Obtained the World's First Commercial Pilot Operation Approval of Passenger-grade AAVs for Air Logistics Uses." This "approval" was apparently granted by the CAAC. In its Chinese language press release, however, the headline was that EHang received "**special approval letter for trial runs of a specified class**." ¶70(iii) (emphasis added). The US version of the press release overstates the scope of approval EHang received and, a reasonable investor would no longer rely on Defendant's outdated risk disclosure based on what was newer and more up-to-date information.

Plus, the stale risk disclosure is specifically limited to China and the US and says nothing about the other purported regulatory approvals from other countries.[14] In its May 29, 2020, 6-K, EHang claimed that it "successfully achieved regulatory breakthroughs in the U.S. and Europe, paving the way for global expansion in the post-COVID 19 world." ¶124. It also claimed to "set a significant regulatory milestone for the industry by achieving the world's first commercial operation approval of passenger-grade AAVs for air logistics from the CAAC." ¶127. Plus, on July 29, 2020 EHang claimed to have "obtained a Special Flight Operations Certificate (SFOC) issued by the Transport Canada Civil Aviation (TCCA) . . . for periodic operations of passenger-grade AAVs in North America." Defendant Hu stated this approval followed "consecutive flight approvals received

---

[14] "To be 'meaningful,' a "cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil." *In re Facebook, Inc. IPO Securities and Derivative Litigation*, 986 F.Supp.2d 487, 515 (S.D.N.Y 2013). Boilerplate and generic language is not enough, "[t]rue cautionary language must warn investors of *exactly* the risk that plaintiffs claim was not disclosed." *In re Bear Stearns Companies Inc., Sec. Derivative, and ERISA Litig.*, 763 F.Supp.2d 423, 515 (S.D.N.Y. 2011) (internal citations omitted).

from aviation authorities in different countries, including the U.S. Federal Aviation Administration, the Civil Aviation Authority of Norway and the Civil Aviation Administration of China." ¶130.

Defendants' assertion that they were "clear" the EH216 were only for a "trial basis" is similarly unavailing. Memo at 19. They rely on earlier in time risk disclosures from the IPO Prospectus and FY 2020 Form 20-F directly contradicted by EHang's later in time statements regarding its approvals. ¶¶121, 125-126, 130. Representations that contradict risk disclosures nullify the disclosures, especially when such statements are made later in time. *See Freudeberg v. E\*Trade Financial Corp.*, 713 F.Supp.2d 171, 194 (S.D.N.Y 2010). These statements were false as EHang has never received any approvals to operate its AAVs to carry passengers for commercial activity anywhere and still has not as of April 2022.

Moreover, as this Court recently noted in *Ideanomics*, "[s]tatements of literal truth 'can become, through their context and manner of presentation, devices which mislead investors.' Even a statement which is literally true, if susceptible to quite another interpretation by a reasonable investor, may properly be considered a material misrepresentation." 2022 WL 784812 at \*7. Here, the context and manner in which Defendants represented their AAV was misleading, even if literally true. A reasonable investor was told that EHang received various regulatory approvals for its "passenger-grade AAVs" which led EHang to proclaim it was the first "company to achieve global commercialization of its passenger-grade" AAVs. ¶160. A reasonable investor would believe that EHang was making money from its EH216 transporting passengers consistent with Ehang's purported business model. In reality, EHang received regulatory approvals for certain specified take-offs and landings of its EH216 and the EH216 never autonomously carried passengers for a fee, i.e., it was never commercialized. ¶154.

19

The statements also failed to disclose material facts necessary to not make EHang's representations not misleading. "Disclosure is required . . . only when necessary 'to make the statements made, in light of the circumstances under which they were made, not misleading." *Ideanomics*, 2022 WL 784812 at \*7. Here, EHang's statements omitted to reveal the limited scope of the various regulatory approvals for the EH216 and that it was still not approved to transport any passengers for a fee anywhere. The disclosure of these facts were necessary to make EHang's representations not misleading.

