**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: EHANG HOLDINGS LTD. SECURITIES      :
LITIGATION                                 :
                                           :
                                           :
                                           :
                                           :
                                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MEMORANDUM DECISION &
ORDER

21 Civ. 1392 (GBD)

GEORGE B. DANIELS, District Judge:

## I.    INTRODUCTION

Lead Plaintiff Sergiu Rata brings this action against Defendants EHang Holdings Limited

("EHang" or "the Company"), Huazhi Hu, Richard Jian Liu, Edward Huaxiang Xu, and Derrick

Yifang Xiong, pursuant to Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-

5(b) promulgated thereunder, and Section 20(a) (*See* Amended Class Action Complaint ("Am.

Compl."), ECF No. 79.)[1] Defendants moved to dismiss for failure to state a claim pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") and the Private Securities Litigation

Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), and for lack of personal jurisdiction over

Defendant Derrick Xiong pursuant to FRCP Rule 12(b)(2). (ECF No. 90.)  Defendants' motion to

dismiss is GRANTED.

---

[1] For ease of reference, this Court refers to the Defendants' memorandum of law in support of its motion to
dismiss as "Def. Br." (ECF No. 90); and to Plaintiffs' memorandum of law in opposition to the Defendants'
motion as "Pl. Opp." (ECF No. 95).

## II.    FACTUAL BACKGROUND[2]

### A.  EHang's Business

EHang (NASDAQ ticker "EH") is an autonomous aerial vehicle ("AAV") platform company focused on developing, manufacturing, and selling AAVs.  (Am. Compl. ¶¶ 2, 4.) EHang is headquartered and based in Guangzhou, China. (*Id.* ¶ 21.)  In December 2020, EHang announced plans to build a larger production facility in Guangdong, Yunfu, dedicated to the production of passenger-grade AAVs. (*Id.* ¶¶ 138, 144.)  EHang's flagship aerial vehicle is the EH216.  (*Id.* ¶ 136.)  During the Class Period, EHang's largest orders of its AAVs were sales to Shanghai Kunxiang Intelligent Technology Co., Ltd. ("Kunxiang") (*Id.* ¶¶ 61, 68.)

The Individual Defendants, Hu, Liu, Xu, and Xiong, served during the Class Period as officers of EHang or as members of its Board of Directors.  (*Id.* ¶ 22–25.)  Plaintiffs bring this federal securities class action on behalf of all investors (the "Class") who purchased or otherwise acquired EHang American Depositary Shares ("ADS") between December 12, 2019 and February 16, 2021, inclusive (the "Class Period").  (*Id.* ¶ 1.)

Plaintiffs allege that, during the Class Period, Defendants made numerous misstatements about EHang's vehicles, regulatory approvals, manufacturing facilities, customer contracts, research and development efforts ("R&D"), and revenues, that artificially increased the stock price and eventually caused financial loss to the Class. (*Id.* ¶¶ 49–51.)

---

[2] This Opinion draws its facts from the Amended Complaint, the well-pleaded allegations of which are taken as true for the purposes of this Opinion. The Court sources additional facts from the Declaration of Sarah Lightdale in support of Defendants' motion to dismiss and the exhibits attached thereto (ECF No. 89) ("Lightdale Decl.")), including the text of EHang's challenged press releases, which the Court may consider because the Complaint incorporates them by reference. *See Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019).

## B. Alleged Misstatements

The alleged misstatements made within the Class Period occurred in EHang's December 12, 2019 Prospectus, its March 25, 2020 Form 6-K and Earnings Release, its April 20, 2020 Form 20-F, and various press releases issued between January 8, 2020 and February 5, 2021. Plaintiffs allege that dozens of statements are material misrepresentations. (*Id.* ¶¶ 93, 96, 98, 100, 104, 111, 115–117, 119–122, 124, 126–128, 130, 131, 134–149, 151–160, 159, 160, 162. 163.) [3] The misstatements that Plaintiffs identify as materially misleading relate to EHang's regulatory approvals and flight permits, the proprietary nature of its AAV technology, representations of its EH216 as "passenger-grade" and having achieved "commercialization," plans to build an E-port for AAV takeoff and landing, and plans to construct a manufacturing facility in Guangdong, Yunfu. (*See, e.g.*, Am. Compl. ¶¶ 111, 96, 116, 117, 134.)

## C. Short-Seller Report

On February 16, 2021, analyst firm Wolfpack Research ("Wolfpack") issued a short-seller report about EHang ("Wolfpack Report" or "the Report") ("Ex. 1"). (Am. Compl. ¶¶ 5, 167.)

The Wolfpack Report stated that its investigators had:

"[G]athered extensive evidence, including behind-the-scenes photographs, recorded phone calls, and videos of on-site visits to EH's various facilities," indicating that EHang was "an elaborate stock promotion, built on largely fabricated revenues based on sham sales contracts with [Kunxiang] …" (*Id.* ¶ 67.)