### 3.    Defendants' "Regulatory Breakthrough" Statements Were False

Defendants' further claim that statements about "regulatory breakthroughs" were both corporate puffery and not false. Memo at 14-15, 17. Not so. For example, they cite to the statement "[w]e set significant regulatory milestone for the industry by achieving the world's first commercial operation approval . . . for air logistics from the CAAC" (¶127) and claim "this is simple puffery." Memo at 15. Tellingly, Defendants' ellipsis omits the phrase "of passenger-grade AAVs" which dramatically changes the meaning of the statement. The Complaint charges the statement is false because it "granted approval [for] trial runs of a specified class of drone" and not for "commercial operational approval for the passenger-grade" EH216. The approval did not allow for the EH216 to carry passengers. Thus, to claim that it set a "significant regulatory milestone" was false and misleading; EHang did not receive the approval it claimed. ¶128.

Defendants also argue that the phrase "regulatory breakthrough" is mere puffery. Memo at 15. Not in this context. See *Aphria, supra* at 10, 17. Here, claims of "regulatory breakthroughs" were used to describe what Defendants claimed were first in the world regulatory approvals to operate their AAV's for commercial operations to carry passengers. The factual underpinning of all these statements is that EHang actually received such regulatory approvals – to carry passengers for money in a highly regulated and cutting-edge industry – which it did not. Instead, EHang

20

received routine approvals allowing it to test its drone – can it take off and land? Thus, a reasonable investor would be misled into believing that EHang achieved a breakthrough – obtaining regulatory approval to operate its AAVs for commercial passenger transportation when this was false. Similarly, Ehang's announcement of approval of a "trial flight" of the EH216 in North Carolina suffers from the same flaw. The challenged statements referred to a "passenger-grade AAV" attaining "flight approval." ¶104. To the contrary, the approval was for a demonstration that the EH216 was capable of flight when controlled by a ground crew. A reasonable investor would believe that such approval was for carrying passengers. Further, as the EH216 was required to be under the control of EHang's ground crew, it could not be acting "autonomously." *Id*. The statement omitted to reveal the material facts which limited the actual approval EHang obtained.

Defendants' description of the limited approval of test flights in Austria as a "significant milestone on the path to offering Urban Air Mobility (UAM) Worldwide" for a "passenger-grade AAV" was misleading even with the use of the words "trial" and "un-manned flights." ¶150; Memo at 22. In context, describing the approval of a "passenger-grade AAV" for a "trial permit" for "unmanned flights" as a "milestone on the path to offering Urban Air Mobility worldwide" would lead a reasonable investor to conclude this approval was part of some approval process for commercialization of the EH216. It was not. Tellingly, Defendants remove the key context from their description of the press release announcing this limited approval and do not address the fact Defendants described the approval differently in English than Chinese. Memo at 22; ¶150.

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.* 300 F.Supp.3d 551, 570 (S.D.N.Y. 2018) does not aid Defendants. While they claim the court there found that corporate puffery includes "statements that do not give an investor an assessment that can be … verified, *Id. at* 570, here, it is very simple to verify whether EHang did nor did not receive regulatory approval for its

AAVs to carry passengers commercially. There can be no dispute that EHang never received such approval.

### 4.    Misrepresentations About EHangs' Proprietary Technology

Defendants erroneously contend that the allegations about EHang's lack of proprietary technology fail because "they come from the [Wolfpack] Report," are "uncorroborated," and Dr. Moore does not specify when he inspected the EH216." Memo at 20.

First, the reliability of the Wolpack Report is a fact question not to be resolved on this motion and is, hence, reliable. *Ideanomics* 2022 WL 784812 at *7. Second, the source is not anonymous – Dr. Moore, a former NASA engineer and aviation expert who explained his views were based on personal evaluation of the EH216. Further, EHang has never disclosed a substantial upgrade, modification or engineering change to the EH216 since its debut in 2018. ¶96. Dr. Moore's evaluation of the EH216 for Uber Elevate was summarized in the Wolfpack Report on February 16, 2021.[15] Clearly, Dr. Moore personally evaluated the EH216 sometime between March 2018, when it was first released, and February 2021. And, since EHang never revealed any substantial or significant changes or modifications to the EH216, it may be inferred that he inspected the EH216 at issue.[16]

Defendants argue that because EHang only disclosed that it "proprietarily developed a complete suite of intelligent aerial logistics solutions," ¶156, which limits their statements to representations about the EH216's "in-flight operating systems" and "ground infrastructure that

---

[15] Dr. Moore's analysis was that the EH216 used a "hobby-grade motor," it's then configuration was "inherently not safe" and he had significant reservations about whether it could ever be certified for carrying passengers in the US market." ¶73.