The Report stated that Wolfpack investigators had reviewed government records, credit reports, and photographic evidence indicating that EHang's business contracts with Kunxiang were a "sham." (*Id.* ¶ 68.) The Report found that Kunxiang had made an undisclosed financial

---

[3] Statements not bolded in the Amended Complaint as materially misleading are omitted from this list.

investment in EHang, and that Kunxiang lacked the financial ability to pay for the contracts it had executed with EHang for the sale of AAVs. (*Id.* ¶ 68.)

The Report stated that investigators visited EHang's facility in Guangzhou and found that "EH[ang]'s main manufacturing facility seems to lack any advanced manufacturing equipment, employees, or even a basic assembly line seen in typical aircraft/drone factories." (Ex. 1 at 3.) The Report also concluded that EHang had not yet commenced a "production ramp" to develop a larger production facility in Yunfu, China. (Ex. 1 at 11.)

Wolfpack investigators discussed EHang's product with Dr. Mark Moore, formerly Uber Elevate's Director of Aviation Engineering. Dr. Moore stated he was concerned about the "rough" quality of EHang's EH216. (Am. Compl. ¶ 73.) Dr. Moore noted that EH216 AAVs use "hobby grade motors" which "are not aerospace products and should never be used in a passenger carrying vehicle." (*Id.*) The Report concluded that "[EHang's] product is majorly flawed, inherently dangerous, and would likely attract very few, if any, actual buyers." (*Id.*)

The Report stated that EHang had overstated claims regarding its prospects for obtaining regulatory approvals and had failed to disclose "legal issues in China" that might impact EHang's ADRs. (*Id.* ¶¶ 70, 74.) The Report concluded that EHang had "perpetuated its story with a collection of lies about its products, manufacturing, revenues, partnerships, and potential regulatory approval of its purported main business, an 'autonomous' aerial vehicle ('AAV') ridesharing network." (*Id.* ¶ 67.)

### D. EHang's February 2021 Press Releases

EHang released five press releases in response to the Wolfpack Report. On February 16, 2021, EHang released a press release stating that the Company believed the Report was inaccurate. (*Id.* ¶ 168.) On February 17, 2021, EHang issued a longer press release in which Hu disputed the

4

specific allegations in the Wolfpack Report. (*Id.* ¶ 169.) Hu stated that Kunxiang was not an EHang shareholder, reiterated the Company's plans to build a new facility in Yunfu, and maintained that EHang's Guangzhou facility "spans a total area of 8,750 square meters." (*Id.* ¶ 172.) On February 18, 2021, EHang issued a press release containing a promotional video of the new manufacturing facility in Yunfu, which stated that AAV production at Yunfu was slated to begin in the second quarter of 2021. (*Id.* ¶ 174.) On February 19, 2021, EHang released a press release regarding Kunxiang, and maintained Kunxiang "is not a related party of EHang, … had never been a shareholder of EHang prior to its IPO … [and] has never purchased any shares from EHang after its IPO." (*Id.* ¶ 175.)

On February 22, 2021, EHang issued a fifth press release, which listed the revenues EHang had derived from sales to Kunxiang in 2019. (*Id.* ¶ 176.) The press release also detailed the specific model numbers of vehicles sold to Kunxiang and provided the delivery locations for each sale. (*Id.* ¶ 176.)

### E.  Plaintiffs' Investigation into EHang

Finally, Plaintiffs hired a business intelligence firm to investigate EHang's facilities and evaluate corporate filings, legal disputes, patents, and media accounts (*Id.* ¶ 76.) Plaintiffs' investigators reported that EHang's design and testing site in Guangzhou was an abandoned amusement park, and that EHang did not have a "meaningful business presence" at the location. (*Id.* ¶ 77.) In addition, Plaintiffs' investigators reported that they were able to independently corroborate Wolfpack's allegations that EHang was a defendant in additional civil litigation matters in China. (*Id.* ¶¶ 81, 83, 84.) Plaintiffs allege that their investigators also confirmed that freeze orders had been placed on shares of Guangzhou EHang Intelligent Technology Co. Ltd. stock, as referenced in the Wolfpack Report. (*Id.* ¶¶ 82, 83.)

## III.   LEGAL STANDARDS

### a.  Rule 12(b)(2) Lack of Personal Jurisdiction

To survive a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff has the burden of making a prima facie showing that personal jurisdiction over the defendant exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012); *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (plaintiff bears the burden of establishing personal jurisdiction on a motion to dismiss for lack of personal jurisdiction).