[16] Dr. Moore doubted that the EH216 could operate autonomously saying "I mean, seriously, if they've only spent $10 to $20 million in the development process, they should not even be flying people around in limited demonstrations, it's just, that's really scary." He added "if EHang can't show that they've spent millions of dollars in research then their autonomy isn't even – and I mean, hundreds of millions of dollars, then their autonomy couldn't possibly be ready." ¶73.

enable autonomous flight" which Dr. Moore did not review, his conclusions should be rejected. Defendants, however, simply ignore the representations in the IPO Prospectus: "We are pioneering the future of transportation through our **proprietarily developed autonomous aerial vehicles, or AAVs …**" ¶93 (emphasis added). Dr. Moore's conclusions are relevant and support the allegation that EHang did not proprietarily develop its AAVs. Plus, his observations about EHang's ability to "enable autonomous flight" are relevant based on his conclusions that it would be impossible for EHang to develop such technology on its anemic R&D budget.

5.     <u>Statements Regarding Revenues Are Actionable</u>

According to Wolfpack, EHang's sales and revenues from its purported major customer, Kunxiang, are a sham. Wolfpack's investigation uncovered that Kunxiang was formed just 9 days before it signed a RMB 450 million (~$65 million) sales contract with EHang and had a RMB 10 million (~$1.4 million) of registered capital. Kunxiang then signed another RMB 30 million (~$4.3 million) sales contract four months later. One of Kunxiang's reported business addresses is a hotel with no Kunxiang presence. Another location, listed as the 13th floor of an 11-story building, and a third listed location "had only one Kunxiang employee in the office on a weekday afternoon." ¶68. Wolfpack included photographic evidence in support of these conclusion. Kunxiang's finance manager said that Kunxiang "made an undisclosed RMB 100 million (~$14 million) pre-IPO investment in EHang. Wolfpack noted that, at the time of its report, Kunxiang's IPO shares would be worth "~RMB473 million (~$68 million)." ¶68. To back up its allegations, Wolfpack noted that EHang had only collected on 20% of its purported sales since its mid-December 2019 IPO and the average length of uncollected sales stands at 200 days. Finally, EHang had only collected approximately $3.6 million in cash from its purported sales. ¶69.

Defendants dismiss the allegations regarding the Kunxiang revenues because they come from the Wolfpack Report and were not independently corroborated by Lead Plaintiff's

23

investigators. Memo at 22 to 23. The truth of the Wolfpack Report "is a factual dispute not appropriate for resolution at this stage" and the Court is to "accept the factual allegations contained in the [Wolfpack] Report . . . as sufficiently reliable as a factual source for Plaintiffs' allegations." *See, e.g., McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013).

Defendants mistakenly claim that the Complaint "does not allege facts showing that neither party performed under the agreements." Memo at 23. Wrong. The Complaint specifically alleges that Kunxiang has not performed by not paying for the products they allegedly purchased. ¶68. The allegations about Kunxiang's offices, capitalization, and pre-IPO investment in EHang all provide detailed facts supporting why the sales were fictitious as Kunxiang is not a company that could fulfill its purchase obligation. Defendants similarly dismiss the allegations regarding EHang's growing accounts receivable balance and lack of cash collections as simply due to "slower collections due to Covid-19." This does not refute the allegations that the Kunxiang sales contracts were shams and EHang has not collected on the sales it reportedly made.