In a Rule 12(b)(2) motion, "a court may consider materials outside the pleadings, but must credit plaintiffs' averments of jurisdictional facts as true." *In re Stillwater Capital Partners Inc. Litig.*, 851 F.Supp.2d 556, 566-67 (S.D.N.Y. 2012). However, the court is neither required to "draw argumentative inferences in the plaintiff's favor," *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (citation omitted), nor must it "accept as true a legal conclusion couched as a factual allegation." *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998) (citation omitted); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

A court cannot exercise personal jurisdiction over a defendant unless doing so comports with constitutional due process principles. *Licci*, 673 F.3d at 60. The due process analysis consists of two discrete components: "the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164 (2d Cir. 2010). Under the minimum contacts inquiry, the court "must determine whether the defendant has sufficient minimum contacts with the forum ... to justify the court's exercise of personal jurisdiction." *Id.* (citing *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). For this

6

inquiry, a court evaluates the "quality and nature" of the defendant's contacts with the forum. *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The Court considers these contacts in totality, with the crucial question being whether the defendant has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws" "such that [the defendant] should reasonably anticipate being haled into court there." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 767 (S.D.N.Y. 2017) (citations omitted).

Once the Court is satisfied that a defendant has sufficient contacts with the forum to justify the exercise of personal jurisdiction, it must then determine "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloé*, 616 F.3d at 164 (quoting *Int'l Shoe*, 326 U.S. at 316). If the court determines that a defendant lacks the requisite contacts, it need not consider the reasonableness prong. *See Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568–69 (2d Cir. 1996) (citation omitted).

For purposes of the minimum contacts analysis, a distinction is made between general and specific jurisdiction. In most instances, general jurisdiction may be exercised only where the defendant's "affiliations with the [forum] ... 'are so constant and pervasive as to render it essentially at home in the forum.'" *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) (quoting *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). By contrast, the exercise of specific jurisdiction "depends on an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citations omitted);

*see also Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (discussing general versus specific jurisdiction).

### b.  Rule 12(b)(6) Failure to State a Claim.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).[4]

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). On a 12(b)(6) motion to dismiss, the court must draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

---

[4] In deciding a motion to dismiss under Rule 12(b)(6), a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Hu*, 927 F.3d at 88.

### c. Rule 9(b) Heightened Pleading Standard and the PSLRA.

Allegations of fraud, including securities fraud, must satisfy the heightened pleading requirements of FRCP 9(b) and the PSLRA, 15 U.S.C. § 78u-4(b). *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under Rule 9(b), a complaint alleging securities fraud must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In particular, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Additionally, the PSLRA expands upon Rule 9(b) by requiring the plaintiff to "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (citation omitted).

### d. Section 10(b) of the Securities Exchange Act of 1934 and Corresponding Rule 10b-5(b).

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe," 15 U.S.C. § 78j(b); *In re Aphria, Inc. Sec. Litig.*, No. 18 CIV. 11376 (GBD), 2020 WL 5819548, at *7 (S.D.N.Y. Sept. 30, 2020). Under Rule 10b-5(b), it is unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b-5. To prevail on a Section 10(b) and Rule 10b-5 claim,

9

Plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (quoting *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016)). The materiality requirement requires a substantial likelihood that the disclosure of the omitted fact "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

### e.  Section 20(a)

Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person" directly liable under the Exchange Act. 15 U.S.C. § 78t(a).  To establish a prima facie case of control person liability pursuant to Section 20(a), a plaintiff must sufficiently allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI Commc'ns*, 493 F.3d at 108). Further, a plaintiff must demonstrate primary liability under Section 10(b) prior to making out a control person liability claim. *See Rombach*, 355 F.3d at 177–78 ("Because we have already determined that the district court properly dismissed the primary securities claims against the individual defendants, [plaintiffs' control person liability claims] must also be dismissed.").

## II.  THIS COURT LACKS PERSONAL JURISDICTION OVER XIONG

Plaintiffs contend that this Court may exercise personal jurisdiction over Xiong, a former foreign director of a Chinese company, because of Xiong's alleged "participation in EHang's

10

fraudulent scheme" to violate federal securities laws. (Pl. Opp. at 9-10.)[5] Defendants dispute this assertion because Xiong did not make any of the statements challenged as materially false or misleading. (Def. Br. at 12.)

The Amended Complaint's theory of liability is that Xiong controlled the content and form of EHang's false and misleading public statements, and participated in a fraudulent scheme to violate federal securities laws.[6] (Am. Compl. ¶ 27; Pl. Opp. at 10.) To this end, the AC alleges that Xiong engaged in the following activities during the Class Period: (1) signed EHang's SEC Form F-1; (2) served on EHang's board of directors, including its audit committee; and (3) authored Tweets and LinkedIn posts from his personal account about EHang's EH-216 and the Company's prospects for obtaining regulatory approval from the United States Federal Aviation Administration ("FAA"). (Am. Compl. ¶ 25; Pl. Opp. at 9-10.) Plaintiffs argue that Xiong's Tweets and LinkedIn posts were directed primarily at U.S. investors, because they mention the FAA and a test flight in North Carolina. (Pl. Opp. at 10.)