> 6.    Statements Regarding EHang's Research and Development Facility are Actionable

To portray itself as a legitimate company engaged in developing cutting edge technology– the ability to autonomously transport passengers by air–EHang claimed to have a research and development facility the Tianhe District, Guangzhou City in China. Lead Plaintiff's investigation confirmed that the business address for EHang's design and testing center is an abandoned amusement park with no facility or equipment capable of manufacturing, testing or evaluating the flight performance of eVTOLs, AAVs, or aircraft of any kind. ¶¶9, 62, 77.

Defendants dismiss these allegations claiming the Wolfpack Report, and Lead Plaintiff's own investigation, "merely confirms the existence of an amusement park – but – is silent regarding

24

the gated and guarded R&D facility that Wolfpack Research found near the amusement park."
Memo at 25. Not so. Both Wolfpack and Lead Plaintiff's investigations concluded there was no
R&D facility, merely a single dilapidated stretch of concrete located at the abandoned amusement
park. ¶¶71, 77–78, 99. Lead Plaintiff's investigators "did not uncover any information evidencing
that EHang has a meaningful business presence at [the] location," merely noting signs bearing
EHang's logo "in a large parking lot accessible through the main entrance to the property as well
as *at the side entrance of the amusement park* which was closed and not guarded by any security
staff." ¶77 (emphasis added). Both Wolfpack or Lead Plaintiff's investigators concluded that the
location was not a research or development facility of any kind. ¶¶9, 62, 71, 77–78, 99.

### 7. Statements Regarding the Yunfu Facility are Actionable

Defendants assert that statements about EHang's building of its Yunfu facility – where it
claimed it would build its AAVs to meet "increasing market demands and commercialization of
AAVs in China," ¶132, are not actionable because EHang said it "will build" and "will cooperate"
with its local partner. Memo at 16. But, in its December 3, 2020, Form 6-K, Defendant Hu stated
"with increased demand and our stronger government emphasis on supporting the development of
urban air mobility and unmanned civil aviation in China, **we have started to ramp up our
production capacity with the new facility in Yunfu.**" ¶138. Defendants admit the Yunfu facility
"was complete" in "July 2021" making Hu's statement–"we have started to ramp up production"
–false when made. After all, EHang could not "have started to ramp up production" at an empty
warehouse.

Defendants' attempts to downplay this misrepresentation are spurious. While they try to
recast Hu's statement as merely claiming that EHang "was ramping up production capacity by
building the facility," that is simply not what he said. They also mislead by claiming that "during
the earnings conference call held the same day EHang disclosed that it expected the facility to be

25

completed in the second half of 2021." Memo at 27. Defendants cite to Ex. 36 at page 7 to the Lightdale Dec., ECF No. 89-36, as their support for this representation. There are three problems with this. First, Exhibit 36 is not a transcript of an earnings conference call, but appears to be a slide deck titled EHang's "Q32020 Earnings Highlights." Second, Defendants have not proven that the slide deck was disseminated to investors or, for that matter, to anyone. Third, page 7 to the slide deck is titled "Capacity to Meet High Demand for AAV's In China" and under "Production Plan" says "To start production in H1 2021." *Id*. This slide does not disclose, as Defendants claim, that EHang "expected the facility to be complete in the second half of 2021."

What underscores the misleading nature of the statement is Hu representation that EHang was "ramping up" production to meet increased demand in China for its AAVs. This is more than just about the semantics of when the facility would be complete. The statement reinforces the false claims there is both genuine and increased demand for EHang's AAVs and that EHang was beginning to build AAVs to meet that demand.[17]

### 8.     Defendants "Opinion Statements" Are Actionable

EHang claims a number of statements prefaced with the phrase "we believe" are non-actionable statements of opinion including the statement "we believe we are the first in the world to launch passenger-grade AAVs . . ." ¶93. Memo at 15. Opinion statements are actionable. *Abramson v. Newlink Genetics Corp*., 965 F.3d 165, 177 (2d. Cir. 2020) (opinion statements actionable "[w]hen omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion."); *In re Avon Sec. Litig*., No. 19-cv-01420-CM, 2019 WL 6115349, at *16-17 (S.D.N.Y. Nov. 18, 2019) (finding opinion statements actionable

---

[17] In an April 22, 2020 press release EHang represented that it would "build and E-port, which will accelerate commercialization of EHang AAVs in the tourism industry. . . .The E-port is planned to be completed and operational by around end of 2020." ¶116. As alleged, by December 2020, EHang had not even started to construct an E-port. ¶118.

where omitted facts would conflict with what reasonable investor conclude from the opinion statements themselves). Here, Defendants omitted to disclose that while it "launched passenger-grade AAVs" those AAVs did not carry passengers and the launch was for a one-time test flight.[18] Omitting to reveal these material facts rendered Defendants' statements false and misleading.