Plaintiffs have not alleged any facts giving rise to general jurisdiction. Likewise, Plaintiffs' assertions, without more, do not sufficiently establish a basis for this Court to exercise specific personal jurisdiction.[7] Specific personal jurisdiction exists where a defendant "purposefully directed his activities towards the forum and the litigation arises out of or is related to the defendant's contact with the forum." *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 545 (S.D.N.Y. 2013)

---

[5] Xiong is EHang's co-founder and was its Chief Marketing Officer from December 2014 to June 2020. Xiong served on EHang's Board of Directors between December 2019 and June 2020. (Am Compl. ¶ 25.)

[6] Jurisdiction over "the representative of a corporation may not be predicated on jurisdiction over the corporation itself, and jurisdiction over the individual officers and directors must be based on their individual contacts with the forum state." *In re Alstom SA*, 406 F.Supp.2d 346, 398 (S.D.N.Y. 2005) (citing *Charas v. Sand Tech. Sys. Int'l, Inc.*, No. 90 Civ. 5638, 1992 WL 296406, at *4–5 (S.D.N.Y. Oct. 7, 1992).

[7] To the extent Plaintiffs allege personal jurisdiction over Xiong based on EHang's U.S. activities, that claim is likewise insufficient.

11

(citation omitted).  Plaintiffs have not alleged facts sufficient to meet either element.  Critically, Plaintiffs do not allege that Xiong played any role in making, proposing, editing, or approving EHang's SEC filings, or the press releases that they challenge as containing false or misleading statements.  The single SEC filing which Xiong signed during the Class Period is not alleged to have contained false or misleading statements.

Plaintiffs' allegations that Xiong's personal Tweets and LinkedIn posts mentioning the FAA and North Carolina test flights were "directed towards U.S. investors" are insufficient to establish personal jurisdiction.  The allegations against Xiong fall far short of the requirement that he "followed a course of conduct directed at ... the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct."  *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S.Ct. 2780, 2789 (2011).  Further, Xiong's posts and Tweets were not statements that Plaintiffs challenged as materially false or misleading.  Absent any role in making or preparing the statements alleged to be false or misleading, the exercise of jurisdiction over Xiong exceeds the limits of due process, as articulated by the Supreme Court and the Second Circuit.  *See Sharef*, 924 F. Supp. at 548 (citation omitted). Plaintiffs' allegations are insufficient for this Court to exercise jurisdiction over Xiong.  The Amended Complaint is therefore dismissed as to Xiong for lack of personal jurisdiction.

## III.   PLAINTIFF FAILED TO ALLEGE SECURITIES FRAUD

### a.  Material Misstatements

The Exchange Act "requires that the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69 (2d Cir. 2001) (quotation marks omitted). Plaintiff cannot merely state that the statements are false or misleading, "they must demonstrate with specificity why and

how" they are so. *Rombach*, 355 F.3d at 174. "An allegedly material misstatement must have been false at the time that it was made." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 290 (S.D.N.Y. 2014); *see also In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 392 (S.D.N.Y. 2006). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (quotation marks omitted). "[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, (2011). "Disclosure is required ... only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* at 44 (quoting 17 C.F.R. § 240.10b–5(b)). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (quoting *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)).

As outlined above, Plaintiffs allege that Defendants' statements about EHang's vehicles, regulatory approvals, manufacturing, revenues, customer contracts, and R&D efforts, were false and misleading. Out of several alleged misstatements, Plaintiffs' counsel focused this Court on the following statements during oral argument: (1) "EHang Obtained World's First Commercial Pilot Operation Approval of Passenger-grade AAVs for Air Logistics Uses," (Am. Compl. ¶¶ 120, 121); (2) "EHang took the lead on the world's first commercial pilot operation approval of passenger-grade AAVs for air logistics uses," (*Id.*); (3) "EHang 216 has received flight approval from the Federal Aviation Administration . . ." (*Id.* ¶ 104.). Plaintiffs also focused this Court on

13

the fact that certain of EHang's press releases omitted the word "trial" from certain press release translations in Mandarin and English when announcing regulatory approvals. (*Id.* ¶¶ 90, 91.)

### i. The Wolfpack Report is Reliable

To establish the falsity of the alleged misstatements, Plaintiffs' complaint relies primarily on the Wolfpack Report. The reliability of an analyst's report is a question of fact. *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012). As Defendants acknowledge, short seller reports "have an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Id.* However, "[t]here is no rule categorically excluding allegations derived from such sources." *In re Hebron Tech. Co., Ltd. Sec. Litig.*, No. 20 CIV. 4420 (PAE), 2021 WL 4341500, at *13 (S.D.N.Y. Sept. 22, 2021) (citation omitted); *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13 Civ. 214 (HB), 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (courts in this District "frequently accept" allegations based on short-seller reports at the motion to dismiss phase). Instead, to determine reliability, "courts critically analyze factual attributions to short-seller reports ... The issue in each case is whether the allegations in the complaint, taken as a whole, state a claim. And where there is a basis to view the short seller's factual allegations as reliable as opposed to fabricated based on self-interest—for example, where facts are cited that tend to substantiate these allegations or reveal the basis for the short-seller's factual assertions— those allegations are more apt to be viewed as reliable." *Hebron*, 2021 WL 4341500 at *13.