Finally, Defendants erroneously claim that the statement that EHang was "the world's first listed UAM company to achieve commercialization of its passenger-grade AAVs" is mere puffery. Mot. at 15. The claim conveyed a specific fact: that EHang commercialized its AAV for use carrying passengers. This was false as EHang did not transport passengers in its AAVs for compensation. Plus, EHang touted its being first to market in a multi-billion industry. Specific representations about the status of EHang relative to the rest of the industry are not puffery.[19]

## IV.   THE COMPLAINT PLEADS FACTS GIVING RISE TO A STRONG INFERENCE THAT DEFENDANTS ACTED WITH SCIENTER.

To establish a strong inference of scienter, a plaintiff can "(a) allege[] facts to show that defendants had both the motive and opportunity to commit fraud or (b) by alleging facts that constitute strong circumstantial evidence of conscience misbehavior or recklessness." *Ideanomics* at *9. "Importantly, an inference of scienter must be more than merely plausible or reasonable–it must be at least as cogent and compelling as any opposing inference of nonfraudulent intent." *Id*.

### A.   Defendants' Contemporaneous Knowledge and Reckless Disregard for the Truth of their Statements Support a Strong Inference of Scienter

Pleading scienter based on conscious misbehavior or recklessness requires a plaintiff to allege conduct that "is highly unreasonable' and . . . represents an extreme departure from the

---

[18] Defendants quote the only portions of the statement identified in ¶¶96 and 152, which is not alleged to be false or misleading, to claim it is non-actionable opinion statement and ignore the portions of the statements which are alleged to be false or misleading.

[19] Defendants' arguments that certain statements are inactionable forward-looking statements disingenuous. They simply cite to a sentence from a long-quote – a sentence not alleged to be false or misleading – and then proclaim the entire statement is forward-looking and not actionable. See ¶¶116-118, 132-133, 156-158.

standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Novak*, 216 F.3d at 308. "Although there is no all-encompassing list of the allegations that would be sufficient to plead recklessness, examples that suffice include defendant "knew facts or had access to information suggesting that their public statements were not accurate ... [or] ... failed to check information they had a duty to monitor." *Id.* at 311. A court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (emphasis in original). Here, numerous facts support a strong inference of scienter.

Defendants altering the description of the types of regulatory approvals based on which language the press releases were issued in, supports scienter. On January 8, 2020, EHang issued a press release in Chinese titled "EHang conducts First-Ever U.S. Flight of Pilotless Air Taxi in North Carolina" and claimed it was the "first time that the EHang 216 has received flight approval from the Federal Aviation Administration." ¶104. The English language version of the press release, however, included the word "trial: "EHang conducts First-Ever U.S. **Trial** Flight of Pilotless Air Taxi in North Carolina." ¶¶104-05. Omitting the word "trial" alters the import of the regulatory approval – which was simply a limited approval for the takeoff and landing of a drone.

Also, on May 27, 2021, in its English version language of a press release announcing a regulatory approval EHang purportedly received from the CAAC: the "World's First Commercial Pilot Operation Approval of Passenger-Grade AAVs for Air Logistics Use." ¶120. In the Chinese language version of the same press release, however, EHang disclosed it received a "special approval letter for trial runs of drones of a specified class." ¶121.