The Wolfpack Report meets the standard of reliability here—albeit slightly. The Report's conclusion that "EH appears to be significantly misleading investors" is based primarily on site visits to EHang's various facilities and to those of EHang's primary customer, Kunxiang. The Report does not provide the dates of these site visits, but does include extensive photographic evidence of each site. (Ex. 1 at 5, 7–9.) The Report also analyzes government records, credit

reports, and Mandarin-English translations to corroborate its claims about EHang's ongoing legal disputes, revenues, contracts with Kunxiang, and regulatory approvals. (*Id.* at 1, 26–28.) Notably, the Report alleges that Wolfpack gathered "recorded phone calls" regarding EHang and Kunxiang's facilities but fails to provide the dates or any details about the calls. (*Id.* at 1.)

Plaintiffs' investigation corroborated some of the Wolfpack Report's claims. While Plaintiffs do not provide the date of their investigation, Plaintiffs' investigators also found that the address for EHang's design and testing center was an abandoned amusement park. (Am. Compl. ¶ 9.) Further, Plaintiffs' investigators also independently corroborated the Wolfpack Report's claims regarding EHang's ongoing legal disputes, and the discrepancies between EHang's press releases published in Mandarin and English, respectively. (*Id.* ¶¶ 12, 81, 90-91.) Plaintiffs failed to corroborate the Report's allegations regarding EHang's purported use of "hobby-grade motors," its contracts with Kunxiang, revenues, E-Port facility,[8] or its "anemic" R&D budget. (*Id.* ¶¶ 68, 69, 73, 79, 99.)

### ii. The Complaint Fails to Plausibly Allege That Statements Made Were Misleading to the Class

Defendants' statements were not false. For instance, the Wolfpack Report and Plaintiffs' investigation did not reveal that EHang had not received regulatory approvals for passenger-grade AAV flights—they only concluded that these were conditional approvals for trial test flights. Further, the challenged press releases include language that clarifies the scope: EHang describes one approval as a "trial permit" for "unmanned flights," another as a "trial air logistics service" for a customer," and stating a third approval was for a "trial ... non-passenger" flight. (July 31,

---

[8] Plaintiffs' investigation failed to corroborate the Wolfpack Report's claims regarding the AAV E-Port, as the Complaint merely concludes it was "unclear" if "the E-Port was ever constructed" because "no specific information was identified about the project's exact location or its operating company." (Am. Compl. ¶ 79.)

2020 Press Release ("Ex. 22"), May 27, 2020 Press Release ("Ex. 17"), January 23, 2019 Press Release ("Ex. 12").[9] The press releases, read in their entirety, make clear that a reasonable shareholder would not have received a false impression of EHang's regulatory approvals from the challenged statements. *See In re Par Pharmaceutical Inc. Securities Litigation*, 733 F. Supp. 668 (S.D.N.Y. 1990) ("a statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement."). That EHang regularly disclosed in SEC filings that it was "not aware of any operator having been granted *all required approvals* for the commercial operations of passenger-grade AAVs in China or the United States" further bolsters a finding that the challenged statements were not misleading. (*See, e.g.*, December 31, 2019 20-F ("Ex. 2") at 5, 45, December 31, 2020 Form 20-F ("Ex. 3") at 5, 61.) (emphasis added).

Similarly, Plaintiffs did not find that EHang lacked proprietarily developed autonomous technology during the Class Period. Instead, Plaintiffs merely rely on Wolfpack's aviation engineering expert who expressed "concern[]" regarding the EH216's "use of 'hobby-grade motors'" after having previously inspected the EH216 while at a conference on an unspecified date. (Am. Compl. ¶ 73.) At the outset, it is not clear from the Report or the AC that Wolfpack's expert evaluated the EH216 at a conference *during* the Class Period. *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018*)* ("Allegations that are so amorphous as to time periods are not pled with the requisite specificity.") In addition, an expert's amorphous concern regarding the EH216's motor does not plausibly allege that the EH216 AAV lacked

---

[9] The Court may consider the full text of the challenged press releases because they are incorporated into the Complaint by reference. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) ("Because [plaintiff] referred in her complaint to [external documents] …, the District Court could deem them incorporated in the complaint and therefore subject to consideration in its review of the adequacy of the complaint.").

proprietarily developed autonomous technology. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801-02 (S.D.N.Y. 2020).