28

There is a vast difference between "special approval" for "trial runs" and "Commercial Pilot Operation Approval of Passenger-Grade AAVs." The English version contains no mention of "special approval" for "drones of a specified class" but instead claims the approval was for EHang's "Passenger-Grade AAVs." "Significant discrepancies between SAIC and SEC filings" supported a strong inference of scienter in *Duoyan Globe Water*, at \*574 and these same significant discrepancies in regulatory approvals in differing languages also supports scienter here.[20]

This Court found scienter was not adequately pled in *Ideanomics* as "Plaintiff has not alleged any specific reports, or alleged that any Individual Defendant had access to a report, that outline the MEG Center status." *Id* at \*10. Here, Defendants had access to the very flight approvals which they then misrepresented to investors. *Novak*, 216 F.3d at 311. For example, Hu is quoted in the May 27, 20202 press release proclaiming EHang received "the world's first commercial pilot operational approval of passenger-grade AAVs" from the CAAC in the English language version but in the Chinese language version, EHang admitted the approval was merely "a special approval letter for trial runs of drones of a specified class." ¶70. Hu "had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 308.

Defendants claim that no U.S. investor could have relied on any Chinese language versions of press releases, so what they disclosed in China is irrelevant. Mot. at 22, n.23. This misses the point; it is not whether U.S. markets were misled by Chinese language press releases but that Defendants intentionally changed their disclosures based on who was reading the release, supporting an intent to deceive. ¶70(iii); *Duoyan Globe Water*, at \*574 ("The Muddy Waters

---

[20] *See Lewy v. SkyPeople Fruit Juice*, 2012 WL 3957916 (S.D.N.Y. September 10, 2012) ("sharply different financial figures" in different sets of filings supported strong inference of scienter); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at \*3 (S.D.N.Y. Jan. 27, 2014) (investigation confirmed "discrepancies in revenues" reported to different regulators during the same time period).

report, although not dispositive, may be relied upon as evidence of . . . scienter at this stage in the proceedings.")

The misrepresentations concerning EHang's R&D facility and Yunfu facility also support scienter. Confirmation that a company's facilities were effectively empty supports the inference that a defendant's contrary descriptions were knowing misrepresentations. *McIntire v. China MediaExpress Holdings, Inc.*, 2013 WL 752954, at *3-5 (S.D.N.Y. Feb. 28, 2013) (finding scienter where investigators visited facilities and found no employees working but playing cards and sleeping in the middle of the day); *Dean v. China Agritech, Inc.*, 2011 WL 5148598, at *4-5 (C.D. Cal. Oct. 27, 2011) (finding scienter where investigation showed factories sitting idle with no production or operating below capacity). Here, both Wolfpack and Lead Plaintiff's investigations concluded that EHang's key facilities were hollow shells.

Contrary to Defendants claims "[w]hen a plaintiff has adequately alleged that the defendant made false or misleading statements, the fact that those statements concerned the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." *In re Atlas Air Worldwide holdings, Inc., Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).

While the Second Circuit has suggested in dicta that the core operations doctrine may not be sufficient to establish scienter alone, it has never overruled *Atlas Air Worldwide* or cases following it and there is no basis for alleging, as Defendants appear to, that the doctrine cannot "provide supplemental support for allegations of scienter." See *New Orleans Employees Retirement System v. Celestica, Inc.*, 455 Fed. Appx. 10, 14 n.3 (2d. Cir. 2011). This is especially true here, where the Individual Defendants are the top executives of a Company with empty factories, hobby-grade motors on products intended for passenger transport, and no meaningful

30

regulatory approval anywhere for their business plan. See *In re China Educ. Alliance, Inc., Sec. Litig.*, 2011 WL 4978483, at \*6 (C.D. Cal. Oct. 11, 2011) (finding scienter against individual defendants where, among other factors, investigators found "state-of-the-art" facility was an empty building). Considering Defendant's "role in a company," and the "importance of the information" to Ehang's operations, it is "absurd to suggest that management was without knowledge" of the falsity of the challenged statements. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021).

The Complaint also alleges that the small share of sale proceeds collected by EHang, combined with longstanding unpaid balances in excess of EHang's credit terms are, taken together, strongly indicative of fabricated revenues. ¶¶191-94; see *In re Complete Management Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327-330 (S.D.N.Y. 2001) (high level of accounts receivable, without actual payment, supported strong inference of scienter). That inference is bolstered by the simple fact that EHang's vehicles lack the regulatory approval which is an express prerequisite for recognizing substantially all revenue under EHang's most significant sales contract. ¶¶40-42.