Plaintiffs contend that Hu's statements regarding the state of the Company's Yunfu facility ("we have started to ramp up our production capacity with the new facility in Yunfu," "we decided to build a new production facility in Guangdong, Yunfu") were materially false or misleading, because Yunfu was "non-operational" when the statements were made, and the facility was not "meaningfully engaged in production" when the Wolfpack Report was released two months later. (Am. Compl. ¶¶ 138–139.) Plaintiffs have failed to plausibly allege that Hu's statements regarding its Yunfu facility were materially false or misleading. Hu's statements do not suggest that EHang was "operational" or "meaningfully engaged in production"—Hu merely states that the Company had *started* to ramp up its production *capacity* with the expansion in Yunfu (emphasis added). Critically, accompanying materials clarify that the Company's Yunfu "Production Plan" anticipated "start[ing] production [in] H1 2021." (December 3, 2020 Press Release ("Ex. 38") at 7.) Hu also expressly told investors in the earnings call on the same day that Yunfu was "expected to *start* production in the first half of 2021." (December 3, 2020 Earnings Call). Plaintiffs have therefore failed to plausibly allege that an investor could have reasonably believed that production was underway at the Yunfu facility when the statement was made.

Some of the statements alleged to be materially false or misleading ("will cooperate with a local partner," (*Id.* ¶ 116), "will accelerate the commercialization of EHang AAVs in the tourism industry," (*Id.* ¶ 124), "will also collaborate on applications for permission to conduct test flights," (*Id.* ¶ 108), "will continue to accelerate regular operations of its intelligent AAV technologies" (*Id.* ¶156)) are inactionable forward looking statements. Forward-looking statements may be precluded from liability under the PSLRA's safe harbor. *See* 15 U.S.C. § 78u-5. Under the PSLRA's safe

17

harbor, a defendant "shall not be liable with respect to any forward-looking statement" if (1) the forward-looking statement is "identified" as such and "accompanied by meaningful cautionary statements," or (2) the forward-looking statement is "immaterial," or (3) the plaintiff "fails to prove that the forward-looking statement ... if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." *Id.*; *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at \*18 (S.D.N.Y. Apr. 2, 2020).

In addition, many of the challenged statements are inactionable expressions of corporate optimism, *i.e.*, puffery. The Second Circuit has held that statements that are too vague, non-specific, or are merely reflections of corporate optimism are not actionable. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014); *Galestan v. OneMain Holdings*, Inc., 348 F. Supp. 3d 282, 297-98 (S.D.N.Y. 2018). Moreover, the inquiry in determining whether a statement amounts to puffery is "not whether the topic of a statement was a key to corporate success, but the nature of the specific statement and whether it concretely assured investors of anything." *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016). Statements about EHang's vehicles and regulatory approvals being "industry leading," "first in the world," or "of great significance" are statements of optimism that are too vague for a reasonable investor to rely upon. (*Id.* ¶¶ 93, 120, 132, 137.) Similarly, statements that EHang's vehicles had "achieve[d] commercialization" are inactionable, because they are too non-specific to concretely assure investors of anything.

### a. **Scienter**

Plaintiff has failed to allege scienter for all Defendants. "A strong inference of fraudulent intent may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence

18

of conscious misbehavior or recklessness. Importantly, an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, No. 19-CV-8720 (AJN), 2021 WL 4481119, at \*4 (S.D.N.Y. Sept. 30, 2021). In this case, Plaintiffs allege either conscious misbehavior or recklessness by each of the Defendants.

### iii. Motive and Opportunity

"A complaint has sufficiently alleged motive and opportunity to commit fraud if it pleads facts showing that the defendant benefited in some concrete and personal way from the purported fraud . . . While the opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer, general motives common to most corporate officers do not constitute 'motive' for the purpose of establishing scienter. Therefore, the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation do not suffice to establish a motive." *Francisco v. Abengoa, S.A.*, No. 15 CIV. 6279 (ER), 2021 WL 4136899, at \*22 (S.D.N.Y. Sept. 10, 2021) (citations and quotation marks omitted). Instead, "[m]otive is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *JP Morgan Chase Co.*, 553 F.3d at 198. However, pleading generalized business motives, "such as the desire for the corporation to appear profitable" is not enough. *Id.*

Here, Plaintiffs only provide specific motive allegations against Defendants Hu and Xiong. (Am. Compl. ¶¶ 179–187.) First, Plaintiffs allege that Hu pledged EHang ADS in order to secure a loan before the start of the Class Period. Plaintiffs allege that Hu and Xiong also sold EHang ADS during the Class Period. Third, Plaintiffs allege that Hu and Xiong sold their respective

19

stakes in EHang's variable interest entity ("VIE"), an EHang subsidiary, while the price of the EHang ADS were artificially inflated. (*Id.*)

Those allegations are insufficient to plead motive and opportunity against either Hu or Xiong.[10] Pleadings "must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Hu pledged EHang ADS as collateral for a loan occurred approximately one year prior to the start of the Class Period—and, therefore, a year *before* any of the statements alleged to be false or misleading were made. As such, Hu's pre-IPO pledge cannot constitute a "concrete and personal benefit" that "result[ed]" from the fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) ("plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud.").

Hu and Xiong's sale of EHang ADS during the Class Period is also insufficient to plausibly allege motive and opportunity. As an initial matter, only Hu is plausibly alleged to have sold EHang ADS. Although Plaintiffs state that Xiong "sold considerable volumes of EHang ADS during the Class Period," the chart provided in the Amended Complaint does not list any holdings or stock sales for Xiong. (Am Compl. ¶¶ 182–184.)