Defendants counter with a series of non-sequiturs, noting that EHang's accounts receivable balance was disclosed in SEC filings throughout the Class Period and that the Company blamed the COVID-19 pandemic for delays. But the Complaint does not allege that EHang failed to disclose its growing accounts receivable, rather, it alleges that the growing figure of uncollected revenues indicates that the purported sales of EHang's vehicles were a sham from the outset.

B.    **Defendants Had Both the Motive and Opportunity to Commit Fraud**

A complaint establishes motive and opportunity "if it pleads facts specify showing the defendant "benefitted in a concrete and personal way from the purported fraud." *Ideanomics*, at \*9; *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63, 74 (2d Cir. 2001). The Complaint alleges in that Defendants benefitted from the alleged fraud in three ways that were "concrete and

31

personal." *Novak*, 216 F.3d at 307-08.

*First,* The Complaint alleges that, on December 24, 2018, Hu agreed to pledge 1,679,557 ADS of EHang following the Company's IPO to secure a personal loan of RMB 50 million. ¶¶83-84, 180. The loan was not disclosed in EHang's IPO. ¶12. The reason the SEC requires that "shares that are pledged as security" be disclosed is obvious: an executive is motivated to keep the stock price high so their loan collateral still has value. See 17 C.F.R. §229.403(b). Here, Hu was clearly motived for EHang to go public and maintain a significant share price so he could obtain the concrete benefit of the RMB 50 million loan which he intentionally avoided revealing to investors. Defendants' observation that the loan "transaction occurred nearly a year before the start of the Class Period" is irrelevant. While the loan agreement may have been executed a year before the IPO, it was not carried out until EHang went public giving Hu a concrete and personal, undisclosed, benefit.

*Second*, EHang's 2020 20-F, notes that Defendant Hu and Defendant Xiong sold their ownership interests in EHang's key subsidiary, EHang GZ, "during 2020" in exchange for a total of RMB 60,000,000, (~ $9.228 million), obtained via interest free loans provided by the Company to two employees of a different subsidiary. ¶185. Hu controlled both sides of this transaction, and it took place in the context of multiple ongoing unaddressed material weaknesses in EHang's internal controls over financial reporting. ¶¶186, 188-89. The Complaint alleges Hu orchestrated the issuance of zero-interest loans, drawn from the Company's resources, to insiders to facilitate a payment to himself in exchange for equity in a subsidiary over which he would maintain control. ¶187. Defendants claim there is no alleged nexus between the sale of EHang GZ and any individual challenged statement, but this misses the forest for the trees. *Tellabs*, 551. U.S at 323. EHang GZ represents the core of EHang's purported business, and the value of EHang GZ's equity was

inflated by all of Defendants prior false and misleading statements. Alleged "looting" of company funds establishes motive and opportunity. *Acticon AG v. China Ne. Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d. Cir. 2015).

*Third*, the Complaint charges that Hu sold at least 559,850 EHang ADS during 2020 while the price was artificially inflated by Defendants false and misleading statements. ¶183. Defendants' comparison to the insider stock sales in *Sketchers* and *Bristol-Myers Squibb* are unpersuasive. There are at least three significant differences: EHang had ongoing material weaknesses with their internal financial reporting; the insider trades in this case were not made pursuant to a 10b5-1 trading plan; and the trades in this case did not result in a net increase in the shares held by Defendants during the Class Period. *See In re Sketchers USA, Inc., Securities Litigation*, 444 F. Supp. 3d 498, 524-25 (S.D.N.Y. 2020); *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F. 4th, 343, 355 (2d Cir. 2022). That Defendant Hu didn't sell a greater percentage of his holdings is irrelevant, as Defendants acknowledge that the Wolfpack Report caught them by surprise. Memo at 9.