Further, a corporate insider merely selling stock during the Class Period is insufficient— Plaintiffs must allege that that the "stock trades are unusual … to raise an inference of bad faith or scienter." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). "Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d

---

[10] While Xiong has been dismissed from this case for lack of personal jurisdiction, this Court also finds that Xiong's actions are insufficient to plausibly allege scienter.

Cir. 2001). Here, Plaintiffs have failed to plausibly allege that Hu's stock sales were unusual. During the Class Period, Hu sold 559,850 of his 46,22,663 total ordinary shares, amounting to a sale of 1.21% of his shares. (Am. Compl. ¶¶ 182–184.) While there is not a "*per se* rule that the sale by one officer of corporate stock for a relatively small sum can never amount to unusual trading," courts in the Second Circuit have held that a stock sale constituting 22.5% of an insider's holdings was not suspicious. *Scholastic*, 252 F.3d at 75; *In re Gildan Activewear Inc. Sec. Litig.,* 636 F. Supp. 2d 261, 271 (S.D.N.Y. 2009); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Here, the *Scholastic* factors strongly weigh against finding Hu's stock sales to be unusual. Plaintiffs do not identify Hu's net profit from the stock sale, and the small portion of stockholdings sold, with Hu being the sole insider plausibly alleged to be selling, indicates that the stock sales were not unusual. *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 592–93 (S.D.N.Y. 2011) (insider stock trading sales not indicative of scienter where plaintiff failed to identify the sellers' net profits).

Finally, Hu and Xiong's sale of their stakes in EHang's VIE subsidiary during the Class Period is insufficient to establish motive and opportunity. Plaintiffs allege that the Defendants sold their stake in EHang's VIE to other EHang employees, in a private transaction financed through loans provided by an EHang subsidiary. (Am. Compl. ¶ 185.) That the Defendants sold their stake in an EHang subsidiary to other EHang employees does not plausibly allege that the Defendants had motive and opportunity to commit fraud. Defendants made substantial disclosures to investors regarding the transaction, Hu and Xiong's involvement, and that EHang financed the loan. (Def. Br. at 29–30, Ex. 2 at F-13.) Further, Plaintiffs have not plausibly alleged facts showing a connection between the VIE transaction and any challenged statement made by Defendants—nothing about the VIE transaction was dependent on EHang's inflated ADS price.

### iv.  Conscious Misbehavior and Recklessness

In order to establish scienter under the conscious misbehavior or recklessness theory, "Plaintiffs must show conduct by defendants that is at the least highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (citation omitted). "To the extent that plaintiffs assert that defendants had access to contrary facts, the complaint must specifically identify the reports or statements containing that information." *Abengoa*, 2021 WL 4136899, at *22 (citation and quotation marks omitted). "Recklessness in the scienter context cannot be merely enhanced negligence." *In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 624 (S.D.N.Y.2005)

When, as here, a plaintiff fails to allege a motive to commit fraud, the plaintiff's allegations that indicate a defendant's recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (citations omitted). Although there is no all-encompassing list of the allegations that would be sufficient to plead recklessness, examples that suffice include defendant "knew facts or had access to information suggesting that their public statements were not accurate ... [or] ... failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

Overall, Plaintiffs contend that the Defendants knew or must have known about the true status of EHang's vehicles, regulatory approvals, manufacturing, sales, and revenues, and that the truth differed from what EHang told the investing public. (Am. Compl. ¶ 164.) Plaintiffs emphasize that the omission of the word "trial" from the titles of certain press releases supports scienter. (*Id.* ¶¶ 165, 166.) In their telling, EHang selectively omitted the word "trial" from press releases in Mandarin about regulatory approvals in the U.S., and vice versa, doing so based on

22

whether the audience was "more likely to be familiar with the regulator in question." (*Id.* ¶ 166.) Plaintiffs further assert that manufacturing facilities were part of EHang's "core operations" and Defendants would have known that these facilities were "hollow shells." (Pl. Opp. at 30.)

The Complaint fails to allege "strong circumstantial misbehavior or recklessness." *Bristol-Myers Squibb Co.*, 28 F.4th at 356 (citation omitted). Plaintiffs' allegations are insufficient to plausibly allege either recklessness or conscious misbehavior. Absent from the complaint are any "concrete allegations" as to each Individual Defendants' particular knowledge of EHang's regulatory approvals, vehicles, manufacturing capacities, or revenues. Although Hu was quoted in one of the challenged press releases, the press release clearly states that the approval was a "flight *test* program" for a "*trial* air logistics service." (Ex. 17) (emphasis added). Beyond Hu's quote in one of the challenged press releases, Plaintiffs have not alleged any facts indicating that the Defendants were involved in the drafting of the challenged press releases regarding EHang's regulatory approvals. Nor have Plaintiffs alleged any facts indicating that the Defendants had reason to know that there might be material differences in the translated versions, or recklessly disregarded the possibility that these differences would mislead investors. That the Individual Defendants were corporate executives is of no import, as "it is practically hornbook law" that accusations "founded on nothing more than a defendant's corporate position[,] are entitled to no weight." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (citations omitted); *Nokia*, 423 F. Supp. 2d at 406.