### C.    A Strong Inference of Scienter is More Compelling Than the Opposing Inference Offered by Defendants

Defendants claim that because they "believed what they were saying," the inference of no scienter is the more compelling inference. Memo at 34. Not so. EHang went public without revealing its controlling shareholder, Hu, pledged a significant number of shares as collateral for a loan of RMB 50 million; it repeatedly told one audience it received a broader regulatory approval then it actually did; it overstated its revenues and misrepresented that it had a real R&D facility and built an new facility in Yunfu, that had already started to meet demand, even though the facility was not yet built; it claimed to have already achieved global commercialization of its "passenger-grade" EH216 when no passenger has paid any money to be transported on the EH216 and EHang

33

has received no approvals for a trial run of its so-called AAV. Plus, the stock price plummeted after publication of the Wolfpack Report and has never come close to regaining its stock price prior to publication of the report. The inference of scienter is more compelling than the rote claim that Defendants "believed what they were saying."

## V. THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

"To establish loss causation, a plaintiff must allege ... that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 175 (2d Cir. 2005) (quotations omitted). A corrective disclosure will "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint...." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). The 'plaintiff must allege that when truthful word revealing the falsity of defendant's representation reached the public, the market reacted negatively causing plaintiff to suffer an injury." *Ideanomics,* at *11 (internal quotations omitted).

The Wolfpack Report is a proper corrective disclosure. It revealed new, undisclosed, facts to the market including that EHang's revenues were overstated, its regulatory approvals were not as broad as represented, its EH216 was a dangerous drone with hobby-grade motors, its R&D facility did not exist, and its Yunfu facility was not up and running as claimed. In *Ideanomics* this Court focused on whether reports "revealed a fact previously undisclosed" and found investigators were simply "unable to establish" that a claimed showroom did not exist. *Id*. In contrast, Wolfpack and Lead Plaintiff's investigators confirmed facts contradicting EHang's claims.

Defendants claim the Wolfpack Report is not a corrective disclosure because it "did not identify material inaccuracies in Defendants' public disclosures" and "did not rely on any inside Company sources." Memo at 35. Defendants do not credibly assert that the Wolfpack Report did

34

not reveal new facts to the market. There is no requirement that a short seller "rely on inside Company sources" and, tellingly, Defendants cite no authority for this fabricated requirement.

Short seller reports can, and do, constitute corrective disclosures. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 28 (2d Cir. 2020) (short report constitute a corrective disclosure where it revealed nonpublic information from Chinese court judgments): *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (rejecting claim of short seller's unreliability "because it is a known short-seller, and had an incentive to magnify Longwei's financial distress."); *McIntire*, 927 F. Supp. 2d at 124 (rejecting argument that short reports "are inherently unreliable" and noting "this contention has been repeatedly rejected in prior cases."); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *13 (S.D.N.Y. Sept. 10, 2012) (explaining that "[a] motion to dismiss is not the proper vehicle to test the credibility of witnesses or the manner in which the plaintiffs will attempt to prove their allegations"). .

Finally, Defendants' claim that a short seller report can never constitute a corrective disclosure misstates the law and cites authority that rejects precisely the "bright-line rule" that Defendants recommend. *See In re Nektar Therapeutics Sec. Litig.*, 34 F. 4th 828, 840 (9th Cir. 2022). Regardless, the Second Circuit does not follow the authority cited by Defendants. *See Duoyuan Global Water, Inc.*, 887 F. Supp. 2d at 564. Defendants' "short report equals no loss causation" ipse dixit should be rejected[21].

## CONCLUSION

Based on the reasons set forth herein, Lead Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss.

---

[21] Lead Plaintiff's § 20(a) claims go entirely unchallenged by Defendants except in so for as Defendants challenge the adequacy of the various §10(b) violations. Memo at 35.

August 8, 2022                                     Respectfully submitted,

/s/ *Jeffrey C. Block*
Jeffrey C. Block
Jacob Walker (admitted pro hac vice)
Brendan T. Jarboe (admitted pro hac vice)
Bryan J. Jennings (admitted pro hac vice)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
brendan@blockleviton.com
bryan@blockleviton.com

*Attorneys for Plaintiff and Lead Counsel*

36

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ *Jeffrey C. Block*
Jeffrey C. Block

;