Further, Plaintiffs have not alleged there were any specific reports or statements, or that any Individual Defendant had access to such reports, that would demonstrate the falsity of EHang's allegedly misleading statements. *Dynex Cap. Inc.*, 531 F.3d at 196 ("[T]hey have not specifically identified any reports or statements that would have come to light in a reasonable investigation

and that would have demonstrated the falsity of the allegedly misleading statements."); *cf.*
*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y.
2019) (scienter adequately alleged where plaintiffs "pointed to specific numbers in CEO Call slide
decks throughout the Class Period and alleged that Defendants reviewed them. Moreover,
Plaintiffs enumerate statements by each Individual Defendant regarding channel inventory.")

Even if Plaintiffs had included the requisite specifics for each Individual Defendant,
omitting the word "trial" from the title of certain press releases does not give rise to a strong
inference of scienter—the press releases make clear that the regulatory approvals EHang had
received were for conditional trial runs of the EH216. Finally, Plaintiffs' reliance on the "core
operations" doctrine is unavailing because Plaintiffs have failed to plausibly allege facts that
independently give rise to a strong inference of scienter. *Behrendsen v. Yangtze River Port &
Logistics Ltd.*, No. 19CV00024DLILB, 2021 WL 2646353, at *12 (E.D.N.Y. June 28, 2021)
("Absent allegations that independently give rise to a strong inference of scienter . . . [Plaintiff]
cannot rely on the core operations doctrine to establish scienter.")

### a. Causation

Plaintiffs have failed to adequately allege loss causation. "Loss causation is the causal link
between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."
*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (citation and quotation marks
omitted). "To establish loss causation, a plaintiff must allege … that the subject of the fraudulent
statement or omission was the cause of the actual loss suffered." *Id.* at 175 (quotation marks
omitted). Plaintiffs may establish loss causation "by alleging that the market reacted negatively to
a corrective disclosure, which revealed an alleged misstatement's falsity or disclosed that allegedly
material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d

24

666, 677 (S.D.N.Y. 2007) (citation and quotation marks omitted).  A corrective disclosure will therefore "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint ..." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).   In addition, a corrective disclosure "must possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp.2d 247, 283 (S.D.N.Y. 2008).

Here, Plaintiffs' theory of loss causation flows from an alleged corrective disclosure: the release of the Wolfpack Report.  In their telling, the Report "revealed ... that EHang consistently made different claims about regulatory approvals in the English and Chinese versions of its press releases," that "EHang's most significant reported sales were a sham" and "its advanced manufacturing facility was an empty shell ..." which then caused a 62.7% dip in the value of EHang's ADS. (Am. Compl. ¶¶ 6, 13, 14.)  The Wolfpack Report was not a corrective disclosure, because it did not reveal "some *then-undisclosed* fact *with regard to the specific misrepresentations* alleged in the complaint." *Omnicom*, 597 F.3d at 511 (emphasis added).  Many of the "facts" that the Report "revealed" were openly disclosed to investors and the market.  For example, EHang openly disclosed to investors that it had not received full operational approvals for the EH216, that existing approvals were for trial or non-passenger flights, and that the Yunfu facility had not begun production in December 2020.  Plaintiffs did not plausibly allege that the Report revealed that EHang lacked proprietary technology, because the Report's sole factual basis for its claims was an expert who examined the EH216 at some unspecified time and was "concerned" about its motor.  Because Plaintiffs have failed to plausibly allege that the Report revealed an undisclosed fact possessing a sufficient nexus to the challenged statements, they have not pled loss causation. *Time Warner*, 503 F.Supp.2d at 679 ("[w]ithout providing a nexus between

the alleged fraud and their losses, either by demonstrating the materialization of a concealed risk or the existence of a corrective disclosure, the plaintiffs fail to plead loss causation …").

### b. 20(a)

Absent a primary violation of the securities laws, Plaintiffs' claim for control person liability against the Individual Defendants also fails. *Porwal v. Ballard Power Sys.*, Inc., No. 18 CIV. 1137 (GBD), 2019 WL 1510707, at \*10 (S.D.N.Y. Mar. 21, 2019).

## IV.   CONCLUSION

Defendants' motion to dismiss is GRANTED. The Clerk of Court is directed to close ECF No. 90 accordingly.[11]

Dated: December 15, 2022
        New York, New York

SO ORDERED.

*George B. Daniels*

GEORGE B. DANIELS
United States District Judge

---

[11] Plaintiffs may seek leave to amend the Amended Complaint, by letter application with a proposed amended complaint attached, if Plaintiffs can show why amendment would not be futile, within thirty (30) days of this decision.